**E-FILED**
Tuesday, 28 February, 2006  05:22:20 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| CINDY SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04-2215 |
| | ) | |
| MASTERBRAND CABINETS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

### DEFENDANT'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendant MasterBrand Cabinets, Inc. ("MBCI") submits its Brief in Support of its Motion for Summary Judgment.  Defendant maintains that based upon the undisputed facts summary judgment should be entered in its favor on all counts of Plaintiff's Complaint as there are no genuine issues of material fact.

## I.     INTRODUCTION

Plaintiff Cindy Smith ("Smith") is a former MBCI employee.  Smith worked as an hourly production employee at MBCI's Arthur, Illinois facility.  MBCI terminated Smith's employment in November 2003 when she had exhausted all available time off from work and remained unable to return to work.  Smith alleges MBCI "engaged in a course of conduct of sex discrimination, sexual harassment" and retaliation.  Smith's claim arises under Title VII of the Civil Rights Act of 1964.

Smith's claims fail as a matter of law.  With three exceptions, all of the conduct about which Smith complains is barred by the applicable statute of limitations.  The remaining incidents about which Smith complains do not constitute violations of Title VII.  MBCI seeks summary judgment on all claims raised in Smith's Amended Complaint.

## II.    <u>UNDISPUTED MATERIAL FACTS</u>

Pursuant to Central District Local Rule 7.1, MBCI submits the following statement of undisputed material facts.

1.    Smith was employed as a Material Handler on second shift in the door plant.  (Smith Dep.11:23; 12:2-5)

2.    Material Handler is a job classification.  There are many different functions that a Material Handler might perform. (Gatons Dep. 37:3-9)

3.    John Winschief was Smith's Team Leader.  (Smith Dep. 13: 2-8)

4.    David Pantier was the second shift superintendent.  (Smith Dep.12:6-7)

5.    The ratio of men to women in the door plant was almost equal.  Smith estimated there may have been a few more men than women in the door plant.  (Smith Dep.14:4-24)

### Job Bidding and Machine Operator Positions

6.    The job classifications in the door plant were Material Handler I, Material Handler II, Assembler I, Assembler II, Machine Operator I, Machine Operator II, Shipper I, Shipper II and Finisher II.  (Ohrt Aff. p. 4)

7.    Open positions are awarded through a job bid process.  (Gatons Dep. 29:14-19;  Ohrt Dep. 80:20-24;  81:1-10).

8.    Bids are awarded on the basis of seniority.  (Gatons Dep.  30:7-11;  Ohrt Dep. 81:11-18)

9.    Team Leaders did not participate in the bid process or have the discretion or authority to refuse to place the successful bidder in the open job.  (Gatons Dep. 30:12-24, 31:1-2;  Ohrt Dep. 82:7-11)

10.    Within the door plant where Smith worked, two Machine Operator jobs came up for bid in 2001.  Smith bid on only one of those jobs (along with four other employees).  Smith was the least senior employee and was not awarded the job.  The other Machine Operator job was awarded to a woman.  (Ohrt Aff. p. 5; Job Bid Sheets)

11.    In 2002, twelve Machine Operator jobs came up for bid in the door plant.  Smith bid on only one of those jobs (along with five other employees).  Smith was not the most senior employee and thus was not awarded the job.  Of the remaining Machine Operator jobs up for bid, a woman was the successful bidder on two jobs.  (Ohrt Aff. p.6; Job Bid Sheets)

12.    In 2003, seven Machine Operator jobs came up for bid in the door plant.  Smith did not bid on any of these jobs.  A woman was the successful bidder on two jobs.  (Ohrt Aff. p. 7; Job Bid Sheets)

13.     Smith does not know or remember whether she ever asked for an opportunity to work the Costa sander. Smith does not know what kind of training is required to be on the Costa sander and did not ask what kind of training would be required.  (Smith Dep. 40: 24,  41:1-6, 42:7-12)

14.     A Machine Operator I runs a Costa sander, not a Material Handler.  (Ohrt Aff. p. 8)  It was not part of the job description of a Material Handler I to run the Costa sander. (Smith Dep. 43:16-18)

15.     Smith does not know what type of training was required to be able to run a saw and does not recall asking what type of training she would need in order to run the saw. (Smith Dep. 41:23-24, 42:1-3,13-15)

16.     A Machine Operator runs the saws.  (Ohrt Aff. p. 8)  It was not part of the job description for a Material Handler I to run a saw.  (Gatons Dep. 33:14-24, 34:1;  Smith Dep. 43:22-24)

**Conduct Occurring May 2001 and November 13, 2002**

17.     On July 19, 2001 Smith had an argument with co-worker Dustin Hall. (Smith Dep. 52:l. 24, 53:1-17)

18.     As a result of the argument Smith was upset and left work 4.8 hours early. (Smith Dep. 52:l. 24)

19.     Smith subsequently received a verbal warning regarding her absenteeism in February 2002 and a written warning regarding her absenteeism in July 2002.  (MB0100, MB0099; Smith Dep. 50:2-24, 51:1-19)  Smith realized that the 4.8 hours counted against her attendance record by the time she received a verbal warning in February 2002.  (Smith Dep. 57:11-21)

20.     In November 2001 Smith visited the Company's Tennessee plant at Company request.  (Ohrt Aff p. 9; Accounts Payable reports)

**Conduct About Which Smith Complains But Does Not Know When it Occurred.**

21.     Smith accused co-worker Allan Brickey of shoving or poking her in the chest on a single occasion but cannot recall when that occurred.  (Smith Dep. 81:12-22)

22.     Smith alleges that on an unknown date co-worker Art Decker hit her across the back of her legs and buttocks with a door part.  (Smith Dep. 169:15-24, 170:1-8)

23.     Decker's employment was terminated September 9, 2002.  (Ohrt Dep. Exhibit 7)

**2003 Incidents**

24.     In January 2003 Smith complained to Matt Ohrt, Employee Relations Manager, that Winschief told her she could not work on a machine because she might break a nail.  (Ohrt Dep. 23:5-8; MB0737)

25.    Ohrt investigated Smith's complaint against Winschief.  (Ohrt Dep. 25:9-12)  Ohrt's investigation included interviews of all women in Winschief's department.  (Ohrt Dep. 25:13-16; MB0737-0752)

26.    Ohrt's investigation did not corroborate that Winschief had made the comment or that Winschief discriminated against women.  (Ohrt Dep. 27:1-14, 36:4-7)

27.    On March 7, 2003 Smith complained to Winschief that a stool she was using was being "thrown" over the other side of the machine by co-worker Dustin Hall.  (Smith Dep. 107:10-13; MB0756-0757)

28.    Winschief reported the complaint to Ohrt.  Ohrt's investigation concluded that co-worker Dustin Hall had moved the stool because it was in an aisle way causing a trip hazard and that although the stool had been moved it had not been thrown.  (MB0756-0757)

29.    The Company has in place a policy on equal employment opportunity, workplace harassment and retaliation.  (MB0707-MB0710)

30.    The policy on equal employment opportunity, workplace harassment and retaliation contains a provision for reporting discrimination that advises employees to report discrimination to Human Resources, to the Vice President of Safety, Environmental and Risk Management or on a confidential password protected voicemail telephone hotline.  (MB0709)  Smith was aware of the existence of the hotline.  (Smith Dep. 89:1-3)

31.    Smith does not recall ever making a report on the hotline.  (Smith Dep. 89:10-11)

**Smith's Leaves of Absence**

32.    The Company implemented a comprehensive leaves of absence policy in March 2002. (MB0141-0148; Ohrt Dep. 84:1-20)  The policy defined the circumstances under which employees could be absent from work on an approved leave of absence.  (MB0139-0141)

33.    The Company's leaves of absence policy provides for among other things leave in accordance with the Family and Medical Leave Act as well as a non-FML medical leave discretionary to the Company.  (MB0141-0148)

34.    Employees including Smith were trained on the new leaves of absence policy in March 2002.  (Smith Dep. Exh. A; Smith Dep. 26:16-24)

35.    Smith exhausted all available time allowed under the Family and Medical Leave Act and accordingly under the Company's FMLA policy.  (Smith Dep.130:7-16; MB0132)

36.    When Smith exhausted all available leave under the Family and Medical Leave Act the Company granted her addition leave under its non-FMLA medical leave policy through November 5, 2003.  (MB0132, MB0133, MB0139-MB0140; Smith Dep. 130:17-24, 131:1-3)

-4-

37.    In approximately June 2003 the leaves of absence policy was modified such that the total amount of leave available to employees was reduced from 12 months to 6 months. (Ohrt Dep. 63:3-7)

38.    MBCI provided written notice of the modification to the leave of absence policy to affected employees, including Smith. (MB0133, 0139-0140; Ohrt Dep. 84:4-15)

39.    Smith was advised of the change in the leave of absence policy as it impacted her leave of absence by letter dated September 5, 2003. (MB0133; Smith Dep. 132:10-24)

40.    When the leave of absence policy was modified such that employees only received six months of total leave, some employees were grandfathered and allowed a total of 12 months leave. (Ohrt Dep. 62:10-24; 63:1-2)

41.    Employees grandfathered under the old time limits were those who had already exhausted their family and medical leave time and had already been on leave for six months. The Company determined that because these employees had already been on leave for six months it was unfair to suddenly terminate their employment. (Ohrt Dep. 62:10-24; 63:1-2)

42.    Employees who were grandfathered included both men and women. They were Mary Garrett, Joyce Good and Brad Hug. (Ohrt Aff. p. 12,13; Leave Letters)

43.    Employees who were not grandfathered were those employees who while on leave had not yet exhausted their family and medical leave act time or who had not yet been absent for six months. Those employees were Cindy Smith, James Poundstone, Martha McCoskey and Susan Mathis. (Ohrt Aff. p.14; Leave Letters)

44.    Smith requested and was approved for leave under the Company's leave of absence policy from December 13, 2002 through December 23, 2002, January 21, 2003 through January 28, 2003, February 5, 2003 through February 21, 2003 and April 7, 2003 through November 5, 2003. (Smith Dep. 125:19-24, 126:1-6 and 124:10-13)

45.    Smith obtained all leave to which she was entitled under the Company's leave of absence policy. (MB0132, MB0133, MB0093-MB0094, MB0139-MB0140)

46.    MBCI terminated Smith's employment on November 17, 2003 because she had exhausted all available time off from work and remained unable to return to work. (Ohrt Aff. p.15)

Additional facts are provided below as necessary

### III.    ARGUMENT

#### A.    The  Statute of Limitations Bars the Vast Majority Of Smith's Complaints.

Title VII required Smith to file her charge within 300 days after the alleged

unlawful employment action.  Title 42 U.S.C. § 2000e-(5)(e)(1); *Lopez v. Chicago Faucet*

*Company*, 2003 WL 22400703 (N.D. Ill. 2003) (Title VII action time barred unless based on an incident occurring within 300 days of the filing of a charge with the EEOC). The relevant 300 day period in this case is the 300 day period from November 14, 2002, through September 10, 2003 (when Smith filed her first charge with the EEOC).[1] It is critical to note that within the 300 day period associated with the first charge, Smith only worked 61 of those 300 days. Smith was absent from December 13, 2002 through December 23, 2002, from January 21, 2003 through January 27, 2003, from February 6, 2003 through February 19, 2003 and from April 7, 2003 until (and beyond) the filing of her charge in September 2003. (Smith Dep. 125:19-24, 126:1-6 and 124:10-13)

### 1.    Conduct Occurring Outside the 300 Day Statutory Period

Smith's Complaint and her first charge raise a series of discrete instances of purported discrimination and harassment that occurred between April 18, 2001 and November 13, 2002 and outside of the 300 day window. MBCI could not have discriminated against Smith in April 2001 because she was not hired until May 2001. Any remaining incidents alleged to have occurred between May 2001 and November 13, 2002 are time barred as falling outside the applicable 300 day window. Those incidents include an argument with co-worker Dustin Hall in July 2001[2], a Company sponsored trip to Tennessee in 2001[3], complaints about light duty

---

1. Smith filed two charges, one in September 2003 and the other in August 2004. In her 2003 charge Smith alleged she was discriminated against on the basis of her sex and her religion, was the victim of sexual harassment and was retaliated against. Smith raised the exact same allegations in her second charge and, in fact, specifically stated that she "herein incorporates all allegations made in the previous charge." The only event to occur with respect to her employment between the first and second charges was the termination of her employment in November 2003. MBCI does not dispute the timeliness of Smith's charge with respect to the termination of her employment. MBCI only disputes the timeliness of Smith's various other allegations of discrimination and harassment.

2 On July 19, 2001, Smith had an argument with co-worker Dustin Hall. (Smith Dep. 52:l. 24, 53:1-17) Smith was upset by the argument and left work 4.8 hours early. (Smith Dep. 52:l. 24) She subsequently received a verbal warning regarding her absenteeism in February 2002 and a written warning regarding her absenteeism in July 2002. (MB0100, MB0099; Smith Dep. 50:2-

-6-

assignments in 2001 and 2002, [4] and an incident involving co-worker Art Decker on an unknown date sometime before September 2002[5]. Each of these occurred long prior to November 13, 2002 and are accordingly time barred.

### 2.    Conduct About Which Smith Complains But Cannot Show When it Occurred.

In addition to the above complaints which are clearly time barred, Smith has a series of other complaints for which she can provide no dates. For example, Smith alleges that her Team Leader would place men to work on machines but that she was never put on a machine. (Smith Dep.15:5-7) When asked whether she was talking about a specific incident she stated "no" and when asked what time period she was talking about she indicated "I don't know." (Smith Dep.15:8-17) When asked for just an approximate timeframe Smith indicated she was unable to give even an approximate timeframe for this alleged discrimination. (Smith Dep. 15:21-23)

Similarly, Smith alleges that she was not allowed to take a driving test in order to obtain a fork truck license. When asked "what year approximately is all of this happening in" she answered, " I don't know." When asked for an estimate she testified, "I would say '01, '02." (Smith Dep. 26:20-24) Moreover, after identifying both male and female Material Handlers who like her also did not drive fork trucks, Smith was asked how it was determined

---

24, 51:1-19) Smith realized that the 4.8 hours counted against her attendance record by the time she received a verbal warning in February 2002. (Smith Dep. 57:11-21)

3 In November 2001 Smith visited the Company's Tennessee plant at Company request. (Ohrt Aff p. 9; Accounts Payable reports)

4. Smith testified that she does not know the date of the injury or when the light duty difficulties allegedly occurred other than to say it was "between '01 and '02. - - I don't know the exact dates." (Smith Dep. 164:11-15) This is insufficient to show that the complained of acts occurred within the 300-day window.

5 Smith was unable to state when that incident occurred. However, MBCI terminated Decker's employment on September 9, 2002. (Ohrt Dep. Exhibit 7) Therefore, any incident involving Smith and Decker had to have occurred prior to September 9, 2002, and was not timely raised in a charge of discrimination.

which Material Handlers would drive a fork truck. She replied, "I don't know." (Smith Dep. 21:22-24) Finally, Smith alleges co-worker Brickey shoved or poked her on one occasion but she does not know on what date that occurred either. (Smith Dep. 81:14-22)

Because Smith does not know when any of the above alleged acts occurred, she has not presented competent evidence that any of the acts occurred within the 300 day window and were the subject of a timely charge of discrimination. Smith cannot avoid summary judgment on these claims for which she can provide no dates. See, *Dority v. City of Chicago*, 2001 WL 1155286 (N.D. Ill. 2001)("If Defendant moves for summary judgment based on the statute of limitations, plaintiff bears the burden of presenting facts to raise a genuine issue to avoid the statute of limitations).

There are only three timely allegations raised by Smith, 1) a comment in January 2003 by Team Leader John Winschief that she might break a nail if allowed to operate a machine and that he would not allow her to operate machinery because she is a woman, 2) an allegation that co-worker Dustin Hall threw her stool and 3) the termination of her employment was unlawful.

B.    **The Evidence Does Not Support Smith's Allegations Of Discrimination**

Of those allegations which are not time barred, the undisputed facts show that Smith was not discriminated against.[6]

---

6 Smith's Charges included a claim of religious discrimination based on a single alleged comment that she would have to 'make things right with God." Her Complaint, however, appears to have omitted this charge. Smith's Complaint alleges only that MBCI "engaged in a course of conduct of sex discrimination, sexual harassment and retaliatory conduct for Smith's complaints of sexual discrimination and harassment." To the extent Smith is pursuing her religious discrimination claim it is subject to summary judgment as well "Inappropriate  but isolated comments that amount to no more than stray remarks in the workplace" do not support a claim of religious

-8-

1.    **Team Leader Winschief Assigned Both Men and Women to Work On Machines.**

Smith complained to Matt Ohrt, Employee Relations Manager, that Team Leader Winschief made a comment about her breaking a nail if she worked on a machine, that he failed to assign her to work on a machine because she is a woman and that Winschief would not assign women to work on machines.  Ohrt investigated Smith's complaint against Winschief.  (Ohrt Dep. 25:9-12)  Ohrt's investigation included interviews of all the women in Winschief's department and concluded that the allegation could not be substantiated.  (Ohrt Dep. 25:13-16; MB0737-0752)   Moreover, no discipline was issued to Smith as a result of this complaint.

Smith identified the relevant machines as the Costa sander and saws.  First and foremost, Smith was employed as a Material Handler I and running a sander or saw was the function of a Machine Operator, a job that Smith never held. (Ohrt Aff. p. 8)   As Smith herself acknowledges, it was not part of the job description of a Material Handler I to run machines. (Smith Dep. 43:16-18)  Had Smith wanted to run a machine she could have bid on a Machine Operator job.  Open positions in the facility are awarded through a job bid process.  (Gatons Dep. 29:14-19;  Ohrt Dep. 80:20-24;  81:1-10).  Bids are awarded on the basis of seniority.  (Gatons Dep.  30:7-11;  Ohrt Dep. 81:11-18)  Even if Winschief did not want to have women in Machine Operator positions he had not role in the job bid process and could not prevent women from obtaining these jobs.  Team Leaders did not participate in the bid process or have the discretion or authority to refuse to place the successful bidder in the open job.  (Gatons Dep. 30:12-24, 31:1-2;  Ohrt Dep. 82:7-11)

### a. Smith Ignored Open Machine Operator Positions.

During Smith's employment, numerous Machine Operator jobs came open for bid in the door plant where Smith worked.  With two exceptions, Smith never bid on the job.  Within

discrimination.  See, *Venters v. City of Delphi*, 123 F.3d 956, 973.

the door plant where Smith worked, two Machine Operator jobs came up for bid in 2001.  (Ohrt Aff. p. 5; Job Bid Sheets)  Smith bid on only one of those jobs (along with four other employees).  (Ohrt Aff. p. 5; Job Bid Sheets)  Smith was the least senior employee and was not awarded the job.  The other Machine Operator job was awarded to a woman.  (Ohrt Aff. p. 5; Job Bid Sheets)

In 2002, twelve Machine Operator jobs came up for bid in the door plant.  (Ohrt Aff. p. 6; Job Bid Sheets)  Smith bid on only one of those jobs (along with five other employees).  (Ohrt Aff. p. 6; Job Bid Sheets)  Smith was not the most senior employee and thus was not awarded the job.  (Ohrt Aff. p. 6; Job Bid Sheets)  Of the remaining Machine Operator jobs up for bid, a woman was the successful bidder on two jobs.  (Ohrt Aff. p. 6; Job Bid Sheets)

In 2003, seven Machine Operator jobs came up for bid in the door plant.  (Ohrt Aff. p. 7; Job Bid Sheets)  Smith did not bid on any of these jobs.  (Ohrt Aff. p. 7; Job Bid Sheets)  A woman was the successful bidder on two jobs.  (Ohrt Aff. p. 7; Job Bid Sheets)

**b.  Smith Made No Attempt To Learn About the Machine Operator Requirements.**

Setting aside the critical fact that Smith bid on only two of twenty-seven Machine Operator jobs that came up for bid in the door manufacturing during her employment, Smith verbalized no interest in running machines or learning what the qualifications for such a job were.  With respect to the Costa sander and saws, the following exchange occurred during Smith's deposition.

Q:  What kind of training is required to be on the Costa sander?
**A:  I don't know.**
Q:  Did you ever ask?
**A:  No I did not.**
Q:  Why not?
**A:  I don't know.**
. . .

-10-

Q:  But in terms of actually running the saw, do you know what kind of training was required?
**A:  No, I do not.**
Q:  Did you ever ask?
**A:  I don't remember asking.**
Q:  Did you want to work the Costa sander?
**A:  I would have liked to have had the opportunity to do so.**
Q:  Did you ever ask?
**A:  I don't know that I - I - I don't know.  I don't remember.**
Q:  Did you want to run the saws?
**A:  I would have liked to had the opportunity to do that.**
. . .
Q:  Did you ever ask specifically for an opportunity to be on the saws?
**A:  I don't know that I did.**

(Smith Dep. 41:1-6, 23-24, 42:1-3, 7-16, 19-21)  Moreover, when asked if she ever volunteered to help out on machines Smith stated, "I don't remember."  (Smith Dep. 68:4-9)  Smith cannot now attempt to hold the Company liable for not placing her on a machine when she never expressed interest or volunteered to learn about the machines and only twice bid on a Machine Operator job.

### c.  Women Supervised by Winschief Ran Machines

Smith's allegation also ignores the fact that women who were supervised by Winschief did in fact run machines.  Smith herself identified women who were supervised by Winschief and who worked on the Costa sander and the saws.  Specifically, Smith identified Sophie Gomez as a woman who ran the Costa sander and Mary Hackman, Becky Hardwick and another woman whose name she could not recall as operating a saw.  (Smith Dep. 69:11-15, 23-24, 70:3-4, 13-24)

A review of the information produced by MBCI in discovery further undermines Smith's contention that women were not allowed to run machinery in the door plant.  MBCI produced to Smith a chart containing the name, job title and employment status of all persons employed by MBCI in Smith's department from May 18, 2001 through October 28, 2003.  (Ohrt Dep. Exhibit 7)  That list reflected 53 employees of whom 15 were classified as Machine

Operators.  Within this group of Machine Operators, three were women.  Had Cindy Smith

wanted to run a Costa sander, a saw or any other machine in the door plant she could have and

should have bid on a Machine Operator position.  However, her position was that of Material

Handler I and the Material Handler I job does not call for the employee to run machines such as

saws and sanders.  (Gatons Dep. 33:14-24, 34:1;  Smith Dep. 43:22-24)

> **2.      The Stool Throwing Incident Does Not Rise to the Level of
> Discrimination**

On a temporary, light duty basis, Smith required the use of a stool in order to

perform her job duties.  In March 2003 Smith complained to Winschief that co-worker Dustin

Hall had "thrown" her stool across a clamp table.  Winschief reported the complaint to Ohrt who

conducted an investigation.  (Smith Dep. 108:4-10; Ohrt Dep. 45:1-3, 12-16;  MB0756-0757)

Smith was not present when the stool was thrown.  (Smith Dep 105:23-24, 106:1-8)  Co-workers

in the vicinity reported that they did not see Hall throw the stool either.  (Ohrt Dep. 45:24, 46:1-

22, 48:22-24, 49:1-2; MB 0756-0757)  Hall claimed he had only moved the stool because it was

a trip hazard.  (Ohrt Dep. 46:15-22; MB 0756-0757)  Ohrt's investigation concluded that co-

worker Dustin Hall had moved the stool because it was in an aisle-way causing a trip hazard and

that although the stool had been moved it had not been thrown and there was no indication of

violence toward Smith.  (MB0756-0757)

This alleged incident occurred when Smith was not even present!  She does not

and cannot allege that she was physically or mentally threatened or harmed.  There is no dispute

that he stool remained available for Smith to use as needed.  The moving of a stool outside of

Smith's presence simply cannot rise to the level of harassment.  Smith herself testified that

although she had reported she did not think anything was going to be done, didn't ask for

anything to be done and doesn't know if she wanted anything to be done.  (Smith Dep. 110:16-

21)  Moreover, no discipline was issued to Smith as a result of this complaint.  (Ohrt Dep. 49:16-18)

Finally, if Smith was dissatisfied with Ohrt's handling of her two complaints, she could have taken further action.  The Company has in place a policy on equal employment opportunity, workplace harassment and retaliation.  (MB0707-MB0710)  The policy on equal employment opportunity, workplace harassment and retaliation contains a provision for reporting discrimination that advises employees to report discrimination to Human Resources, to the Vice President of Safety, Environmental and Risk Management or on a confidential password protected voicemail telephone hotline.  (MB0709)  Smith was aware of the existence of the policy and her further reporting options including the hotline but made no reports to the hotline.  (Smith Dep. 89:1-3, 10-11)

## C.    Smith Was Terminated For Legitimate Non-Discriminatory Reasons

To make a *prima facie* case for retaliation, Smith must demonstrate that 1) she engaged in statutorily protected activity; 2) she suffered an adverse employment action after that activity; and 3) there was a causal link between the adverse action and the protected activity. *Johnson v. Nordstrom*, 260 F.3d 727, 734-35 (7th Cir. 2001).  MBCI is entitled to summary judgment on Smith's retaliation claim.  This claim fails for two independently sufficient reasons.  One, Smith is unable to show that her complaints caused her discharge and two, Smith is unable to show that MBCI's stated reason for her discharge was pretextual.

### 1.    Smith Cannot Show Any Causal Link Between Her Complaints About Harassment And Her Discharge

Smith was hired on May 18, 2001.  (Smith Dep. p. 11:ll. 15-20)  The only two complaints lodged by Smith with the Company were in January 2003 and March 2003.  As discussed above, the first complaint was against her Team Leader, John Winschief and the

-13-

second complaint was against co-worker, Dustin Hall regarding movement of a stool.  Smith

received no discipline as a result of her complaints in 2003 and there were no changes to the

terms or conditions of her employment.  (Ohrt Aff. p. 15)  Smith went on leave approximately

one month after her last complaint in 2003 and never returned to work.  Smith's employment

was terminated November 17, 2003.

       The timing of these events does not lead to the conclusion that Smith was

terminated for having filed complaints.  "The mere fact that one event preceded another does

nothing to prove that the first event caused the second."  *Sauzek v. Exxon Coal USA, Inc.*, 202

F.3d 913, 918 (7th Cir. 2000).  In *Sauzek* the Plaintiffs simply asserted that the fact Exxon

declined to rehire them three months after they filed EEOC discrimination charges illustrated

that the decision was retaliatory.  *Id*. at 916, 918.  The Seventh Circuit disagreed pointing out

that the Plaintiffs had cited no evidence connecting the two events.  *Id*. at 918-919.  See also,

*Bilow v. Much Shelist Freed Denenberg Ament & Rubenstein, P.C.*, 277 F.3d 882 (7th Cir. 2001)

("we question whether a time lag of more than two months is suspicious on the facts presented

here for the purpose of establishing retaliation . . ..").  Similarly, here, the mere fact that Smith

complained some eight months prior to her termination is not evidence of a causal connection.

       The cause of Smith's termination was nothing more than the consistent

application of the Company's leaves of absence policy.  The Company implemented a

comprehensive leaves of absence policy in March 2002.  (MB0141-0148; Ohrt Dep. 84:1-20)

The policy defined the circumstances under which employees could be absent from work on an

approved leave of absence.  (MB0139-0141)  The Company's leaves of absence policy provides

for, among other things, leave in accordance with the Family and Medical Leave Act as well as a

non-FML medical leave discretionary to the Company.  (MB0141-0148)  Employees including

Smith were trained on the new leaves of absence policy in March 2002.  (Smith Dep. Exh. A;

Smith Dep. 26:16-24)

It is undisputed that Smith exhausted all available leave under the Family and

Medical Leave Act.  (Smith Dep. 130:7-16; MB0132)  Thereafter, Smith was allowed additional

time off from work under the Company's discretionary non-FML medical leave policy.  (Smith

Dep. 130:17-24, 131:1-3; MB0132, MB0133)  In total, Smith requested and was approved for

leave under the Company's leave of absence policy from December 13, 2002 through December

23, 2002, January 21, 2003 through January 28, 2003, February 5, 2003 through February 21,

2003 and April 7, 2003 through November 5, 2003.  (Smith Dep. 125:19-24, 126:1-6 and

124:10-13) MB0132, MB0133, MB0139-MB0140; Smith Dep. 130:17-24, 131:1-3)

In approximately June 2003 the leaves of absence policy was modified such that

the total amount of leave available to employees was reduced from 12 months to 6 months.

(Ohrt Dep. 63:3-7;  MB0133, MB0139-MB0140)  MBCI communicated this change to Smith

and advised of the impact this would have on her available leave time.  (MB0133)  MBCI

provided written notice of the modification to the leave of absence policy to affected employees,

including Smith. (MB0133, 0139-0140;  Ohrt Dep. 84:4-15)  Smith was advised of the change in

the leave of absence policy as it impacted her leave of absence by letter dated September 5,

2003.  (MB0133; Smith Dep. 132:10-24)  Smith alleges that a male employee, Brad Hug, was

allowed 12 months leave and she herself was only allowed six months leave.  From this she

concludes foul play.  Yet when asked whether she believes she was restricted to the six months

leave because she is a woman Smith replied, "I don't know."

In reality, both male and female employees were affected by the policy change.

When the leave of absence policy was modified such that employees only received six months of

total leave, some employees were grandfathered and allowed a total of 12 months leave.  (Ohrt

Dep. 62:10-24; 63:1-2)  Employees grandfathered under the old time limits were those who had

already exhausted their family and medical leave time and had already been on leave for six

months.  The Company determined that because these employees had already been on leave for

six months it was unfair to suddenly terminate their employment.  (Ohrt Dep. 62:10-24; 63:1-2)

Employees who were grandfathered included both men and women.  They were Joyce Good and

Brad Hug.  (Ohrt Aff. p. 13; Leave Letters)

       Other employees, including Smith, were not grandfathered, again based on the

amount of leave used at the time the change was implemented and this applied to both men and

women.  (Ohrt Aff. p. 14;  Leave Letters)  Employees who were not grandfathered were those

employees who while on leave had not yet exhausted their family and medical leave act time or

who had not yet been absent for six months.  Those employees were Cindy Smith, James

Poundstone and Martha McCoskey.  (Ohrt Aff. p. 14;  Leave Letters)

       Smith obtained all leave to which she was entitled under the Company's leave of

absence policy.  (MB0132, MB0133, MB0093-MB0094, MB0139-MB0140)  MBCI terminated

Smith's employment on November 17, 2003 because she had exhausted all available time off

from work and remained unable to return to work.  (Ohrt Aff. p. 15)  Because Smith cannot show

any causal link between her complaints about harassment and her discharge, MBCI is entitled to

summary judgment on her retaliation claim.

    **2.**     **Smith Cannot Show That MBCI's Legitimate Non-Discriminatory Reason
           For Her Discharge Was Pretextual**

       Smith cannot show that MBCI's legitimate non-discriminatory reason for her

discharge was pretextual.  Moreover, even if Smith had established the required causal

connection between her complaints of harassment and her discharge, which she has not, her

claim would fail because MBCI has presented evidence of its legitimate, non-discriminatory

reasons for Smith's discharge and Smith cannot show these reasons to be pretextual.  See, *Bilow*,

277 F.3d at 895.  Pretext requires more than a showing that a business decision was mistaken or ill considered.  *Franzoni v. Hartmarx Corp.*, 300 F.3d 767, 772 (7th Cir. 2002).  Rather, a plaintiff must show that the employer did not honestly believe that it was justified in terminating the plaintiff for the reasons given.  *Id.*

Smith cannot prove that anyone involved in the decision to terminate her employment was dishonest about the reasons stated for that termination, as documented in the September 5, 2003 letter advising Smith when she would exhaust all available leave time and in her November 17, 2003 termination letter.  (MB0093, MB0133)  Again, Smith argues only that a male employee was granted greater leave time.  However, as explained above, the male employee to which Smith points was grandfathered under the old policy along with other female employees.  Smith was not eligible to be grandfathered under the old policy.  That Smith can point to one male employee who validly obtained a greater amount of leave is not evidence that management was lying about the stated reasons for her termination and is not a sufficient showing to survive summary judgment.  See, *Johnson*, 260 F.3d at 734 (Because Johnson was unable to present evidence that [the manager who failed to promote her] was lying, lack of pretext is a clearer ground for affirming the grant of summary judgment on the failure to promote claim.")  Because Smith cannot show that MBCI's stated reasons for her discharge were not honestly believed by management, MBCI is entitled to summary judgment on her retaliation claim.

## IV.    CONCLUSION

Only three of Smith's allegations were the subject of a timely charge of discrimination.  MBCI is entitled to summary judgment with respect to all allegations that occurred outside of the statutory 300 day period preceding her charge(s).  MBCI is also entitled

-17-

to summary judgment on Smith's timely claims as the undisputed, objective evidence

demonstrates that she was not subject to discrimination or harassment on the basis of her sex.

## CERTIFICATE OF COMPLIANCE

Defendant, MasterBrand Cabinets, Inc., by counsel, certifies that the Defendant's

Brief In Support Of Its Motion For Summary Judgment complies with Local Rule 7.1(B)4.

Although the Brief exceeds 15 pages, it does not contain more than 7,000 words or 45,000

characters. The word processing system used to prepare the document indicates that the

Defendant's Brief consists of 5,368 words, 26,921 characters without spaces or 32,511 characters

with spaces and 304 lines of text *not* including the required statement of facts.

Respectfully submitted,


s/Kelley Bertoux Creveling
Mark J. Romaniuk (#15255-49)
Kelley Bertoux Creveling (#19309-49)
BAKER & DANIELS LLP
300 N. Meridian Street, Suite 2700
Indianapolis, IN 46204
Phone: (317) 237-0300
Fax: (317) 237-1000

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I certify that on the 28 day of February, 2006, a copy of the foregoing

Defendant's Motion for Summary Judgment was filed electronically.  Notice of this filing will be

sent to the following parties by operation of the Court's electronic filing system.  Parties may

access this filing through the Court's system.

Alexandra de Saint Phalle
Londrigan, Potter & Randle, P.C.
1227 South Seventh Street
P.O. Box 399
Springfield, IL 62703

s/Kelley Bertoux Creveling