**E-FILED**
Wednesday, 01 March, 2006  08:15:06 AM
Clerk, U.S. District Court, ILCD

# Attachment 1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT
STATE OF ILLINOIS

CINDY SMITH,
            Plaintiff,
            vs.                    No. 04-2215
MASTERBRAND CABINETS, INC.,
            Defendant.

DEPOSITION

        The deposition of CINDY SMITH, a citizen
of the State of Illinois, a witness of lawful age;
produced, sworn, and examined upon her corporeal
oath, at the Law Offices of Londrigan, Potter &
Randle, P.C., 1227 South 7th Street, Springfield,
Illinois, on the 15th day of November, 2005, before
Dana Hammond, RPR, Notary Public in and for the
County of Macon and State of Illinois, as a witness
in a certain suit and matter now pending and
undetermined in the United States District Court
for the Central District of Illinois.

APPEARANCES

        Attorney representing the Plaintiff:
            Londrigan, Potter & Randle, P.C.,
            Attorneys at Law
            1227 South 7th Street
            Springfield, Illinois 62703
            BY:  Ms.  Alexandra de Saint Phalle

        Attorney representing the Defendant:
            Baker & Daniels, L.L.P.,
            Attorneys at Law
            300 North Meridian Street, Suite 2700
            Indianapolis, Indiana 46204
            BY:  Ms. Kelley Bertoux Creveling
        Also present with counsel is Matthew Ohrt.

        CSR License No.  84-003853

ORIGINAL

```
 1
 2              I-N-D-E-X
 3
 4    EXAMINATION CONDUCTED BY        PAGE
 5
 6  Ms. Creveling                3
 7
 8          E-X-H-I-B-I-T-S
 9
```

10  Smith Deposition Exhibit MB0100      50
11  Smith Deposition Exhibit MB0099      51
12  Smith Deposition Exhibit MB0103      52
13  **Smith Deposition Exhibit Group A     126**
14  **Smith Deposition Exhibit MB0132     128**
15  **Smith Deposition Exhibit MB0133     132**
16  **Smith Deposition Exhibit MB0139     133**
17  **Smith Deposition Exhibit MB0093     140**
18  **Smith Deposition Exhibit MB0707     176**

```
19
20
21
22
23
24
```

```
 1     (Whereupon deposition commenced at 10:14 a.m.)
 2              CINDY SMITH,
 3      The witness having been first duly
 4  affirmed upon her oath testified as follows:
 5           EXAMINATION CONDUCTED
 6           BY: MS. CREVELING
 7    Q. Good morning.  My name's Kelley Creveling.
 8  I'm representing Masterbrand Cabinets in your
 9  lawsuit against the company.
10      As we get started with this, I want to go
11  over just a few of the basic ground rules that your
12  attorney may have already shared with you, but it
13  will greatly help us as we go forward in the
14  deposition today.
15      I think the hardest rule for anybody to
16  remember is to give verbal answers.  A lot of us
17  have a tendency to shake our heads and talk with
18  our hands and say uh-huh and huh-uh.  We understand
19  what each other means while we're sitting here
20  today, but it's very difficult for the court
21  reporter to transcribe that.  And when it comes out
22  in written form, it can be difficult to understand.
23  So if you would please remember to give verbal and
24  audible answers today, I would appreciate it.
```

```
 1      This is not an endurance contest, so at
 2  any time you would like to take a break, please do
 3  let me know.  I would simply ask that you finish
 4  responding to the question before we take your
 5  break.
 6      If at any time you don't hear my question
 7  or understand my question, please let me know and
 8  I'll be more than happy to repeat it to you.  But
 9  if you answer, I'm gong to assume you understood
10  the question, all right?
11    A. Okay.
12    Q. Would you please state your full name for
13  the record.
14    A. Cindy Dee Smith.
15    Q. And it is Mrs. Smith; is that right?
16    A. That's correct.
17    Q. Did you used to be known as Cindy Heiman?
18    A. Yes, I did.
19    Q. When did you get married?
20    A. I got married on July 7th of 2003.
21    Q. And your husband's name, please?
22    A. Elmer D. Smith.
23    Q. Where do you reside?
24    A. I reside at Rural Route One, Box 202,
```

```
 1  Neoga, Illinois.
 2    Q. How long have you lived at that address?
 3    A. That's -- I'm going to say for the last
 4  two years.
 5    Q. Who lives there with you?
 6    A. My husband.
 7    Q. You have children, do you not?
 8    A. Yes, I do.
 9    Q. Their names and ages, please?
10    A. Carry Trussle, and Carry was born in 1979;
11  Connie Heiman, and Connie was born in '82 -- '80 --
12  '81; and Corey Heiman, and she was born in '82.
13    Q. And none of your daughters currently live
14  at home?
15    A. No.
16    Q. Were you previously married?
17    A. Yes, I was.
18    Q. Your ex-husband's name?
19    A. John Heiman.
20    Q. During what period of time were you
21  married to Mr. Heiman?
22    A. I was married to him from '77 until we
23  were -- 2000.
24    Q. Where does your ex-husband currently
```

## Page 6

1 reside?

A. My ex-husband is deceased.

Q. When did he die?

A. 2000.

Q. Are you on any medication today?

A. Lexapro.

Q. What is the Lexapro for?

A. The Lexapro is a nerve pill to calm me, calm my nerves.

Q. How long have you been on Lexapro?

A. Um, since May of 2003.

Q. What doctor prescribes that for you?

A. Dr. Kopacz.

Q. Is he still the prescribing physician?

A. Yes, he is.

Q. Are you on any other medication today?

A. No, I'm not.

Q. Okay. Are you currently employed?

A. No, I am not.

Q. When was the last time you worked?

A. The last time I worked was for Masterbrand Cabinets. November of 2003.

Q. Other than speaking with your attorney today, what did you do to prepare for the

## Page 7

1 deposition?

A. I went over notes that I had, talked with my husband about it.

Q. Anything else?

A. Nope. Talked with my lawyer.

Q. When you say you went over notes, what notes are you talking about?

A. I'm talking about notes that I -- my own personal notes and any information that I had given Alex.

Q. Do you know whether these own personal notes that you're referring to are notes that you have previously provided to your attorney to produce to us in the litigation?

A. Yes, I believe so.

Q. Would that be like your diary?

A. Right.

Q. Okay. Any other note that you reviewed?

A. No.

Q. Have you made any effort to find employment since your job at Masterbrand?

A. No, I have not.

Q. Why not?

A. I'm still under a doctor's care.

## Page 8

1 Q. Has any doctor instructed you not to work?

A. Um, yes.

Q. What doctor?

A. Dr. Kopacz.

Q. When was the last time you saw Dr. Kopacz?

A. September, I believe.

Q. September of 2005?

A. Correct.

Q. And Dr. Kopacz has told you not to work at all?

A. Correct.

Q. Has there been any period since November of 2003 that you've been cleared to return to work?

A. I would say no.

Q. What is it that Dr. Kopacz, in your understanding, believes prevents you from returning to work?

A. Depression, anxiety attacks.

Q. Anything else?

A. No.

Q. I understand that you have one or two claims, either in the past or still currently, for work related injuries sustained.

A. That is correct.

## Page 9

1 Q. What parts of your body were injured?

A. Shoulder, wrist, knee.

Q. What physicians are you seeing or did you see for those injuries?

A. At first, I seen company doctor, which was Dr. Heartman; company doctor, Dr. Johnston; and Dr. Bonutti.

Q. Any other doctors that you've seen for those injuries?

A. A doctor from Champaign, and I can't think of his name right now.

Q. Have you seen any doctors other than the company doctors for your work injuries?

A. Dr. Bonutti.

Q. So he's not a company physician; he was a physician of your choice?

A. Correct. He was a -- Dr. Kopacz referred me to him, so he was a referral.

Q. When was the last time that you saw Dr. Heartman?

A. I don't remember.

Q. Can you tell me what year it was that you last saw Dr. Heartman?

A. I don't remember.

**Page 10**

1   Q. Was he -- is that a he or a she?
2   A. He.
3   Q. Was that -- did he treat you for the
4   shoulder, the wrist or the knee?
5   A. All three.
6   Q. Have you been released from treatment for
7   your shoulder?
8   A. Yes, I have.
9   Q. Have you been released from treatment for
10  your wrist?
11  A. Yes, I have.
12  Q. How about for your knee?
13  A. Yes, I have.
14  Q. Can you tell me approximately when you
15  were released from treatment for your shoulder?
16  A. I don't remember.
17  Q. Can you tell me what year?
18  A. I don't know.
19  Q. Has it been more or less than a year?
20  A. (No response.)
21  Q. Let me ask it to you this way. Has it
22  been since your termination, or was it before your
23  termination?
24  A. Since.

**Page 11**

1   Q. Do you have any restrictions assigned with
2   respect to your shoulder?
3   A. No, I do not.
4   Q. How about for your wrist?
5   A. No, I do not.
6   Q. And for your knee?
7   A. No, I do not.
8   Q. When did you first start treating with
9   Dr. Kopacz?
10  A. I don't remember the date.
11  Q. Can you remember the year?
12  A. No, I can't right now.
13  Q. Was it before or after the termination?
14  A. Before.
15  Q. Let's start by talking a little bit about
16  the management structure that was in place when you
17  started at Masterbrand, which I believe was in May
18  of 2001. Does that date seem roughly correct to
19  you?
20  A. Yes.
21  Q. Tell me what job you started in and who
22  your supervisors were.
23  A. I was hired as a material handler. My
24  supervisor was -- his first name was Bill. Heinz,

**Page 12**

1   Bill Heinz.
2   Q. What shift were you working?
3   A. Second shift.
4   Q. What department were you in?
5   A. Door.
6   Q. Was David Pantier the superintendent?
7   A. Yes, I believe so, yes.
8   Q. Tell me about the other plant management.
9   Who else do you recall being in management there,
10  aside from team leaders?
11  A. Jerry Ray was safety. Linda Watkins, Cord
12  Cozma, Rhonda Gatons. I believe manager was -- was
13  Mick Price.
14  Q. The plant manager?
15  A. Plant manager. Jody McGrath was company
16  nurse.
17  Q. Okay.
18  A. That's it.
19  Q. How long did you stay as a material
20  handler in the door plant?
21  A. I was material handler from the day I
22  started until the day that I was let go, no longer
23  employed.
24  Q. What supervisor did you have after Bill

**Page 13**

1   Heinz?
2   A. John Winschief.
3   Q. When did Mr. Winschief begin supervising
4   you?
5   A. Shortly after I started.
6   Q. Did you have any supervisors other than
7   Bill Heinz and John Winschief?
8   A. No, I did not.
9   Q. I understand from reviewing your complaint
10  and your charges -- at least I have a basic
11  understanding of your allegations, that you're
12  raising claims under Title Seven for
13  discrimination.
14      What I want to do today is get a complete
15  understanding of all of your allegations. So what
16  I want to start to do is just have you list for me,
17  tell me each of the things that you believe
18  happened that constituted sexual harassment,
19  discrimination, and then we can go back and talk
20  about them in further detail.
21  A. Well, discrimination would be -- I feel
22  women were not allowed to do -- at that time were
23  not allowed to do machine work; that the men were
24  allowed to call females names and nothing was done;

1  that I was terminated from my job after six months
2  when a male employee was grandfathered in. And I
3  can't think of anything else.
4  Q. Okay. In your estimation, what was the
5  percentage split between men and women employees in
6  the door plant?
7  A. I don't know.
8  Q. I'm asking for your estimate, not a
9  precise number.
10  A. There may have been a few more men than
11  women.
12  Q. Roughly, how many employees did you work
13  with on second shift in your department?
14  A. Um, I'm going to say in my department,
15  altogether there was probably twenty -- between
16  twenty and thirty. I don't --
17  Q. So twenty to thirty employees, roughly, in
18  door plant on second shift?
19  A. I don't know. That's just what I'm
20  guessing.
21  Q. I understand. And so if we were to use
22  the thirty number, there might be a little fewer
23  than fifteen women, a little less than half?
24  A. I -- I would guess that.

1  Q. Okay. When -- let's go back to your
2  specific allegations then. When you say women were
3  not allowed to do machine work, tell me what you
4  mean by that.
5  A. My supervisor would take men who were
6  helping me and put them on machines, and I was
7  never put on a machine.
8  Q. Are you talking about a specific incident?
9  A. No.
10  Q. What men are you talking about who were
11  helping you?
12  A. Men in my department.
13  Q. I need names, please.
14  A. Dustin Hall, Allen Brickey, Maury
15  Laurence.
16  Q. What time period are you talking about?
17  A. I don't know.
18  Q. You don't know when men who were helping
19  you were put on a machine?
20  A. No, I don't know the time or the date.
21  Q. I'm not asking for a specific date. Can
22  you give me an approximate timeframe?
23  A. No.
24  Q. What was Dustin Hall's job?

1  A. When I started, Dustin Hall was -- I don't
2  remember the name of the doors, but they were doors
3  without panels. And he worked in -- in that area.
4  Q. Do you know what his title was? Was he a
5  machine operator, material handler, assembler? Do
6  you know?
7  A. At the time that I started, no, I do not
8  know what the job that he was doing, if that was
9  his job title or not.
10  Q. He was in an area where he worked with
11  doors that had no panels?
12  A. Correct.
13  Q. Who was his supervisor?
14  A. John Winschief.
15  Q. How long did you work with Dustin Hall?
16  A. From the -- off and on from the day I
17  started until I went out on leave.
18  Q. Did Dustin -- Dustin's job change over
19  time while you were in the department?
20  A. Dustin did many jobs while I was there.
21  Q. Do you know whether Dustin ever bid into
22  job -- other jobs?
23  A. No, I do not know that.
24  Q. What other jobs did Dustin do while you

1  were there?
2  A. Dustin was a builder. Dustin would work
3  in my work area. The Costa, he would help on the
4  Costa machine. He drove a fork truck.
5  Q. Are these all different jobs he did in
6  door plant?
7  A. Yes.
8  Q. Tell me about Allen Brickey. What was his
9  job?
10  A. I believe that Allen was a builder. While
11  I was there, off and on Allen would help in my
12  area. He would help out on the Costa. He would
13  help wrap loads, doors. He was on a fork truck and
14  there was another machine, but I can't remember the
15  name of it.
16  Q. Were all of these jobs that Allen Brickey
17  did in the door plant?
18  A. Yes.
19  Q. Was Winschief also his supervisor?
20  A. Yes, he was.
21  Q. For what period of time did you work with
22  Allen Brickey?
23  A. From the day I started off and on until
24  the day I went out on leave.

Page 18

1　Q. Tell me about Maury Laurence.
2　A. I don't know what Maury's job title was.
3　Maury would work with me. He would run the Costa.
4　He would build doors. He would help the
5　assemblers. He worked pulling panels. And that's
6　all.
7　Q. Again, those were all jobs that he did in
8　the door plant?
9　A. Yes.
10　Q. And Winschief was his supervisor, as well?
11　A. Correct.
12　Q. For what period of time did you work with
13　Mr. Laurence?
14　A. I worked with Maury off and on. I didn't
15　work with him when I first started. And I'm not
16　sure about the date, but I worked with Maury
17　until -- I don't remember when Maury left, but we
18　worked off and on together.
19　Q. And he left before you did?
20　A. Maury bid on a job, and I'm thinking that
21　I worked with him until he went to a different
22　department or a different shift.
23　Q. Tell me what your job was as a material
24　handler.

Page 19

1　A. My job -- when I went for my orientation,
2　my job was to pull styles and rails, drive a fork
3　truck, inventory, keep track of inventory on bad --
4　bad parts, pull parts, and that's -- pull parts for
5　the builders. And that's it.
6　Q. Okay. Give me an overview of what happens
7　in the door plant. What were people -- what are
8　you trying to accomplish? What are you doing in
9　there?
10　A. We are building doors that fit on the
11　front of cabinets.
12　Q. How was the area set up?
13　A. It was set up -- it was set up to where
14　people who pulled panels for the doors would put
15　them on a cart. That cart would next go to the
16　Costa machine. And the Costa was a machine that
17　the panels had to go through in order to be sanded.
18　Then after that, it was put on a cart that
19　would come over to the -- my department, or my work
20　area. And in the parts, we would pull parts for
21　the sides and the bottom of the cabinet doors.
22　There would be -- then it would go over to the
23　builders.
24　Q. Describe your work area for me.

Page 20

1　A. My work area was shelves that held tops,
2　bottoms, sides, the door frame, cabinet door frame.
3　I would pull parts from the shelves and load them
4　in the awaiting tubs, or carts.
5　Q. How many people -- well, how many material
6　handlers were there on second shift?
7　A. I don't know.
8　Q. How many -- were you all working in the
9　same area in the door plant as material handlers?
10　A. In the material handlers, in the door
11　plant, there was probably -- I don't know -- I'm
12　going to say three, four.
13　Q. Including yourself?
14　A. Including myself, that I knew of.
15　Q. So there were three to four material
16　handlers that you knew of on second shift in the
17　door plant?
18　A. Correct.
19　Q. Who were the other material handlers that
20　you can think of?
21　A. Scott Stewart. I think that was what
22　Maury Laurence was. I think that was his job
23　title. And Becky -- I can't remember Becky's last
24　name. And myself.

Page 21

1　Q. Would that be Becky Hardwick?
2　A. Correct. And Art Decker.
3　Q. Was another material handler?
4　A. Yes.
5　Q. So is it accurate to characterize this
6　work area as almost like a little warehouse area?
7　A. My -- my work station, I would describe it
8　as that, yes.
9　Q. What's a style? I think you said you pull
10　styles and rails.
11　A. Styles and rails are the tops, the bottom
12　and the sides.
13　Q. You also drove a fork truck?
14　A. I didn't drive a fork truck.
15　Q. Did the other material handlers all drive
16　fork trucks?
17　A. Scott Stewart did. I seen Maury on a fork
18　truck. And I don't believe that Becky did.
19　Q. How about Art?
20　A. I don't ever recall seeing Art on a fork
21　truck.
22　Q. How was it determined which material
23　handlers would drive a fork truck?
24　A. I don't know.

**AREA WIDE REPORTING (800)747-6789**

1    Q. Were you unhappy or satisfied with the
2  fact that you did not drive a fork truck?
3    A. I don't know.
4    Q. Did you care?
5    A. I would say that was in my job description
6  and I thought I would drive a fork truck.
7    Q. Did you ever ask anybody why you weren't?
8    A. I took a fork truck test, but was never
9  given my permanent license.
10    Q. When did you take the fork truck test?
11    A. I don't remember.
12    Q. Was it shortly after you started, or
13  later?
14    A. It was -- I took two tests.  The first
15  test I took and they lost my test and another
16  woman's test.  So then we had to be re-tested.  And
17  I don't know when that was either.
18    Q. Did you pass the test?
19    A. Yes, I did.
20    Q. And it's your understanding that you
21  should have received something indicating, a
22  license, something indicating that you had passed
23  the test?
24    A. I did receive a temporary license.

1    Q. What was the process to obtain a permanent
2  license?
3    A. You had to take a driven -- you had to
4  drive the fork truck in order to get a permanent
5  license.
6    Q. Did you take the driving test?
7    A. No, I did not.
8    Q. Why not?
9    A. When I asked, it was never a good time.
10    Q. Who did you ask?
11    A. I -- I don't -- Rich -- Rich -- hm.  I
12  can't remember his last name.  He was the one who
13  gave the first test.  And I had asked him.  And
14  then the second test was given by someone else.
15  And I think maybe his name was -- his first name
16  was Steve.
17    Q. How many times did you ask Rich -- I'm
18  sorry, did you say Rich or Rick?
19    A. I think it was Rich.
20    Q. Okay.
21    A. I remember asking right after the test if
22  I could take my test that same day.  And I could
23  not.
24    Q. Why not?

1    A. Um, I don't remember the reasoning.
2    Q. Did it seem like a reasonable reason to
3  you?
4    A. Yes.  At that time that I asked it, it --
5  it was.
6    Q. When did you next ask?
7    A. Well, I had asked Rich again, and he
8  informed me that they had lost my test, written
9  test.  So that had to be straightened out.
10    Q. Did you ask once you passed the written
11  test?
12    A. Yes.
13    Q. Tell me about that.
14    (Whereupon there was a brief interruption.)
15    Q. Okay.  I'm sorry.  You were telling me
16  about whether or not you asked after you took the
17  second written test.
18    A. I had asked again because some of the men
19  who had taken the first test had their permanent
20  license and they were driving around the factory.
21    Q. When did you ask the second time?
22    A. That was after my test was lost.
23    Q. So you have -- you asked the same day as
24  you took the first test?

1    A. Right.
2    Q. You asked Rich a second time, and learned
3  that your first test was lost?
4    A. Correct.
5    Q. You re-took the test?
6    A. Correct.
7    Q. And you've asked -- now you asked Rich
8  again?
9    A. Rich was not there on my second test.
10    Q. Who did you ask after you took the written
11  test?
12    A. Whoever was giving the second test.
13    Q. Is that the Steve person, you think?
14    A. Right.  But I don't remember his last
15  name.
16    Q. Did you ask him the same day that you took
17  the written test?
18    A. I asked him when I came out from taking
19  the test, and I don't remember what his answer was
20  as to why I couldn't take it.
21    Q. And did you believe it was a reasonable
22  reason?
23    A. I don't remember about -- about that.  I
24  don't remember.

1    Q. Tell me about any further efforts to take
2    the driving test.
3    A. Well, I remember we were needing -- Scott
4    Stewart went home early or -- for some reason,
5    Scott Stewart wasn't there to run the fork truck.
6    And I remember asking John about -- I needed parts,
7    and Scott would bring my parts down by fork truck.
8    And I -- Scott wasn't there. So I asked about
9    getting my own parts.
10    John said I could get my parts. But when
11    I went to get the fork truck, I had no key for it.
12    And John said that -- I had come back after looking
13    for a key, and he come back and said that he was
14    told that since I didn't have my permanent license,
15    had not taken a driven test, a driving test on the
16    fork truck, that I could not do that. And Dustin
17    Hall got my parts for me.
18    Q. Did John mention who he had talked to?
19    A. I don't remember.
20    Q. What year approximately is this all
21    happening in?
22    A. I don't know.
23    Q. Do you have any estimate?
24    A. I would say '01, '02.

1    Q. What did you think of Winschief's report
2    that you were unable to get your own parts since
3    you hadn't taken the driving test?
4    A. Just that, that I couldn't drive the fork
5    truck because I didn't have my permanent license.
6    Q. Did you talk to him further about that?
7    A. I don't -- I don't remember.
8    Q. You mentioned that there were -- you saw
9    men taking -- or men on fork trucks who had taken
10    their written tests the same time you had. Who
11    were those men?
12    A. I don't remember their names. They
13    weren't from my department.
14    Q. Was it necessary for all five material
15    handlers to be able to drive a fork truck?
16    A. I would say the job descriptions called
17    for that.
18    Q. I understand that may be listed in the job
19    description. I'm asking you if -- was it necessary
20    during a shift for all five material handlers to
21    drive a fork truck?
22    A. I don't know.
23    Q. Do you have an opinion as to whether it
24    was, since you worked there?

1    A. I would say at times it was necessary for
2    all material handlers to have a license in case
3    Scott wasn't there or for some reason Scott was not
4    around to -- to get parts.
5    Q. Well, what about Maury? I think you said
6    he drove a fork truck, right?
7    A. Correct.
8    Q. Could Maury get it, get parts?
9    A. I would say yes, he could.
10    Q. Okay. Did Becky ever take her driving
11    test?
12    A. I don't know.
13    Q. How much time did Scott Stewart spend on a
14    fork truck on an average shift?
15    A. I would say most of the day, most of the
16    shift.
17    Q. How about Maury, how much time of the
18    shift did he spend on a fork truck?
19    A. I don't know. I only saw Maury on a fork
20    truck once.
21    Q. How about -- I guess -- so Scott Stewart
22    seems like the primary person on a fork truck
23    during second shift.
24    A. Correct.

1    Q. Anyone else on second shift in the door
2    plant who would drive a fork truck besides Scott
3    Stewart?
4    A. Not in my department.
5    Q. Is your department door plant, or did you
6    have a different department?
7    A. Door plant.
8    Q. Okay. Is the fact that -- well, let me go
9    back.
10    After the evening where John Winschief
11    told you that you were unable to get your own parts
12    because you didn't have a permanent license, did
13    you ever pursue after that getting your permanent
14    license?
15    A. On my permanent license, there was a date
16    when they expired. And I asked John, commented to
17    John that I needed to take a driving test before
18    that date expired.
19    Q. I'm sorry. I think you said on your
20    permanent license. Do you mean on your temporary
21    residence?
22    A. On my temporary license.
23    Q. What was his response?
24    A. He said he would see about having that

Page 30

1  taken care of before they expired.
2      Q. What happened?
3      A. They expired.
4      Q. Do you know who needed to give you the
5  driving test?
6      A. I would assume that it was the same person
7  who was giving the written test.
8      Q. So it would have been Steve?
9      A. Steve.
10     Q. Did Steve work in your department?
11     A. No, he did not.
12     Q. Do you know what department Steve worked
13  in?
14     A. Um, I'm -- I -- I'm thinking at the time
15  he -- he was supervisor in door storage.
16     Q. Did you have any further conversations
17  with Winschief before the license expired?
18     A. I don't remember.
19     Q. Did you ever go talk to Steve about it?
20     A. I don't remember.
21     Q. After the temporary license expired, did
22  you make any effort to become licensed for a fork
23  truck?
24     A. I don't remember.

Page 31

1      Q. Is the fact that you never became licensed
2  for a fork truck part of your allegation for
3  discrimination?
4      A. Would you repeat that, please?
5      Q. Sure. Is the fact that you never got your
6  permanent license part of your allegation for
7  discrimination? In other words --
8      A. I would --
9      Q. Go ahead.
10     A. I would say that -- I don't know how to
11  answer that.
12     Q. Do you believe that you didn't get your
13  second -- or, I'm sorry -- your driving test
14  because you're a woman?
15     A. Yes.
16     Q. Why?
17     A. Because the other men in the department
18  had -- the other material handlers had their
19  permanent license.
20     Q. How do you know that Art Decker had a
21  license?
22     A. I don't know that.
23     Q. How do you know that Maury Laurence had a
24  license?

Page 32

1      A. Maury Laurence said -- he told me he did.
2      Q. How about Scott Stewart?
3      A. Scott Stewart had a license.
4      Q. How did you know that?
5      A. Because I was on the safety committee and
6  they had to show safety committee members their
7  license when asked.
8      Q. So you believed that you did not get to
9  take the driving test because you're a woman
10  because two men had their license?
11     A. Because men had their license and were
12  able -- were allowed to drive the fork trucks, as
13  to where when asked if I could take the written
14  test in order to get my license, it just didn't
15  happen.
16     Q. Is there anything else that we haven't
17  talked about that you believe is an indication that
18  your gender played a role in the fact that you
19  didn't get the driving test?
20     A. Not -- I don't know how to answer that.
21     Q. Did Winschief ever tell you he's not going
22  to let you take the driving test?
23     A. No.
24     Q. Steve ever tell you that?

Page 33

1      A. No.
2      Q. Rich ever tell you that?
3      A. No.
4      Q. Anybody else in management ever tell you
5  that?
6      A. No.
7      Q. Did you ever talk to Becky Hardwick about
8  that?
9      A. About --
10     Q. The driving tests.
11     A. She was a material handler and so was I.
12  And Becky was suppose to take a written test the
13  same time I did. And she didn't.
14     Q. Do you know why?
15     A. No, I don't know why.
16     Q. Were you able to do your job as a material
17  handler without your license?
18     A. I was able to do the job of pulling parts,
19  as long as Scott Stewart brought my parts.
20     Q. Did you ever receive discipline for not
21  taking the driving test?
22     A. No, I did not.
23     Q. Did you ever receive discipline for not
24  being able to complete that portion of the material

1 handler job description?

2    A. No, I did -- was not.

3    Q. Did all the material handlers work

4 together as a team?

5    A. I don't know.

6    Q. Sometimes I'm aware that in certain

7 manufacturing settings, people are assigned to work

8 together as little cells or little groups or little

9 teams. Did you have a similar arrangement?

10    A. I think the whole door plant was expected

11 to work together as a team.

12    Q. How did you know what parts to pull?

13    A. I had a sheet, a worksheet.

14    Q. Where did you get that?

15    A. It was on my tub.

16    Q. When you arrived?

17    A. When my tub -- when I would pull a tub

18 from the Costa, it was loaded with panels and then

19 my worksheet was in that tub.

20    Q. And your worksheet would tell you what to

21 add to that tub?

22    A. Yes, what parts were needed.

23    Q. Did you have to work with anyone else in

24 order to pull the parts that were indicated on that

1 worksheet?

2    A. Sometimes.

3    Q. Tell me about that.

4    A. Sometimes if I didn't have the parts, I

5 would have to make a list of parts needed, and then

6 give it to Scott, and Scott would bring the parts.

7        Sometimes if there wasn't enough panels in

8 the cart, I would have to ask people working on the

9 Costa if there was a reason for a missing panel or

10 missing panels.

11        Sometimes if I didn't have precut parts, I

12 would have to ask -- and I'm not for sure what

13 Keith and Walt's job titles were, but they ran

14 saws, did work on saws, and I would have to place

15 orders with them on what parts I was needing cut.

16    Q. What's Keith's last name?

17    A. I don't remember.

18    Q. How about Walt?

19    A. I don't remember.

20    Q. Okay.

21    A. Saunders. Walt's last name was Saunders.

22    Q. Other than not driving a fork truck, are

23 there any other examples that go along with your

24 allegation that men who were helping you were put

1 on machines?

2    A. If someone didn't show up for work,

3 whoever was -- sometimes whoever was helping me

4 would be taken away from the parts, pulling parts,

5 and put on machines.

6    Q. You talking about another material handler

7 who would be assigned to that?

8    A. Well, I can remember Dustin being taken

9 away when he was pulling parts. Maury, Allen,

10 Keith would be over helping me and because he

11 needed to cut parts in his -- on what his job was,

12 he would be taken -- which that's what he was, a

13 machine operator, so I would have to go over and --

14 and cut parts when we needed.

15    Q. I'm a little confused. When I asked you

16 whether you worked with a group or a team, I

17 understood the response was no, that you took your

18 tub, figured out what you needed to pull based on

19 the sheet, and filled the tub.

20        Now you're telling me that if -- if there

21 was an absence somewhere in the department, then

22 the person who was helping you would be taken. So

23 are you working alone or are you working with other

24 people?

1    A. Well, I said my department was a team.

2    Q. Uh-huh.

3    A. Worked as a team. That's -- you asked

4 about my -- my actual work station. And I said

5 that the team was the department -- was the whole

6 department. I guess I misunderstood your saying

7 my -- just my area -- just my work area?

8    Q. Well, I'm trying to understand. It

9 sounded to me as if you were -- you're working

10 obviously in the door plant with twenty to thirty

11 other employees pulling your parts.

12    A. Uh-huh.

13    Q. But -- and I understood you were doing

14 that by yourself. But you've also said that the

15 person helping you would be taken away.

16    A. Uh-huh.

17    Q. Are you talking about just other -- other

18 door plant employees would get reassigned, or are

19 you talking specifically about someone working with

20 you to fill that tub?

21    A. To fill that tub, there would be different

22 people helping me to fill tubs, because when I

23 first started, there was three people filling tubs.

24    Q. So let's talk about that process.

Page 38

1    A. Okay.
2    Q. Do all three people work on the same tub,
3 or do they all have their own tubs to fill?
4    A. Own tubs.
5    Q. Who were the --
6    A. Sometimes if there was more than one tub,
7 everybody would work on the same tub.
8    Q. Who were the other people that would help
9 with the tubs?
10    A. The other people who would help with the
11 tubs was -- that would depend on who was working in
12 my work area that night.
13    Q. Understood. Who could that be?
14    A. That would be Dustin Hall, Allen Brickey,
15 Maury. Wes Wicker worked with me for awhile. When
16 we were shorthanded, John would have builders come
17 over, assemblers come over.
18    Q. We've talked about what Dustin and Allen
19 and Maury did in the department. What did Wes
20 generally do in the department?
21    A. Wes started out as a -- gluing doors,
22 which would be assembler or builder's department or
23 work station, I guess I want to say.
24    Q. Okay.

Page 39

1    A. And then Wes was put over pulling parts.
2    Q. On a regular basis or as a fill-in?
3    A. I -- I don't know. He was -- he -- he
4 worked with me for awhile, and I don't know if he
5 was -- if that was just -- if he was put there as a
6 new job title for him. I don't know.
7    Q. So what machines would Dustin Hall be
8 taken to work on?
9    A. Well, Costa, different saws.
10    Q. How often would that happen?
11    A. Whenever we were short.
12    Q. So if you were short, somebody on the
13 Costa sander, he might go in and fill in on the
14 Costa sander?
15    A. Correct.
16    Q. Same for the saws?
17    A. Correct.
18    Q. Can you quantify that for me how regular
19 of an occurrence that was?
20    A. I don't know.
21    Q. Is Dustin's regular job as a parts puller?
22    A. I don't -- I don't think it was. I don't
23 know.
24    Q. Tell me what machines Allen Brickey would

Page 40

1 be assigned to work on.
2    A. It depended on how shorthanded we were and
3 he would be pulled over to help on the Costa, to
4 help on sanding and saws.
5    Q. Is there a -- we're talking about hand
6 sanding or some machine that does sanding?
7    A. There was some hand sanders, but there was
8 also a machine that would sand, and that's the
9 Costa.
10    Q. So when you say he was pulled to help on
11 sanding, we're talking about him working on the
12 Costa machine?
13    A. Correct.
14    Q. How about Maury? What would he be pulled
15 to work on?
16    A. Same things.
17    Q. How about Wes Wicker?
18    A. Wes, no; he didn't get pulled over to do
19 any machine work.
20    Q. Any others who would help you who did not
21 get pulled over to do machine work?
22    A. Just Wes. And that's all I can think of
23 right now.
24    Q. Okay. What kind of training is required

Page 41

1 to be on the Costa sander?
2    A. I don't know.
3    Q. Did you ever ask?
4    A. No, I did not.
5    Q. Why not?
6    A. I don't know.
7    Q. What kind of training is required to run
8 saws?
9    A. The only thing I know about the training
10 was from safety committee, and -- and when I think
11 of running machines, I think of it as a -- the
12 safety side. You know, you have to be trained, you
13 have to have your shirts tucked in and your
14 glasses -- safety glasses on. But I don't know
15 what -- what the requirements were for running the
16 machines because I never ran the machines.
17    Q. Okay. And when you're talking about your
18 shirt tucked in and your glasses on, you're talking
19 about the entanglement policy and personal
20 protective equipment?
21    A. Anything that we were told in safety and
22 safety meetings.
23    Q. But in terms of actually running the saw,
24 do you know what kind of training was required?

1  A. No, I do not.
2  Q. Did you ever ask?
3  A. I don't remember asking.
4  Q. Did you want to be on the Costa sander?
5  A. I would have like to have been cross-
6  trained.
7  Q. Did you want to work the Costa sander?
8  A. I would have like to had the opportunity
9  to do so.
10  Q. Did you ever ask?
11  A. I don't know that I -- I -- I don't know.
12  I don't remember.
13  Q. Did you want to run saws?
14  A. I would have like to had the opportunity
15  to do that.
16  Q. Did you ever ask anyone?
17  A. Machines, yeah, I'd ask about running
18  machines.
19  Q. Did you ever ask specifically for an
20  opportunity to be on the saws?
21  A. I don't know that I did.
22  Q. When you say you asked to be on machines,
23  what -- what machines are we talking about?
24  A. There were -- we were having new machines

1  brought in.
2  Q. Before we move on to that, let me ask you
3  this. The -- what time period are we talking about
4  when Dustin or Allen or Maury might be moved to
5  work on a Costa sander or a saw?
6  A. Would you -- what time periods were they
7  on those?
8  Q. What time period are we talking about?
9  You've given me examples that if the team was
10  shorthanded that they may be moved to run the Costa
11  machine, for example. What time period are we
12  talking about?
13  A. I don't know. I would say from the time
14  that I started -- I don't know. Off and on while I
15  was there.
16  Q. Is it part of the job description of a
17  material handler to run the Costa machine?
18  A. It wasn't on my job description.
19  Q. Do you think it was on some other material
20  handler's job description?
21  A. I don't know.
22  Q. Was running saws part of the job
23  description for material handler?
24  A. Not on my job description.

1  Q. Was it on some other material handler's
2  job description?
3  A. I don't know.
4  Q. What new machines are we talking about and
5  when did these arrive?
6  A. I don't know the name of the machines.
7  Q. What was their function?
8  A. I don't know.
9  Q. Well, if you didn't know what it was
10  called and you didn't know what it did, why did you
11  want to work it?
12  A. I don't know what the name of the new
13  machines are. Their functions had to do with
14  cutting parts, and I'm -- I -- I don't remember at
15  this time what -- what the machine's exact
16  functions were. We were getting new machines in.
17  Old machines were being taken out. And we were
18  adding new machines, also.
19  Q. Who did you ask about the new machines?
20  A. I had asked John Winschief.
21  Q. What time period are we talking about?
22  When did this happen?
23  A. Right before and right after the new
24  machines came in, sometime in that time period.

1  Q. I understand that. I mean in terms of
2  years or dates.
3  A. I don't remember.
4  Q. You worked there for what, almost three
5  years; 2001, 2002, 2003. Can you tell me what year
6  this occurred?
7  A. What one year that occurred?
8  Q. Yeah. What year the new machines came in.
9  A. I don't know.
10  Q. Well, let me -- let me phrase it this way
11  for you. You were off on leave for a period in
12  January of 2003, then for most of February 2003,
13  and then continuously after April of 2003. Do you
14  believe that the new machines arrived in 2003?
15  A. I would say they arrived before I went out
16  on sick leave.
17  Q. You were also off from -- well, for a
18  two-week period of time, it looks like, in mid to
19  late December of 2002. Do you think they came
20  before or after that?
21  A. I don't remember.
22  Q. What exactly did you ask Winschief about
23  these machines?
24  A. I asked if everyone was going to be --

Page 46

1  with the new machines, if everyone, including
2  women, was going to be allowed to be trained on the
3  new machines.
4      Q. Where did you have this conversation?
5      A. In the door plant.
6      Q. Where specifically in the door plant?
7      A. I don't remember.
8      Q. Who else was present for this
9  conversation?
10     A. Sheryl Doss.
11     Q. Anyone else?
12     A. Not that I recall.
13     Q. What was his response?
14     A. John's response was -- and I don't
15  remember the exact words -- but it was the machines
16  were expensive machines and that I might break a
17  fingernail and something to the effect that it
18  would be too expensive to replace parts to have
19  women trained on them.
20     Q. Did you think he was serious when he said
21  that?
22     A. Yes, I did.
23     Q. Did Doss hear him say that?
24     A. Yes, she did.

Page 47

1      Q. Did anyone else hear him say that?
2      A. I don't know if anyone else heard.
3      Q. What was your response?
4      A. I don't remember if I responded.
5      Q. Were you offended?
6      A. I was offended.
7      Q. Did you tell him you were offended?
8      A. I don't remember. I don't think I did,
9  though.
10     Q. Did you ever bid on a machine operator
11  position?
12     A. No, I don't believe I did.
13     Q. Did you ever try and bid on any job
14  outside your material handler job?
15     A. No, I don't think I did.
16     Q. Why not?
17     A. Well, I would say seems like to me I -- I
18  had a written write-up, so if I was trying -- if I
19  was trying -- maybe I bid on something. I don't
20  remember. But if you have a write-up, you can't
21  bid.
22     Q. What was your write-up for?
23     A. I'm going to say it was attendance.
24     Q. How many write-ups did you have, roughly,

Page 48

1  when you were there?
2      A. A write-up, I would say there was a -- a
3  verbal write-up, or maybe a discussion, and then a
4  verbal write-up and then a write-up. I'm going to
5  say that I had one write-up, possibly two.
6      Q. How long would this write-up affect your
7  ability to bid?
8      A. For one year, I believe.
9      Q. What was the absenteeism policy at the
10  plant?
11     A. I don't remember.
12     Q. How was your time clocked at the plant?
13     A. Clocked in and out on a time clock, or
14  sheet.
15     Q. Sorry?
16     A. A time sheet, time clock.
17     Q. You put that in the clock and it would
18  punch it?
19     A. You would punch in and out.
20     Q. Did you have any disagreements for your
21  write-up for attendance?
22     A. I did.
23     Q. Why?
24     A. Because I was -- when I got my verbal and

Page 49

1  my written, what effected, that was hours. And I
2  don't remember exactly how, but it was determined
3  in the amount of hours.
4      Q. In terms of hours missed, you mean?
5      A. Correct.
6      Q. Okay.
7      A. There was four hours or something like
8  that that was on this write-up, and those four
9  hours was when I had left and gone home because --
10  from being upset over an incident with Dustin Hall.
11     Q. Who gave you this write-up?
12     A. John Winschief.
13     Q. When was it?
14     A. I don't know. I don't know the date.
15     Q. From reviewing your personnel file, I
16  understand that you had a written warning on
17  July 17, 2002 for being absent 22.5 hours, and a
18  verbal warning on February 12, 2002 for having been
19  absent 36.8 hours. Might those be the ones you're
20  talking about?
21     A. I don't believe so.
22     Q. You believe there were other warnings that
23  you received?
24     A. I -- I don't know about the date. What

Page 50

1 was the dates again?

2    Q. The verbal was February of 2002, and the
3 written was July of 2002.

4    A. Um, I don't know about the dates. If they
5 were in my personnel file, um, I don't know.

6        MS. CREVELING: Would you mark this,
7 please.

8        (At this point in the proceedings an
9        off-the-record discussion was held, after
10       which the following proceedings were
11       conducted:)

12       (Whereupon Defendant's Deposition Exhibit
13       No. MB0100 was marked for identification
14       by the court reporter.)

15    Q. (BY MR. CREVELING: I'll have you take a
16 look at the verbal from 7-12-02. It's our Bates
17 number MB0100. Do you remember receiving that?

18    A. Yes, I remember this now.

19    Q. Okay. And that shows that you had
20 exceeded the allowable absenteeism rate of two
21 percent, right?

22    A. Correct.

23    Q. And did you agree or disagree with that
24 warning?

Page 51

1    A. I don't remember.

2    Q. You signed that, correct?

3    A. I signed that, correct.

4    Q. And you made no remarks in the associate
5 remark section?

6    A. No. But I believe I wrote out a separate
7 sheet and turned it in.

8    Q. I'll have you take a look at the written,
9 which is Bates stamped 99.

10       (Whereupon Defendant's Deposition Exhibit
11       No. MB0099 was marked for identification
12       by the court reporter.)

13    Q. (BY MS. CREVELING) Do you remember that
14 written?

15    A. I remember of a verbal and I remember
16 signing this.

17    Q. So that's your signature there on the
18 bottom of the -- of the written warning?

19    A. Yes, it is.

20    Q. Okay.

21    A. Of the verbal. This is a verbal, isn't
22 it? Written warning, okay. And the first one was
23 a verbal.

24    Q. You have signed both, right?

Page 52

1    A. Right.

2    Q. Is either of those the one where you
3 believe you had a disagreement over the write-up?

4    A. I believe it was the verbal.

5        (Whereupon Defendant's Deposition Exhibit
6        No. MB0103 was marked for identification
7        by the court reporter.)

8    Q. (BY MS. CREVELING) I'm going to hand you
9 Exhibit 103, which is a time keeper report that
10 runs from July 19, 2001 through July 12, 2002. It
11 would appear to be related to that verbal and
12 written.

13    A. Okay.

14    Q. And that I believe refers to Cindy
15 Hindman, that would be you, right?

16    A. Right.

17    Q. And that appears to be a report of your
18 time --

19    A. Okay.

20    Q. -- over that year, roughly, long time
21 period. Can you identify for me which hours on
22 that list you're disputing, if they fall within
23 that time period.

24    A. The July 19th, '01, 4.8.

Page 53

1    Q. That's when you believe you had the
2 argument with Mr. Hall?

3    A. I believe that is when I had missed time
4 due to the being upset with Dustin Hall.

5    Q. What happened with Mr. Hall?

6    A. I was working, pulling parts, putting in
7 tubs, and Dustin had come over to the work area to
8 return parts that had been on a previous tub. And
9 I asked him what the problem was with those parts,
10 and he informed me that, in not so nice words, that
11 I was putting wrong parts on tubs and that I knew I
12 was doing it. And he was very loud and -- and
13 upsetting.

14    Q. What did you say to him?

15    A. I told him that I didn't -- hadn't
16 realized I had put wrong parts on the tub, that I
17 was sorry. I didn't know it.

18    Q. Then what happened?

19    A. Then shortly after that, I went over to
20 talk to John Winschief.

21    Q. Why?

22    A. Because I was upset.

23    Q. Why were you upset by that argument?

24    A. I was upset because Dustin was yelling at

1 me and accusing me of doing that on purpose. And
2 he wasn't using very nice language.
3    Q. What specifically did he say?
4    A. He said that -- when I asked him what was
5 wrong, he said that -- and I don't remember the
6 exact words -- but it was -- I was doing it on
7 fucking purpose. I knew I was fucking doing it
8 wrong. And something about five fucking tubs were
9 wrong. So after Dustin went back to his work area,
10 I went over to -- I was upset crying and I went to
11 talk to John Winschief.
12    Q. Were the tubs in fact wrong?
13    A. I don't know.
14    Q. Did you ever check?
15    A. I -- found -- they -- they weren't wrong
16 when they left my department, that I knew of. And
17 later, two people in the department had mentioned
18 it wasn't -- and Dustin had brought those parts
19 back that he came over with -- he brought the
20 original ones on the tubs, he brought them over,
21 put them in the location, and then he picked up
22 different sizes and took them back to his work
23 area.
24        Then he was back over -- shortly after

1 that, back over taking the original parts I had put
2 on the tub. And later, some of the people that
3 were building the doors said it wasn't that my
4 parts were wrong, it was that the panels were
5 actually wrong.
6    Q. Who told you this?
7    A. Sue -- and I don't remember her last name.
8    Q. Gonzales?
9    A. Yeah, Sue Gonzales. And I can't think of
10 the other girl's name. I don't know.
11    Q. So do I understand then that you believe
12 that the tub -- any error in the tub was due to
13 either the panels being wrong or because Dustin had
14 changed things in them?
15    A. It was due to the fact that the panels
16 were not the right size.
17    Q. Whose fault was that?
18    A. Whose fault was that?
19    Q. Uh-huh.
20    A. Whoever pulled the panels.
21    Q. Was that Dustin?
22    A. No. Dustin wouldn't have pulled the
23 panels. He was building the doors.
24    Q. When you went to tell Winschief about the

1 problem, what did he say?
2    A. I was crying. And he said, let's go
3 outside on the picnic table so you can get some
4 fresh air. And so we did.
5    Q. What did John say?
6    A. I told him what had happened. And John
7 said that he was not going to put up with people in
8 our department being disrespectful, using that kind
9 of language, and, um -- I don't -- I don't remember
10 what all he said.
11    Q. Did he indicate whether or not he would
12 discipline Mr. Hall?
13    A. Yes, I believe that he did say that he was
14 going to talk to -- to Dustin about it.
15    Q. Do you know if he in fact did that?
16    A. I don't know.
17    Q. Did he say anything else?
18    A. I don't recall. I was upset and crying
19 and I -- and I remember I -- I went home.
20    Q. Who did you talk to about whether or not
21 you were able to leave?
22    A. John Winschief.
23    Q. What did you specifically ask him?
24    A. I told him that I was feeling kind of sick

1 to my stomach and could I go -- I go home? I was
2 too upset to work. John said he didn't see a
3 problem with it and that it would be okay to go
4 home.
5    Q. Did you understand that those would be
6 excused absences?
7    A. I remember I asked John if that would
8 affect my attendance, and he said, no, it would
9 not, that it was okay for me to go ahead and go
10 home.
11    Q. When did you realize that you had in fact
12 gotten points or that those hours counted against
13 you for absenteeism?
14    A. I don't remember the date. I -- I don't
15 know.
16    Q. Well, was it by the time you had your
17 verbal warning?
18    A. Um, and I -- I think maybe that's what it
19 was, was a verbal warning. I would have -- I would
20 have found out about it then, if it would have
21 affected my absenteeism.
22    Q. So what did you do about it?
23    A. I remember I talked to John about it, and
24 seems like to me he went to talk to Rhonda Gatons

Page 58

1  or Gatens about -- about those four hours.
2  Q. And what happened?
3  A. Nothing that I know -- that I can
4  remember.
5  Q. So you raised it with John in the verbal
6  warning meeting?
7  A. Um, yeah.
8  Q. And John went to talk to Rhonda?
9  A. Yes.
10  Q. What was Rhonda's position?  Where did she
11  work?
12  A. She was in the front office, and I believe
13  her title was -- and I'm not for sure -- but I
14  think it was Human Resource.
15  Q. What did Rhonda have to say?
16  A. I don't -- I don't remember.  I don't
17  remember.
18  Q. Well, when you raised it with John in the
19  meeting about your verbal warning and he told you
20  he would go talk to Rhonda, did he ever follow up
21  with you?
22  A. I don't -- I don't remember.
23  Q. Did you ever follow up with him?
24  A. I don't remember.

Page 59

1  Q. Did you ever talk to Rhonda?
2  A. Yes, I did talk to Rhonda.
3  Q. When did you talk to Rhonda?
4  A. I don't remember when I talked to Rhonda,
5  the date.  But I believe I talked to Rhonda, and
6  Sheryl Doss went with me and I talked to Rhonda
7  about -- about the four hours I missed when Dustin
8  upset me.
9  Q. What was Rhonda's response?
10  A. She was going to -- she was going to check
11  into it.
12  Q. Why did you take Sheryl Doss with you?
13  A. I don't remember.
14  Q. Is there some reason why you felt that you
15  just couldn't talk to Rhonda on your own about this
16  issue?
17  A. I don't know.
18  Q. Would Sheryl know?
19  A. I don't know.
20  Q. You don't know why you took Sheryl with
21  you to talk to Human Resources about your points?
22  A. I don't remember why.
23  Q. Okay.  Who witnessed the argument with
24  Dustin?

Page 60

1  A. I don't know.  I don't know who -- who
2  would have witnessed it.  I was -- I guess I was
3  too upset to notice if anybody -- I don't know.
4  Q. So what happened after you met with Rhonda
5  and she said she would check into it?  What did you
6  think that meant?
7  A. That she would check into it.
8  Q. What happened after that?
9  A. I can't remember what became of that
10  meeting.
11  Q. Did Rhonda ever follow up with you?
12  A. I don't remember.
13  Q. Did you ever follow up with Rhonda?
14  A. Not that I remember.
15  Q. Why not?
16  A. Why not what?
17  Q. Why didn't you follow up with Rhonda?
18  A. I don't know.  I don't know if I did or
19  not.
20  Q. I'm sorry.  I thought you said you didn't
21  follow up with Rhonda.
22  A. I don't know if I did or not.  I don't
23  remember.
24  Q. Whatever happened to those points, or that

Page 61

1  4.8 hours on your record?
2  A. I don't understand the question.
3  Q. Were they ever taken off?
4  A. Apparently not, because after the verbal,
5  I -- I got a write-up.
6  Q. So tell me about when you got the write-up
7  in July of 2002.  We're now a year out, roughly,
8  from this argument with Dustin, right?
9  A. Um, correct, about a year.
10  Q. Did you meet with Winschief when you got
11  the written warning?
12  A. I would have had to meet with John because
13  he's the one who give me the written warning.
14  Q. Was Dave Pantier there for those meetings,
15  as well, for the verbal and the written?
16  A. Not that I recall.
17  Q. Was anyone else present for those
18  meetings?
19  A. Not that I recall.
20  Q. Did you raise those 4.8 hours in your
21  meeting about the written warning?
22  A. I don't remember.
23  Q. What jobs did you want to bid on but
24  believed you could not because of these warnings?

Page 58 - Page 61

1    A. I don't know that I did. I said maybe I
2  had bid on a job. I couldn't remember if I had or
3  not.
4    Q. Was there some job that you particularly
5  wanted other than material handler?
6    A. Not that I recall.
7    THE WITNESS: Would it be okay if we took
8  a break?
9    MS. CREVELING: Sure. That would be fine.
10   (11:50-11:54 At this point in the
11   proceedings a short recess was taken,
12   after which the following proceedings were
13   conducted:)
14   Q. (BY MS. CREVELING) Do you believe that
15 you were -- or rather, do you believe that those
16 4.8 hours counted against your attendance record
17 because you're a woman?
18   A. No, I -- I don't think that did.
19   Q. We've talked about reassignment of Hall,
20 Brickey and Laurence as examples of men who got to
21 work on machines. We've talked about the fork
22 truck. Is there anything else that relates to your
23 first allegation that women were not allowed to do
24 machine work?

1    A. Would you repeat that over again, more --
2  what we covered?
3    Q. Sure. When we -- when we started talking,
4  you made a list for me of the allegations. We're
5  on the first one. I wrote down your description
6  was women not allowed to do machine work. And
7  within that first allegation, you've given me
8  examples about Dustin Hall, Allen Brickey and Maury
9  Laurence being assigned to help out on machines.
10 And we've talked about the fork truck and your
11 permanent license.
12      Are there any other examples or instances
13 that fall within this allegation that women were
14 not allowed to do machine work?
15   A. Not that I can remember at this time.
16   Q. Oh, I'm sorry. The other thing we talked
17 about is the new machines and Winschief indicating
18 that you might break a nail.
19   A. Yeah, not at this time, I can't think
20 of -- of anything else.
21   Q. Did you ever have any follow-up discussion
22 with Winschief about getting training on the new
23 machines, other than that break a nail
24 conversation?

1    A. Not that I remember.
2    Q. Did you ever complain to anyone about
3  John's comments that you might break a nail?
4    A. Um, yes, I did.
5    Q. Before we get started on that, let me ask
6  you just a side question. Were there women in the
7  door plant who operated machines?
8    A. Um, when I first started there, on my
9  shift, second shift, my department, there was not.
10   Q. How about after that?
11   A. And then after -- after the new machines
12 were going to be coming in, they downsized. And
13 when they downsized, I believe that there was one
14 woman who was Mary Hackman, yeah, Mary Hackman, she
15 went over to a machine called Time-Saver or Time-
16 Sander, Time-Saver.
17   Q. Okay.
18   A. And later on when -- when the new
19 machines -- old machines was moved out and new
20 machines were starting to be moved in -- I can't
21 think of her name right now, but she -- she was on
22 a saw.
23   Q. And that was after the new machines came
24 in?

1    A. From the switch, taking the old machines
2  out, bringing the new machines in, and I don't know
3  if the old ones were completely taken out or the
4  new ones was completely brought in yet, but she
5  was -- I remember her cutting parts on a machine.
6    Q. Okay. Any other women in door plant on
7  machines?
8    A. I don't remember.
9    Q. How many machine operators, roughly -- or
10 I'm sorry. How many people were needed to run the
11 machines that were in the door plant, roughly, on
12 second shift?
13   A. I don't know.
14   Q. Can you give me an estimate?
15   A. No.
16   Q. Do you believe that the low number of
17 women in -- or, I'm sorry, or working on machines
18 was a gender related thing?
19   A. Yes.
20   Q. Why?
21   A. Well, before I -- before I complained
22 about the fingernail incident, women didn't run on
23 the machines.
24   Q. Okay.

Page 66

1    A. I'm going to say -- and -- and that may
2    be -- that may be an incorrect answer, because Mary
3    may have been over there because things was moving
4    fast with -- with downsizing and the department
5    changing.
6    Q. Can you give me the names of any women who
7    bid on any machine operator position who did not
8    receive the bid?
9    A. No, I cannot.
10    Q. Okay. Do you believe that John Winschief,
11    for example, could appoint people into different
12    positions and avoid the bid system?
13    A. I don't know.
14    Q. Tell me why it is that you think women
15    weren't allowed to -- why you think that the fact
16    that there weren't as many women in machine
17    operator positions was a gender related decision by
18    the company.
19    A. Well, my opinion is that the males in my
20    department were cross-trained and were given the
21    chance to be cross-trained, and the women were not.
22    Q. And you don't believe that women operated
23    machines until you complained about the fingernail
24    incident?

Page 67

1    A. I don't know.
2    Q. I'm asking you about what your allegation
3    is, what your belief is. Were women operating
4    machines or not before you complained?
5    A. In my department?
6    Q. Yes.
7    A. I don't know.
8    Q. Tell me again why it is that you think
9    that women weren't running machines based on their
10    gender.
11    A. Well, like I said, my opinion is that John
12    did not cross-train women when he cross-trained
13    men.
14    Q. Tell me what men were cross-trained and
15    when.
16    A. Well, from the time I was there, for
17    instance, my work station, rather than John taking
18    me over to help out on a Costa, to help out on a
19    saw, to help out on machines, John would always
20    pick the men. And the men were being cross-trained
21    at that time how to do the -- the jobs on the
22    machines.
23    Q. What do you mean when you say cross-
24    training?

Page 68

1    A. I mean they were being experienced --
2    getting the experience of how to run machinery.
3    Q. What men specifically?
4    A. Maury, Dustin, Allen. Those were all then
5    who was doing the same job as me, and John would
6    come over and take the men every time to help out
7    on machines.
8    Q. Did you ever volunteer?
9    A. I don't remember.
10    Q. When you say cross-training, do you simply
11    mean putting somebody on a new machine and letting
12    them learn by experience, or do you mean something
13    more formal like --
14    A. What I mean is the men were taken over on
15    pieces of equipment and were -- got the experience
16    and the training to run those pieces of equipment.
17    Q. Okay. On-the-job experience?
18    A. (No response.)
19    Q. I'm trying to distinguish between a
20    separate training session where somebody comes in
21    and says, let me show you how to operate this
22    machine from go over there and figure it out and
23    talk to so and so if you have any questions.
24    A. Well, I would say it was on-the-job

Page 69

1    training.
2    Q. So Maury, Dustin and Allen got on-the-job
3    training, and I think we already talked about this,
4    where they worked on the Costa sander and they
5    worked on the saws.
6    A. Correct.
7    Q. Was there ever an occasion where you can
8    recall a woman working on the Costa sander?
9    A. Yes.
10    Q. Who?
11    A. Sophie Gomez was the operator on the
12    Costa.
13    Q. How did she get to run the Costa if she's
14    a woman?
15    A. She bid on the job and she got it.
16    Q. Who else, other women who were running the
17    machines?
18    A. I don't know of any.
19    Q. Did you ever see any other women besides
20    Sophie on the Costa sander?
21    A. There was no one -- no other women do I
22    remember running the Costa.
23    Q. Let's talk about the saws. Ever see any
24    women operating the saws?

**Page 70**

1  A. Later on after the changes started taking
2  effect in our department.
3  Q. What women did you see operating the saws?
4  A. I can't remember her name.
5  Q. When you say after the changes in the
6  department, are you talking about after the new
7  machines came in?
8  A. Before and -- before the machines -- new
9  machines got there and the changes started
10 happening with -- with awaiting the new machines,
11 moving of the new machines -- or moving the old
12 machines and --
13 Q. Anybody other than this one woman whose
14 name you can't remember on saws?
15 A. Yes. Mary Hackman, she would help out --
16 I remember seeing Mary Hackman helping out with --
17 there was a -- there was doors that had to be cut
18 down to size, a complete door that would have to be
19 cut down to size, and it took two people to hold a
20 door up to a saw for it to be cut.
21 Q. Any other women on saws?
22 A. None that I can remember.
23 Q. Becky ever run a saw?
24 A. I believe Becky did later on.

**Page 72**

1  have that job and to run a saw. And she was -- she
2  was actually -- and I don't know if she bid on it
3  or not. All I know is that Brenda was running that
4  saw.
5  Q. And you don't know how that -- whether
6  that position was obtained through the bid process?
7  A. It -- it was -- I don't know. I don't --
8  I don't know. I don't remember.
9  Q. Would you have expected a job like that to
10 have been obtained through the bid system?
11 A. I would expect -- I don't -- I don't know.
12 Q. How did Mary Hackman come to be helping on
13 the saws?
14 A. I don't know.
15 Q. How did Becky Hardwick come to be helping
16 on the saws?
17 A. I don't know.
18 Q. Any other women running machines in your
19 department on second shift?
20 A. In my department?
21 Q. In the door plant on second shift.
22 A. Not that I can remember right now.
23 Q. Were departments other than door plant
24 operating on second shift?

**Page 71**

1  Q. Okay.
2  A. Yeah, I think she did. And I -- it may
3  have just been she was helping downsize a door. I
4  don't remember if she was actually running the saw
5  or helping with the saw.
6  Q. Would it have been Winschief's decision to
7  allow this woman, whose name you can't remember, to
8  help out on the saw?
9  A. Actually, it wasn't his decision. When
10 that machine came in -- before that machine came
11 in, her name was Brenda. And before that machine
12 came in, John Winschief had already made up his
13 mind and had already asked Rich -- and I can't
14 remember Rich's last name -- but John had actually
15 asked Rich that when that machine came in, would he
16 be interested in being the operator. And Brenda
17 had heard -- and I was there, also, Brenda and I
18 heard John ask Rich that question.
19     And then Brenda was upset -- Brenda was
20 disturbed about it. And I can't remember if it was
21 that time, at that exact time that she questioned
22 John about it or if it was just later if I had just
23 heard it from someone else, that Brenda had
24 complained about it, and that she would like to

**Page 73**

1  A. Yes.
2  Q. Okay. Did those departments also have
3  machines?
4  A. Yes.
5  Q. Is it your allegation that women in those
6  departments were not allowed to run machines?
7  A. I don't know if they were.
8  Q. So it's not part of your allegations?
9  A. I don't know if the women ran machines in
10 the other departments.
11 Q. Do you think they did?
12 A. I don't know.
13 Q. Okay. So when you said that you
14 complained about the comment from John Winschief
15 about breaking a nail, who did you complain to and
16 when?
17 A. I went to Matt Ohrt.
18 Q. The gentleman who is sitting next to me
19 here?
20 A. Yes.
21 Q. Tell me about that.
22 A. I don't remember the exact conversation,
23 but I remember we were sitting in a break room and
24 I brought it to his attention, John's comment. And