Page 74
Page 76
Page 75
Page 77
Page 1 of 20
2:04-cv-02215-MPM-DGB #33-3
E-FILED
Wednesday, 01 March, 2006 08:15:25 AM
Clerk, U.S. District Court, ILCD

**Page 74**

1  Matt said that he would do an investigation.
2  Q. Was anybody else present for that
3  conversation?
4  A. No.
5  Q. What happened next?
6  A. I went back to work.
7  Q. Did you ever have follow-up from Matt?
8  A. Yes, there was a follow-up from Matt.
9  Q. Do you believe that he conducted an
10 investigation?
11 A. I don't know if he did.
12 Q. Okay. Tell me what the follow-up was from
13 Matt.
14 A. The follow-up was, the best I can
15 remember, I was -- I went to Matt's office and --
16 along with me John Winschief, Dave Pantier and
17 Sheryl Doss was in that meeting.
18 Q. So let me make sure I have everybody.
19 John Winschief, Dave Pantier, Sheryl Doss, Matt and
20 you?
21 A. Correct.
22 Q. Why was Sheryl Doss there?
23 A. Because I asked for Sheryl Doss to be in
24 there.

**Page 75**

1  Q. Why?
2  A. Because I wanted a witness as to what was
3  going to take place.
4  Q. Why?
5  A. Because I felt like I needed one.
6  Q. Why?
7  A. Just I felt that I needed someone in
8  there.
9  Q. Did you not trust Matt?
10 A. No, I did not trust -- I don't know at
11 that time that I didn't trust Matt. Later I didn't
12 trust Matt. I didn't know Matt.
13 Q. So what was -- what was happening that
14 made you feel like you had to have a witness with
15 you in the meeting?
16 A. I don't know. I don't remember.
17 Q. Why Sheryl Doss?
18 A. Why Sheryl Doss?
19 Q. Uh-huh.
20 A. Sheryl Doss is a friend.
21 Q. Not a material handler, right?
22 A. No, she's not a material handler.
23 Q. And wasn't at that time?
24 A. I believe the only job that I've known

**Page 76**

1  that Sheryl had from the time I started was
2  auditor.
3  Q. Did you record the conversation?
4  A. Did I record it?
5  Q. Yes.
6  A. No.
7  Q. Did you make any attempt to record the
8  conversation?
9  A. No.
10 Q. Tell me, where did this conversation
11 occur?
12 A. As I said, it occurred in Matt Ohrt's
13 office.
14 Q. What time of day was this?
15 A. Sometime between the beginning of my shift
16 and -- I don't know -- the end of my shift, I
17 guess.
18 Q. What was said in the meeting?
19 A. Matt said that he did an investigation,
20 found that my allegations were not true, or found
21 no truth in it. Said he had talked to several
22 women in the department. Accused me of preferring
23 married men. Accused me of leaving notes on John
24 Winschief's windshield. And that's all I can

**Page 77**

1  remember right now.
2  Q. What did you understand his investigation
3  to consist of?
4  A. I thought it would consist of --
5  Q. No, not what did you expect. What did you
6  understand it in fact consisted of?
7  A. Just what he said. He did an
8  investigation and --
9  Q. What did you think that meant?
10 A. That he was going to do an investigation
11 as to if John Winschief was actually making
12 comments.
13 Q. Did you talk to any of the women out in
14 door plant to find out if Matt Ohrt had talked to
15 them?
16 A. I probably did.
17 Q. Who did you talk to?
18 A. I don't remember.
19 Q. Tell me who Karen Sinclair is.
20 A. Karen St. Claire?
21 Q. Sinclair.
22 A. It's Karen St. Claire.
23 Q. I think it's S-i-n-c-l-a-i-r.
24 A. St. Claire.

Page 78

1   Q. Are these two different people or
2 something that we're talking about?
3   A. No.
4   Q. Okay. Go ahead.
5   A. I'm talking about Karen St. Claire.
6   Q. Who is she?
7   A. She worked in my department and she worked
8 making the doors that didn't have panels in it.
9 And I don't remember what the name of that -- that
10 door is called.
11   Q. What did you talk to Karen about with
12 respect to this investigation?
13   A. I don't remember.
14   Q. What was your impression coming away from
15 your discussion with Karen about whether she had
16 concerns about John Winschief or not?
17   A. I don't remember my conversation with
18 Karen.
19   Q. Did you ever ask Karen to join you in any
20 type of complaint?
21   A. I don't remember that.
22   Q. Would you be surprised that Karen
23 indicated that she had never seen any behavior or
24 heard any comments from John Winschief that could

Page 79

1 be viewed as discrimination or unfair treatment
2 toward women?
3   A. Would I be surprised if what?
4   Q. If she reported in the investigation that
5 she's never heard any comments or seen any conduct
6 by John Winschief that indicated he discriminated
7 against women?
8   A. I don't know.
9   Q. Was Karen one of your friends?
10   A. Karen -- yeah, Karen was a friend.
11   Q. Tell me about Dorothy Jolly. Who is she?
12   A. Dorothy Jolly was a woman who worked in
13 the door plant and she worked alongside Karen.
14   Q. Did you talk to Dorothy about the
15 investigation?
16   A. Not that I remember.
17   Q. Did you ever talk to Dorothy about whether
18 she had any opinion about whether John Winschief
19 discriminated against women?
20   A. I don't remember.
21   Q. Who is Carol Bogin?
22   A. Carol Bogin worked in the door plant, and
23 she -- I'm not for sure what her job title was, but
24 she sanded and filled in doors, holes in doors, and

Page 80

1 she used a hand sander and would smooth them out.
2 Maybe it was inspect the doors.
3   Q. Did you talk to her about your complaints
4 about John Winschief?
5   A. Not that I remember.
6   Q. Did you talk to her about the
7 investigation?
8   A. I don't remember.
9   Q. Mary Hackman we've talked a little bit
10 about. I think you told me that Mary was someone
11 who ran machines on occasion?
12   A. And -- right.
13   Q. Did you ever accuse Mary Hackman of
14 hitting you?
15   A. Mary Hackman hit me, yes. I would say she
16 slapped me.
17   Q. When?
18   A. All I remember about that that pops in my
19 mind is the fact that I had a sunburn and it was
20 very obvious and she came up and slapped me on the
21 shoulder. And I remember it hurting.
22   Q. Now, when you use a word like slap, it
23 gives the impression it's like some kind of
24 physical assault that someone slaps you. Is that

Page 81

1 what happened?
2   A. Slap, hit. That's what she did. She come
3 up and slapped me on my sunburn.
4   Q. Did you report that?
5   A. I don't remember if I did or not.
6   Q. Did you think it was a friendly slap?
7   A. No, it wasn't a friendly slap.
8   Q. And I'm sorry. You said you don't recall
9 if you reported that to anybody?
10   A. I can't -- I can't -- at this time, I
11 don't remember.
12   Q. Did you ever accuse Allen Brickey of
13 hitting you?
14   A. I accused Allen Brickey of shoving me,
15 pushing me, my chest.
16   Q. When?
17   A. It was -- I don't know what the date was.
18 I don't know the date.
19   Q. Was it 2001, 2002?
20   A. I don't know.
21   Q. Was this on one occasion?
22   A. Yes.
23   Q. Who witnessed that?
24   A. Um, I don't know.

1  Q. Where were you when this occurred?
2  A. I was in the door plant.
3  Q. Where in the door plant?
4  A. I was retrieving a -- went over to
5  retrieve a cart with parts, so that cart would have
6  been in Allen's work area at that time. He was
7  building doors.
8  Q. And what happened?
9  A. I went over to get this tub back that the
10 fork truck driver, Scott Stewart, had picked it up
11 with his fork truck. And it was leaning against --
12 the tub actually was pushed against a center pole
13 and it was awaiting parts that needed to be put on
14 it. It wasn't a complete tub. And Scott had
15 picked that tub up and set it over for the
16 builders, not knowing that it wasn't a complete
17 tub.
18      So when I went over to get it back, Allen
19 got very loud and said I had put a tub over there
20 that was incompleted and he shoved me, was in my
21 face yelling and pointing his finger at me.
22 Q. Then what happened?
23 A. Well, I went to John's desk. Allen had
24 taken off and --

1  Q. What do you mean taken off?
2  A. He left that area.
3  Q. Okay.
4  A. And so I went over to John's desk and John
5  wasn't there and I asked Sheryl to please find
6  John.
7  Q. Sheryl who?
8  A. Sheryl Doss.
9  Q. Why would you ask Sheryl Doss to find John
10 Winschief?
11 A. Because Sheryl Doss was at John's desk.
12 And I then went back to my work area.
13 Q. Why was Sheryl at John's desk?
14 A. I don't know.
15 Q. Did you go to Human Resources?
16 A. At that time, I didn't.
17 Q. Why not?
18 A. Because John Winschief is my supervisor
19 and I went to report it to him, wanted to report it
20 to him.
21 Q. Did you go find Dave Pantier?
22 A. No, I did not.
23 Q. Why not?
24 A. Because I had already asked Sheryl to find

1  John and tell him I -- tell him that I needed to
2  speak with him.
3  Q. Was this before or after the nail breaking
4  comment?
5  A. I don't remember.
6  Q. The nail breaking comment happened in
7  early January of 2003. Does that help you
8  determine when it happened?
9  A. No. I don't remember.
10 Q. Would it have been before or after you had
11 your argument with Dustin Hall?
12 A. I don't remember.
13 Q. So you go back to work. Does Sheryl go
14 find John Winschief?
15 A. I'm assuming she did, because John came to
16 the department, came over to the -- my work area.
17 Q. And --
18 A. And then we -- he asked what had happened.
19 And I -- I told him. And I remember -- I remember
20 maybe Allen had -- maybe Allen had gone after Dave
21 Pantier when he left because I remember Allen
22 and -- I remember when I looked up, Allen and Dave
23 was at John's desk at that time.
24 Q. So John Winschief comes to you, and what

1  happens?
2  A. And I told John what had happened. And
3  John -- John left and went back to his desk, or
4  went over to his desk.
5  Q. Did you go with him?
6  A. No, not at that time.
7  Q. What did John do next?
8  A. He was talking with Dave and -- and Allen,
9  I believe.
10 Q. Go ahead.
11 A. And then John said that I needed to come
12 over to his desk. And I went over to his desk.
13 And he asked me what happened. And it was -- Dave
14 was there and John. And Allen wasn't -- wasn't
15 there any longer. And I told him what had happened
16 and how -- and how Allen had pushed on my chest.
17 And I had asked that -- I told them that I wanted
18 to call the police. And I was not allowed to call
19 the police. And Dave said, if this ever happened
20 again, I will -- you wouldn't have to call the
21 police, I'll call the police.
22 Q. I'm sorry. Let me interrupt you for just
23 a second. Who told you that you could not call the
24 police?

Page 86

1  A. I asked if I could call -- they said they
2 would not call the police. I said, can I call the
3 police.
4  Q. Okay.
5  A. And I was told no by Dave.
6  Q. Okay.
7  A. And I don't remember if John said no or
8 not. And then they called Allen back over, and
9 John had explained what had happened with that tub,
10 what I had told him happened with that tub, that it
11 was not put over there by me and I was only over
12 there to get it back because it was incomplete.
13 And I -- I don't know what happened -- I don't
14 remember what happened at -- I just remember going
15 back to work.
16  Q. Did Brickey ever apologize to you?
17  A. Yes, he did apologize that night. He
18 didn't want to, but he did.
19  Q. Why, did Dave Pantier or John Winschief
20 make him?
21  A. I think -- I think it was Dave that said,
22 you owe her an apology.
23  Q. Do you know whether Brickey got any kind
24 of write-up?

Page 87

1  A. I don't know.
2  Q. Okay. Were you satisfied with how it was
3 handled?
4  A. No, I was not.
5  Q. What did you think should have happened?
6  A. I think they should have called the police
7 in.
8  Q. After your -- did you finish working your
9 shift?
10  A. Yes, I did.
11  Q. Did you go to the police to report it?
12  A. No, I did not.
13  Q. Why not?
14  A. I don't know.
15  Q. Did you ever go talk to anyone in the
16 front office, anyone in Human Resources about it?
17  A. I don't remember.
18  Q. Did you ever go talk to Mick Price?
19  A. I -- I don't remember.
20  Q. Have you ever made a police report before?
21  A. Have I ever made a police report before?
22  Q. Yes.
23  A. On somebody at work?
24  Q. For any reason.

Page 88

1  A. Yeah, I have made a police report.
2  Q. Okay. What have you made a police report
3 about?
4  A. Police report on some problems I was
5 having with the neighbor.
6  Q. What kind of problems were you having with
7 the neighbor?
8  A. Had to do with a property line and a
9 fence.
10  Q. Was that before or after this incident
11 with Brickey?
12  A. That was before.
13  Q. What police did you make that report with?
14  A. Windsor Police Department.
15  Q. Any other police reports that you've ever
16 made?
17  A. Elmer and I made a police report on a
18 handyman that we had doing some work at our house
19 and he wouldn't return the house key.
20  Q. What police department did you make that
21 police report to?
22  A. Windsor Police Department.
23  Q. Any others?
24  A. None that I can think of at this time.

Page 89

1  Q. Were you aware that the company had a
2 hotline?
3  A. Yeah, I think I knew that. Yes.
4  Q. Did you report the Brickey incident to the
5 hotline?
6  A. No, I did not.
7  Q. Did you report the breaking a nail comment
8 to the hotline?
9  A. I don't think so.
10  Q. Did you ever make a report to the hotline?
11  A. I don't recall.
12  Q. Do you have any hesitation about calling
13 the hotline?
14  A. No.
15  Q. Okay. I think Brenda Purcell, we've
16 talked about a little bit. Was that the woman you
17 said sometimes ran a machine around the time of the
18 changes in the department?
19  A. I think she ran a saw.
20  Q. Did you ever talk with Brenda Purcell
21 about John Winschief?
22  A. I'm sure I did.
23  Q. What would you have talked to Brenda
24 Purcell about?

1 A. We worked together.
2 Q. Did you ever complain to Brenda Purcell
3 about John Winschief?
4 A. Not that I recall.
5 Q. Do you believe that Brenda Purcell had any
6 complaints about John Winschief?
7 A. Brenda didn't like when John Winschief was
8 going to give a job to Rich that she wanted to bid
9 on, or she wanted.
10 Q. Do you believe that Mary Hackman had any
11 complaints against John Winschief?
12 A. I don't know.
13 Q. How about Carol Bogin, do you think she
14 had any complaints against John Winschief?
15 A. I don't know.
16 Q. How about Dorothy Jolly?
17 A. I don't know.
18 Q. Karen Sinclair or St. Claire?
19 A. Not that I recall.
20 Q. Tell me again, who is Sue Gonzales?
21 A. Sue was a lady who worked in our
22 department, and she glued -- put the glue on door
23 parts most of the time. I don't know what her job
24 title was. I don't know.

Page 91

1 Q. Okay. Did you ever talk with her about
2 whether she had any complaints about John
3 Winschief?
4 A. I don't remember.
5 Q. Did you talk to Sheryl Doss about John
6 Winschief?
7 A. I'm sure we did.
8 Q. Okay. What did you talk to Sheryl Doss
9 about?
10 A. Whatever might be in the conversation.
11 Q. Did Sheryl Doss have any complaints
12 against John Winschief?
13 A. I don't know.
14 Q. Did you ever ask her?
15 A. I don't know.
16 Q. It's my understanding that you've asked
17 Sheryl Doss through your attorney to testify on
18 your behalf in this case. What does Sheryl Doss
19 know about the allegations in your complaint?
20 A. Well, she was there when I had the
21 conversation with Matt, Dave, John. She was there
22 when John made the comment about the women and
23 running the machines.
24 Q. Anything else that Sheryl would be aware

Page 92

1 of?
2 A. I can't think of anything at this time.
3 Q. Does Sheryl Doss believe that John
4 Winschief discriminates against women?
5 A. I don't know.
6 Q. Does Sheryl Doss think that the company in
7 general discriminates against women?
8 A. I don't know.
9 Q. Did you talk to Becky Hardwick about John
10 Winschief and her opinion of him?
11 A. I didn't talk much to Becky, so I -- I
12 would say I don't recall.
13 Q. Who is Deb Gill?
14 A. Deb Gill is -- she worked in our
15 department, and she glued -- would glue the parts
16 to build a door.
17 Q. Did you ever talk to her about whether she
18 had any complaints about John Winschief?
19 A. I don't recall.
20 Q. Do you know whether Deb Gill believes that
21 John Winschief discriminated against women?
22 A. I don't recall if she told me that.
23 Q. Okay. Are there other women that worked
24 in your department that we haven't talked about in

Page 93

1 2003?
2 A. Are there other women? Was that the
3 question?
4 Q. Yeah. Were there in January of 2003 at
5 the time of Matt's investigation into your
6 complaint?
7 A. I don't remember who all we've talked
8 about. Could you --
9 Q. Sure. We've talked about Karen Sinclair,
10 Dorothy Jolly, Carol Bogin, Mary Hackman, Brenda
11 Purcell, Sue Gonzales, Sheryl Doss, Becky Hardwick
12 and Deb Gill. Nine women, roughly.
13 A. Not that -- I can't recall anyone else at
14 this time.
15 Q. Do you believe that any of those women
16 would have supported your contention to Matt that
17 John Winschief had indicated that you might break a
18 nail if you worked a machine, and in general, that
19 women shouldn't run machines?
20 A. I don't know.
21 Q. Was there anyone that you expected would
22 be able to corroborate your version of events?
23 A. I -- I don't recall.
24 Q. Would you have expected Matt to have

Page 94

1 interviewed anyone else in his investigation, other
2 than the nine women we've just discussed?
3    A. I don't know.
4    Q. You said you were accused of preferring
5 married men. What's that about?
6    A. Well, that happened in the meeting with
7 Matt and John and Dave. And Sheryl Doss was there,
8 too.
9    Q. Tell me the context. How did this come
10 up? What was said?
11   A. Well, I don't remember the exact
12 conversation, but Matt accused me of preferring
13 married men.
14   Q. Now, what would that have to do with, the
15 nail breaking incident? How would that come up?
16   A. Exactly. You would have to ask Matt about
17 that.
18   Q. Well, you were present for the
19 conversation. Can you give me some idea of how the
20 conversation turned to that?
21   A. I -- at this time, I -- I don't recall.
22   Q. Were you married at this time?
23   A. No, I was not.
24   Q. Did you ever date anyone on your team in

Page 95

1 your department?
2    A. No.
3    Q. Did you ever sleep with anyone in your
4 department?
5      THE WITNESS: Alex, do I have to answer
6 that?
7      MS. De SAINT PHALLE: Well, I think given
8 the situation, probably.
9    A. No, I did not.
10   Q. (BY MS. CREVELING) Did you ever indicate
11 to other woman in your department that you were
12 dating married men within the department?
13   A. No, I did not.
14   Q. Did you ever indicate to anyone in the
15 department that you were sleeping with men,
16 particularly married men, in the department?
17   A. No, I did not.
18   Q. Did you ever tell anyone in the department
19 that you were interested in sleeping with John
20 Winschief?
21   A. No, I did not.
22   Q. When you were allegedly told that you
23 preferred married men, what was your response to
24 that?

Page 96

1    A. I don't know. Probably how ridiculous it
2 was.
3    Q. Were you ever told by others in your
4 department that you ought to clean your life up?
5    A. In my department?
6    Q. Uh-huh.
7    A. No.
8    Q. Were you ever told that by anyone in the
9 plant?
10   A. In those exact words, no.
11   Q. Did you ever leave a note for John
12 Winschief on his car?
13   A. No, I did not.
14   Q. Did you ever leave any note for anyone to
15 the effect of, 'if you're in need, come to
16 Windsor'?
17   A. No, I did not.
18   Q. Do you know who might have done so?
19   A. No, I do not.
20   Q. Do you know whether anyone reported having
21 seen you do so?
22   A. No, I do not.
23   Q. Have you left a note for anyone at the
24 plant on their car?

Page 97

1    A. No, I have not.
2    Q. Did you ever ask John Winschief out for
3 drinks?
4    A. Yes, I did.
5    Q. Did you ever ask him out to dinner?
6    A. No, I did not.
7    Q. What was his response when you asked him
8 out for drinks?
9    A. He said he had been in trouble before and
10 that he didn't think that would be a good ideal.
11   Q. Did he tell you what he meant by he had
12 been in trouble before?
13   A. No, I did not.
14   Q. What did you understand it to mean or
15 think it to mean?
16   A. Probably that company would frown upon
17 that.
18   Q. How many times did you ask him out for
19 drinks?
20   A. It just wasn't John by himself that I
21 asked out for drinks. But I don't know. Four or
22 five times.
23   Q. Who was present when you asked him?
24   A. Probably Sheryl, Sue. And I don't recall

Page 98

1 who else.
2 Q. In the investigation follow-up meeting
3 when you were accused of leaving notes on John
4 Winschief's car, what was your response?
5 A. I did not.
6 Q. Did you ever invite John Winschief to any
7 function other than for drinks?
8 A. No, I did not.
9 Q. Did you ever extend an invitation to John
10 Winschief for anything other than drinks?
11 A. No, I did not.
12 Q. Did you ever tell anybody that you had a
13 desire for a sexual relationship with John
14 Winschief?
15 A. No, I did not.
16 Q. Did you so desire a relationship with John
17 Winschief?
18 A. No, I did not.
19 Q. How did the meeting with Matt and Dave
20 end?
21 A. Um, I went back to work.
22 Q. Did you understand the investigation was
23 closed at that point?
24 A. I don't know. I don't recall.

Page 99

1 Q. Were you issued any warnings as a result
2 of the investigation?
3 A. Not that I recall.
4    MS. CREVELING: Let's take a quick break.
5    (12:51-1:00 At this point in the
6    proceedings a short recess was taken,
7    after which the following proceedings were
8    conducted:)
9 Q. (BY MS. CREVELING) Were you told anything
10 in the meeting with Matt and Dave about the
11 propriety of inviting John Winschief out for
12 drinks?
13 A. I don't remember.
14 Q. After you had the meeting with Matt and
15 Dave, were you satisfied with the outcome of the
16 investigation?
17 A. No, I was not.
18 Q. Why not?
19 A. Well, I had just been accused of
20 preferring married men and I was told that I was
21 making false accusations. So that wasn't very
22 satisfying.
23 Q. What do you mean you were told you were
24 making false accusations?

Page 100

1 A. I was told that an investigation was --
2 had taken place.
3 Q. Uh-huh.
4 A. And that from that information that they
5 had gathered, that nothing I said was true. False
6 accusations.
7 Q. Were you told that nothing you said was
8 true, or were you told that they were unable to
9 confirm your reports?
10 A. I don't remember how it was worded.
11 Q. So what did you do after the -- after that
12 meeting?
13 A. I went back to work.
14 Q. Did you ever go talk to Mick Price?
15 A. I don't recall.
16 Q. Did you ever have any follow-up
17 conversation with Ohrt or with Pantier?
18 A. I don't remember.
19 Q. Did you ever make a hotline call?
20 A. No, I didn't.
21 Q. Did you ever try to pass out notebooks at
22 work?
23 A. Yes, I did pass out notebooks. A
24 notebook.

Page 101

1 Q. A single notebook?
2 A. To one person. No. I take that back. It
3 was two people.
4 Q. Who did you approach with notebooks?
5 A. I didn't approach anyone. I had a bag of
6 notebooks that -- it was before work, and along
7 with those notebooks was a bag that I brought in,
8 and it had candy in it. And Sue got a notebook and
9 I got a notebook and Sheryl Doss got a notebook.
10 Q. For what?
11 A. To write down anything they needed it for.
12 Q. What did you think they needed it for?
13 Why would they need a notebook at work?
14 A. Because we never had paper at work.
15 Q. Why didn't you give it to anybody else in
16 the department?
17 A. Along with my candy was the notebooks, and
18 people would always come up and help themselves to
19 candy and -- and notebooks. And if there was
20 something there that they needed and I had and they
21 asked, they got.
22 Q. So you kept a bag of candy at your work
23 station?
24 A. Actually it was kept in a locker.

## Page 102

1  Q. And you kept a bag of notebooks at work?
2  A. I had a bag of notebooks.
3  Q. Did you ever indicate to anyone that they
4  should write down complaints about John Winschief
5  in those notebooks?
6  A. No, I don't believe I did.
7  Q. Do you know if any employees ever
8  complained that you did so?
9  A. I heard from Matt Ohrt that Sue, he said
10 Sue said -- that Sue had stated that I gave her a
11 notebook, and Matt had told me that Sue told him it
12 was for writing down complaints -- anything she had
13 to complain about.
14 Q. What was your response to that?
15 A. I don't know that I responded to -- to
16 Matt on that.
17 Q. What did Matt tell you to do with the
18 notebooks, if anything?
19 A. He accused me of doing it on company time.
20 And I told him that that was at my work station and
21 when Sue took a notebook, it was before we started
22 to work.
23 Q. Any of the men ever come take a notebook?
24 A. Maury took a notebook.

## Page 103

1  Q. What other supplies did you stock for
2  employees at your work station or in your locker?
3  A. I would have -- I would bring in pencils.
4  Pencils were hard to come by. And tape measures.
5  I usually had an extra tape measure, besides my
6  good one. And apron. I know I had two aprons.
7  Q. How did you publicize the fact that you
8  had notebooks?
9  A. Probably the same way as candy, pencils.
10 Q. Which was --
11 A. Which was there's some notebooks in there.
12 There's some candy in there. There's pencils.
13 Q. When did you begin the practice of
14 bringing notebooks into the workplace?
15 A. I don't know. I guess along with the rest
16 of the supplies.
17 Q. How often did you bring in notebooks?
18 A. Not as often as candy, I don't think.
19 Candy was something that went quick, and so was
20 pencils.
21 Q. Did you have notebooks available for
22 people before you made any complaints about John
23 Winschief?
24 A. Yes.

## Page 104

1  Q. Do you know whether Sheryl Doss made any
2  complaints about you trying to get her to write
3  down things in a notebook?
4  A. No, I don't.
5  Q. Were you given any instructions with
6  respect to the notebooks?
7  A. Matt told me I was not allowed to be
8  passing out notebooks on company time.
9  Q. What did you do?
10 A. The notebooks got put in my locker, and
11 when somebody asked for a notebook, I -- I had to
12 tell them that they couldn't have a notebook unless
13 it was before work.
14 Q. The investigation took place in January of
15 2003. Tell me what happened after the
16 investigation ended.
17 A. What investigation?
18 Q. Into your complaint about breaking the
19 nail.
20 A. What happened after that?
21 Q. Uh-huh.
22 A. I don't know.
23 Q. Did you have any further complaints at
24 work?

## Page 105

1  A. I don't remember.
2  Q. Did you ever accuse Brenda Purcell of
3  sleeping with married men at the plant?
4  A. No.
5  Q. Do you know if Brenda Purcell ever made a
6  complaint that you had done so?
7  A. No, I do not.
8  Q. Tell me about a complaint that you made in
9  March of 2005 that someone had thrown a stool at
10 you.
11 A. I don't know of any complaint that someone
12 had thrown a stool at me.
13 Q. Did you make any complaint in March of
14 2005 involving a stool?
15 A. I made a complaint about a stool that was
16 part of my restriction for my injuries.
17 Q. What was your complaint?
18 A. I was sitting on this stool and I was
19 wiping glue from doors and had to sit on the
20 stool -- had to sit for awhile, had to stand for
21 awhile. That was what the -- that's what it was --
22 injury, whatever, I was told to do by the doctor,
23 instructions from the doctor. And when I would
24 move to go get a panel to replace a bad panel or to

Page 106

1 go get a part that was needing to be cut, when I
2 come back, my stool was over on the other side of a
3 machine.
4  Q. Why would you complain about that?
5  A. Well, because I needed that stool to
6 follow the doctor's orders. And when I would come
7 back, I would have to walk around over to the other
8 side of the machine and get it.
9  Q. Is that a big deal?
10  A. Well, I guess it was a big deal.
11  Q. Who else was working in the area that
12 night, or at that time when this happened?
13  A. I remember Dustin Hall.
14  Q. Anybody else?
15  A. No. I don't remember who else was working
16 with us.
17  Q. Did you talk to Dustin about it?
18  A. I went around and picked the stool up. I
19 don't know how many times I walked around and got
20 the stool and brought it back around. And I don't
21 know if I talked to Dustin about it.
22  Q. Who did you talk to about it?
23  A. I reported it to John Winschief.
24  Q. Why would you take that -- an issue like

Page 107

1 that to your supervisor, rather than trying to
2 raise it with the employees that you were working
3 with?
4  A. The reason being, that's what my
5 supervisor is there for. In the past, I have
6 witnessed and I have experienced times when you go
7 to employees and try to settle it with them and it
8 gets -- they get very upset, very loud, very
9 abusive. So I would go to my supervisor.
10  Q. What did you tell your supervisor?
11  A. I told my supervisor that the stool that I
12 was sitting on and using was being thrown over on
13 the other side of the machine.
14  Q. What did he say?
15  A. He asked who it was doing it. And I told
16 him I had saw Dustin do it once. I didn't know
17 about the other times. But I had saw Dustin. And
18 maybe I saw Dustin twice. But nevertheless, I
19 reported that to him.
20  Q. What did he do?
21  A. He said he would take care of the problem.
22  Q. Any idea what he did to take care of the
23 problem?
24  A. I had -- I don't -- I didn't -- I don't

Page 108

1 know. I didn't know at that time what he did.
2  Q. Do you now know?
3  A. I was called in. I had -- was called in
4 to Matt's office and he told me -- Matt told me at
5 the time that John had reported to him that there
6 was an incident with Dustin last night, and I was
7 having problems with a chair. And did he -- he
8 asked me, did I know anything about it. And I
9 said, not with a chair, it was with a stool. And I
10 said -- I told him what happened.
11  Q. What did you tell him?
12  A. I told him that my doctor's orders was I
13 needed something to sit on, and that the stool I
14 was using to sit on was being put over on the other
15 side of the machine.
16  Q. Did you say put over or thrown over?
17  A. I don't remember. I think it was thrown
18 over --
19  Q. Okay.
20  A. -- that I said. And so the next thing --
21 and then I was in his office to -- for something
22 other than that, though, when he approached me
23 about it, that there was a problem, an incident in
24 the department. I don't remember what it was.

Page 109

1   But nevertheless, I went back to work. I
2 was called in the office -- back to Matt's office.
3 Dave Pantier was there and Matt. And Matt said
4 that he had talked to people about the stool
5 incident, and that I was making a false accusations
6 about other employees.
7  Q. Let me back up for just a minute. You
8 reported it to John?
9  A. Right.
10  Q. After you made that report, at some point
11 later, you get called into Matt's office?
12  A. Uh-huh.
13  Q. Matt asked you for the specifics on what
14 happened?
15  A. Right.
16  Q. At that point, did you understand he was
17 going to do some sort of investigation?
18  A. No. I didn't get that feeling at that
19 time.
20  Q. How did that meeting end?
21  A. Oh, he was -- I was originally in
22 Matt's -- had gone into Matt's office because John
23 Winschief told me my employee file, that I had
24 asked for copies of my employee records, and that

1 Matt had the copy of them for me and I needed to
2 take my checkbook with me so I could write a check
3 for the cost of 'em. And that is what I had gone
4 to his office for. So when I left, I left with my
5 personnel records.
6 Q. Okay. And during -- when you went to get
7 those records is when you talked to Matt about the
8 stool --
9 A. Yes, yes.
10 Q. -- incident?
11 A. Matt had brought up that there was an
12 incident with the stool, that John had reported
13 that to Matt.
14 Q. What did you understand that Matt was
15 going to do about it, if anything?
16 A. At that point, I didn't think anything was
17 going to be done.
18 Q. Did you ask?
19 A. No, I didn't.
20 Q. Did you want something to be done?
21 A. I don't know.
22 Q. Well, why did you report it if you didn't
23 want something done?
24 A. I reported it to John. And I thought

Page 111

1 John, being my supervisor, John said he would take
2 care of it. So I just assumed that he would take
3 care of it.
4 Q. And apparently John felt to take care of
5 it, he needed to involve Human Resources?
6 A. Correct, yes. That's what he did.
7 Q. Okay. So what kind of resolution were you
8 looking for?
9 A. I was looking for not having to go back
10 around the machine every time I would leave my work
11 area to pick up my stool that I had to have.
12 Q. So you picked up your personnel file. You
13 have this discussion about Matt. You leave. You
14 don't talk to him at all about what happens --
15 what's going to happen next?
16 A. To Matt?
17 Q. Yes.
18 A. No.
19 Q. Did you talk to John about what would
20 happen next?
21 A. No.
22 Q. Why not?
23 A. Because John said he was going to take
24 care of the problem.

Page 112

1 Q. And you believed that he would do that?
2 A. And I thought that John would do that.
3 Q. So you then later are called back into
4 Matt's office. Dave Pantier is there?
5 A. I got called back, yes, and Dave was
6 there. Dave and Matt.
7 Q. Anyone else?
8 A. No. There was no one else.
9 Q. Did you bring Sheryl Doss with you this
10 time?
11 A. No.
12 Q. Why not? She's been to, seems like, every
13 other meeting.
14 A. Correct. I asked for Sheryl Doss to be
15 there, and Matt said no.
16 Q. What happened then in the meeting? Matt
17 said he had talked to other people?
18 A. Said he had talked to other people in the
19 department about the stool throwing.
20 Q. Did he indicate to you who he had talked
21 to?
22 A. No, he did not.
23 Q. Did he indicate what he had found out in
24 talking to those other people?

Page 113

1 A. He indicated that I was making false
2 accusations against an employee.
3 Q. How did it end?
4 A. Matt had said that I wouldn't get a
5 write-up or anything at this time, but if that kind
6 of behavior continued, that I was making false
7 accusations against other employees, that it could
8 be a write-up or even no longer being employed.
9 And I told him that I was not making false
10 accusations, that what I said happened was the
11 truth.
12 Q. How did the meeting end?
13 A. I don't remember the exact words, but it
14 ended with Matt telling me I better make things
15 right with God. And he made the comment that --
16 and that was -- and I don't remember what order,
17 but I said, I -- I was telling the truth.
18 And he said -- I said, and I know I'm
19 telling the truth. And he said something to the
20 effect that -- something about God watches us. And
21 then I was crying. I know I was upset. And I said
22 something to the effect that I was not a liar,
23 that -- I don't remember exactly how it went. But
24 I remember him saying that I needed to make things

**Page 114**

1 right-on? And Matt threatened at that
2 point. You know, what was going to happen to me
3 that I needed to make things right with God?
4     And I told him that I was a Christian.
5 And he said, God sees everything. He knows. And I
6 was crying and I stood up and Dave Pantier opened
7 the door for me and I walked out and Dave walked
8 out with me.
9   Q. Did you have any discussions about how you
10 described the incident in the -- and your choice of
11 words in describing the incident?
12   A. Yes, that was -- yes.
13   Q. Okay. Tell me about that.
14   A. And that was he -- he stated that the
15 stool was not thrown, that it was set. Well, when
16 I saw Dustin do it, he threw it. He threw it over
17 across the machine and it landed in the middle of
18 the aisle. So he said that Dustin had said that he
19 placed it or he had put it there. And I felt like
20 that was splitting hairs over the words.
21     My point was that my chair was being --
22 that I needed and I had been sitting on to do that
23 job was being put over on the other side of the
24 machine, which was making me walk around to pick it

**Page 115**

1 up every time that I would leave to get parts.
2   Q. There seems to me to be a difference
3 between -- or is there a difference, I guess,
4 between a description that says it's being put on
5 the other side and I have to go get it every time,
6 versus it's being thrown over there?
7   A. (No response.)
8   Q. Do you recognize a difference there?
9   A. Well, maybe you might, not knowing the
10 machine that it was being put across or thrown --
11 thrown across, not being there and not seeing the
12 machine, you might think there was a difference.
13 But for it to be the reach that it was, if it was
14 being put there, it was also being dropped there,
15 so -- and being thrown there.
16   Q. Why do you say that?
17   A. Because the reach of across the machine
18 and -- to put that heavy a stool across there, it
19 wasn't just lightly being put down. It was being
20 dropped or thrown.
21   Q. How do you know that?
22   A. Because I witnessed it. I saw Dustin do
23 that.
24   Q. You saw Dustin do it --

**Page 116**

1   A. Yes.
2   Q. -- once, maybe twice?
3   A. I saw Dustin once, possibly twice. But I
4 did see how he did it.
5   Q. Describe for me what you saw.
6   A. What I saw, I had gone after parts and I
7 had left my seat. And when I come back, Dustin was
8 throwing -- and he had to reach over the conveyer
9 and over part of the machine -- and he was throwing
10 that stool over there. And I remember Mary Hackman
11 picked it up once. It was out in the middle of
12 the -- the aisle.
13   Q. As I'm watching your hand movements, I
14 just want to clarify this for the record. You're
15 showing reaching out in front of your body and then
16 dropping it down on the --
17   A. Dropping, throwing.
18   Q. What's the stool look like?
19   A. It was just a -- it was a ladder. And it
20 was on wheels. And I guess it had three or four
21 steps on it. It was made out of metal. And on the
22 top -- and maybe the steps -- were made out of like
23 a criss-cross metal.
24   Q. How tall was it?

**Page 117**

1   A. I don't know. Maybe three, three-foot.
2   Q. So you're sitting on the top of a ladder
3 while you're doing this work?
4   A. Yes, right.
5   Q. How do you know that Mary had picked it
6 up?
7   A. How do I know?
8   Q. Uh-huh.
9   A. Because I saw Mary pick it up.
10   Q. Okay.
11   A. And she scooted it in close to the
12 machine, the back of the machine.
13   Q. So tell me about what discussion you had
14 with Matt about your choice of words in reporting
15 the stool problem.
16   A. I -- I guess I don't understand the
17 question.
18   Q. Well, what did he tell you? Did he tell
19 you it wasn't thrown? Did he tell you -- what --
20 what did he tell you about your -- how you
21 described the incident?
22   A. He said that the stool had been placed,
23 that it was not dropped, it was not thrown, that it
24 was placed. Dustin had told him that, is what he

1 said.
2  Q. Did he indicate whether he had talked to
3 other employees besides Dustin?
4  A. I don't remember. I don't know.
5  Q. So you were told that the stool wasn't
6 thrown, but it was placed --
7  A. Yes.
8  Q. -- and so therefore, what?
9  A. I don't know.
10  Q. Tell me about what it was that caused you
11 to start crying.
12  A. I don't know. I started crying.
13  Q. Okay. How did the topic of Christianity
14 arise?
15  A. How did the top --
16  Q. Topic.
17  A. Topic?
18  Q. Uh-huh.
19  A. It had to do with whenever Matt was
20 telling me I needed to make things right with God.
21  Q. Okay. Tell me specifically what he said
22 and how that came up.
23  A. If I could remember that conversation word
24 for word, I would repeat it, but I don't -- I don't

Page 119

1 remember that conversation word for word.
2  Q. Okay. Did Matt ever ask you about whether
3 or not you were happy, happy at work or happy in
4 general?
5  A. I don't remember.
6  Q. Did he offer you an E.A.P. card?
7  A. (No response.)
8  Q. I mean Employee Assistance Program card.
9 That's what I mean by E.A.P.
10  A. I'm not for sure about that. I -- I think
11 maybe he did.
12  Q. Did you have any discussions about your
13 job position or whether you were interested in
14 staying there?
15  A. I don't remember that.
16  Q. You're telling me that -- I'm sorry. Tell
17 me again the comments about -- about something with
18 God sees things.
19  A. Well, I don't remember where in the
20 conversation, but Matt had stated that God --
21 God -- God knows everything we do, or God sees
22 everything we do. I don't remember the exact
23 words.
24  Q. Who brought up the topic of Christianity?

Page 120

1  A. Matt did.
2  Q. Are you a Christian?
3  A. I think I'm a Christian. Well, I don't
4 have to say I think. I know I'm a Christian.
5  Q. Okay. Do you know whether Matt's a
6 Christian?
7  A. No, I do not.
8  Q. Did the discussion with God bother you?
9  A. It bothered me that he brought it up when
10 I had said I was telling the truth, and he said --
11 he thought that I wasn't, and I needed to make
12 things right with God.
13  Q. Did you tell him that?
14  A. I don't know if I did.
15  Q. What was Dave Pantier doing during all of
16 this?
17  A. Dave was sitting right beside me, and I
18 don't remember Dave doing or saying anything. I
19 don't recall. I don't recall him doing or saying
20 anything.
21  Q. And at one point, I think earlier you told
22 me you felt threatened. Why was that?
23  A. Well, I felt threatened that he said I
24 should make things right with God. You know, it

Page 121

1 made things run through my mind, was he threatening
2 me that something was going to happen to me soon,
3 or --
4  Q. Do you mean you felt threatened physically
5 or you felt that your job was threatened?
6  A. Probably physically.
7  Q. So you thought Matt Ohrt was going to do
8 something to you physically?
9  A. I don't know that Matt was. I just -- at
10 that time, that was the feeling I had.
11  Q. Okay. Anything else that Matt said
12 that -- that contributed to your feeling of being
13 threatened?
14  A. I guess I -- I felt threatened when he
15 made the comment that I was making false
16 accusations, and if I -- if it happened again, that
17 I could possibly be wrote up or even no longer be
18 employed. I guess I -- I felt threatened at that
19 time.
20  Q. And again, is that a personal physical
21 threat or a job threat?
22  A. I probably thought that was a threat to my
23 job.
24  Q. How does the meeting end?

Page 122

1 at one point stood up and I was
2 crying and -- and I remember Dave opened the door
3 and I walked out it.
4   Q. Did you finish your shift?
5   A. Yes, I did.
6   Q. Did you talk to anyone out on the floor
7 once you got back out on the floor?
8   A. I can't remember.
9   Q. Did you have any other meetings with Matt
10 that we haven't already discussed, either about
11 this incident or any other?
12   A. Not that I can recall right now, no.
13   Q. Did you ever talk to Cord Cozma?
14   A. Yes, I did.
15   Q. Did you ever complain to Cord Cozma about
16 Matt?
17   A. About Matt?
18   Q. Yes.
19   A. I don't recall that.
20   Q. Did you ever complain to anyone about the
21 conversation you had with Matt and the fact that
22 you felt threatened?
23   A. Jerry Ray.
24   Q. Tell me about that conversation.

Page 123

1   A. Now, I don't know that it was the same
2 time. I was in -- I don't know what meeting that
3 was with Matt. But I remember I had to cut back
4 through from the front office. I went outside and
5 back into the plant and Jerry Ray was coming from
6 his office, and we walked on the sidewalk together.
7 And I remember I had -- and I had been crying. And
8 I remember Jerry had asked what was wrong. And I
9 said I had just had a meeting with Matt. And I
10 don't remember what I said to him.
11   Q. What did Jerry do?
12   A. I don't know, because -- I mean, he
13 walked -- we walked up to the factory door together
14 and -- and I went in and he went in and I went to
15 my work station.
16   Q. What was Jerry's role at that point?
17   A. He was safety, the head of safety.
18   Q. Okay. Did you have any other
19 conversations or follow-up conversations with
20 Jerry?
21   A. Not that I recall.
22   Q. Did you ever complain to Mick Price about
23 Matt?
24   A. Not that I can remember.

Page 124

1   Q. Did you ever call the hotline?
2   A. No, I don't believe I did.
3   Q. Did you complain to anybody about the
4 conversation you had with Matt?
5   A. I don't know. I don't remember.
6   Q. About a month later, you went out on
7 leave, right?
8   A. I don't know -- I don't know how long it
9 was.
10   Q. If the records indicate that you went on
11 leave April 7, 2003, would you have any reason to
12 dispute that?
13   A. No.
14   Q. Tell me about your conversation with Cord
15 Cozma.
16   A. I don't remember what it was.
17   Q. Did it have something to do with one of
18 your complaints or one of the meetings?
19   A. My mind's blank now. I don't know.
20   Q. Do you have any specific complaints about
21 Cord?
22   A. No.
23   Q. Do you have any specific complaints about
24 Dave Pantier?

Page 125

1   A. I don't -- I don't know what they would
2 be. I don't know.
3   Q. Any other complaints about Matt?
4   A. None that I can think of at this time.
5   Q. Do you have any other specific complaints
6 about anybody else in management?
7   A. None that I can think of right now.
8   Q. Any other complaints about any of your
9 co-workers that we haven't talked about?
10   A. I'm not -- I don't know. I would say not
11 at this time.
12   Q. Tell me about the process that you went
13 through in order to obtain your leaves of absence.
14   A. When I was off work, I would talk to Linda
15 Watkins, drop off doctor's notes, fill out the
16 proper forms, give them to the doctor to do his
17 part, and then they would be sent back in or
18 delivered back to the office.
19   Q. Did you have any difficulty obtaining your
20 leave of absence in December of 2002?
21   A. I don't recall.
22   Q. Did you have any difficulty obtaining your
23 leave of absence in January of 2003?
24   A. I don't recall.

Page 126

1  Q. Did you have any difficulty obtaining your
2  leave of absence in February of 2003?
3  A. I don't recall.
4  Q. Clearly, you got the leave that you
5  requested, right?
6  A. Correct.
7      (Whereupon Defendant's Deposition Group
8      Exhibit A was marked for identification by
9      the court reporter.)
10  Q. (BY MS. CREVELING) Let me hand you what
11 we've marked as Exhibit A. The top page refers to
12 training for leave of absence policy, and the
13 second is a sign-in sheet. Let me know when you've
14 had a chance to look at that.
15  A. Okay.
16  Q. Do you recall the training on March 6,
17 2002?
18  A. No.
19  Q. If you look at the second page, does your
20 signature appear on that sheet?
21  A. Yes.
22  Q. Are there signatures of other employees
23 from your department on that sheet?
24  A. Yes.

Page 127

1  Q. Tell me what your understanding was at the
2  time you requested leave in 2003 of the leave of
3  absence policy.
4  A. Would you repeat that question?
5  Q. Sure. In 2003 when you were requesting a
6  leave of absence, what was your understanding of
7  the leave of absence policy in place at the
8  company?
9  A. My understanding was -- and when was that
10 time? What was the date again?
11  Q. It's on the sign-in sheet there. I
12 believe it was March 6, 2002.
13  A. March 6th. I don't know what -- I don't
14 know. I -- I thought that the policy for leave of
15 absence policy, at this -- I thought it was for one
16 year. I went out under a one year. The policy was
17 you had one year to return to work, and that's what
18 it was.
19  Q. Did you understand that to change at some
20 point?
21  A. I understood that changed when I received
22 letters from -- and I'm not for sure who they were,
23 but they were from Masterbrand. I don't know whose
24 signature was on it.

Page 128

1  Q. Okay.
2  A. Informing me that this sick leave policy
3  had changed while I was out.
4  Q. You were on a leave of absence, by the
5  company's records, from April 7, 2003 through --
6  looks like the date of your termination was
7  November 17, 2003. Does that seem approximately
8  correct?
9  A. Could be.
10  Q. In addition to the prior leaves that we've
11 already mentioned --
12  A. Okay.
13  Q. -- okay, would you agree with me that
14 April -- from April through the point of your
15 termination is roughly seven months?
16  A. Yes.
17  Q. When you -- well, let me show you these.
18      (Whereupon Defendant's Deposition Exhibit
19      No. MB0132 was marked for identification
20      by the court reporter.)
21  Q. (BY MS. CREVELING) Let me ask you to take
22 a look at Exhibit 132.
23  A. Uh-huh.
24  Q. Tell me if you recall receiving that

Page 129

1 letter.
2  A. I don't recall.
3  Q. Do you have any reason to believe you at
4 any time received that letter?
5  A. No, I don't.
6  Q. That letter advises you that you've
7 exhausted all available leave time under the Family
8 and Medical Leave Act, right?
9  A. Yes.
10  Q. Okay. What was your understanding of what
11 you were entitled to under the Family Medical Leave
12 Act?
13  A. Twelve weeks.
14  Q. So you received twelve weeks of leave
15 under the F.M.L.A., right?
16  A. I'm assuming I did.
17  Q. Any reason to doubt that you did?
18  A. I don't know.
19  Q. Well, we've established that from April 7,
20 2003 through the time of your termination alone was
21 seven months, not including your prior leave. So
22 are we in agreement that you received twelve weeks,
23 as you were entitled to, under the F.M.L.A.?
24  A. Yes, I guess. I'm not for sure about that

Page 130

1 question.
2 Q. What are you not for sure about?
3 A. From May 23rd -- and I was out seven
4 months -- Family Medical Leave was twelve weeks.
5 And that was included in that time. Is that what
6 I'm understanding?
7 Q. Twelve -- what I want to know is, is there
8 any disagreement about whether you were allowed to
9 be absent from work for a total of twelve weeks?
10 A. Oh, no, no, I was not.
11 Q. There's no disagreement on that point,
12 right?
13 A. No.
14 Q. So you received your twelve weeks under
15 the F.M.L.A.?
16 A. Okay.
17 Q. You get this letter telling you that
18 you've now exhausted your time, and the company's
19 telling you that they're placing you on a
20 non-F.M.L.A. medical leave; is that correct?
21 A. Yes.
22 Q. What was your understanding about how
23 medical leave worked?
24 A. Medical leave, to my understanding, was --

Page 131

1 what I understood it to be was I was no longer on
2 Family Medical Leave Act and I was now on just a
3 company leave, medical leave.
4 Q. When you told me earlier that you thought
5 the policy was that you got a whole year off of
6 work, did that include -- does that year, in your
7 understanding, include F.M.L.A. time, or did you
8 think you got twelve weeks, plus a year?
9 A. I didn't -- I didn't think that that was
10 included, Family Medical Leave Act was included.
11 Q. So it was your understanding that you got
12 twelve weeks of leave under the F.M.L.A., plus the
13 company would give you another year's worth of time
14 separate and apart from that?
15 A. I don't know. I don't remember what I
16 thought about that. In looking at this, I'm not
17 for sure what I thought then.
18 Q. Well, you told me -- sitting here today,
19 is it your belief that the company policy allowed
20 you one year leave of absence?
21 A. Yes.
22 Q. So my question to you sitting here today
23 is, when you say to me that you thought you got a
24 year off, are you telling me that that includes or

Page 132

1 does not include F.M.L.A. time?
2 A. I don't know.
3 Q. Well, either you think you were entitled
4 to a year or you think you were entitled to a year
5 and three months. Which -- which is it?
6 A. I think I was entitled to a year.
7        (Whereupon Defendant's Deposition Exhibit
8        No. MB0133 was marked for identification
9        by the court reporter.)
10 Q. Let me have you take a look at
11 Exhibit 133.
12 A. Okay.
13 Q. Have you seen that letter before?
14 A. I believe I have.
15 Q. And that letter's from Linda Watkins,
16 right?
17 A. Yes.
18 Q. Is Linda the person that you dealt with
19 for your leaves of absence?
20 A. Yes, I believe she was.
21 Q. And Linda's telling you there when your
22 medical leave would end or what the terms of your
23 medical leave were?
24 A. Yes.

Page 133

1 Q. What did you do once you got that letter?
2 A. I don't know.
3 Q. Did you call her and --
4 A. I don't remember.
5 Q. Did you call her and say, hey, wait a
6 minute. November 2003 doesn't -- means I haven't
7 gotten a year leave?
8 A. I could have. I don't know. I don't
9 remember.
10 Q. Did you call anybody at the company to
11 talk about leaves of absence after you got that
12 letter?
13 A. At this time, I don't remember.
14        (Whereupon Defendant's Deposition Exhibit
15        No. MB0139 was marked for identification
16        by the court reporter.)
17 Q. (BY MS. CREVELING) Let me have you take a
18 look at Exhibit 139, which is a letter from Robert
19 Flowers. Tell me if you recall receiving that
20 letter.
21 A. (No response.)
22 Q. Do you recall receiving that letter?
23 A. I remember receiving -- or reading that.
24 Q. Had you had any conversations before with

1 Mr. Flowers?
2    A. I don't remember.
3    Q. Do you have any reason to disbelieve the
4 information contained in Mr. Flowers' letter?
5    A. I don't know. Parts of this, I remember.
6 Parts, I don't.
7    Q. Did you have any reason to disbelieve
8 Mr. Flowers when he told you, as had Linda Watkins,
9 that your leave was -- your medical leave was going
10 to expire in November of 2003?
11   A. I didn't believe that that was right.
12   Q. Why?
13   A. Because I thought I had a year, and I
14 didn't think my year was up.
15   Q. They clearly told you that you were
16 mistaken with respect to the year. So did you then
17 understand that you had less than a year?
18   A. I understood what they were saying in that
19 letter.
20   Q. What does that mean?
21   A. Well, that means that I understand what
22 they wrote in that letter, that that's what they
23 were getting across to me, that come November, my
24 year was up.

Page 135

1    Q. Did you have any reason to disbelieve
2 Linda Watkins when she told you that?
3    A. I don't know.
4    Q. Well, one of the allegations that you
5 listed for me this morning was, in essence, that
6 the company policy wasn't six months of leave.
7 So I'm asking --
8    A. It was -- I don't know. I'm confused. I
9 don't know.
10   Q. Well, ma'am, it's part of your complaint,
11 and we're here today to understand what your
12 complaint is.
13   A. And I understand that.
14   Q. After looking at these letters, were you
15 reconsidering whether or not you were correct with
16 respect to the one year stance?
17   A. No. I still believe that.
18   Q. Why do you believe that in the face of a
19 letter to the contrary from Linda Watkins and in
20 the face of a letter from the vice president -- a
21 vice president of the company telling you to the
22 contrary?
23   A. I don't know how to answer your question.
24   Q. Who do you believe got more leave than you

Page 136

1 in 2003?
2    A. Do I believe what?
3    Q. Do you believe people got more leave than
4 you did in 2003?
5    A. I don't know.
6    Q. Well, I think you told me earlier that men
7 were allowed to get more than six months, and so
8 when you made that statement, who were you
9 referring to?
10   A. I was referring to Brad Hugg.
11   Q. Brad Hugg?
12   A. Yes.
13   Q. How do you spell his last name?
14   A. H-u-g-g, I believe.
15   Q. In what department did Mr. Hugg work?
16   A. He worked at door.
17   Q. When did he go on leave?
18   A. I don't know. He went out -- I don't
19 know. I don't know dates.
20   Q. Would you agree with me that it's
21 important to understand when he went out on leave,
22 given that the company policy evidently changed in
23 early 2002, and then again in 2003?
24   A. I don't know.

Page 137

1    Q. Anybody besides Mr. Hugg that you think
2 got more than six months's leave?
3    A. Not that I know of.
4    Q. When you said that somebody was
5 grandfathered in, were you referring to Mr. Hugg?
6    A. Yes, I was.
7    Q. How long was Mr. Hugg absent?
8    A. I don't know.
9    Q. Well, how do you know then that he got
10 more than six months?
11   A. I know that -- I know that -- I know that
12 from what Mr. Hugg told me, what Brad Hugg told me.
13 That's what I was going by. And that's what it was
14 based on.
15   Q. What did he tell you?
16   A. That he was grandfathered in, even though
17 that -- and he was going to get a full year.
18   Q. When did you have this conversation with
19 Mr. Hugg?
20   A. I don't remember the date.
21   Q. Was this while you were on leave?
22   A. I don't remember.
23   Q. Do you know whether it was even in 2003?
24   A. I don't know.

## Page 138

1  Q. Why were you talking to Mr. Hugg about the
2  leave of absence policy?
3  A. I don't recall.
4  Q. So other than Mr. Hugg, you're not aware
5  of anyone else who got more leave than you?
6  A. No, not at this time.
7  Q. Okay. Why do you think you were limited
8  to six, although in fact you got seven, months of
9  leave?
10  A. I don't know.
11  Q. Do you believe that you were restricted to
12  that amount of time because you're a woman?
13  A. I don't know.
14  Q. Is that part of the allegation in your
15  complaint? Are you seeking damages on that basis?
16  A. I don't know how to answer that.
17      MS. CREVELING: Alexandra, is this part of
18  your complaint or not?
19      MS. De SAINT PHALLE: It is part of her
20  complaint.
21  Q. (BY MS. CREVELING) Okay. So you filed a
22  lawsuit with the federal court indicating that men
23  were allowed more leave than you. My question to
24  you then is, why do you believe that the time that

## Page 139

1  you were allowed to be absent from work was tied to
2  your gender?
3  A. Because Brad Hugg was grandfathered in for
4  one year.
5  Q. But you don't know the specifics on
6  Mr. Hugg's leave and you don't know when it
7  happened?
8  A. I can't recall at this time. I know Brad
9  went out before I did and then Brad came back and
10  he was back at work before I went out. So if he
11  was back to work before I went out -- and he showed
12  me a letter that he received that he was
13  grandfathered in.
14  Q. Who was that letter from?
15  A. I don't recall who -- it was from
16  Masterbrand.
17  Q. So if he went out on leave and came back
18  to work before you started leave, wouldn't that
19  mean that he had to have taken his leave in 2002?
20  You were out almost all of 2003.
21  A. I don't know. I don't recall.
22  Q. Are there women who were grandfathered in?
23  A. I don't know.
24  Q. Were there women who got a year?

## Page 140

1  A. I don't know.
2  Q. Were there women who got six months,
3  besides you?
4  A. I -- I don't know.
5  Q. Were there men who got six months, besides
6  you?
7  A. At this time, I don't know.
8  Q. Your employment was terminated in November
9  of 2003, right?
10  A. I believe that's right.
11  Q. Okay. Did you get a letter from the
12  company?
13  A. Yes, I did.
14  Q. Who was the letter from?
15  A. It came from Masterbrand.
16  Q. Do you remember who specifically at
17  Masterbrand?
18  A. No, I don't.
19  Q. What did the letter tell you?
20  A. It had a date, I believe, that I would --
21  to return to work and that I was no longer employed
22  because I didn't make that date, something of that
23  effect.
24      (Whereupon Defendant's Deposition Exhibit

## Page 141

1  No. MB0093 was marked for identification
2  by the court reporter.)
3  Q. (BY MS. CREVELING) Take a look at what
4  we've marked as Exhibit 93. Is that the
5  termination letter you received?
6  A. I believe it is.
7  Q. That, again, is a letter from Mr. Flowers,
8  right?
9  A. Matt -- Matt Ohrt.
10  Q. I'm sorry. Matt Ohrt and Mr. Flowers.
11  Mr. Flowers is copied, isn't he?
12  A. Right.
13  Q. The letter mentions that Dr. Kopacz had
14  sent in a note that you needed to be off at least
15  through December, sometime in December. Is that
16  accurate?
17  A. That -- that would be my next doctor's
18  appointment with him.
19  Q. Did you have any expectation in
20  December -- at that December 2003 appointment with
21  Dr. Kopacz that you would in fact be released to
22  return to work?
23  A. I don't recall.
24  Q. Did you think you were going to need more

1 leave beyond December of 2003?
2   A. I didn't know.
3   Q. What have you calculated would be the
4 expiration of your leave, based on your one year
5 understanding?
6   A. Well, at this time, I -- I don't know. I
7 don't know the dates.
8   Q. I'm happy to help you. You went out on
9 leave April 7th of 2003, and so based on starting
10 leave April 7th, 2003, when did you think -- how
11 long did you think you were going to be -- remain
12 off work?
13   A. If I went out in April, I thought I would
14 be able to return back to work in probably March.
15   Q. And we know, based on today's testimony,
16 that you wouldn't have come back to work in March,
17 right?
18   A. No, I probably wouldn't have.
19   Q. So ultimately your employment would have
20 been terminated in, by your calculations, sometime
21 in March of 2004?
22   A. That's -- yeah, March 2004.
23   Q. Are there any other pieces of your
24 allegation that you were terminated after six

1 months, but male employees were grandfathered in
2 that we haven't discussed?
3   A. Nothing that I can recall at this time
4 that --
5   Q. Okay. Your other allegation from this
6 morning was that male employees were allowed to
7 call females names.
8       THE WITNESS: Can we have a break?
9       MS. CREVELING: Sure.
10      (2:07-2:10 At this point in the
11      proceedings a short recess was taken,
12      after which the following proceedings were
13      conducted:)
14  Q. (BY MS. CREVELING) Okay. So before we
15 went on break, I want to pick up with your second
16 allegation, which was that men were allowed to call
17 females names and nothing was done. Tell me what
18 that allegation's about.
19   A. The men were allowed to call women names.
20   Q. Let's be specific. What men?
21   A. Well, Allen Brickey told me that I was a
22 lazy fat ass. I've been called a fucking bitch by
23 him. I've been called a fucking fat bitch by him.
24 I've been called a cunt. And other women, I've

1 heard other women being called fat asses,
2 bitches --
3   Q. By?
4   A. By Dustin Hall, by Allen. Right now,
5 those -- Allen and -- and Dustin are the two that I
6 recall doing it often, many times.
7   Q. When you say you heard other women called
8 this, do you mean you personally heard it?
9   A. Yes.
10  Q. What other women did they say this to?
11  A. I heard them say it about and to -- now,
12 whether the other women heard it -- and I'm sure
13 some did. Some may not have. Sheryl Doss, Sue. I
14 can't think of Sue's last name now.
15  Q. Are you still talking about Sue Gonzales?
16  A. Gonzales. And I don't even know who --
17 what the girl's last name was. But her name was
18 Jennie, and that's when I first started. A
19 Katrina. And that's all of them that I can recall
20 at this time.
21  Q. Did you ever hear Sheryl Doss being called
22 these names directly to her face?
23  A. Yes.
24  Q. By whom?

1   A. Allen Brickey.
2   Q. How about Sue Gonzales?
3   A. I don't know that I -- I heard her being
4 called names, but I don't remember if Sue heard.
5   Q. I'm sorry. That confuses me. So you
6 didn't directly hear anybody calling Sue Gonzales
7 names?
8   A. I heard it, yes.
9   Q. But you don't know whether Sue heard it?
10  A. Correct.
11  Q. Why would you have heard it?
12  A. I heard it because they were walking off
13 after a wrong part or whatever and they were
14 walking off to get new parts and -- and Sue didn't
15 catch it, didn't catch the bad parts, didn't catch
16 the wrong parts. So as they were heading over my
17 way to replace bad parts, wrong parts, damaged
18 parts, they were saying this as they were heading
19 to my work area.
20  Q. And who is they?
21  A. Allen and -- and Dustin Hall.
22  Q. What specifically did you hear Allen
23 Brickey say?
24  A. About Sue, I -- I don't remember the

1  exact -- his exact whole conversation, but Sue was
2  a stupid fucking bitch. Couldn't read a tape
3  measure.
4      Q. Anything else?
5      A. I can remember when Allen worked with me
6  and he was making fun of -- he would always say Sue
7  was a fat ass. Look how wide her ass is. And
8  where our work station was, we could look over and
9  see the back side of the builders through the
10 racks.
11         I remember Sheryl being called names
12 because she would -- she was a auditor and she
13 would find a bad door, bad parts, and she would
14 take -- take it out and start to break it down.
15 And she would be called a fucking bitch because she
16 was tearing apart one of the doors the builders had
17 just built, which meant they would have to rebuild
18 it.
19     Q. Who called her a fucking bitch?
20     A. It was usually Dustin, Paul and Allen
21 Brickey.
22     Q. You heard that directly?
23     A. I heard that directly.
24     Q. Did Sheryl hear it?

1      A. I'm sure Sheryl did.
2      Q. Who is Jennie and what about Jennie?
3      A. Jennie was -- and I don't know Jennie's
4  last name. Jennie was on the job when I first
5  started. And she worked over by the Costa. And
6  um, she -- she put -- she put panels through -- on
7  the line, and I'm not for sure what the -- her job
8  was, but she put panels on a line. And I remember
9  that they would call her names because she didn't
10 have the correct size panel, or that -- that went
11 along with paperwork.
12     Q. Who is they?
13     A. Once again, there was Kevin -- at that
14 time, it was Kevin Gibson, Allen Brickey and Dustin
15 Hall.
16     Q. Is that something that you heard said with
17 Jennie or that you saw being said to Jennie's face?
18     A. I had heard it being said about Jennie,
19 but I also heard it being said directly to Jennie.
20     Q. And Katrina?
21     A. Katrina -- I don't remember what her last
22 name is.
23     Q. Did you see it being said directly to her
24 or just hear about it?

1      A. I heard -- I heard it being said directly
2  to her and she at that time -- Jennie was no longer
3  doing the job that she was doing earlier. Jennie
4  was gone. No longer at the factory. And Katrina
5  was now doing Jennie's job. And I remember one
6  incident where it got so loud and so bad that
7  Katrina went and called Dave Pantier on the phone.
8  And she was crying and upset, and I don't know what
9  became of that.
10     Q. Who was calling her names?
11     A. Kevin Gibson, Allen, Jason Gene.
12     Q. Anyone else?
13     A. That's all I remember at this time.
14     Q. Okay. During what period of time were you
15 being called names by Allen Brickey and Dustin
16 Hall?
17     A. Well, that would have been shortly after I
18 started up until I went out on sick leave.
19     Q. Are you talking about your leave in 2002?
20     A. I'm talking about my leave in 2002.
21         MS. De SAINT PHALLE: You mean 2003.
22     A. 2003.
23         MS. CREVELING: Well, she had a leave in
24 both.

1      Q. (BY MS. CREVELING) So are we talking
2  about it happening in 2002, or --
3      A. Up until the time I went out on my last
4  leave.
5      Q. April of '03? How frequently did this
6  happen?
7      A. Very often.
8      Q. What's very often?
9      A. Very often would be whenever those --
10 whenever those things came up that they would --
11 the men would be upset about, that that would upset
12 them, as far as bad parts --
13     Q. That doesn't really help me. Was that
14 once a month, once a year?
15     A. I'm going to say that that happened
16 probably several times a week.
17     Q. What did you do about it?
18     A. Well, in the beginning I reported it.
19     Q. To --
20     A. To John.
21     Q. How many times did you report it to John
22 Winschief?
23     A. I'm not sure.
24     Q. More than once?

## Page 150

1  A. Yes.
2  Q. More than five times?
3  A. Possibly.
4  Q. More than ten times?
5  A. I'm not for sure how many times. More
6 than once.
7  Q. What did he do?
8  A. He said he would have a talk with whoever
9 was doing the name calling.
10  Q. Did he?
11  A. I don't know.
12  Q. Other than John, did you report it to
13 anyone else?
14  A. Um, I reported it to Rhonda Gatons and
15 possibly to Cord Cozma, or whatever his last name
16 is. I'm not for sure about the last name. Cozma,
17 I think.
18  Q. When did you report it to Rhonda?
19  A. I reported it to her -- I don't know the
20 date.
21  Q. What year?
22  A. I don't know the year.
23  Q. How many times?
24  A. I'm going to say at least once.

## Page 151

1  Q. What did Rhonda do? Or what did Rhonda
2 say?
3  A. I would say she told me she was going to
4 get back with me on it.
5  Q. Did she?
6  A. I don't remember.
7  Q. Did you ever follow up with Rhonda?
8  A. I don't remember that either.
9  Q. Why is it that you can remember in detail
10 what was done to you, but you can't remember at all
11 what the company did in response?
12  A. I don't know.
13  Q. So you think you talked to Cord?
14  A. I would say that I did talk to Cord.
15  Q. Did you submit these complaints in writing
16 or verbally?
17  A. Verbally.
18  Q. What did Cord do?
19  A. I believe Cord told me he would talk to
20 John.
21  Q. Do you know if he did?
22  A. No, I don't know if he did.
23  Q. Did you ever follow up with Cord?
24  A. I don't know.

## Page 152

1  Q. Did you ever call the hotline?
2   MS. De SAINT PHALLE: I'm going to object.
3 You've asked that question four or five times.
4   MS. CREVELING: I've asked it with respect
5 to each complaint. You're right.
6  A. I don't know if at the time of that date
7 that I called the hotline. I don't recall.
8  Q. (BY MS. CREVELING) When was the last time
9 that you complained about it?
10  A. Complained about what?
11  Q. About men calling you names.
12  A. I don't recall the date.
13  Q. Did you consistently complain up until you
14 went out on leave?
15  A. I would say that I did -- I did try to
16 complain. I will say I did.
17  Q. You seem confused on that point.
18  A. Well, I'm going to say yes.
19  Q. Okay. Just so I'm clear, you can't
20 remember when. You're not sure how many times.
21 And you haven't -- you don't recall what they did
22 in response. Is that --
23  A. I answered those questions.
24  Q. Is that -- am I clear on that point? That

## Page 153

1 is correct?
2  A. I'm telling you that on some things, I
3 can't recall.
4  Q. Did you ever complain about what you heard
5 being said to or about Sheryl Doss, Sue Gonzales,
6 Jennie or Katrina?
7  A. Would you repeat that, please?
8  Q. Did you ever complain to anyone about what
9 you heard being said to or about Sheryl Doss, Sue
10 Gonzales, Jennie or Katrina?
11  A. I complained about the behavior of the men
12 and their name calling in general to all women,
13 including myself.
14  Q. So when you made your complaints to John
15 Winschief, do I understand that you weren't
16 complaining just about what was being said to you,
17 but what was being said about all women?
18  A. On some occasions.
19  Q. Were there some occasions where you only
20 complained about what was happening to other women?
21  A. Yes.
22  Q. Were there some occasions where you only
23 complained about what was being said to or about
24 you?