Page 154
Page 156
Page 1 of 15
2:04-cv-02215-MPM-DGB   # 33-4
E-FILED
Wednesday, 01 March, 2006 08:15:40 AM
Clerk, U.S. District Court, ILCD

**Page 154**

1  A. Yes.
2  Q. Is there any other component to your
3  allegation that men were allowed to call females
4  names and nothing was done?
5  A. Now, what was that question?
6  Q. Are there any other components to your
7  allegation that men were allowed to call females
8  names and nothing was done?
9  A. I'm not for sure how to answer that
10 question. I'm not sure I understand that.
11 Q. Well, you told me that one of your
12 complaints against the company is that men were
13 allowed to call females names. You've told me
14 about name calling to you, to Sheryl Doss, to Sue
15 Gonzales, to Jennie and to Katrina. Is that
16 everything that you're complaining about when you
17 say men were allowed to call females names?
18 A. No.
19 Q. What else is there?
20 A. Well, they were allowed to do it and got
21 by with it, so it continued.
22 Q. Anything else?
23 A. To my knowledge -- to my knowledge, I
24 don't know for sure that any of them -- any of the

**Page 155**

1  men were ever written up or -- I guess written up
2  for it -- for doing that, for that behavior.
3  Q. Do you generally know the disciplinary
4  contents of other employee's files?
5  A. Sometimes.
6  Q. How?
7  A. Those employees will come up and say,
8  you're a fucking bitch for going to John Winschief
9  about that. So yes, some, I do. There was one
10 that I did know of.
11 Q. Who?
12 A. Allen Brickey.
13 Q. Did Allen Brickey's behavior then change?
14 A. No, it did not.
15 Q. Did you alert John Winschief to the fact
16 that Allen Brickey's behavior did not change?
17 A. Yes, I did.
18 Q. So is there anything else to that part of
19 your complaint?
20 A. At this time, I can't recall anything
21 else.
22 Q. I believe we've covered all of the three
23 allegations that you told me about at the beginning
24 of the day. Is there anything else that we haven't

**Page 156**

1  covered that is relevant to your complaint that
2  women were discriminated against or that you in
3  particular were discriminated against?
4  A. (No response.)
5     MS. De SAINT PHALLE: Here, take a look
6  through this.
7     MS. CREVELING: And I'm going to go
8  through that. I just wanted to make sure there
9  wasn't anything we missed.
10 A. Male employees, when they were injured,
11 they were actually taken off the jobs, put else
12 where for light duty. And John would leave the
13 women on the same jobs they had been injured on and
14 doing the same -- same thing. And I don't remember
15 if we went over that.
16 Q. (BY MS. CREVELING) Who had responsibility
17 for assigning light duty?
18 A. I'm assuming my supervisor.
19 Q. Why do you make that assumption?
20 A. Because he makes -- he makes the decisions
21 on who is going to be where in my -- in my
22 department.
23 Q. Is it possible that you're wrong in your
24 assumption about Mr. Winschief's involvement in

**Page 157**

1  light duty assignments?
2  A. Well, anytime that -- I guess yes, that
3  there could be a possibility.
4  Q. Okay.
5  A. But anytime that assignments of light duty
6  was -- John would come over and take the people
7  from -- from my work area or tell them where they
8  needed to go.
9  Q. What men got more light duty?
10 A. I can remember Maury was having problems
11 with his wrist, and when he complained that he was
12 having problems with his wrist, John took him off
13 the job that he was having problems with, took him
14 off right away and put him on something else.
15 Q. Do you have any idea whether John
16 Winschief or anyone at the company had received any
17 medical slips from Maury's physicians about what he
18 was able to do?
19 A. No, I do not.
20 Q. Isn't light duty a function of what the
21 treating physician says about the particular
22 employee?
23 A. In my case, it was.
24 Q. Do you have reason to believe it wasn't

### Page 158

1 for other people?
2   A. No, I don't have any reason to believe
3 that.
4   Q. So what other men do you think got more
5 light duty than they were entitled to --
6   A. Allen Brickey --
7   Q. -- or more favorable light duty?
8   A. -- when he complained of problems with his
9 wrist, he was taken and put in a different position
10 right away.
11   Q. Are you acquainted with the opinions and
12 recommendations of Allen Brickey's physician?
13   A. I don't know. No, I'm not.
14   Q. Would you expect that that might play a
15 role in what light duty he was given?
16   A. I don't know.
17   Q. Do you have any reason to believe that it
18 didn't?
19   A. No, I do not.
20   Q. Did you receive light duty?
21   A. I did receive light duty.
22   Q. Did other women receive light duty
23 assignments?
24   A. Yes.

### Page 159

1   Q. So men and women received light duty
2 assignments?
3   A. Men received light duty assignments as
4 soon as they complained of an injury and they
5 stayed there on light duty until they felt -- or
6 whoever felt that they were in good enough shape to
7 come back.
8      For myself, when I was put on light duty,
9 I was continued to work by myself on several nights
10 doing parts by myself. So I was not taken off my
11 job right away to go to light duty, as to where
12 Maury was for my job and Allen Brickey was taken
13 off of my job as soon as they reported injuries.
14   Q. Do you know whether or not they had
15 restrictions in place at that time?
16   A. All I know is that by John telling me that
17 he was taking my help away from me because they
18 were having problems and needed to be on light
19 duty.
20   Q. Okay. And when you complained, did you
21 have any restrictions in place?
22   A. Yes.
23   Q. Were you given light duty at the time the
24 company received your restrictions?

### Page 160

1   A. No, I was not.
2   Q. So it's your allegation that you were made
3 to work in violation of your restrictions?
4   A. Yes.
5   Q. Who did you complain to about that?
6   A. I complained to Jody McGrath. I
7 complained to John Winschief. And that's all I can
8 recall at this time.
9   Q. Did you complain to Jerry Ray?
10   A. Yes, I did.
11   Q. Did you complain to anyone else?
12   A. I complained to Jerry Ray in a safety
13 committee meeting with all -- with most of the
14 committee members there.
15   Q. Did you complain to your doctors?
16   A. Yes, I did.
17   Q. Do you believe there are other women who
18 were made to work in violation of their
19 restrictions?
20   A. My only personal opinion is yes.
21   Q. Do you know that based on any facts
22 associated with doctor's slips?
23   A. Not with doctor's slips, no.
24   Q. Did any women particularly complain to you

### Page 161

1 about that?
2   A. Yes.
3   Q. Who?
4   A. Debbie Gill.
5   Q. Anyone else?
6   A. None that I can recall at this time.
7   Q. Was her complaint that she was working in
8 violation of her restrictions, or was her complaint
9 that she didn't like her light duty assignment?
10   A. I'm going to -- I think that her complaint
11 was that it was not -- she was doing the same job
12 that she was hurt on.
13   Q. Unless her restriction said that she
14 couldn't do that job, is there a -- is there a
15 problem with that?
16   A. I don't know what her doctor's note
17 stated.
18   Q. Do you know whether or not her medical
19 restrictions were inconsistent with that particular
20 job?
21   A. I -- I don't remember if she ever -- I
22 don't remember her telling me that that's what her
23 doctor's note says, and I don't remember her ever
24 saying that -- what her -- her light duty was. I

## Page 162

1 know that she complained about being on the same
2 job that her injuries -- she received her injuries
3 from.
4 Q. But you don't know what her restrictions
5 were?
6 A. No, I do not.
7 Q. Any other women?
8 A. Not at this time.
9 Q. Is your complaint that you were made to
10 work in the same job that you were injured on?
11 A. In the beginning, yes.
12 Q. What restrictions did you have that were
13 inconsistent with that job?
14 A. In the beginning, my -- I had a -- a arm
15 in a sling and I was still working my same job,
16 even with my arm in a sling, and was told not --
17 not to use that arm.
18 Q. Who told you not to use that arm?
19 A. I had a restriction from the doctor that
20 give me the sling.
21 Q. Okay.
22 A. And there was no possible way to do that
23 job one-handed and be able to keep up with
24 production. And by not keeping up with production,

## Page 163

1 then you get -- got called all these nasty names by
2 Dustin Hall and Allen Brickey again.
3     As far as my knee --
4 Q. I'm sorry. Before we go on to that, which
5 arm did you have a sling on?
6 A. Left.
7 Q. Are you left or right-handed?
8 A. Right.
9 Q. Okay. Go ahead.
10 A. My knee, my restriction was to sit for
11 awhile, stand for awhile, sit for awhile, stand for
12 awhile. And I believe my wrist -- my arm in the
13 sling -- or bad arm, I believe I still had a
14 restriction on my arm because I know I was up
15 wiping glue off of doors and I wasn't suppose to be
16 using that arm. And there was no way that you
17 could flip those big doors over to wipe the glue
18 off of them and then flip them back over the other
19 way to send them down the conveyer.
20 Q. How many times did this happen, or what
21 length of time are we talking about?
22 A. Well, when I was still doing my job, the
23 parts, that went on for quite sometime. I'm going
24 to say that probably -- after the restrictions,

## Page 164

1 that probably went on for -- I'm going to say three
2 weeks to a month.
3 Q. When was your shoulder injury?
4 A. I don't know the date.
5 Q. What year?
6 A. I don't even -- I don't know the year.
7 And the reason I don't know the year is because
8 when my wrist was smashed between the rolling
9 carts, they're not for sure if that wasn't the same
10 injury from pulling my -- trying to pull my wrist
11 out that I injured my shoulder. So I don't know if
12 that was reported as two separate injuries or just
13 one. So I don't know. But I'm going to say that
14 was between '01 and '02. I don't -- I don't know
15 the exact dates.
16 Q. Which happened first, your knee or your
17 shoulder?
18 A. My wrist happened first.
19 Q. Then shoulder, then knee?
20 A. And then when I went in for my knee, I was
21 allowed to -- Jody told me to ask about my
22 shoulder.
23 Q. So you had problems with your light duty
24 assignment for three weeks to a month with respect

## Page 165

1 to your time period you were in a sling on your
2 shoulder?
3 A. For my -- my -- from the time with my
4 shoulder -- repeat that again.
5 Q. I'm just trying to understand. You told
6 me before that you had a sling, and I thought I
7 understood. You said this problem with your light
8 duty assignment went on for three weeks to a month?
9 A. With my -- with my arm, it did, yes.
10 Q. Did you have problems with your knee? Did
11 you have light duty with your knee?
12 A. I had light duty with my knee.
13 Q. Did you have any difficulties with the
14 light duty assignment? Did you feel that it was an
15 appropriate assignment?
16 A. Yes.
17 Q. What?
18 A. And that was for the fact that I was
19 suppose to -- when I finally got taken out of the
20 department and put in a different department on
21 light duty, I was set down to a little table -- to
22 a little table that had a -- I don't know what --
23 what it would be called. But what it did was it
24 melted the plastic, sealed the plastic bag.

1  Q. Okay.
2  A. And you had to sit down in order to do
3  that job. And I was still on stand so long, sit so
4  long. And that job was a sit down job only.
5  Q. Okay.
6  A. Which meant I was sitting in -- in a -- at
7  this table, this desk with this sealer on it for a
8  very long time.
9  Q. Okay. And who did you complain to about
10 that?
11 A. Willy.
12 Q. Wyckert?
13 A. Yeah.
14 Q. What did he do?
15 A. He told me to get up and move around
16 when -- when I felt like I needed to. So at that
17 point, I did start moving around. And then --
18 Q. Had anybody told you before that you
19 couldn't do that?
20 A. I was told to go over and seal bags. And
21 in order to do that, the job was you had to sit
22 down to do it. That was a sit down job.
23 Q. Were you able to just move the chair and
24 do it standing up?

Page 167
1  A. No.
2  Q. Why?
3  A. Because your fingers would get sealed
4  right along with the bag.
5  Q. Okay.
6  A. You had -- you are at eye level with it,
7  watching the bag be sealed.
8  Q. Okay. So once Willy told you you could
9  stand up when you wanted to, did that solve the
10 problem?
11 A. For awhile. And then Willy approached me
12 about somebody saying that -- something about the
13 fact that I was walking around and I was suppose to
14 be over there sealing bags. So from that point on
15 then, I was back to sitting again.
16 Q. Why?
17 A. Why?
18 Q. Yes.
19 A. Because I was -- was out walking around
20 right there by the machine and I was suppose to be
21 sitting doing that job.
22 Q. What did Willy Wyckert say to you?
23 A. I'm not for sure word for word. It was --
24 well, it was -- it was that I needed to be sitting

Page 168
1  to do that job. And then shortly after that, Willy
2  had me go over and help stand up -- it was stand up
3  job where you -- where I would pull plastic apart
4  on things going down a conveyer line.
5  Q. Did you complain to anybody besides Willy?
6  A. I'm sure I did, but I can't recall who at
7  this time.
8  Q. Do you believe that your gender had
9  anything to do with your light duty assignments?
10 A. Yes, I do.
11 Q. Why?
12 A. For reasons I mentioned before.
13 Q. Because other men got light duty?
14 A. They got light duty quicker and -- and it
15 was -- when men got light duty, they got light duty
16 and kept within their department.
17 Q. The company has an obligation to keep you
18 in your department when you're on light duty?
19 A. I don't know.
20 Q. Did you think they did?
21 A. I thought it was strange that men got to
22 stay in the department and women were shipped out.
23 Q. Can you point me to any company policy
24 that says they're required to keep you in your

Page 169
1  department on light duty?
2  A. I don't know.
3  Q. Do you anticipate you'll be able to in the
4  future?
5  A. I don't know at this time.
6  Q. You also allege in your complaint --
7  that's all light duty related -- that you had your
8  bottom patted or hit with wooden parts. I don't
9  believe we've heard that today.
10 A. Whenever -- whenever bad parts were
11 brought back to my work area, they would put
12 them --
13 Q. They who?
14 A. Art Decker, all builders and some
15 assemblers. Art Decker is the person I'm talking
16 about that hit me, patted me with a part for
17 cabinet door.
18 Q. How many times?
19 A. One time that really sticks in my mind.
20 Q. When was that?
21 A. One night at work on second shift, he hit
22 me with a door part right across the butt.
23 Q. Can you give me a year?
24 A. A year?

Page 170

1  Q. Uh-huh.
2  A. I don't know a year.
3  Q. Okay.
4  A. 2001, 2002 or 2003.
5  Q. Obviously.
6  A. Right.
7  Q. Can you narrow that down more?
8  A. Not at this time.
9  Q. Did he do it in jest?
10 A. Did he do it in jest?
11 Q. Uh-huh.
12 A. What do you mean by that, in jest?
13 Q. Did you think he was doing it as a joke?
14 Did he appear to think it was a joke?
15 A. I don't know.
16 Q. Did he laugh?
17 A. I don't remember him laughing.
18 Q. What did you do?
19 A. I reported it to John Winschief.
20 Q. Just verbal in or writing?
21 A. Verbal.
22 Q. Who else was present?
23 A. Sheryl Doss.
24 Q. By your request?

Page 171

1  A. She was at John's desk when I reported it.
2  Q. What did John say?
3  A. John said Art had a thing for me.
4  Q. What else did he say or do?
5  A. He laughed when he said that.
6  Q. Anything else?
7  A. Not on that incident.
8  Q. Did he make it stop?
9  A. I don't remember. I'm going to say no.
10 It continued.
11 Q. But did you ask -- what did you want John
12 to do, I guess, is my question.
13 A. I wanted him to stop that.
14 Q. Do you know if he took any action?
15 A. No, I do not.
16 Q. It did not stop?
17 A. No, it did not.
18 Q. I thought you told me there was one time
19 you could think of with Art Decker?
20 A. One time that set out in my mind, and that
21 was because he hit me so hard that it hurt and
22 there was actual bruising on the back of my legs.
23 Q. Did he hit you on your butt or on your
24 legs?

Page 172

1  A. Back of my legs and my butt. It was a
2  very long piece and it went at an angle.
3  Q. Did you seek medical treatment?
4  A. No, I did not.
5  Q. Take pictures?
6  A. No, I did not.
7  Q. Show the bruises to anybody?
8  A. Showed them to Sheryl.
9  Q. Where did you show them to Sheryl?
10 A. In the bathroom.
11 Q. Am I suppose to understand then that there
12 were other times that Art Decker hit you?
13 A. Yes, there was.
14 Q. How often did this happen?
15 A. Whenever he felt in the mood and was
16 bringing a part back.
17 Q. I'm asking you to quantify it for me.
18 A. He did that several times.
19 Q. What's several?
20 A. More than once.
21 Q. Can quantify it more than that?
22 A. He did it several times.
23 Q. Anybody else?
24 A. Kevin Gibson, who worked on the Costa,

Page 173

1  would fling his cabinet panels over at a trash
2  container, which was lined up directly with -- with
3  where my table or my work area was. And he would
4  throw -- from his machine, he would throw panels to
5  try to throw them in the dumpster and parts that
6  would be thrown in the dumpster and they would
7  ricochet off, and I've been hit that way before.
8  Q. Do you think he was purposely trying to
9  hit you?
10 A. I think he didn't care whether he hit me
11 or not.
12 Q. Do you think he was trying to hit you?
13 A. I think he didn't care whether it hit me
14 or not.
15 Q. I understand that. Do you think he
16 purposely was throwing it to hit you or to hit the
17 trash can?
18 A. I don't know.
19 Q. How many times did that happen?
20 A. Several times.
21 Q. Are you able to quantify several?
22 A. More than once.
23 Q. Anybody see it?
24 A. I don't know.

Page 174

1  Q. Anybody see Art Decker hit you?
2  A. I don't recall.
3  Q. Did you have to seek medical treatment for
4  any of this?
5  A. No, I did not.
6  Q. Complain to anybody?
7  A. Yes, I did.
8  Q. Who?
9  A. John Winschief.
10 Q. And what --
11 A. And that's who I reported it to.
12 Q. What happened after you reported it?
13 A. Nothing. It continued.
14 Q. Do you know if John Winschief ever talked
15 to Kevin Gibson?
16 A. No.
17 Q. Did you ever complain to anybody besides
18 John Winschief?
19 A. I went to Matt Ohrt. I went to -- on
20 different things. I went to Rhonda Gatons.
21 Q. Let me stop you there.
22 A. Okay.
23 Q. I specifically asked you, Art Decker
24 hitting you or Kevin Gibson throwing things at the

Page 175

1  trash and having them bounce off and hit you, did
2  you complain to anybody besides John Winschief and
3  management?
4  A. No, I did not.
5  Q. Why not?
6  A. Because John was my supervisor.
7  Q. But it obviously was not working?
8  A. No, it was not.
9  Q. So you didn't go to Human Resources?
10 A. I don't recall if I did. Right now, I
11 don't -- I would say no. I don't remember that
12 happening.
13 Q. Didn't call the hotline?
14 A. No, I did not.
15 Q. Didn't talk to Mick?
16 A. No, I did not.
17 Q. Any other examples of being hit?
18 A. I can't think of any others at this time.
19 Q. Why did you believe that it was
20 appropriate to report this kind of conduct to John
21 Winschief as opposed to anybody else?
22 A. I -- I would go to John Winschief because
23 he was my supervisor. And the reason to report
24 these incidents to John Winschief, which was my

Page 176

1  supervisor, was because other employees who took it
2  upon themselves to -- that were having problems,
3  they worked it out between themselves, which
4  usually ended up in yelling, screaming and the
5  whole department listening to their conversations.
6  And I chose not to handle it that way. I seen what
7  those people were capable of doing, yelling,
8  screaming, name calling. So I chose to go to my
9  direct supervisor, who was John Winschief.
10       (Whereupon Defendant's Deposition Exhibit
11       No. MB0707 was marked for identification
12       by the court reporter.)
13 Q. (BY MS. CREVELING) Take a look at that
14 exhibit. Tell me whether you've seen that before.
15 A. I believe I have.
16 Q. Can you point out any provision in that
17 E.E.O. and harassment policy that indicates that
18 you're required to report those things to your
19 supervisor?
20 A. What was the question again, please?
21 Q. Are you directed in that policy to report
22 instances of discrimination or harassment to your
23 supervisor?
24 A. I don't see that in here.

Page 177

1  Q. Where does the policy direct you to make
2  those complaints?
3  A. I don't see that in this policy.
4  Q. If you take a look at number six --
5  A. Number six, I see that.
6  Q. -- reporting discrimination --
7  A. Right.
8  Q. -- it indicates that you have options for
9  reporting, that it should be reported to H.R. or to
10 the vice president of safety, and it gives his
11 phone number, or to the confidential password
12 protected telephone hotline. Did you exercise any
13 of those options?
14 A. If you'll check the dates and let me know
15 if Matt Ohrt was in the building at that time, that
16 may have been an option for me. But I don't -- I
17 went to my -- my supervisor, my department
18 supervisor.
19 Q. I think that we have covered all of the
20 allegations that are listed in your complaint.
21 There are just a few other things in terms of
22 allegations that I want to go over.
23       In October of 2003, it's understood -- my
24 understanding was that you were seen by a Dr. Wayne

Page 178

1  Stillings.
2   A. Yes, I did see a Dr. Stillings.
3   Q. Okay. And in Dr. Stillings' report, you
4  indicated to him that someone was using your
5  computer code and ordering supplies. I don't
6  believe we've heard that allegation today. What's
7  that about?
8   A. That -- that came about when I was leaving
9  work one night. And I was no longer working in the
10 door plant. And I had stopped by to inform John
11 Winschief that I -- I was leaving. And on my way
12 to inform John -- I can't think of his name --
13 Scott Stewart stopped me with a printout.
14  Q. Scott Stewart, the same forklift driver --
15  A. Yes.
16  Q. -- that we talked about earlier?
17  A. And on this printout was my initials for
18 inventory control over bad parts that had to be
19 taken out of the system. And my name, initials, my
20 name was being used on the computer as being the
21 person to do that.
22  Q. Did you have access to a computer at work?
23  A. At that time, I had not been doing
24 inventory control for quite sometime.

Page 179

1   Q. Was there some problem?
2   A. Yes. Somebody was using my initials on
3  coding out and doing inventory.
4   Q. Were they doing it correctly?
5   A. I -- I do not know.
6   Q. Let me -- let me be more specific, I
7  guess, in my question. Was there some allegation
8  that you were doing something wrong, or were they
9  just simply pointing out to you that for whatever
10 reason, your name was still showing up on the
11 report?
12  A. It was showing for that particular day
13 that it was printed out that I had done inventory
14 control. And I had not.
15  Q. But did anybody confront you and say, you
16 screwed up this inventory and I know it's you
17 because your name's on the record, anything along
18 those lines?
19  A. Not that I know of.
20  Q. So the only concern was that your name was
21 on there when you weren't doing it?
22  A. Someone else was using my name.
23  Q. Right.
24  A. Was falsely using my name, without my

Page 180

1  permission, somebody was using my name in order to
2  do inventory control.
3   Q. But it didn't cause any adverse employment
4  issues for you?
5   A. (No response.)
6   Q. You weren't disciplined for it, you
7  weren't accused of changing inventory or --
8   A. Not at that time, no.
9   Q. What's the ordering supplies component of
10 that complaint?
11  A. (No response.)
12  Q. It says that someone was using your
13 computer code and ordering supplies.
14  A. Well, I don't know who -- that's a
15 mistake, because I didn't order supplies.
16  Q. Okay.
17  A. So that must be a whole new thing my
18 initials showed up on maybe.
19  Q. No. I'm referring to what's reflected in
20 Dr. Stillings' complaint of what you had told him.
21 Let me see if I can find it and I'll read it to
22 you.
23     MS. De SAINT PHALLE: Allegedly told him.
24     MS. CREVELING: I'm sorry?

Page 181

1      MS. De SAINT PHALLE: Allegedly told him.
2      MS. CREVELING: Okay.
3   Q. (BY MS. CREVELING) Well, I'm not finding
4  it easily. In any event, the problem, as I
5  understand it, should have been reflected as you
6  were -- your name was showing up on this inventory
7  control report, not that someone said that your
8  name was showing up as having ordered supplies.
9   A. My name was showing up as being the one to
10 key in inventory at that time into the system, and
11 I was not using the computer at that time.
12  Q. Dr. Stillings' report reflects she also
13 alleged that a co-worker stated that she was
14 allowed to go on a company picnic because she
15 sucked dick. And that's a quote.
16  A. That was when I went to -- there was a
17 company trip to Tennessee. And John Winschief
18 approached me and asked me if I would be interested
19 on going to -- and I believe it was Tennessee --
20 to -- the only trip I ever took when I worked for
21 Masterbrand -- he asked me if I would be interested
22 in going along. And I told him I would have to
23 make a phone call and I would give him my answer.
24     Then after break, I made -- I had made my

1  phone call on break, and then after break, I told
2  John that yes, I could go. And in the meantime,
3  John had also asked -- after he asked me, he had
4  asked Maury if he would be interested in going if I
5  couldn't. And then John told Maury that I would be
6  going on it. And it was an issue on quality of --
7  of wood, and --
8     Q. What was an issue on quality of wood?
9     A. We were getting bad wood in, so we were
10 making a trip to the supplier.
11    Q. Is this another Masterbrand plant you were
12 going to in Tennessee?
13    A. I believe it was a Masterbrand plant. And
14 it was going to a supplier to address some issues
15 on what was expected as far as what wood was good
16 and what wasn't, what would qualify as good and
17 what wouldn't.
18    Q. Okay.
19    A. And we --
20    Q. I'm sorry. Did you tell me then that John
21 Winschief told Maury that you were going?
22    A. That I would be going, and Maury wasn't
23 going. I remember Sheryl Doss was upset because
24 she was then actually the inspector, the person who

1     A. I don't -- I don't -- I don't know what
2  was said. I don't recall at this time. I went
3  back to work.
4     Q. Did John promise you that he would do
5  anything about it?
6     A. I don't know that he did at that time.
7     Q. Was anything done about it?
8     A. No, not -- not to my knowledge, there
9  wasn't.
10    Q. Well, I think we've talked about
11 everything on my list. Is there anything else that
12 we haven't talked about that you think is important
13 for me to know about what was going on at the
14 plant?
15    A. (No response.)
16       MS. De SAINT PHALLE: No.
17    Q. (BY MS. CREVELING) I tried to cover
18 everything that was in both of your charges, in
19 your report to Dr. Kopacz and Dr. Stillings and in
20 the complaint you filed.
21    A. Well, at this time, I can't think of
22 anything else.
23    Q. Okay. One thing I want to clarify is your
24 complaint uses both the phrase sexual

Page 183

Page 185

1  inspected the wood. And I don't know that she was
2  upset, but she didn't understand as to why she
3  wouldn't be making the trip with John.
4        Then there was a day shift person that
5  went with us. I can't remember her name. Patty --
6  Patty Brown. Patty Brown went. So there was John,
7  Patty Brown and myself. And Patty Brown's job was
8  the same as Sheryl Doss's, but she did it on day
9  shift. She was an auditor, a wood inspector, an
10 auditor.
11       So we went to -- John drove and we went to
12 the wood supplier. And I don't remember the date
13 when we went. But when we got back, Maury asked
14 how my trip was. And he said the only reason I got
15 to go was because I sucked John's dick.
16    Q. What did you do in response?
17    A. Well, I -- I had went over and talked to
18 John, and John said he knew about it, that -- and
19 apparently someone -- the impression I was under
20 from what John said was that somebody had
21 already -- had already said that to him. Whether
22 it was Maury or someone else, I don't know. But
23 John knew about that remark.
24    Q. Did he say anything else?

1  discrimination and sexual harassment. I understand
2  that you believe many things happened to you at
3  work because you're a woman. Were you sexually
4  harassed in the sense that someone made sexual
5  advances to you or made comments of a sexual nature
6  to you?
7     A. Well, I remember one day when I gave my
8  opinion, I was wiping glue from doors, and I had
9  given my opinion that -- had something to do with
10 too much glue or the type of glue on a door. And I
11 had mentioned it to a builder. And I remember
12 Dustin Hall saying, if we want your opinion -- if I
13 want your opinion, I'll rattle my zipper. So I
14 don't know what that falls under.
15    Q. How many times did Dustin Hall make such a
16 statement?
17    A. That statement, once.
18    Q. Can you tell me when it was?
19    A. It was in the same period that I was
20 working wiping glue from the doors and about the
21 same time period that Dustin put, threw, placed,
22 whatever, my stool over on the other side of the
23 machine.
24    Q. I think that was roughly March of '05.

1 Q. Does that seem about right?
2     MS. De SAINT PHALLE: Not '05.
3 A. Not '05.
4 Q. (BY MS. CREVELING) I'm sorry. '03.
5 A. Okay.
6 Q. How are you making a living since you've
7 been terminated?
8 A. I'm not making a living.
9 Q. How are you supporting yourself, I guess,
10 would be a better question?
11 A. I'm not supporting myself.
12 Q. Who is supporting you?
13 A. My husband.
14 Q. What does he do?
15 A. He's retired.
16 Q. What did you do before you worked for
17 Masterbrand?
18 A. I worked in a factory.
19 Q. Which one?
20 A. Ampad.
21 Q. Is that short for anything?
22 A. American Pad and Paper.
23 Q. How long did you work for them?
24 A. For 16 years.

Page 187

1 Q. Under what circumstances did you leave
2 their employment?
3 A. The company was being bought, and my
4 letter from them stated that my job was eliminated.
5 Q. Did you ever have any Workmans'
6 Compensation claims against American Pad and Paper?
7 A. Yes, I did.
8 Q. How many?
9 A. One, two.
10 Q. And did you ever file a charge of
11 discrimination against them?
12 A. I don't recall. And the reason I say that
13 is I don't know if there was anything filed.
14 Q. Okay.
15 A. We were -- we were trying to get a union
16 in. And I guess there was something filed. Yes.
17 Q. What was it about?
18 A. Union activity.
19 Q. Did you ever file any kind of complaint
20 against anyone at American Pad and Paper that they
21 discriminated you on the basis of gender or for any
22 other prohibited reason?
23 A. It had to do with the union activities,
24 yes.

Page 188

1 Q. So you believe you were discriminated
2 against because you were assisting in union
3 organizing?
4 A. Yes.
5 Q. And that was filed with some agency?
6 A. I don't remember. Yes. The union filed
7 charges.
8 Q. With the National Labor Relations Board?
9 A. Yes, yes.
10 Q. Were you involved in any other complaints
11 against American Pad and Paper?
12 A. None that I recall.
13 Q. Did you experience conflicts with any of
14 the employees at American Pad and Paper similar to
15 what you've described at M.B.C.I.?
16 A. I was there 16 years, and I think I got
17 along very well with my people that I worked with,
18 until the union activities started.
19 Q. What type of things do you believe
20 happened to you because of your union organizing
21 activities?
22 A. One incident I can remember was I was
23 accused of passing out a -- a union card on company
24 time.

Page 189

1 Q. Other than the lawsuit that we're here
2 about today, have you filed any other -- or been a
3 party to any other lawsuits?
4 A. No, I have not.
5 Q. What does Betty Burns know about the
6 allegations in your complaint?
7 A. Betty Burns. I can't think of it right
8 now.
9 Q. Did she work in your area?
10 A. No, Betty Burns didn't work in my
11 department.
12 Q. Was she supervised by John Winschief?
13 A. No. She wasn't a supervisor.
14 Q. Was she a witness to anything done or said
15 by Brickey or Hall or any of the other men you
16 mentioned?
17 A. I'm not for sure.
18 Q. What does Shirley Boddy know about any of
19 the allegations in your complaint?
20 A. Shirley stated that she -- she was -- has
21 been treated unfairly.
22 Q. By the same people you were?
23 A. By some of the same people.
24 Q. Who?

## Page 190

1  A. Management.
2  Q. Like who?
3  A. Dave Pantier, Matt Ohrt.
4  Q. She did not work in your department?
5  A. No.
6  Q. Was she supervised by John Winschief?
7  A. Not that I'm aware of.
8  Q. But she has complaints about Dave Pantier
9 and Matt Ohrt?
10  A. Yes.
11  Q. How are your bills from Dr. Kopacz'
12 treatment being paid?
13  A. They are being paid by insurance.
14  Q. Whose insurance?
15  A. My insurance.
16  Q. Are you on COBRA?
17  A. I am no longer on COBRA.
18  Q. What insurance do you have?
19  A. I have a personal health insurance.
20  Q. When did you acquire that policy?
21  A. Probably a few months back, a few months
22 ago.
23  Q. And before that?
24  A. I was on my husband's policy.

## Page 191

1  Q. Who is your current policy through?
2  A. Personal Care.
3  Q. That's the name of the carrier?
4  A. Yes.
5  Q. What's -- what's the co-insurance? Is it
6 a 80/20, 90/10, certain deductible? What's the
7 arrangement for what your personal out-of-pocket
8 is?
9  A. I'm not real sure about that.
10  Q. Can you estimate for me how much you've
11 had in out-of-pocket medicals related to
12 Dr. Kopacz' care?
13  A. At this time, I -- I can't. I -- I don't
14 have a clue.
15  Q. Have you had to pay any out-of-pockets?
16  A. Yeah, I've paid out-of-pocket.
17  Q. Has any of Dr. Kopacz' treatment been
18 picked up, or was any of it picked up by Workmans'
19 Compensation?
20  A. Not that I know of, no.
21  Q. Your complaint alleges that you suffered
22 anxiety, major depression and -- and P.T.S.D. as a
23 result of what you experienced at Masterbrand.
24  A. Yes.

## Page 192

1  Q. Tell me all the doctors that you've
2 treated with or health care providers that you've
3 treated with for that.
4  A. I have been treated by Dr. Kopacz.
5  Q. Anyone else?
6  A. No. He's the only one who's treated me
7 for that.
8  Q. No other therapist?
9  A. Other than Dr. Stillings, which that was
10 company --
11  Q. Right.
12  A. -- doctor who sent me to him. There was a
13 counselor that I saw in Dr. Kopacz' office. Her
14 name was Pat. And I believe that's all.
15  Q. How often are you seeing Dr. Kopacz?
16  A. Now I see him anywhere from two months to
17 three months, I'm going to say.
18  Q. When is your next appointment with him?
19  A. I don't remember.
20  Q. Is it anytime soon?
21  A. Probably have one coming up soon.
22  Q. Is it already scheduled?
23  A. Yes.
24  Q. Why do you -- for what -- for what

## Page 193

1 symptoms or for reasons do you continue to see
2 Dr. Kopacz?
3  A. I see him because I -- I --
4     THE WITNESS: Can I take a break?
5     MS. CREVELING: Sure.
6     (3:20-3:22 At this point in the
7     proceedings a short recess was taken,
8     after which the following proceedings were
9     conducted:)
10  Q. (BY MS. CREVELING) So for what reasons or
11 symptoms are you seeing Dr. Kopacz?
12  A. I see Dr. Kopacz for anxiety attacks,
13 depression.
14  Q. Anything else?
15  A. No. Counseling.
16  Q. How often do you have anxiety attacks?
17  A. Whenever they happen.
18  Q. I'm sure of that. But do they happen with
19 any frequency?
20  A. I can't determine. I don't -- I don't
21 know when they're going to happen, no.
22  Q. Based on your experience since you started
23 seeing Dr. Kopacz, roughly two years ago, how often
24 have your anxiety attacks occurred?

1  A. Often.
2  Q. Are you able to be anymore specific than
3  that?
4  A. No.
5  Q. Does Dr. Kopacz know?
6  A. I -- I don't know how to answer that.
7  Q. Do you tell Dr. Kopacz when you have
8  anxiety attacks?
9  A. Yes.
10  Q. So would Dr. Kopacz know then?
11  A. He would know from my last appointment,
12  yes.
13  Q. So if I were to review Dr. Kopacz'
14  records, would I be able to determine on how
15  frequent of a basis you've experienced anxiety
16  attacks?
17  A. I don't know.
18  Q. Have you seen your records from
19  Dr. Kopacz?
20  A. I've seen them once, yes.
21  Q. You've reviewed your records from
22  Dr. Kopacz?
23  A. Once.
24  Q. Did those records from Dr. Kopacz reflect

Page 195

1  that you had told him when you experienced anxiety
2  attacks?
3  A. I don't remember.
4  Q. Is there any way we can figure out how
5  often you're having anxiety attacks?
6  A. I don't know.
7  Q. What triggers your anxiety attacks?
8  A. I don't know.
9  Q. You don't know what triggers your anxiety
10  attacks?
11  A. (No response.)
12  Q. What do you think triggers your anxiety
13  attacks? What do you suspect?
14  A. (No response.)
15  Q. For example, some people suffer from
16  migraines. They think licorice causes their
17  headaches or -- what do you suspect causes your
18  anxiety attacks?
19  A. I suspect that what causes my anxiety
20  attacks is when my nerves have had it, when I have
21  to review things like -- that has to do with
22  Masterbrand, things like that --
23  Q. You were terminated roughly two years ago.
24  Have you been back to the plant since you were

Page 196

1  terminated?
2  A. I don't believe I have.
3  Q. Have you been to any hearings associated
4  with your Workmans' Compensation claim since you've
5  been terminated?
6  A. No hearings, no.
7  Q. I guess I should ask you, did you
8  experience anxiety attacks prior to your
9  termination?
10  A. Yes, I did.
11  Q. When did they start?
12  A. Um, I don't know.
13  Q. Did you tell anybody when they started?
14  A. I don't know.
15  Q. Who would know?
16  A. My doctors.
17  Q. The only doctor you've seen is Dr. Kopacz,
18  right?
19  A. He -- he is my doctor, yes.
20  Q. When you say doctors, plural, is there
21  anyone else who would know?
22  A. My doctor, Dr. Kopacz.
23  Q. And that's it?
24  A. Yes.

Page 197

1  Q. So you can't tell me how often your
2  anxiety attacks have occurred and you can't tell me
3  what triggers them, other than if you think about
4  Masterbrand?
5  A. That's correct.
6  Q. How long do they last?
7  A. Until I'm not having one.
8  Q. Ma'am, when you get in front of jury and
9  you're trying to explain to them how you feel that
10  you've been damaged as a result of Masterbrand
11  Cabinets, are you going to tell the jury that it
12  only lasted until it was over, or are you going to
13  tell them something more specific? If you intend
14  to tell them something more specific, then I'm
15  entitled to know that today.
16  A. At this time, I don't have anything more
17  specific to tell you than that.
18  Q. Do they last more than a day? Do they
19  last a week? Do they last an hour?
20       MS. De SAINT PHALLE: Let's put on the
21  record this deposition has been going on for almost
22  six hours. So I think, yes, that at this point in
23  time, that's probably an accurate answer.
24       MS. CREVELING: Are you instructing her

Page 198

1 not to answer?
2   MS. De SAINT PHALLE: No, I'm not
3 instructing her not to answer. But I mean, you
4 know, there's a limit to how much one can undergo.
5   MS. CREVELING: I'm happy to pick this up
6 on Friday, if you would prefer. We're almost done.
7 We are talking about her damages. We're entitled
8 to have an understanding of her damages. She makes
9 very serious allegations. Presumably she's going
10 to put a very serious dollar amount on the table.
11 And we're entitled to understand how she valued
12 that and what she's going to tell the jury. If she
13 doesn't know the answer to that question, I don't
14 know who does.
15   A. There is not any time limit on how long
16 they last.
17   Q. (BY MS. CREVELING) What's your -- can you
18 give me an example of what your experience has
19 been?
20   A. My experience has been anywhere from
21 fifteen minutes to two days.
22   Q. What types of things happen to you when
23 you experience an anxiety attack?
24   A. The same thing that's happening right now.

Page 199

1   Q. You cry?
2   A. I can't breathe. I need some air.
3      (4:28-4:32 At this point in the
4      proceedings a short recess was taken,
5      after which the following proceedings were
6      conducted:)
7      (At this point in the proceedings an
8      off-the-record discussion was held, after
9      which the following proceedings were
10     conducted:)
11   Q. (BY MS. CREVELING) You were describing
12 your symptoms for me during an anxiety attack. I
13 understand that's crying and having difficulty
14 breathing. Are there any other physical components
15 to that?
16   A. My hands get tingly and I feel
17 light-headed.
18   Q. Do you take any medication to address the
19 problem?
20   A. Lexapro.
21   Q. What are your instructions on how you're
22 suppose to take your Lexapro?
23   A. One every morning, and then I take one in
24 the afternoon if I need it.

Page 200

1   Q. What dosage is that?
2   A. That is, I believe, 20-milligram.
3   Q. Do you find that it helps you?
4   A. Yes, I believe it does.
5   Q. Has Dr. Kopacz given you any indication of
6 when he thinks you'll be released from his care?
7   A. No.
8   Q. How long -- how old are you presently?
9   A. I'm 46.
10   Q. Have you applied for Social Security
11 Disability?
12   A. Yes, I have.
13   Q. When did you apply for that?
14   A. I'm not for sure. I applied -- I don't
15 know the date, but I have applied for it.
16   Q. Have you received a response?
17   A. I received a response that they denied it.
18 And then I -- I have replied.
19   Q. You appealed that decision?
20   A. Yes.
21   Q. What's the status of your appeal?
22   A. Anxiety, depression.
23   Q. Do you have any idea when you'll hear from
24 Social Security folks?

Page 201

1   A. No, I do not.
2   Q. Do you have an attorney representing you
3 on that claim?
4   A. No, I do not.
5   Q. Has anyone other than Dr. Kopacz submitted
6 any sort of report on your behalf in conjunction
7 with that application?
8   A. All -- I signed a release for all my
9 medical records. And I'm not for sure who -- who
10 all would be involved in that.
11   Q. At any time in your life, have you treated
12 with anybody other than Dr. Kopacz for things like
13 anxiety or depression?
14   A. Yes.
15   Q. When was that?
16   A. I don't know what date it was, but it was
17 before -- sometime -- I don't know what year
18 that -- I don't know when it was. It was years
19 ago.
20   Q. Before you worked for Masterbrand?
21   A. Yes.
22   Q. Who did you treat with back then?
23   A. I believe it was Dr. Winnograd or
24 Dr. Massie.

1  Q. Where are those doctors located?
2  A. Toledo, Illinois.
3  Q. How do you spell Massie?
4  A. M-a-s-s-i-e, I believe.
5  Q. How long did you treat with Dr. Winnograd
6  or Dr. Massie?
7  A. Dr. Massie, for many years. I don't know
8  for how many years. Then he retired and
9  Dr. Winnograd was one of the doctors who replaced
10 him.
11 Q. Was your treatment with Dr. Massie solely
12 for things like anxiety and depression?
13 A. I don't know that I -- I said Dr. Massie
14 because he was in the same office. I believe it
15 was just Dr. Winnograd. I -- I'm thinking that I
16 had a nerve pill for a few weeks. I had a
17 prescription to take a nerve pill for a few weeks,
18 a couple weeks.
19 Q. Okay. Did you have any plans or have any
20 thoughts about how long you would remain in the
21 work force?
22 A. Until I retired.
23 Q. When did you think you might retire?
24 A. I was thinking 65.

Page 203

1  Q. Your husband's already retired, right?
2  A. Yes, my husband's already retired.
3  Q. You had no plans to retire early to be
4  able to spend time with him?
5  A. No. I have always worked.
6  Q. Your husband -- is your husband your only
7  source of support?
8  A. Yes, he is.
9  Q. The health insurance that you have, that's
10 not through any employer?
11 A. No, it's not.
12 Q. Okay. How did you find that health
13 insurance?
14 A. I believe I received something through the
15 mail, and so I called the number.
16 Q. Have there been any financial impacts on
17 your family as a result of the termination of your
18 employment?
19 A. Yes.
20 Q. Is your family able to meet its bills
21 based on your -- just on your husband's income?
22 A. Yes.
23 Q. Have you taken out any loans or anything
24 of that nature that you attribute to the loss of

Page 204

1  your employment at M.B.C.I.?
2  A. I've taken out a loan. We have taken out
3  a loan, yes.
4  Q. Tell me about that loan.
5  A. That loan was to purchase a rental.
6  Q. A rental what?
7  A. A rental, real estate rental.
8  Q. Are you telling me that if you had not
9  been terminated, you wouldn't have had to have that
10 loan in order to buy that rental?
11 A. I'm saying that we -- we wouldn't have had
12 to take out a loan if I was still working.
13 Q. How much is the loan for?
14 A. I'm not for sure. Somewhere between --
15 hm. Somewhere between fifteen to twenty thousand.
16 Q. Where is this rental property?
17 A. It's in Windsor.
18 Q. What's the address?
19 A. 1512 Oklahoma -- or Ohio.
20 Q. Who owns that property, just you and your
21 husband?
22 A. Yes.
23 Q. Any other loans, withdraws from savings or
24 retirement type thing that you attribute to the

Page 205

1  loss of your job from Masterbrand?
2  A. Yes.
3  Q. Tell me about those.
4  A. We take out -- or we use money to make the
5  house payment on my house in Windsor that I used
6  before Elmer and I got married. He now pays that.
7  Q. Is he able to pay that from his income?
8  A. Yes.
9  Q. Do you rent that property?
10 A. No, we don't.
11 Q. What's happening with that property?
12 A. It's just sitting there waiting to be
13 remodeled.
14 Q. Then what will you do with it?
15 A. And then it will either be sold or used as
16 a rental.
17 Q. How long has it been empty?
18 A. Probably for a year, year and a half.
19 Q. What happened to it before that?
20 A. Before that, that was where I lived.
21 Q. Did you have a 401(k) or an I.R.A., any
22 kind of retirement?
23 A. No, I did not.
24 Q. Did your husband?

Page 206

1   A. I'm not for sure.
2   Q. Nothing that he's taken out in order to
3 meet bills, or --
4   A. He takes out -- I know that he's taken out
5 some money to -- in order to pay bills. But I'm
6 not for sure. It's -- it would -- it's retirement,
7 but I'm not for sure what it is.
8   Q. How much were you making at Masterbrand
9 when you left?
10   A. Probably -- I'll guess -- $11 an hour.
11   Q. Is that more or less than you were making
12 at Ampad?
13   A. That was less.
14   Q. Other than health insurance, did you have
15 any other benefits through Masterbrand?
16   A. Dental insurance. I guess that would be
17 covered with health. No, I can't think of anything
18 at this time.
19   Q. Have you been sent to collection on any
20 bills since your termination?
21   A. Yes, I have.
22   Q. Tell me about that.
23   A. It has to do with Workmans' Compensation,
24 my injuries and Workmans' Compensation hasn't been

Page 207

1 settle, decided whether it was Workmans'
2 Compensation or not. So I have those bills.
3   Q. You've been sent to a collection agency on
4 those bills?
5   A. Yes, I have.
6   Q. Those will either be picked up by
7 Workmans' Comp or you'll have to pay them
8 out-of-pocket; is that right?
9   A. That's correct.
10   Q. Have you filed for bankruptcy?
11   A. Yes.
12   Q. When did you do that?
13   A. Um, back in the -- let's see. Sometime in
14 '90.
15   Q. Any current plans to file?
16   A. No.
17   Q. Are your daughters self-supporting?
18   A. Yes.
19   Q. Do you currently make an income from any
20 source?
21   A. No, I do not.
22   Q. Have you since your termination?
23   A. No, I have not.
24   Q. You were diagnosed at one point by

Page 208

1 Dr. Kopacz with P.T.S.D. Is it your understanding
2 that you still suffer from P.T.S.D.?
3   A. That would be my understanding.
4   Q. That you still have Post-Traumatic Stress
5 Disorder?
6   A. Yes.
7   Q. Does that differ in your mind from your
8 anxiety attacks?
9   A. No.
10   Q. Same type symptoms?
11   A. I think --
12   Q. Same issue?
13   A. I think it's the same thing.
14   Q. You've also been diagnosed with major
15 depression?
16   A. Yes.
17   Q. What's that about?
18   A. Well, I think that all is -- is the same
19 thing that I'm seeing Dr. Kopacz for.
20   Q. Same type symptoms?
21   A. Yes.
22   Q. Have you been hospitalized for any of
23 these conditions?
24   A. No.

Page 209

1       MS. CREVELING: I think that's all I have.
2       MS. De SAINT PHALLE: Okay. We're done.
3       MS. CREVELING: Do you want to explain
4 signature?
5       MS. De SAINT PHALLE: Oh, yeah.
6       (At this point in the proceedings an
7       off-the-record discussion was held, after
8       which the following proceedings were
9       conducted:)
10       MS. De SAINT PHALLE: So we'll just waive
11 signature.
12
13           *****
14
15 (Whereupon deposition concluded at 3:47 p.m.)

```
 1  STATE OF ILLINOIS    )
 2  COUNTY OF MACON      )
 3
            I, Dana Jo Rowe, a Notary Public in and for the
 4  County of Macon, State of Illinois, do hereby
    certify that CINDY SMITH, the deponent herein, was
 5  by me first duly sworn to tell the truth, the whole
    truth and nothing but the truth, in the
 6  aforementioned cause of action.
            That the foregoing deposition was taken on
 7  behalf of the Defendant, on the 15th day of
    November, 2005. That said deposition was taken
 8  down in stenograph notes and afterwards reduced to
    typewriting under my instruction; and that it is a
 9  true and accurate record of the testimony given by
    the deponent.
10          I do hereby certify that I am a disinterested
    person in this cause of action; that I am not a
11  relative of any party or any attorney of record in
    this cause, or an attorney for any party herein, or
12  otherwise interested in the event of this action,
    and am not in the employ of the attorneys for
13  either party.
            IN WITNESS WHEREOF, I have hereunto set my hand
14  and affixed my notarial seal this 17th day of
    November, 2005.
15
16              Dana Jo Rowe, RPR
17              Notary Public
18
19
20  "OFFICIAL SEAL"
    Dana Jo Rowe Notary Public, State of Illinois
21  My commission expires:  10/31/09
22
23
24
```