**E-FILED**
Wednesday, 01 March, 2006  08:15:57 AM
Clerk, U.S. District Court, ILCD

# Attachment 2

**Page 1**

```
            IN THE UNITED STATES DISTRICT COURT

            FOR THE CENTRAL DISTRICT OF ILLINOIS

                    URBANA DIVISION


CINDY SMITH,                    )
                                )
            Plaintiff,          )
                                )
    vs.                         )   Case No. 04-2215
                                )
MASTERBRANDS CABINETS,          )
INC.,                           )
                                )
            Defendant.          )
```

Discovery deposition of MATTHEW OHRT, taken at
the instance of the Plaintiff, on November 18, 2005
scheduled for the hour of 12:20 P.M., at 1201
Tuscola Blvd., Tuscola, Illinois, before Molly A.
Hobbie, Certified Shorthand Reporter and Notary
Public, pursuant to the attached stipulation.

```
                GOLEMBECK REPORTING SERVICE
                Connie S. Golembeck, Owner
                      (217) 523-8244
                      (217) 632-8244
```

**Page 2**

## S T I P U L A T I O N

It is stipulated and agreed, by and between
the parties hereto, through their attorneys, that
the deposition of MATTHEW OHRT, may be taken before
Molly A. Hobbie, a Certified Shorthand Reporter,
upon oral interrogatories, on November 18, 2005 at
the instance of the Plaintiff, scheduled for the
hour of 12:20 P.M., at 1201 Tuscola Blvd., Tuscola,
Illinois.

That the oral interrogatories and the answers
of the witness may be taken down in shorthand by
the Reporter and afterwards transcribed.

That any requirement as to the reading over
and signing of the deposition by the witness or the
filing of the same are not expressly waived.

That all objections are hereby reserved except
as to the form of the question which is waived
unless specifically noted.

That the deposition or any part thereof may be
used for any purpose for which depositions are
competent, by any of the parties hereto, without
foundation proof.

That any party hereto may be furnished copies
of deposition at his or her own expense.

**Page 3**

APPEARANCES:

MS. ALEXANDRA de SAINT PHALLE
Londrigan, Potter & Randle
Attorneys at Law
1227 South Seventh Street
Springfield, Illinois 62703

   Appeared on behalf of Plaintiff,


MS. KELLEY BERTOUX CREVELING
Baker & Daniels
Attorneys at Law
300 N. Meridian Street, Suite 2700
Indianapolis, Indiana 46204

   Appeared on behalf of Defendant.

ALSO PRESENT:
Mr. Matthew Ohrt
Ms. Cindy Smith

**Page 4**

## I N D E X

PAGE

Direct Examination by Ms. de Saint Phalle 5
Cross Examination by Ms. Creveling        62
Redirect Exam. by Ms. de Saint Phalle     85

EXHIBITS                                  MARKED
Deposition Group Exhibit 6                  19
Deposition Exhibit 7                        55
Deposition Exhibit 0560                     77
Deposition Exhibit 0132 & 0133              82

(Exhibits attached.)

5

(The witness was sworn by the
2      Reporter.)
3                MATTHEW OHRT,
    called as a witness herein, at the instance of the
    Plaintiff, having been duly sworn upon his oath,
6   testified as follows:
7                DIRECT EXAMINATION
8   BY MS. de SAINT PHALLE:
9      **Q.** Could you please state your name and
10  address.
11     **A. Matthew Ohrt, Rural Route 3, Box 94C,**
12  **Sullivan, Illinois, 61951.**
13     **Q.** Could you tell me what is your educational
14  background?
15     **A. I have a masters degree.**
16     **Q.** Where did you get your masters degree?
17     **A. University of Tulsa.**
18     **Q.** When did you get that masters degree?
19     **A. '99.**
20     **Q.** What's your masters degree in?
21     **A. It's called industrial organizational**
22  **psychology or IO.**
23     **Q.** Before getting the masters degree, had you
24  gone to college?

6

1      **A. Yes.**
2      **Q.** Where did you go to college?
3      **A. Western Illinois University.**
4      **Q.** When did you graduate from Western?
5      **A. '96.**
6      **Q.** What was your degree in at Western?
7      **A. Human resources psychology.**
8      **Q.** When did you graduate from high school?
9      **A. '91.**
10     **Q.** Where did you go to high school?
11     **A. Freeport, Illinois.**
12     **Q.** Did you work any time between 1991 and
13  1996?
14     **A. Yes.**
15     **Q.** And where did you work?
16     **A. I owned a construction company.**
17     **Q.** Where is that located?
18     **A. Freeport, Illinois as well as Macomb,**
19  **Illinois where I went down to school.**
20     **Q.** Are you married?
21     **A. Yes.**
22     **Q.** After completing your degree at Western,
23  did you have any outside employment?
24     **A. Just worked a year with the construction**

7

1   business.
2      **Q.** Then did you -- what was the year that you
3   entered the University of Tulsa?
4      **A. It would have been '97, I believe. I was**
5   **there two years.**
6      **Q.** After completing the degree at the
7   University of Tulsa, where did you become employed?
8      **A. I became employed at Tenaco Automotive.**
9      **Q.** Where is that company located?
10     **A. Plant was in Smithville, Tennessee.**
11     **Q.** How long did you work there?
12     **A. Approximately two years.**
13     **Q.** Would that be from 1999 to approximately
14  2001?
15     **A. Uh-huh, yes.**
16     **Q.** What was the reason for leaving that
17  employment?
18     **A. I went to Toyota.**
19     **Q.** Where was the plant Toyota that you worked
20  in?
21     **A. Georgetown, Kentucky.**
22     **Q.** How long did you work there?
23     **A. Approximately two years.**
24     **Q.** So what dates did that comprise?

8

1      **A. I'd have to look as far as the months, but**
2   **'01 to '03 -- I started with Masterbrands in '02,**
3   **August of '02.**
4      **Q.** Why did you leave the Toyota plant?
5      **A. Moved back to family in Illinois.**
6      **Q.** Do you have any family located in the
7   Sullivan area?
8      **A. No.**
9      **Q.** Where is the closest family you have in
10  Illinois?
11     **A. Freeport.**
12     **Q.** Is your wife from Illinois?
13     **A. Yes.**
14     **Q.** What part of Illinois is she from?
15     **A. A little town called Adeline. It's close**
16  **to Freeport.**
17     **Q.** When you started with Masterbrands, did
18  you make more money than you had been making at the
19  Toyota plant?
20     **A. Yes.**
21     **Q.** Are you a member of any church in
22  Illinois?
23     **A. Not currently.**
24     **Q.** In the period of 2002 to 2003 were you a

2    A. No.

3    Q. You mentioned that you started with Masterbrands in August of 2002; is that correct?

A. Yes.

6    Q. What position did you hire in to?

7    A. Employee relations manager.

8    Q. What were your job duties in that respect?

9    A. It was a generalist role reporting to the
10   human resources manager.

11   Q. Who was the human resources manager?

12   A. Kord Kozma.

13   Q. Is Kord Kozma still employed?

14   A. No.

15   Q. When did he leave the company?

16   A. It would have been January of '03 I
17   believe.

18   Q. Do you know the reason why he left the
19   company?

20   A. No, I don't.

21   Q. Who took his job?

22   A. After a short period of time I was
23   promoted.

24   Q. What would have been the month in which

---

1    you became human resource manager?

2    A. It would have been I believe January of
3    '04 I believe.

4    Q. As an employee relations manager, what did
5    you --what do your job duties consist of?

6    A. Like I said, it was a generalist role.
7    That would be benefits, training, safety,
8    investigations, et cetera. Anything in HR really.

9    Q. In the period from August of '02 to
10   January of '03, what were your hours of employment?

11   A. I generally work the first shift hours.
12   It would be flexible as needed. It could be coming
13   in at 5:00 A.M., it could be staying late as
14   needed.

15   Q. What would determine what hours you would
16   work?

17   A. Access to the shifts.

18   Q. But generally speaking you worked
19   5:00 A.M. to --

20   A. No, not normally 5:00 A.M., no.

      Q. Okay. What, seven to three or something
22   like that?

23   A. No, probably 7:30 to six or seven.

24   Q. You worked 12-hour shifts?

---

1    A. Yes. Not every day, but it wasn't
2    uncommon to do that.

3    Q. Did you get paid overtime?

4    A. No.

5    Q. I take it Kord Kozma was your boss up
6    until January of '03?

7    A. Yes.

8    Q. After he left, who became your boss?

9    A. I became acting HR manager reporting
10   directly to the general manager.

11   Q. Who is the general manager?

12   A. Nick Price.

13   Q. Did you have, when you were employee
14   relations manager, did you have an office?

15   A. Uh-huh.

16   Q. Where was your office located?

17   A. I'm sorry, yes. Same as it is now, in the
18   -- by the front entrance kind of.

19   Q. Pardon?

20   A. By the front entrance, in that set of
21   offices.

22   Q. Are you in a separate building from the
23   factory?

24   A. No.

---

1    Q. Same --

2    A. Right next to the cafeteria.

3    Q. Did all the employees who worked in the
4    factory have to come in the front entrance?

5    A. Not when they entered work, no. If they
6    interviewed they would or something like that.
7    They could if they wanted to, but not all.

8    Q. Generally speaking there were factory
9    entrances for the regular employees?

10   A. Yes, uh-huh.

11   Q. Have you given depositions before?

12   A. Yes.

13   Q. As employee relations manager, how many
14   employees did you have any role in terms of acting
15   as employee relations manager?

16   A. I was responsible for supporting the
17   location.

18   Q. What do you mean by supporting the
19   location?

20   A. Every employee at the location.

21   Q. Okay. In the time frame of 2002 to April
22   of 2003, how many employees would that have been?

23   A. I really don't know. Approximately the
24   same as it is now.

---

**13**

2    A. **830.**
3    Q. 830 employees?
     A. **Uh-huh.**
     Q. Would generally speaking your duties be
6 done in your office?
7    A. **Not necessarily.**
8    Q. What portion of time would you have to go
9 out into the plant to see various people or the
10 like?
11   A. **I think it depends on the person, but I**
12 **think to be active I was out there probably 30 to**
13 **40 percent.**
14   Q. What would cause you to go out into the
15 plant?
16   A. **To see associates, to get to know them, to**
17 **talk to them, to see how things are going, to help**
18 **with meeting our goals, to see the changes**
19 **happening if we made improvements. Just to be**
20 **aware of those things.**
21   Q. Were all the employees called associates?
22   A. **Yes, uh-huh.**
23   Q. What type of role did you have regarding
24 training and safety?

**14**

1    A. **It was really as needed. If there was**
2 **training that was needed in an all associate**
3 **meeting I would do that. If there was safety**
4 **support I would do that as well.**
5    Q. Was there a safety committee?
6    A. **Safety team, yeah, whatever you want to**
7 **call it.**
8    Q. Who were the participants in the safety
9 committee?
10   A. **I don't recall. I can name a couple that**
11 **have been on it since it started, but I couldn't**
12 **name them all.**
13   Q. Was that part of your regular
14 responsibilities to be part of the safety
15 committee?
16   A. **During what period of time?**
17   Q. During the period of August '02 through
18 April of '03.
19   A. **No.**
20   Q. When did that become part of your
21 responsibility?
22   A. **When Jerry retired it would have been, I**
23 **don't know the date, but until we were able to**
24 **replace him I sat in.**

**15**

1    Q. You say until Jerry retired. Who is
2 Jerry?
3    A. **Jerry Ray.**
4    Q. What position did Jerry Ray have?
5    A. **Safety manager.**
6    Q. When did Jerry Ray retire?
7    A. **I'd have to look. I don't know.**
8    Q. Did you have any specific role regarding
9 sexual harassment?
10   A. **I was -- yes, investigations.**
11   Q. If you got a complaint of sexual
12 harassment, was there a set, did you have a set
13 responsibilities of what you were supposed to do?
14   A. **We had a standard protocol, general**
15 **procedure to follow as far as how investigations**
16 **were to be conducted.**
17   Q. What was the standard protocol for
18 investigating a complaint of sexual harassment?
19   A. **Really what's outlined in the policy. It**
20 **would be receiving the complaint. It would be**
21 **talking to that person, getting an understanding,**
22 **and then investigating, talking to other people as**
23 **necessary. Getting the right documentation and**
24 **informing them of the right things.**

**16**

1    Q. During the time frame of August of '02
2 through April of '03, did you carry out any
3 investigations of sexual harassment or allegations
4 of sexual harassment or discrimination?
5    A. **Yes.**
6    Q. Could you tell me, first of all,
7 approximately how many different investigations you
8 carried out during that time?
9    A. **I have no idea.**
10   Q. Did they concern different shifts as well?
11   A. **I have no idea.**
12   Q. Would you always make written
13 documentation of any type of complaint of sexual
14 harassment or sexual discrimination that you
15 investigated?
16   A. **Yes, anything of that seriousness I would.**
17   Q. What did you regard as a serious complaint
18 of sexual harassment?
19   A. **Violation of the EEO policy would be**
20 **serious or inappropriate behavior of that that**
21 **could lead to that.**
22   Q. When is the first time that you recall
23 having any dealings with Cindy Smith?
24   A. **January of '03.**

**17**

1    met Cindy Smith?

2        A.   Not that I recall.

3        Q.   Had you ever heard anything about her?

4        A.   Not that I recall.

5        Q.   Prior to January of '03, had you had any

6    dealings with John Winschief?

7        A.   Yeah.  Well, I would have, I don't know

8    what you mean by dealings, but I would have met

9    him, yes, in working with him.

10       Q.   You said you would have met him?

11       A.   Uh-huh.

12       Q.   Approximately how many supervisors of John

13   Winschief's position in a parallel position were

14   there at Masterbrands at that time?

15       A.   Approximately 25.

16       Q.   Had you ever, prior to January of '03,

17   gotten any complaints about John Winschief?

18       A.   No.

19       Q.   Had you gotten any complaints about sexual

20   harassment about any of the other supervisors in

21   the equivalent level of John Winschief?

22       A.   Not that I recall.  I think that it would

23   stand out if I did.  Not that I recall.

**18**

1        Q.   What specifically transpired in January of

2    '03 that brought Cindy Smith to your attention?

3        A.   Cindy had a concern that she was being

4    treated unfairly and that women were being treated

5    unfairly.

6        Q.   Did she come to you personally with a

7    complaint?

8        A.   I don't recall exactly how it was.  I

9    believe that's how it happened.

10       Q.   Did she fill out a written complaint or

11   was it she just knocked on the door of your office

12   and said can I talk to you?

13       A.   As far as on her own a written complaint?

14       Q.   Yes.

15       A.   At first we had a discussion.

16       Q.   So in other words, in January of '03 you

17   said that Cindy Smith came to your office to make a

18   complaint about sexual discrimination or

19   harassment?

20       A.   No, I told you I don't remember exactly

21   how she approached me, but I remember talking with

22   Cindy about it, yes.

23       Q.   What was the date on which this

24   transaction took place?

**19**

1        A.   I'd have to look.

2        Q.   Let me hand to you a bunch of documents

3    here, and these documents were furnished in

4    discovery.  I'm going to mark -- well, treat as a

5    group exhibit this Masterbrands exhibits or Numbers

6    733 through 757.

7             MS. de SAINT PHALLE:  I wonder if we

8    should mark them as a group.

9             MS. CREVELING:  Probably.

10            MS. de SAINT PHALLE:  Why don't we mark

11   them as a group.

12                 (Deposition Group Exhibit No. 6

13                  was marked for identification.)

14   BY MS. de SAINT PHALLE:

15       Q.   Could you tell me what does Group

16   Exhibit 6 consist of?  Take a look at them all.

17                 (Whereupon there was a brief

18                  pause in the proceedings.)

19       A.   It looks to be the documentation of events

20   that took place in January as well as complaints

21   that was made about Cindy and other documentation

22   from the HR person that was before me.  I could

23   read it.  It's handwritten from Rhonda.  And then

24   other documentation regarding Cindy Smith.  It

**20**

1    looks to be an investigation that took place in

2    March of '03.

3        Q.   Are all those documents marked with bates

4    numbers?

5        A.   These little numbers in the bottom right?

6        Q.   Yes.

7        A.   Yes.

8        Q.   And what are the numbers inclusive from

9    just so we'll have it in the record?

10       A.   MB 0733, and if they are sequential to MB

11   0757.

12       Q.   Did you have some role in preparing all of

13   those documents?

14       A.   No, not all of them.

15       Q.   Okay.  Which of the page numbers would you

16   have had some role in preparing?

17       A.   MB 0735, it's written by Kord.  MB 0749

18   was written by John Winschief.  MB 0754 and 55 it

19   looks like was written by John to Rhonda, and the

20   rest of them I would have been involved with.

21       Q.   The ones that were written by John

22   Winschief to Rhonda, that's 755 and 756 --

23       A.   Uh-huh.

24       Q.   -- would they have predated your arrival

1    the like.  What happened during that meeting?

2    A.  Yes, ma'am.

3    Q.  And Rhonda, what was her job position?

A.  I don't know.  She worked in HR.  I don't know what her title was.

6    Q.  Was she still employed when you came on?

7    A.  No, no.

8    Q.  Had she been terminated or did she quit?

9    A.  I had heard that she left to another
10   company.

11   Q.  Taking a look at those documents in that
12   Group Exhibit 6, did you make one of those at the
13   time or shortly after the time that Cindy first
14   came to you to make a complaint about sexual
15   harassment or discrimination?

16   A.  I'm sorry, I want to make sure I
17   understand the question.  Could you say that again?

18   Q.  Sure.  Did you -- or strike that.

19           You mentioned that Cindy came to you
20   with some type of complaint about sexual harassment
21   or discrimination, and my question is did you make
22   a documentation of that visit?

23   A.  Yes.

24   Q.  Which page number reflects that complaint

2    A.  Cindy had also brought up, after we were
3    finished talking about that, she brought up that
4    she felt that John discriminated against women.

5    Q.  Did she state why she felt that he
6    discriminated against women?

7    A.  She made the comment to the alleged
8    comment of the break a nail.

9    Q.  What further conversations, if any, did
10   you have with Cindy at that time?

11   A.  Cindy didn't want me to investigate it,
12   and I at that time told her that I had to and told
13   her that I would start it full force in the next
14   day or so.

15   Q.  Did Cindy say why she didn't want you to
16   investigate it?

17   A.  I don't recall why.  I remember telling
18   her that I had to do it since it was reported to
19   me.

20   Q.  At that time when Cindy Smith came to you,
21   were you aware of what her reputation was in the
22   plant?

23   A.  No, I didn't know Cindy up until that
24   point.

1    that Cindy Smith made?

2    A.  Reflects my meeting with her, 0737.

3    Q.  What do you recall that she said at that
4    time?

5    A.  Initially I had the message that she
6    wanted to talk about a vacation approval issue.

7    Q.  And did you then ask Cindy to come talk to
8    you?

9    A.  Yes, I went and got her in the door plant
10   and we met.  Not in the door plant, but we met.

11   Q.  Normally did you have to approve vacations
12   for employees?

13   A.  Myself?

14   Q.  Yes.

15   A.  No.

16   Q.  Do you know why she was approaching you
17   for vacation approval?

18   A.  She had felt, I don't remember the
19   details, she felt that she should have had a day
20   approved or something of that nature.

21   Q.  What was the date that you met with her?

22   A.  January 3rd of '03.

23   Q.  And you mentioned that the initial
24   stimulus was a request for a vacation approval and

1    Q.  Did Cindy tell you that apparently John
2    Winschief made a comment to she and Cheryl Doss
3    that with getting the new machinery in the plant
4    that he didn't think that women could work on the
5    new machinery because it was too expensive?

6    A.  No, Cheryl's name wasn't brought up.

7    Q.  Did you ask Cindy if there were any other
8    witnesses to this conversation in which she
9    complained about a comment that John Winschief
10   made?

11   A.  I don't recall.  I probably would.  That
12   would be a normal question to ask.

13   Q.  Did Cindy tell you that there were no
14   other witnesses other than Cheryl Doss?

15   A.  I don't recall.

16   Q.  What specific details did Cindy give you
17   about the comments that John or what she felt about
18   John Winschief discriminating against women?

19   A.  Specific details other than what we
20   haven't talked about?

21   Q.  Yeah.

22   A.  Nothing more that's not here.

23   Q.  When you got this complaint, was Kord
24   Kozma still present?

**25**

2      Q.   Did you talk to him about this complaint
3    that Cindy made?
4          A.   I don't recall, but I imagine I would
5    have.
6          Q.   Did he tell you to conduct the
7    investigation or did you do that on your own?
8          A.   I don't recall.
9          Q.   What type of investigation did you carry
10   out?
11         A.   It was a pretty extensive investigation
12   talking to approximately nine or ten people.
13         Q.   How did you determine which people you
14   would talk to?
15         A.   If I recall I talked to every female in
16   the department.
17         Q.   Did you talk to Cheryl Doss?
18         A.   As I recall, yes.
19         Q.   Did you make any memorandum of your
20   discussions with Cheryl Doss?
21         A.   There would have been a statement or
22   documentation of what she had said, yes.
23         Q.   Is that statement in that pile?
24              (Whereupon there was a brief

**26**

1              pause in the proceedings.)
2          A.   Yes.
3          Q.   What number is the statement that was made
4    by Cheryl Doss?
5          A.   MB 0745.
6          Q.   What numbers are the statements of the
7    other women that you have there?
8          A.   You want every one of them?
9          Q.   Yeah.
10         A.   All right.  MB 0738.
11         Q.   Who is that one by?
12         A.   Cindy Heiman.  39, 40, 41, 42, 43, 44, I
13   already said 45.  46, 47, 48.  It looks like that's
14   it.
15         Q.   When did you conduct these various
16   interviews?
17         A.   It would have been starting on the 6th of
18   January.
19         Q.   Over how many days did that take place?
20         A.   Approximately two or three.  I'd have to
21   look at the details.
22         Q.   Did you record all of the substance of
23   every interview that you took place?
24         A.   Yes.

**27**

1          Q.   Did you conduct an interview with John
2    Winschief?
3          A.   Yes.
4          Q.   Did John Winschief admit that he made the
5    comment about the fingernail?
6          A.   I don't recall.
7          Q.   You don't recall?  If you take a look at
8    the interview you have with John Winschief and see
9    if it refreshes your recollection.
10              (Whereupon there was a brief
11              pause in the proceedings.)
12         A.   He said that he didn't make such a comment
13   and if he did it would have been taken out of
14   context.
15         Q.   Other than what you have recorded, did any
16   employees indicate that they felt that Cindy was a
17   troublemaker?
18         A.   Yes.  Not to those words, but yes.
19         Q.   Who indicated that?
20         A.   Karen Sinclair, Dorothy Jolley,
21   J-O-L-L-E-Y.
22              (Whereupon there was a brief
23              pause in the proceedings.)
24         A.   Mary Hackman, Brenda Purcell, Cheryl Doss.

**28**

1          Q.   You're saying that Cheryl Doss said that
2    Cindy was a troublemaker?
3          A.   Cindy wants everything her way or no way.
4    I would say that's not exactly great team work.
5              (Whereupon there was a brief
6              pause in the proceedings.)
7          Q.   Were you asking these employees
8    specifically --
9          A.   Can I finish?
10         Q.   Oh, sure.
11              (Whereupon there was a brief
12              pause in the proceedings.)
13         A.   And John Winschief.
14         Q.   What did John Winschief say about Cindy?
15         A.   Cindy has been a problem.
16         Q.   Did the substance of Cindy's complaint
17   when she talked to you the first time, did it
18   simply concern this incident with the fingernail
19   incident regarding John Winschief?
20         A.   I'm not sure I understand your question.
21         Q.   Besides this conversation in which John
22   Winschief allegedly stated that Cindy could not
23   work on the new machines because she might break a
24   fingernail, did Cindy have any other complaints of

**29**

1 Winschief?

2     A.  Other than what we've already talked

3 about?

4     Q.  Well, anything other than that specific

5 statement.

6     A.  There is a comment here about something

7 here didn't want it tore up.

8     Q.  Pardon?

9     A.  Something here about a comment didn't want

10 the machine tore up.

11     Q.  Yes, and that relates to the new

12 machinery, but anything other than that?

13     A.  No, nothing else.  I would have documented

14 it if there would have been.

15     Q.  Since Cindy's complaint with regard to

16 John Winschief was simply related to that comment

17 about the new machinery, why did you talk to all

18 these other women about Cindy Smith?

19     A.  Because I wanted to make sure it wasn't

20 happening, and if it was happening I wanted to

21 address it.

22     Q.  When you say it wasn't happening, what are

23 you referring to?

**30**

1     A.  What Cindy was alleging with John treating

2 women differently.

3     Q.  Did Cindy Smith allege that John Winschief

4 was treating women differently?

5     A.  Yes.

6     Q.  What specifically did Cindy say?

7     A.  I don't know if these were her words, but

8 I have noted that she felt John discriminated

9 against women.  Something to that affect, yes.

10     Q.  Were there any women who indicated that

11 they felt that men were treated differently than

12 women?

13         MS. CREVELING:  Just for clarification,

14 you mean by John Winschief?

15         MS. de SAINT PHALLE:  Yes.

16     A.  There were women that knew that Cindy felt

17 that way.

18             (Whereupon there was a brief

19             pause in the proceedings.)

20     A.  Becky Hardwick had a perception of that.

21     Q.  Becky Hardwick felt that women were

22 treated differently than men?

23     A.  She said that she felt that he favors the

24 males.

**31**

1     Q.  Do you know specifically what that comment

2 related to or do you recall?

3     A.  She had a beef with Scott Stewart that she

4 didn't feel like that he -- he's driving too fast

5 and she didn't think John was addressing it.

6     Q.  Do you recall whether Becky Hardwick made

7 any complaint about the fact that she was not

8 allowed to drive the forklift truck whereas Scott

9 Stewart was?

10     A.  No.

11     Q.  Was Becky Hardwick a material handler?

12     A.  I don't recall.

13     Q.  Is Becky Hardwick still employed with the

14 company?

15     A.  No.

16     Q.  Was she fired?

17     A.  Yes.

18     Q.  Do you know the reason why she was fired?

19     A.  Drug positive.

20     Q.  Is it the company policy to do random drug

21 testing of its employees?

22     A.  No, ma'am.

23     Q.  Did you talk to an employee by the name of

24 Debbie Gill?

**32**

1     A.  Yes.

2     Q.  And what did Debbie Gill say?

3     A.  She felt that way as well.

4     Q.  She felt that women were treated

5 differently than men?

6     A.  Yes.

7     Q.  In what regard did she say that?

8     A.  I'm not sure what you mean.

9     Q.  Well, how did she say that women were

10 treated differently than men?

11     A.  When she used to have long hair that John

12 had told her to put her hair up but there was a

13 male employee that he didn't.

14     Q.  Did Debbie Gill have any other complaints

15 of sexual discrimination or harassment?

16     A.  It appears like she wasn't happy with the

17 job that she was performing on modified duty.

18     Q.  Does that modified duty mean that she had

19 been given light duty with a doctors permit?

20     A.  Yes.  Based on her restrictions she was

21 doing -- she was eligible for modified duty.  We

22 would make sure that she's doing a job that doesn't

23 go against her restrictions, whatever that may be.

24     Q.  Did Debbie Gill state that men were

## 33

2 treated differently and not permitted to do that?

3    A.  **She said that she didn't get moved. She**
**did not claim that modified duty wasn't provided to**
**her.**

6    Q.  Do you recall whether there were any
7 complaints by employees that men were more easily
8 granted change in job duties if they had
9 restrictions, doctors restrictions, on light duty
10 than women were?

11    A.  **No, there were no complaints.**

12    Q.  Was Debbie Gill required to do her normal
13 job duties even though she was on light duty
14 restrictions?

15    A.  **I don't recall.**

16    Q.  After conducting all these interviews --
17 when you did these interviews, would it be simply
18 one on one you with and the particular female
19 employee?

20    A.  **I don't recall.**

21    Q.  Did you have -- did Kord Kozma
22 participate?

23    A.  **I don't recall.**

24    Q.  Were the women upset that you were calling

## 34

1 them in?

2    A.  **I don't recall anything like that, no.**
**Many voluntarily shared their concern about Cindy.**

4    Q.  After conducting -- how long after the
5 interview would you make those recordings that you
6 have there?

7    A.  **I do that while we talk almost word for**
**word.**

9    Q.  Did you actually have a computer there --

10    A.  **Yeah.**

11    Q.  -- that you would type up things as they
12 were talking?

13    A.  **Yes.**

14    Q.  Did they see you doing that?

15    A.  **Yes.**

16    Q.  Would you ask them to sign it?

17    A.  **I don't recall.**

18    Q.  I mean is the format that is there in
19 front of you with those bates numbers, is that the
20 format that would have come out --

      A.  **These particular ones are not signed.**

22    Q.  Did you ever get any signed complaints
23 regarding Cindy?

24    A.  **I don't recall.**

## 35

1    Q.  Do you recall any others that you received
2 regarding Cindy that are not in that stack?

3    A.  **I did not.**

4    Q.  So all of the complaints that you have
5 regarding Cindy are in that stack?

6    A.  **Yes.**

7    Q.  When you were interviewing these women,
8 did you talk to Dave Pantier?

9    A.  **Could you be more specific.**

10    Q.  Did you tell Mr. Pantier that you were
11 planning to interview all these women?

12    A.  **He was aware of the investigation, but not**
**aware of the results, specific statements, no.**

14    Q.  After you conducted these interviews, did
15 you get together with Cindy?

16    A.  **Yes, there was a follow-up meeting.**

17    Q.  Who was in attendance at that follow-up
18 meeting?

19    A.  **It looks like Dave Pantier and I.**

20    Q.  Dave Pantier and yourself?

21    A.  **Yes.**

22    Q.  Anybody else besides you and Dave Pantier?

23    A.  **I believe Cheryl Doss may have been in**
**there.  Yes, she was.**

## 36

1    Q.  Was John Winschief?

2    A.  **Yes.**

3    Q.  What transpired during that meeting?

4    A.  **Explained to Cindy that I conducted a**
**thorough investigation.  Explained that we're not**
**able to substantiate differential treatment from**
**John Winschief toward women.  And then I gave her**
**feedback of some of the points that were brought up**
**about her in the investigation.**

10    Q.  What was Cindy's reaction to some of the
11 comments?

12    A.  **I don't recall.**

13    Q.  Was there a discussion of leaving notes on
14 vehicles?

15    A.  **Not that I can see at a glance.**

16    Q.  Was there any discussion of inappropriate
17 conduct on Cindy's part?

18    A.  **Yes.**

19    Q.  What specifically was there about quote
20 inappropriate conduct on Cindy's part?

21            (Whereupon there was a brief
22            pause in the proceedings.)

23    A.  **I'm sorry, could you repeat the question.**
24 Was it concerns that were raised about or feedback

1 that Cindy was accusing another associate of
2 sleeping -- of her sleeping with married men; that
3 Cindy had told Brenda there wasn't anything wrong
4 with sleeping with married men, and she had slept
5 with married men in the plant and there were three
6 in the door plant that she would like to sleep
7 with.
8
9    Q. You're saying that some other woman said
10 that's what Cindy said?
11    A. Yes.
12    Q. Who was that?
13    A. We gave if I recall, Brenda Purcell, we
14 gave her general feedback about that; that there
15 was a perception of that that had come up in the
16 investigation. Also told her that she had made
17 repeated requests toward John Winschief to go out
18 for drinks and she needed to stop and John told her
19 no. She was, I recall, counseled on the sexual
20 harassment policy.
21    Q. What was said about the requests that
22 Cindy allegedly made to John Winschief to go out
23 for drinks?
24    A. What was said about it?

1    Q. Yeah.
2    A. That that came up in the investigation and
3 if that was happening that she should stop making
4 those requests. They were not welcomed.
5    Q. Did Cindy said anything in response to
6 that?
7    A. She claimed that she did this to help
8 others see John as a person.
9    Q. Was it your understanding that Cindy did
10 this in groups with other friends?
11    A. I don't recall.
12    Q. Do you know whether those requests for
13 drinks were as part of a group?
14    A. I don't recall.
15    Q. Did you conduct any interviews of Shirley
16 Boddy?
17    A. No.
18    Q. Did you conduct any interviews of Karen
19 Bunten?
20    A. No.
21    Q. Were you aware of whether either one of
22 those two women ever made complaints of sexual
23 discrimination or harassment?
24    A. Not to me they didn't.

1    Q. What did you tell Cindy Smith during that
2 interview which you haven't already mentioned?
3    A. In the meeting on 1/9?
4    Q. Yes.
5    A. She had asked that if I would review
6 incidents given by John. I asked what she meant.
7 She was apparently referring to discipline papers.
8 I obliged I would read the documents and that I
9 could not share their personal information with
10 her.
11    I explained the retaliation that would
12 be inappropriate as I do in all cases. Expressed
13 the importance of moving forward, building the
14 damaged relationship with her fellow associates,
15 and offered hope that she and John could see eye to
16 eye to resolve this. Offered support from myself
17 and Dave as well and closed the meeting.
18    Q. Was Cindy Smith crying during this
19 meeting?
20    A. Not that I recall.
21    Q. Did you ever say that you heard that Cindy
22 preferred married men?
23    A. I told her that that came out in the
24 investigation, yes.

1    Q. Did you tell her that John Winschief
2 alleged that she left notes on his vehicle?
3    A. We've already covered that, haven't we?
4 You want me to look again?
5    Q. Yeah.
6    (Whereupon there was a brief
7    pause in the proceedings.)
8    A. It appears like it was brought up.
9    Q. Did Cindy mention that she did not leave
10 any notes on John Winschief's windshield?
11    A. I don't see that in the notes.
12    Q. Do you recall whether or not that was
13 stated?
14    A. I recall she denied it.
15    Q. She did deny it?
16    A. If I recall.
17    Q. Okay. Did you ever make any investigation
18 as to find out who was leaving notes on
19 Mr. Winschief's vehicle?
20    A. No, I did not.
21    Q. Did you tell Cindy that she had to make
22 things right with God?
23    A. No, I did not.
24    Q. Did you tell Cindy that she had to clean

**41**

2   A. No, I did not.
3   Q. Did you tell her that she was making false
accusations?
5   A. What date are we talking about here? Are
6 we talking about 1/9?
7   Q. Yes.
8   A. No, I did not.
9   Q. At some later point did you tell her that
10 she was making false accusations?
11   A. If you're referring to the closing meeting
12 of the March investigation, I cautioned her on the
13 words that she chose and that had to do with
14 throwing and moving. I did not accuse her.
15   Q. Did you tell Cindy that God watches us?
16   A. I made a comment that God does see
17 everything, but I was only reiterating what she had
18 just told me.
19   Q. And what did she just --
20   A. Well, when I had asked her in that meeting
21 in March I had asked her if she was happy and that
22 set some kind of spark with Cindy and she
23 absolutely lost it, and for about two minutes went
24 on somewhat of an uncontrollable speech where we

**42**

1 tried to stop her and she ignored and so we just
2 let her talk.
3        And eventually she stopped and at the
4 very end of that she said that and I simply
5 repeated her something to the fact that you're
6 right, God does see everything. And she was crying
7 and she was mad and she was just going through all
8 ranges of emotions in that two minutes.
9   Q. You're saying that took place in March?
10   A. Yes.
11   Q. Let's go back to again this meeting of
12 March 9th. What was the upshot of that meeting?
13   A. That was a follow-up meeting regarding the
14 investigation where Cindy had alleged that another
15 associate had thrown a stool.
16   Q. Okay. But going back to the meeting in
17 January, did anything else happen as a result of
18 that meeting of follow-up meeting in January 9th?
19   A. I can answer any questions you have. I'm
20 not sure what you're referring to.
21   Q. Well, what was the conclusion of the
22 January 9th meeting?
23   A. Okay. The conclusion was that, it's in
24 here documentation, to inform John Winschief that

**43**

1 the investigation did not appear to identify or
2 substantiate any claims of impermissible
3 harassment. However, he should be aware that there
4 exists to some degree a perception that he is
5 chauvinistic in his treatment of associates and he
6 needs to manage in a manner to eliminate that
7 perception.
8   Q. What --
9   A. He needs to immediately address Cindy,
10 perhaps we did that in the meeting, that he does
11 not want or desire a relationship with Cindy; that
12 no means no, and that finally to remind John that
13 safety is a core value and that he should address
14 Scott Stewart in going too fast on the forklift.
15   Q. With regard to acting in a chauvinistic
16 manner, what did that concern?
17   A. I don't know. Kord wrote it.
18   Q. Pardon?
19   A. Kord wrote it. I don't know what he meant
20 by it.
21   Q. Was Kord a participant in this meeting?
22   A. No.
23   Q. Do you know whether or not Kord made any
24 independent investigation on his own?

**44**

1   A. Not that I'm aware of.
2   Q. Where is Kord located now?
3   A. It's a good question. I don't know.
4   Q. Do you know whether he's located in the
5 State of Illinois?
6   A. I have no idea.
7   Q. After this meeting of January 9th, when is
8 the next time that you had any dealings with Cindy
9 Smith?
10        (Whereupon there was a brief
11        pause in the proceedings.)
12   A. March 7th or approximately.
13   Q. Okay. What was the occasion of the
14 March 7th meeting?
15   A. John Winschief asked if we could meet. He
16 came up and he closed the door and was very
17 frustrated with Cindy. He was actually considering
18 quitting.
19   Q. John Winschief --
20   A. Yes.
21   Q. -- was considering quitting?
22   A. Yes.
23   Q. Why was he considering quitting?
24   A. That she causes problems on a daily basis

**Page 45**

1  previous night rather, that Cindy had claimed that
2  Dustin threw her stool.
3  
4  **Q.** What else did he have to say?
5  **A.** That appears to be it. It's in the notes.
6  Oh, also said that she disrupts the department
7  and no one enjoys working with her.
8  **Q.** What specifically did he mean by she
9  disrupts the department and no one enjoyed working
10  with her?
11  **A.** You'd have to ask him.
12  **Q.** Did John Winschief indicate whether or not
13  he actually saw Dustin throw the stool or move the
14  stool?
15  **A.** He said that Cindy came to him; that he
16  did not see it.
17  **Q.** Did he say -- what did he do or what did
18  he tell you he did after Cindy claimed that Dustin
19  threw her stool?
20  **A.** He said that he would look into it and if
21  it was found to be true that he would handle it
22  appropriately.
23  **Q.** Do you know --
24  **A.** And he also talked with Allen and Sue and

**Page 46**

1  they said it wasn't true.
2  **Q.** Allen Brickey?
3  **A.** Apparently so.
4  **Q.** And who is the Sue?
5  **A.** We can speculate, Sue Gonzalez was in the
6  department.
7  **Q.** Did you talk with Sue Gonzalez?
8  **A.** Yes.
9  **Q.** What did Sue Gonzalez say?
10  **A.** That she saw the stool directly on the
11  other side of the table, but if it was thrown there
12  is no way it could have landed directly on the
13  other side, and reiterated basically some things
14  that Dustin had said.
15  **Q.** What did Dustin say?
16  **A.** He said that he did not throw it; that
17  John had already asked him that, and that Sue and
18  Alan were there and they would have seen him if he
19  would have thrown it. He said that this was
20  another time that Cindy had accused him of
21  something that wasn't true and apparently has been
22  written up in the past.
23  **Q.** Dustin had been written up in the past?
24  **A.** It appears so.

**Page 47**

1  **Q.** Did you ever look up those investigations
2  to see if Dustin had been written up?
3  **A.** I don't recall.
4  **Q.** Did Dustin say why he put the stool on the
5  other side of the machine?
6  **A.** He said it was a trip hazard. Safety
7  issue.
8  **Q.** Were you aware that during that time that
9  Cindy was on light duty?
10  **A.** I don't recall.
11  **Q.** Do you recall whether Cindy had had --
12  **A.** Well, she had had the stool yes, clearly.
13  **Q.** Do you recall she had the stool because of
14  her doctors orders?
15  **A.** We don't allow modified duty for personal
16  injury, so yes, that would have had to have been some
17  kind of alleged work-related injury or the doctor
18  would have had to have said that.
19  **Q.** Given that Cindy needed the stool to work,
20  would it have been inappropriate for Dustin to have
21  put the stool on the other side of the machine?
22  **A.** No.
23  **Q.** Why not?
24  **A.** If it's a trip hazard I would expect him

**Page 48**

1  to move it, but I would expect him to work that out
2  within the team on what the solution is.
3  **Q.** During this -- did you meet with Dustin
4  with him one on one?
5  **A.** Yes.
6  **Q.** Had you ever met with him before
7  concerning other instances?
8  **A.** Not that I recall.
9  **Q.** What do you recall him voicing about
10  Cindy?
11  **A.** Nothing that I haven't already said.
12  **Q.** Did he have general complaints about
13  Cindy?
14  **A.** Nothing that I haven't already said.
15  **Q.** What did Sue Gonzalez say about Cindy?
16  **MS. CREVELING:** Do you mind if we take a
17  break before we move on to the next question?
18  **MS. de SAINT PHALLE:** No.
19  **MS. CREVELING:** Okay. Thanks.
20  (Whereupon there was a recess
21  taken.)
22  **A.** Sue said that she was there all night and
23  like we would have seen it if Dustin would have
24  thrown it. She did sit on the other side of the

1   table, and that it would have been thrown that

2   it wouldn't have landed where it is sitting.

3      Q.  Do you recall anything else Sue Gonzalez

4   said about Cindy at that time?

5      A.  No.

6      Q.  What was the upshot of that meeting?

7      A.  What do you mean by upshot?

8      Q.  Well, what was the result of it.

9      A.  Okay.  The result of that was a meeting

10  with Cindy to follow-up based on her concern that

11  she raised.

12     Q.  Was John Winschief satisfied with the

13  result of that meeting?

14     A.  I don't recall.  I don't know if I even

15  talked with him.

16     Q.  Was any discipline made as a result of

17  that meeting?

18     A.  No, it was not.

19     Q.  Did you make any recommendations as far as

20  different job duties for Cindy?

21     A.  Job duties you mean different modified

22  duties?

23     Q.  Right.

24     A.  Not that I recall.

1      Q.  When was the next time that Cindy Smith

2   came to your attention?

3      A.  From what standpoint?

4      Q.  As in your job duties as human resource

5   manager.

6      A.  The next time would have had to do with

7   her leave at some point.  I don't know the date.

8      Q.  Were you aware of the last day on which

9   she actively worked at Masterbrands?

10     A.  No.

11     Q.  There were some allegations that she was

12  -- somebody else was using her computer or initials

13  on a computer.

14     A.  No.

15     Q.  You're not aware of that?

16     A.  No.

17     Q.  You're not saying it didn't happen, you're

18  just not aware of it?

19     A.  I'm not aware of anything about it, no.

20     Q.  Are you aware of whether or not she left

21  work on, let's see I think it was April 3rd, to go

22  immediately to the doctor?

23     A.  No.

24     Q.  Are you aware that then she became under a

1   psychiatrist's care?

2      A.  I was aware that she was under a

3   psychiatrist's care at one time, not necessarily

4   that day, looking back probably.

5      Q.  When did you become aware that she was

6   under a psychiatrist's care?

7      A.  I think it was the reason for her leave as

8   I recall.  I don't recall the specifics looking at

9   why she was off on leave.

10     Q.  Did you receive the doctors reports, the

11  psychiatrist reports?

12     A.  I've read them at one point.  It's been

13  years ago.

14     Q.  Were you aware that she was under

15  considerable stress at work?

16     A.  No.

17     Q.  This incident in March where she, as you

18  say lost it, were you aware that she was under

19  stress then?

20     A.  No.

21     Q.  Did you have any opinion as to why she

22  quote lost it?

23     A.  I thought she was troubled.  I didn't know

24  why.  I gave her an EAP card and thought they could

1   help.  I'm not a doctor.  It's a free service that

2   we give.  Not free to us.

3      Q.  In this meeting in March did you tell

4   Cindy that she needed to make things right with

5   God?

6      A.  No.

7      Q.  Did you ever have any conversations with

8   Jerry Ray concerning Cindy Smith?

9      A.  At some point we talked about her work

10  comp cases.

11     Q.  What specifically did you talk about her

12  work comp cases?

13     A.  I don't remember the details.  He was very

14  frustrated, he was a safety manager, and he was

15  very frustrated and I think he was kind of venting

16  to me about how the doctors weren't agreeing with

17  Cindy's allegations of an injury.

18     Q.  Did he say anymore details other than

19  that?

20     A.  Not that I recall.

21     Q.  Did he indicate that he did not believe

22  Cindy's complaints of injury?

23     A.  I don't think he gave his opinion.  He's

24  not a doctor.  He did share some stories about

**53**

2      **Q.** What stories did she share regarding
3   mechanical bull riding?
4          **A.   Things that people had told him.**
5          **Q.** What specifically had they told him?
6          **A.   That she was, apparently when she was on**
7   **restriction she was in a bar and doing things that**
8   **were breaking her restrictions.**
9          **Q.** What specifically had you been told about
10  that?
11         **A.   Something to do with riding a mechanical**
12  **bull and something to -- I don't recall the**
13  **details.**
14         **Q.** Do you know the names of the specific
15  employees that made those allegations?
16         **A.   No.**
17         **Q.** Did you ever have any conversations with
18  Dan Pantier concerning Cindy Smith?
19         **A.   None that we haven't talked about.**
20         **Q.** That we haven't talked about?
21         **A.   Right.**
22         **Q.** No?
23         **A.   None that we haven't talked about.**
24         **Q.** All right. Did you have any dealings with

**54**

1   the leave time regarding Brad Hug?
2          **A.   I'm sorry, I didn't hear the question.**
3          **Q.** Did you have any dealings with the leave
4   time regarding Brad Hug?
5          **A.   Probably indirectly or very brief, yes, at**
6   **one point.**
7          **Q.** Did he leave employment with Masterbrands
8   in October 28th of '03?
9          **A.   I'd have to look, ma'am.**
10         MS. CREVELING: For the record, you're
11  asking him to look at the list of the employees at
12  the door plant that we produced to you in
13  discovery?
14         MS. de SAINT PHALLE: Yes.
15         MS. CREVELING: Are we marking them as an
16  exhibit?
17         MS. de SAINT PHALLE: Sure, we can mark
18  that as an exhibit.
19         MS. CREVELING: I don't care. It's up to
20  you.
21         **A.   According to this sheet it says**
22  **October 28th of 2003.**
23         MS. de SAINT PHALLE: Why don't we go
24  ahead and mark that document as an exhibit. We'll

**55**

1   mark it as Exhibit Number 7.
2          (Deposition Exhibit No. 7 was
3          marked for identification.)
4   BY MS. de SAINT PHALLE:
5          **Q.** What is Exhibit Number 7?
6          **A.   It looks like an employee list of some**
7   **kind.**
8          **Q.** Is it an employee list of people who
9   worked in the door plant at the time that Cindy
10  Smith worked there?
11         **A.   I see some names, but I couldn't verify**
12  **that.**
13         **Q.** There is a notation regarding Brad Hug as
14  having left in October 28th of 2003. Does that
15  refresh your recollection anything about Brad Hug?
16         **A.   Very lightly.**
17         **Q.** Apparently it indicates DC. I take it
18  that means he was terminated by the company?
19         **A.   Yes.**
20         **Q.** Do you know the reason he was terminated?
21         **A.   He had taken all of his six-month limit,**
22  **or I'm sorry, he had taken all of his leave.**
23         **Q.** Do you know what the reason why he had the
24  leave for?

**56**

1          **A.   No, I don't.**
2          **Q.** Was he permitted to have a one year leave?
3          **A.   If I recall, yes, he was.**
4          **Q.** Why was he permitted to have a one year
5   leave whereas Cindy Smith was not?
6          **A.   Because his six months came up at almost**
7   **-- at very close or the same time that we rolled**
8   **out the six-month change, and it wouldn't be fair**
9   **to terminate employees without any notice of that**
10  **change so they were grandfathered.**
11         **Q.** What was the specific date on which Brad
12  Hug was permitted to be grandfathered?
13         **A.   I don't know.**
14         **Q.** Why was Cindy Smith not permitted to be
15  grandfathered?
16         **A.   Because at the time of the roll out she**
17  **had not taken all of her six-month leave, and in**
18  **fact was on family medical at the time so had**
19  **family medical time left.**
20         **Q.** After April of '03 when Cindy left the
21  plant did you have any conversations with Cindy?
22         **A.   Not that I recall.**
23         **Q.** Were there any other employees that were
24  permitted to grandfather in for the six-month to

1    Q. ... employee besides Brad Hug?

2    A. Yes.

3    Q. Who were they?

A. I don't know if I could recall the names.
I'm aware of two more, I believe, that fell at that

6  same time period.

7    Q. Were they all males?

8    A. No.

9    Q. What was the name of any female that was

10  permitted to grandfather in?

11   A. I believe Joyce Good is one of them.

12   Q. Joyce --

13   A. Joyce Good.

14   Q. G-O-O-D?

15   A. Yeah. The other name isn't coming to

16  mind. I could look it up.

17   Q. Were you aware that Cindy had complaints

18  that co-employees used terminology like fucking

19  bitches, cunts, and other sorts of derogatory

20  language towards females in the plant?

21   A. Absolutely not.

22   Q. Did John Winschief ever tell you that

23  Cindy Smith had made complaints like that?

24   A. No.

---

58

1    Q. Were you aware of Cindy Smith ever

2  distributing notebooks and the like?

3    A. Yes.

4    Q. What were you apprised of of this notebook

5  issue?

6    A. On January 7th of, it says '02 but it was

7  '03, the e-mail is dated '03. January 7th of '03.

8    Q. What specifically were you apprised of

9  then?

10   A. That an employee was complaining about

11  Cindy that she was handing out notebooks in the

12  door plant.

13   Q. Was that during the course of your

14  investigation of the complaint about John

15  Winschief's sexual harassment?

16   A. Yes, it was right at the end of it.

17   Q. And what was the name of the employee that

18  made that complaint?

19   A. Dorothy Jolley.

20   Q. Did you ask any other employees about

that?

22   A. Not that I recall.

23   Q. Did Dorothy Jolley indicate what Cindy

24  wanted done with these notebooks?

---

1    A. She had said that they wanted -- she was

2  trying to get other associates to side with her and

3  started taking notes about things going on in the

4  door plant.

5    Q. What things was she referring to?

6    A. You'd have to ask her.

7    Q. Was there any follow-up regarding this

8  notebook issue?

9    A. Just a follow-up with Cindy in that closed

10  meeting about making sure that she followed within

11  the solicitation and distribution policy.

12               (Whereupon there was a brief

13               pause in the proceedings.)

14   Q. Did you ever meet with Shirley Boddy about

15  complaints of sexual harassment or discrimination?

16   A. Not that I recall.

17   Q. Did you ever meet with Betty Burns about

18  complaints of differential treatment with men and

19  women?

20   A. Yes.

21   Q. What did that concern?

22   A. I don't recall any of the details. She

23  had felt that the men in some way were favored and

24  made a comment in a focus group.

---

1    Q. What was the date of that?

2    A. Sometime in 2003.

3    Q. Was that during the time that Cindy Smith

4  was actively employed?

5    A. I don't know. I'd have to look.

6    Q. Did you ever receive any complaints or

7  comments from J.D. Wilder regarding an employee by

8  the name of the Jeff Bonatrigger (phonetic) shoving

9  her?

10   A. Yes.

11   Q. What did that concern?

12   A. Resulted in an investigation.

13   Q. And what was the upshot of that?

14   A. I don't know if it was shoving. I think

15  that's a pretty strong way to put it. I forget.

16  It was something to do with language or a bump or

17  something, but yes, there was an investigation

18  regarding that.

19   Q. Was it found to be valid?

20   A. It was unsubstantiated.

21   Q. Was there a complaint by Diana Risley

22  concerning differential treatment of men and women?

23   A. Not that I recall.

24   Q. Was there ever a complaint by Brenda

---

**61**

2    A.  Not that I recall.

3         MS. CREVELING:  I'm sorry, Rich what did

you say?

         MS. de SAINT PHALLE:  Rich Crumrin.

6    BY MS. de SAINT PHALLE:

7    Q.  Was an employee by the name of Sally

8    Risley fired as a result of a sexual harassment

9    claim?

10    A.  I wouldn't term it sexual harassment, no.

11    Q.  A complaint regarding sexual conduct?

12    A.  No.

13    Q.  Was Sally Risley terminated by the

14    company?

15    A.  Yes.

16    Q.  What was the reason why she was terminated

17    by the company?

18    A.  Inappropriate behavior.

19    Q.  What was the inappropriate behavior?

20    A.  She put herself in a very questionable

21    position of being in a dark office, locked dark

22    office with a male employee.

23    Q.  Who was the male employee?

24    A.  Rick Fialla (phonetic).

**62**

1    Q.  Was he terminated as well?

2    A.  Yes.

3    Q.  Was there an incident like that involving

4    Dennis Parish?

5    A.  No.

6         MS. de SAINT PHALLE:  I don't have any

7    other questions.

8              CROSS EXAMINATION

9    BY MS. CREVELING:

10    Q.  I'd like to go back and talk about the

11    leaves of absence that Ms. Smith had.  I think you

12    talked about the fact that, for example, Brad Hug

13    and a few others had been grandfathered into the

14    old policy where employees got a year long leave;

15    did I understand that correctly?

16    A.  Uh-huh, yes.

17    Q.  Tell me what was the criteria for an

18    employee being grandfathered?

19    A.  They had to have taken their leave and the

20    six months would have hit right at the time of the

21    roll out.

22    Q.  And why did you think that was important?

23    A.  Because it wouldn't be fair to inform

24    somebody that well your six -- they thought they

**63**

1    had a year, they had no notification and say well,

2    your six months is up.  So they were grandfathered.

3    Q.  Okay.  And when did that six-month rule

4    roughly get implemented?

5    A.  Early June.

6    Q.  Of what year?

7    A.  2003, I believe.

8    Q.  Okay.  So if there were employees who

9    obtained a year long leave of absence after June of

10    2003, those were employees who were grandfathered?

11    A.  Yes, that would be the only ones.

12    Q.  Okay.  To your knowledge were there any

13    exceptions to that rule?

14    A.  No.

15    Q.  Okay.  Cindy Smith was not grandfathered?

16    A.  She was not.

17    Q.  Okay.  And why was that again?

18    A.  She had -- she hadn't taken her -- wasn't

19    at a six-month leave point when it was rolled out.

20    In fact she was much less.

21    Q.  Were there other people that the six-month

22    rule were applied to?

23    A.  Yes.

24    Q.  Were there other men that it was applied

**64**

1    to?

2    A.  I would imagine.

3    Q.  Okay.  Do you think it applied to women as

4    well?

5    A.  Yes, it applies to everyone.

6    Q.  Okay.  I think you've mentioned family

7    medical leave time.  Can you tell us briefly what

8    are the types of leave of absence that are, when we

9    say leave of absence, that really are in play

10    today?

11    A.  There really are two primary types.  One

12    would be what's called an FML leave and that is

13    based on the Family Medical Leave Act where you're

14    allowed 12 weeks, and the other would be a non FML

15    leave which is the company provided benefit.

16    Q.  Okay.  And do you combine those two things

17    or can you combine those two things in order to get

18    to the six months?

19    A.  Yes, they certainly overlap.

20    Q.  Okay.  I'd like you to take a look at

21    Group Exhibit 6.  You mentioned in your testimony

22    that there had been at least a complaint by Dorothy

23    Jolley that Cindy Smith was handing out notebooks

24    at work.

**65**

2  other employees that you spoke with who had similar
3  complaints?

(Whereupon there was a brief
pause in the proceedings.)

6  A.  Carol Bogen said that she would go to HR
7  if she was approached.
8  Q.  Anyone else?
9  A.  Brenda Purcell said she has not asked her
10  yet and she does not want her to.
11  Q.  Anyone else?
12  A.  Sue took it but she said she would not
13  write in it.
14  Q.  Did Sue give you any indication as to what
15  the notebook was reportedly for?
16  A.  To write things that you don't like about
17  John.
18  Q.  Okay.  Anyone else indicate that Cindy had
19  given them or tried to give them a notebook?
20  A.  She had given Cheryl Doss one.  She said
21  that she didn't agree with some of the things that
22  Cindy does.  That's it.
23  Q.  Okay.  Did you have any understanding of
24  when Cindy Smith was passing these notebooks out

**66**

1  and was that timing of concern to you?
2  A.  Yes, it was right basically during or at
3  the end of the investigation.
4  Q.  I mean during the course of the workday or
5  was it outside the workday?
6  A.  Oh, I'm sorry, it appeared to be that it
7  was during work time.
8  Q.  Okay.  Was that of concern to you?
9  A.  Certainly.
10  Q.  Why?
11  A.  It's a violation of the solicitation and
12  distribution policy.
13  Q.  What does that policy say?
14  A.  It says that you shouldn't solicit or
15  distribute anything during work time whether that
16  person is on work time or whether the person that
17  they're talking to is on work time and you
18  shouldn't distribute it in a work area.
19  Q.  Did you discuss with Cindy Smith these
20  notebooks and your concerns about them being handed
21  out on work time?
22  A.  Yes.
23  Q.  What did you tell her?
24  A.  Explained our distribution policy.  Said

**67**

1  that I wanted to help her with her concerns but we
2  could not allow anyone to break policy.  I said it
3  could not be done during work time, and to make
4  sure that you inform -- that she inform us about
5  any concerns and that we can't help her if we don't
6  know.
7  Q.  Did she get any formal discipline for
8  violating that solicitation policy?
9  A.  She did not.
10  Q.  Okay.  That was just a verbal counseling?
11  A.  Yes.
12  Q.  I'd like you to take a look at Page MB
13  0747.  We talked or you had testified earlier about
14  a complaint that Deb Gill had about her hair and
15  something John Winschief had done.
16  A.  Yes.
17  Q.  Could you give me more context of what
18  that was about?
19  A.  We have an entanglement policy in the
20  plant --
21  Q.  A what kind of policy?
22  A.  Entanglement.  And it has to do with
23  getting wrapped up in a machine or something that's
24  spinning, and that applies to clothing or hair and

**68**

1  such.  And in that particular department there are
2  machines and it's important that employees, based
3  on the policy, have their hair tied back if it's of
4  a certain length so that it doesn't get caught in
5  the machine.
6  Q.  And was the complaint from Deb Gill that
7  John Winschief used her as an example of the length
8  of hair that would need to be tied up or was the
9  complaint that John Winschief only made the women
10  tie up their hair?
11  A.  She felt that since John had asked her to
12  -- pointed me out as having to wear my hair up so
13  when he was explaining the policy had referred to
14  Deb.
15  Q.  I'm sorry, had referred to?
16  A.  Had referred to Deb Gill as an example of
17  hair length it appears.
18  Q.  Is the entanglement policy applicable to
19  everyone in the plant?
20  A.  Yes, it's based on the machines in the
21  area, yes.
22  Q.  Okay.  Is it also applicable to visitors
23  in the plant?
24  A.  If they're in those areas, yes.

69

2 Q. Lets talk a little bit about light duty.
2 Who coordinates light duty or modified duty for
3 employees?

**A. It would be our safety department.**

Q. Okay. True today and true back in the --

6 **A. Yes.**

7 Q. -- August '02 and April '03 time period?

8 **A. Yes, to my knowledge.**

9 Q. Are the supervisors responsible for
10 placing employees and determining what positions
11 are available for light duty?

12 **A. No.**

13 Q. What roles do the supervisors, if any,
14 play in light duty or modified duty assignments?

15 **A. They would be able to explain to the**
16 **safety department what the duties are, and then it**
17 **would be up to the supervisor and the employee**
18 **equally to make sure that the restrictions aren't**
19 **violated.**

20 Q. Okay. How do you know whether or not an
21 employee needs light duty?

22 **A. It's based on what their doctors note**
23 **says.**

24 Q. Okay. If you would please refer to your

70

1 notes regarding the January of 2003 follow-up
2 meeting that you had with Cindy Smith and Dave
3 Pantier. I know you indicated that Cheryl Doss and
4 John Winschief were also present for that meeting.
5 Were Winschief and Doss present for the entire
6 meeting?

7 **A. It looks like at least John joined us**
8 **later as I read this.**

9 Q. Did Cindy Smith indicate why she wanted to
10 have Cheryl Doss present in the meeting?

11 **A. I don't know. I don't recall a specific**
12 **reason.**

13 Q. Okay.

14 **A. Unless it's in here.**

15 Q. You were asked whether, in the course of
16 your investigation in January of 2003 you
17 interviewed Shirley Boddy, and I believe you
18 answered no. Was Shirley Boddy an employee in the
19 door plant?

20 **A. No.**

21 Q. Okay. Was she supervised by John
22 Winschief?

23 **A. Not to my knowledge, no.**

24 Q. Did Cindy Smith direct you to talk to

71

1 Shirley Boddy or otherwise indicate that Shirley
2 would have relevant information regarding her
3 complaint?

4 **A. No.**

5 Q. You were also asked on direct examination
6 whether you had conducted an interview of Karen
7 Bunten in January of 2003 and I believe you said
8 no.

9 **A. Correct.**

10 Q. Did Karen Bunten work in the door plant?

11 **A. Not to my knowledge.**

12 Q. And was she supervised by John Winschief?

13 **A. Not to my knowledge.**

14 Q. Did Cindy Smith direct you to talk to
15 Karen Bunten or otherwise indicate that she had
16 information relevant to the complaint at issue?

17 **A. No or I would have.**

18 Q. I think you testified that you advised
19 Cindy Smith that during the course of the
20 investigation comments had come out about her
21 involvement with married men?

22 **A. Yes.**

23 Q. Okay. Did you accuse her of preferring
24 married men?

72

1 **A. No.**

2 Q. Can you give me more detail about how that
3 came up in the conversation?

4 **A. Well, the way I would think that I would**
5 **have presented it is that I was not there so I**
6 **presented what the investigation showed. So it's**
7 **feedback based on the investigation.**

8 Q. Okay. Whether or not Cindy Smith
9 preferred married men wouldn't have anything to do
10 with any company policy, would it?

11 **A. No.**

12 Q. It was just strictly letting her know what
13 the perception was of her on her team?

14 **A. Yes.**

15 Q. Did you get a sense for what the
16 perception was of Cindy Smith on her team as a
17 result of your investigation?

18 **A. Yeah, the majority of the females that I**
19 **talked with didn't respect her or didn't like her.**

20 Q. Did you get some indication of why that
21 was?

22 **A. There were some comments about trust,**
23 **about her behavior as far as getting people in**
24 **trouble.**

73

1   well in the meeting?

2   A. I could look at the notes, but to some

3   affect yes.

4   Q. Okay. And then the next meeting you had

5   with her with Cindy Smith was in March 2003; is

6   that right?

7   A. Yes.

8   Q. And did you ever accuse, either in March

9   or in January of 2003, did you ever accuse Cindy

10  Smith of making false accusations?

11  A. No.

12  Q. Wouldn't you -- did you make any comments

13  about the nature of the complaints she had raised?

14  A. Yes. I explained that throwing was a

15  strong word to use since it was just on the other

16  side of the clamp table. I cautioned Cindy in her

17  words, especially when making accusations toward

18  others.

19  Q. Do you think there is a difference between

20  if an employee came to you, for example, and said a

21  stool was thrown as opposed to an employee coming

22  to you and saying a stool was put someplace, do

23  those things have different connotations to you?

74

1   A. There is a big difference.

2   Q. Why?

3   A. Well, moving the stool would be something

4   to work out among the two or among the team.

5   Throwing a stool is a safety issue, it's

6   inappropriate behavior, and it's not tolerated.

7   Q. Okay. Was the conclusion in your

8   investigation that the stool had been thrown or

9   that the stool had been put on the other side of

10  the table?

11  A. The investigation showed that the stool

12  had been moved.

13  Q. Did the investigation reveal that there

14  was any element of aggression or violence in the

15  act of moving that stool?

16  A. No, it did not.

17  Q. Did you understand the allegation to be

18  that there had been some act of aggression or

19  violence?

20  A. Absolutely because when I talked to Cindy

21  and she had said, I had said are you sure, was it

22  thrown, or I was trying to clarify the wording, and

23  she said yes it was thrown.

24  Q. Did any discipline result to Cindy Smith

75

1   as a result of the March 2005 investigation and

2   meeting?

3   A. 2003.

4   Q. 2003, sorry.

5   A. She was counseled again.

6   Q. Okay. Anything formally written up in

7   terms of discipline?

8   A. No, no.

9   Q. Okay. How about as a result of the

10  January 2003 investigation and meeting, was any

11  discipline issued to her as a result of that?

12  A. No.

13  Q. Okay. Did you ever accuse Cindy Smith of

14  lying?

15  A. No.

16  Q. Other than the complaint that Cindy Smith

17  brought to you about the breaking a nail comment

18  and the complaint that was brought to you about

19  throwing a stool, did Cindy Smith bring any other

20  complaints to you about her work environment during

21  the tenure of her employment?

22  A. No, she did not.

23  Q. Are you generally available to employees

24  who wish to make such complaints?

76

1   A. Yes.

2   Q. Does that fall within your role in human

3   resources?

4   A. Yes.

5   Q. Cindy Smith testified earlier in the week

6   in her deposition that she repeatedly complained to

7   her supervisor about the conduct of male employees

8   in her department. I believe she further testified

9   that she never brought those complaints to human

10  resources.

11  Is it reasonable in your view for an

12  employee who believes they have repeatedly suffered

13  those types of acts and who have complained without

14  any benefit, is it reasonable for that employee not

15  to make a report to human resources?

16  MS. de SAINT PHALLE: I'm going to object

17  to that kind of opinion type testimony. I mean

18  that's -- I don't think there is any foundation for

19  that and --

20  MS. CREVELING: Let me revise my question.

21  BY MS. CREVELING:

22  Q. Cindy Smith says she repeatedly complained

23  to her supervisor and her supervise did nothing and

24  yet she never filed a complaint with HR. Is that

1   reasonable?

2       A.   It doesn't sound reasonable to me.

3       Q.   Do you have in place a policy that lets

employees know that they have options for reporting

those types of issues?

6       A.   We have a very clear policy that states

7   what the proper reporting channels are.

8                   (Deposition Exhibit No. 0560 was

9                   marked for identification.)

10      Q.   Let me have you take a look at

11  Exhibit 0560 and tell me if that's the policy that

12  you've referenced?

13      A.   It appears to be, yes.

14      Q.   Okay.  What options are available to

15  employees under that policy?

16      A.   For reporting?

17      Q.   Yes.

18      A.   To local human resources, which would be

19  myself, there is a confidential hotline, an 800

20  number, and there is also a direct phone number to

21  the VP of safety in risk management Ron Flowers.

22      Q.   Does the company have a policy on

23  retaliation with respect to people who make

24  complaints?

1       A.   Absolutely.

2       Q.   What is that policy?

3       A.   How ever the retaliation fit into this

4   policy or how does it work?

5       Q.   Right.  What's the company's position on

6   retaliation?

7       A.   The position is that there is a zero

8   tolerance for any retaliation if somebody reports

9   something.  They need to do so and feel

10  comfortable.

11      Q.   What happens if the complaint is

12  unsubstantiated though, are they still shielded

13  from retaliation?

14      A.   No, they're not shielded.  Retaliation is

15  never acceptable.

16      Q.   Betty Burns testified earlier and said

17  that she complained to corporate I think she

18  described it about favoritism.  Do you know what

19  meeting she's referring to?

20      A.   She's referring to a follow-up focus group

21  meeting for a survey, for a company wide survey

22  that we took.

23      Q.   Okay.  When did that occur?

24      A.   Sometime in latter of 2003.

1       Q.   Okay.

2       A.   Mid to latter.

3       Q.   Okay.  So this was not an individualized

4   session with Betty Burns?

5       A.   No.

6       Q.   This meeting didn't happen as a result of

7   some complaint by Betty Burns?

8       A.   No.

9       Q.   Do you know who the person from corporate

10  was?

11      A.   Rick Mullis (phonetic) and I think maybe

12  Mike Schmidt.

13      Q.   What is Rick Mullis' position with the

14  company?

15      A.   He's the executive VP of HR.

16      Q.   And what is Mike Schmidt's position with

17  the company?

18      A.   I believe he's the VP of employee and

19  labor relations.

20      Q.   Okay.  And did Mr. Mullis and Mr. Schmidt

21  go to other MBCI locations to conduct these

22  meetings?

23      A.   Yes.

24      Q.   Were these meetings conducted or at least

1   open to all employees in Arthur?

2       A.   Yes, volunteers.

3       Q.   Okay.  Is this something that the company

4   periodically does?

5       A.   Every two years approximately.

6       Q.   You mentioned you were asked about a woman

7   whose last name I only caught was Risley?

8       A.   Yes.

9       Q.   You indicated she was terminated for

10  inappropriate behavior?

11      A.   Yes.

12      Q.   When was she terminated?

13      A.   Just recently in the last couple of

14  months.

15      Q.   This didn't happen while Cindy Smith was

16  employed?

17      A.   No.

18      Q.   Did the conduct for which she was

19  terminated occur while Cindy Smith was employed?

20      A.   No.

21      Q.   There has been some discussion about job

22  biding.  Can you just give us a brief description

23  of how job biding occurs?

24      A.   Job biding is a way for associates to move

**81**

1 to positions, either higher pay, lower pay, or
2 something that's more liking to them. They do this
3 and it's exclusively with about four positions in
4 the whole plant of 800 or 700 some hourly, it's
5 exclusively based on seniority.
6 Q. Okay.
7 A. And eligibility.
8 Q. Okay. So if a material handler wants to
9 become a machine op, they do that by --
10 A. Biding on the job.
11 Q. They bid on the job. And that job is
12 awarded based on what criteria?
13 A. Seniority. And they have to be able to do
14 the job once they're in it, but there are no
15 prerequisites except for those four exceptions.
16 Q. Those four exceptions being four
17 positions?
18 A. Four positions, yes.
19 Q. Do you know what those four positions are
20 that aren't subject to bid?
21 A. There is a roaming quality auditor, the
22 assistant team leader which is a developmental
23 position, a paint kitchen operator, and I think
24 there is one more, but those would be the only

**82**

1 ones.
2 Q. Okay. Are team leaders able to reject the
3 successful bidder on the job?
4 A. CDL driver is the other one, I'm sorry.
5 Q. Is the other of the four positions?
6 A. Yes.
7 Q. So are team leaders able to look at who
8 bid on a job and say no I don't want that person?
9 A. No.
10 Q. Okay.
11 A. They get who they get.
12             (Deposition Exhibit Nos. 0132 and
13             0133 were marked for
14             identification.)
15 Q. Let me have you take a look at
16 Exhibit 0132. Tell me if you recall seeing that
17 letter before.
18 A. Yes.
19 Q. What is that letter?
20 A. It's a letter informing Cindy that she's
21 taken all of her FMLA leave as of May 23rd and that
22 her job would be bid in accordance with the LOA
23 policy.
24 Q. LOA being leave of absence?

**83**

1 A. Yes, sorry.
2 Q. Okay. So what would happen once an
3 employee's job is bid? Does that mean that
4 basically their employment is over?
5 A. No. That just means that the job would be
6 put up on the bid board, but when they come back
7 they would be placed into a vacancy.
8 Q. So the employee has -- they're still
9 employed by the company, they just don't have a
10 specific job?
11 A. That's right.
12 Q. Okay. Can you take a look at Exhibit 0133
13 and tell me if you've seen that letter before?
14 A. Yes.
15 Q. Now that letter was sent by whom?
16 A. Linda Watkins.
17 Q. Okay. And would you have discussed this
18 letter with Linda Watkins before it went?
19 A. Very likely.
20 Q. Okay. And what was the purpose of this
21 letter?
22 A. To provide an update of the status of the
23 non FMLA leave. It was to advise of the changes
24 with the MBCI policy.

**84**

1 Q. Is this letter advising Cindy Smith of the
2 fact that her leave would be limited to six months?
3 A. Yes.
4 Q. Did other employees get a similar letter
5 advising them --
6 A. Yes.
7 Q. -- of that six-month?
8 A. Yes.
9 Q. Did you do a general announcement or
10 training to the plant about the six-month rule?
11 A. We did not.
12 Q. How did you inform employees of this
13 change?
14 A. On a case by case basis individuals in
15 writing.
16 Q. And how did you determine which
17 individuals you would give that written notice to?
18 A. To anyone that it applied to with the
19 exception of the ones that the six months hit right
20 when we rolled it out.
21 Q. Okay. So anybody who was on leave who
22 wasn't grandfathered got some kind of written
23 notice?
24 A. Yes.

85

```
2   doesn't mention the six-month rule, right?
3       A.  That's correct.
4       Q.  Why not?
5       A.  Because the change was implemented in
6   early June and this is in May.
7       Q.  Okay.
8               (Whereupon there was a brief
9               pause in the proceedings.)
10          MS. CREVELING:  I don't believe I have any
11  other questions.
12          MS. de SAINT PHALLE:  I just have a couple
13  follow-up questions.
14              REDIRECT EXAMINATION
15  BY MS. de SAINT PHALLE:
16      Q.  In your investigation of the stool
17  incident, did you find out that the stool was moved
18  more than once in that evening?
19      A.  I don't recall.
20      Q.  Would that be relevant in terms of the
21  fact if the employee moved the stool more than
22  once?
23      A.  I don't know.
24      Q.  Did people sell things like Girl Scout
```

86

```
1   cookies and Avon products on company time?
2       A.  They may sell Girl Scout.  They better not
3   sell Avon.
4       Q.  Would selling Girl Scout cookies on
5   company time be within the policy?
6       A.  Oh, did you say on company time?
7       Q.  Yes.
8       A.  Oh, no.  They shouldn't be selling
9   anything on company time.
10      Q.  Did employees receive discipline or
11  counseling if they were selling Girl Scout cookies
12  on company time?
13      A.  They would if they were.
14      Q.  Would they receive counseling if they were
15  selling things like say Avon products on company
16  time?
17      A.  Sure, sure.  If it was known.
18          MS. de SAINT PHALLE:  I have nothing
19  further.
20          MS. CREVELING:  Okay.
21              FURTHER DEPONENT SAYTH NOT
22
23
24
```

87

88

```
1   STATE OF ILLINOIS  )
2                      )
3   COUNTY OF SANGAMON )
4               C E R T I F I C A T E
5       I, MOLLY A. HOBBIE, a Certified Shorthand
6   Reporter and Notary Public, in and for said County
7   and State, do hereby certify that the Deponent
8   herein, MATTHEW OHRT, prior to the taking of the
9   foregoing deposition, and on November 18, 2005 was
10  by me duly sworn to testify to the truth, the whole
11  truth and nothing but the truth in the cause
12  aforesaid; that the said deposition was taken down
13  by me in shorthand and afterwards transcribed, and
14  that the attached transcript contains a true and
15  accurate translation of my shorthand notes referred
16  to.
17          Given under my hand and seal this 7th day
18  of December, A.D., 2005.
19
20              Certified Shorthand Reporter
21              and Notary Public
22              CSR # 084-003897
23
24  My commission expires April 14, 2006.
```

ERRATA SHEET

OFFICIAL SEAL
Molly A. Hobbie
Notary Public, State of Illinois