E-FILED
Wednesday, 01 March, 2006 08:16:13 AM
Clerk, U.S. District Court, ILCD

# Attachment 3

Page 1

```
        IN THE UNITED STATES DISTRICT COURT
          FOR THE CENTRAL DISTRICT OF ILLINOIS
                    URBANA DIVISION


CINDY SMITH,                )
                            )
          Plaintiff,        )
                            )
     vs                     ) Docket No. 04-2215
                            )
MASTERBRANDS CABINETS, INC.,)
                            )
          Defendant.        )
```

COPY

Deposition of RHONDA GATONS taken at the instance of the Plaintiff, on December 21, 2005, scheduled for the hour of 11:00 a.m., at Holiday Inn Express, 1201 Tuscola Boulevard, Tuscola, Illinois, before Donna M. Dodd, Certified Shorthand Reporter and Notary Public, pursuant to the stipulation attached hereto.

```
              GOLEMBECK REPORTING SERVICE
                Connie S. Golembeck, Owner
                    (217) 523-8244
                    (217) 632-8244
```

Page 2

APPEARANCES:

```
     MS. ALEXANDRA de SAINT PHALLE
     Londrigan, Potter & Randle
     Attorneys at Law
     1227 South Seventh Street
     Springfield, Illinois 62703
         Appeared on behalf of the Plaintiff.


     MS. KELLEY BERTOUX CREVELING
     Baker & Daniels
     Attorneys at Law
     300 North Meridian Street, Suite 2700
     Indianapolis, Indiana 46204
         Appeared on behalf of the Defendant.
```

ALSO PRESENT:

Mr. Matt Ohrt

Ms. Cindy Smith

Page 3

```
                    I N D E X
DEPONENT                                     PAGE NUMBER
Direct Examination by Ms. de Saint Phalle        5
Cross Examination by Ms. Creveling              27
Redirect Examination by Ms. de Saint Phalle     34
Recross Examination by Ms. Creveling            37
```

Page 4

S T I P U L A T I O N

It is stipulated and agreed, by and between the parties hereto, through their attorneys, that the deposition of RHONDA GATONS may be taken before Donna M. Dodd, a Certified Shorthand Reporter and Notary Public, upon oral interrogatories, on December 21, 2005, at the instance of the Plaintiff, scheduled for the hour of 11:00 a.m., at 1201 Tuscola Boulevard, Tuscola, Illinois.

That the oral interrogatories and the answers of the witness may be taken down in shorthand by the Reporter and afterwards transcribed.

That any requirements as to the reading over and signing of the deposition by the witness or the filing of the same are expressly waived;

That all objections are hereby reserved except as to the form of question which is waived unless specifically noted.

That the deposition or any parts thereof may be used for any purpose for which depositions are competent, by any of the parties hereto, without foundation proof.

That any party hereto may be furnished copies of the deposition at his or her own expense.

Page 5

1  (The Deponent was sworn
2  by the Reporter.)
3  RHONDA GATONS
4 called as a witness herein, at the instance of the
5 Plaintiff, having been first duly sworn on her oath,
6 was examined and testified as follows:
7  DIRECT EXAMINATION
8  BY MS. de SAINT PHALLE:
9  Q. Could you please state your full name and
10 your current address?
11  A. Rhonda Gatons, 206 South Ontario Street,
12 Tower Hill, Illinois 62571.
13  Q. What is your current telephone number?
14  A. 217-567-3584.
15  Q. Are you employed at the current time?
16  A. Yes.
17  Q. Where do you work?
18  A. Blue Cross Blue Shield of Illinois.
19  Q. Blue Cross Blue Shield where?
20  A. Of Illinois.
21  Q. Okay. Where? What office of theirs do you
22 work?
23  A. Springfield, Illinois.
24  Q. So you travel from Tower Hill to Springfield

Page 6

1 every day?
2  A. Sure do.
3  Q. How long is that a commute?
4  A. Approximately an hour.
5  Q. How long have you worked for Blue Cross Blue
6 Shield?
7  A. I started July of this year.
8  Q. What do you for Blue Cross Blue Shield?
9  A. I'm a Senior Work Force Engagement
10 Specialist.
11  Q. What generally do you do there as that?
12  A. It's in the arena of human resources. I'm
13 responsible for the regions within Springfield. They
14 have three different facilities, and I'm the really,
15 the easiest way would be the Human Resources Generalist
16 for those sites.
17  Q. Do you work at the Blue Cross Blue Shield
18 facility that is located on -- off MacArthur Boulevard
19 in Springfield?
20  A. No. That's one of the sites that I'm
21 responsible for, but I am actually located at the
22 Liberty Drive office.
23  Q. Before you started working for Blue Cross
24 Blue Shield where were you employed before that?

Page 7

1  A. I had my own consulting company.
2  Q. What was the name of your consulting company?
3  A. HR Assist Consulting.
4  Q. And what did you do in that?
5  A. Various HR functions for small to midsize
6 clients.
7  Q. How long did you have that consulting
8 company?
9  A. About two years.
10  Q. Was that operated out of your home or how did
11 you operate that?
12  A. Part of the time out of my home and part of
13 the time I had an office building.
14  Q. Where was that located?
15  A. At my home in Tower Hill for a portion of the
16 time and then at Pana, P-a-n-a, Illinois for a portion
17 of the time.
18  Q. Prior to having this HR Consulting Assist
19 business, where were you employed prior to that time?
20  A. Decatur Electronics.
21  Q. What did you do for Decatur Electronics?
22  A. Human Resource Manager.
23  Q. How long did you work for them?
24  A. About a year and a half.

Page 8

1  Q. Tell me, if you could, what would have been
2 the, as best you can recall, the inclusive dates in
3 which you worked for Decatur Electronics.
4  A. I'm going to guess here. It's probably
5 around the 2002/2003 time frame.
6  Q. What was your reason for leaving Decatur
7 Electronics?
8  A. I had another company that I thought was a
9 better opportunity for me.
10  Q. What was that company?
11  A. Safe-T-Storage.
12  Q. How long did you work for Safe-T-Storage?
13  A. Approximately a year, but then I did a lot of
14 consulting work for them through my own company after
15 that point.
16  Q. So were you working for Safe-T-Storage like
17 in the year, in the time frame of 2003/2004?
18  A. Right, uh-huh.
19  Q. Where is Safe-T-Storage located?
20  A. Charleston, Illinois.
21  Q. And what was your reason for leaving that
22 company?
23  A. I started my own consulting business.
24  Q. Let's jump back. Before working for Decatur

Page 9

```
 1  Electronics, who did you work for?
 2     A. I believe I worked for Masterbrands Cabinets
 3  at that point.
 4     Q. How long did you work for Masterbrands?
 5     A. Again, I'm guessing here, but I'm going to
 6  say the time frame of 1999 to 2001 or 2002, somewhere
 7  in that time frame.
 8     Q. What job position did you hold at
 9  Masterbrands?
10     A. Employee Relations Manager.
11     Q. Before working at Masterbrands did you have
12  another job?
13     A. Uh-huh.
14     Q. What was that job?
15     A. Human Resource Manager for a company called
16  Akorn, A-k-o-r-n.
17     Q. Where was that company located?
18     A. Decatur.
19     Q. How long did you work for them?
20     A. Approximately seven years.
21     Q. Were you a Human Resource Manager for them
22  too?
23     A. Yes.
24     Q. And what was the reason for leaving Akorn?
```

Page 10

```
 1     A. Actually that Human Resource Manager position
 2  was being relocated to the Chicagoland area and I chose
 3  not to relocate.
 4     Q. Tell me what your educational background is.
 5     A. I have a bachelor's degree in Human Resource
 6  Management. I have the PHR certification.
 7     Q. When did you obtain your bachelor's degree?
 8     A. 1993.
 9     Q. Where did you obtain that degree?
10     A. Millikin University.
11     Q. Then you mentioned you had your PHR --
12     A. Uh-huh.
13     Q. -- certification?
14     A. Uh-huh.
15     Q. And that -- did you get that after -- when
16  you graduated from Millikin?
17     A. Actually, no. You had to have some work
18  experience and I believe I received it in 1995 and it's
19  still current.
20     Q. Who issues that certification?
21     A. The Society of Human Resource Management.
22     Q. Just to go back now to Masterbrands, you left
23  Akorn because you didn't want to relocate to Chicago,
24  and so you started with Masterbrands as an Employee
```

Page 11

```
 1  Relations Manager, is that correct?
 2     A. Correct.
 3     Q. And what were your job duties at
 4  Masterbrands?
 5     A. Staffing and recruiting, new hirer
 6  orientation, supervisory training, employee relations.
 7  I would say those are the main categories.
 8     Q. While you were at Masterbrands did you have
 9  the same position during the time, the entire time that
10  you were there?
11     A. Yes.
12     Q. Did you ever get any promotions while you
13  were there?
14     A. No.
15     Q. Did you ever seek any promotions while you
16  were there?
17     A. Yes.
18     Q. What promotion did you seek?
19     A. I may be inaccurate on the title, but I
20  believe it was the Human Resource Manager.
21     Q. When did you seek that position?
22     A. Probably six months prior to me leaving so,
23  again, it's either 2001 or 2002 time frame.
24     Q. Did you apply for the Human Resource Manager
```

Page 12

```
 1  position?
 2     A. Yes.
 3     Q. And who was the job given to?
 4     A. Kord Kozma, K-o-r-d K-o-z-m-a, I'm pretty
 5  sure.
 6     Q. Was he already employed by Masterbrands at
 7  the time that he got that job?
 8     A. No.
 9     Q. He came in from outside?
10     A. Correct.
11     Q. Do you know where he was employed prior to
12  working for Masterbrands?
13     A. No, I don't recall.
14     Q. Do you know, was he still employed with
15  Masterbrands when you left?
16     A. Yes.
17     Q. Have -- when was the last time that you saw
18  him?
19     A. The day that I left the company.
20     Q. Okay. Have you ever had any contact with him
21  since that time?
22     A. No.
23     Q. Do you know whether he's still employed with
24  the company, Masterbrands?
```

Page 13

1  A. No, I do not.
2  Q. Do you know where he's located now?
3  A. No.
4  Q. Do you know whose decision it was that Kord
5  Kozma was hired as Human Resource Manager as opposed to
6  you?
7  A. I don't know who was ultimately responsible
8  for the decision. Mick Price, who was the general
9  manager for the Arthur location was involved. I'm not
10 certain if he was the ultimate decision maker.
11     I interviewed in our corporate location in, I
12 think it's Jasper, Indiana, and I can remember his name
13 was Paul, I'm sorry, I can't remember the last name.
14 Q. To your observation, did Kord Kozma have more
15 qualifications then you did for this position?
16 A. I think he had different experiences then I
17 did.
18 Q. What type of experience did he have that you
19 didn't?
20 A. I think his exposure was greater as it
21 referred to union experience. I did not have any union
22 experience, whether it be anti-union or pro-union. I
23 didn't have any union experience and I know he had some
24 experience with that.

Page 14

1  Q. Were the employees at Masterbrands unionized?
2  A. No.
3  Q. Was there a threat that the employees might
4  become unionized?
5  A. There was not a threat, no.
6  Q. Was there a concern on behalf of management
7  that the employees might become unionized?
8  A. I think coming from a management background
9  myself, you always are mindful of the possibility of
10 union involvement. I don't know that I would say there
11 was a threat or a concern.
12 Q. Did you ever overlap with the employee Matt
13 Ohrt who is sitting over there?
14 A. No.
15 Q. Have you ever spoken with Matt Ohrt before?
16 A. No, I have not.
17 Q. What was your -- did you leave Masterbrands
18 voluntarily in 2002?
19 A. Yes.
20 Q. What was the reason for your leaving
21 Masterbrands?
22 A. I went to Decatur Electronics as the Human
23 Resource Manager for that company.
24 Q. When you went to Decatur Electronics, did you

Page 15

1  get a salary increase?
2  A. Yes.
3  Q. At the time that -- who was your supervisor
4  when you were working at Masterbrands?
5  A. When I originally started my supervisor was
6  Jerry Ray. At the end of my employment it was Kord
7  Kozma.
8  Q. What -- when Kord Kozma was hired as Human
9  Resource Manager, what position did Jerry Ray take?
10 A. I don't know the exact title, but he
11 participated in the safety arena.
12 Q. Was -- when -- was Jerry Ray still working at
13 Masterbrands when you left?
14 A. Yes.
15 Q. Have you had any conversations with any
16 personnel at Masterbrands since the year 2003?
17 A. The only person that comes to mind would be
18 Stephanie Haines, because I -- when I went to Decatur
19 Electronics, there was a HR Assistant position that
20 became open and I recruited her from Masterbrands to
21 Decatur Electronics. I don't know the date. It would
22 be around the 2003 time frame.
23 Q. When you worked at Masterbrands as Employee
24 Relations Manager, what were your hours of employment?

Page 16

1  A. Typically 8 to 4:30. However, I know we,
2  each person within the HR Department picked one day of
3  the week that they would come in and work a later
4  shift, say ten to 6:30 or maybe noon to 8:30 so that we
5  would be available for the second shift hours.
6  Q. Did you have any responsibility as a --
7  working as Employee Relationship -- Relations Manager
8  for dealing with sexual harassment or sexual
9  discrimination complaints?
10 A. Yes.
11 Q. Could you tell me basically what your
12 responsibility was?
13 A. Initially to hear the complaint, determine
14 based on that complaint what appropriate steps would be
15 next. It may be to investigate or talk with further
16 individuals, bring those concerns or information to my
17 supervisor and/or the superintendent or the plant
18 manager depending on what the situation may have
19 included.
20 Q. When you were at Masterbrands did you
21 investigate any complaints of sexual harassment or
22 complaints of sexual discrimination?
23 A. Not that I can recall at this point.
24 Q. If you investigated a complaint, if you, for

### Page 17

1 example, interviewed various employees who may have had
2 a complaint about other employees, would you always
3 make up a written report?
4     A. Yes.
5     Q. Would these complaints sometimes just be
6 complaints that other coemployees were, things like
7 rude or things like that or what type of level of
8 complaint would come to you?
9     A. Well, various levels would come to me. For
10 example, if someone was rude to another employee, that
11 may come to me.
12     In many cases I would discuss that with their
13 supervisor in a meeting and determine what's the best
14 course of action for this complaint.
15     Q. Did you -- were you -- did you ever receive
16 any complaints from Cindy Smith, who then was named
17 Cindy Heiman?
18     A. Not that I recall.
19     Q. Did she ever complain that other employees
20 were using abusive language to her?
21     A. Not that I recall.
22     Q. Were you provided with any documents to
23 review in preparation for this deposition?
24     A. No.

### Page 18

1     Q. Have you ever had any conversations with
2 Kelley Creveling who is sitting over to your right?
3     A. Yes.
4     Q. Do you regard her as your attorney?
5     A. No.
6     Q. Could you tell me what conversations that
7 you've had with Ms. Creveling?
8     A. When I received the subpoena from your
9 office, I also received a letter from Kelley stating to
10 give her a call so that we could discuss this. I did
11 make that call.
12     Q. What did you and she discuss?
13     A. Who Cindy Smith was and I was then told it
14 was Cindy Heiman because I was having extreme
15 difficulty even recalling a Cindy Smith.
16     After hearing Cindy Heiman, I did at least
17 recognize the name.
18     Q. What did you recognize about the name Cindy
19 Heiman?
20     A. Just a memory recall.
21     Q. Okay. I take it since you worked mostly on
22 the day shift, you really wouldn't come in contact with
23 Cindy Heiman, correct?
24     A. I would definitely have more contact with

### Page 19

1 first shift employees then second shift, however,
2 second shift employees typically would come in
3 somewhere between 3:00 or 4:00 depending on what
4 department they worked in.
5     So I did have contact with second shift
6 employees. It just wasn't as much as first shift.
7     Q. Do you recall ever having any contact with
8 Cindy Heiman Smith?
9     A. Yes. I know I've had contact with Cindy. To
10 say what that contact was, I can't recall what those
11 situations may have been.
12     I know all new employees because I would have
13 been involved in her hiring more than likely or her new
14 hirer orientation.
15     Q. Would you have any role in performing
16 employee evaluations?
17     A. I don't perform employee evaluations while I
18 was at Masterbrands. However, I was on the signature
19 page of the employees, I believe it was a 45 day or a
20 60 day.
21     There were two or three performance
22 evaluations that they would receive within their
23 probationary period. I can't remember the dates on
24 those.

### Page 20

1     But at certain time frames within that 90 day
2 period they would be evaluated by their supervisor. I
3 would be a signature line on that as it came into the
4 HR office. I would sign off on that before placing it
5 in the personnel file.
6     Q. Do you recall ever -- do you recall working
7 with John Winschief?
8     A. Yes, I recall John.
9     Q. Do you recall ever dealing with him in regard
10 to Cindy Heiman?
11     A. Nothing specifically that comes to mind.
12     Q. Do you recall whether there was ever an
13 incident where a fellow employee, male employee was
14 using abusive language to Cindy Smith to the extent
15 that she was in tears?
16     A. No, I don't recall that.
17     Q. Do you ever recall having any dealings with
18 an employee by the name of Dustin Hall?
19     A. I'm sorry, no, I don't.
20     Q. When you spoke with Ms. Creveling, did you
21 speak about any specific incidents regarding Cindy
22 Heiman?
23     A. Kelley had shared with me that there was
24 documents with regard to her performance evaluations

Page 21

1 that had my signature on there. I did not see the
2 documents, but those were -- there were documents with
3 my signature, which would have been, I'm assuming, the
4 performance evaluations that I would normally sign for
5 all employees.
6   Q. Did Ms. Creveling ever share with you any or
7 the contents of any complaint or statement that was
8 written up by John Winschief?
9   A. I believe Kelley shared with me there was a
10 document that John had written to me with regard to
11 Cindy but, again, I have never seen that document.
12   Q. Did you ever recall whether on Cindy Smith's
13 first 75 day evaluation or first probationary
14 evaluation, whether there was a question about whether
15 she would be marked off because she left a shift early,
16 four hours early because of an incident involving
17 Dustin Hall where he allegedly used profane and abusive
18 language towards her?
19   A. The question again was, do I recall a
20 document or recall a conversation?
21   Q. Do you recall a conversation about that?
22   A. No.
23   Q. Do you recall a conversation where there was
24 a question about whether or not Cindy would have an

Page 22

1 excused absence of four hours because of this incidence
2 involving Dustin Hall?
3   A. I don't recall anything that far back, no.
4 I'm sorry.
5   Q. Let me hand you what was marked as Deposition
6 Exhibit 1 in John Weinchief's deposition, which is
7 temporary associate evaluation form.
8     MS. CREVELING: Alex, does it have a Bates
9 Number on it?
10     MS. de SAINT PHALLE: Yes. It's Bates Stamped
11 0113.
12     MS. CREVELING: Thanks.
13     MS. de SAINT PHALLE: Is your signature on
14 that document?
15     THE DEPONENT: Yes, it is.
16   Q. Does reviewing that document refresh your
17 recollection at all as to what this incident involving
18 missing time of 4.8 hours?
19   A. No.
20   Q. There is a comment there under the general
21 comments there, do you recall having any conversation
22 with John Winschief regarding what that meant?
23   A. No, I'm sorry, I don't.
24   Q. Okay. Let me have that back a minute,

Page 23

1 please.
2     In your job duties is this something, Cindy
3 understands the absentee policy and under different
4 circumstances I don't think she would have missed any
5 time, is that something that you in your job would
6 investigate or is that something that you would just
7 put --
8   A. Not --
9   Q. -- put into the personnel file?
10   A. Yeah. There is nothing with 4.8 hours that
11 would cause me to look into that further. In a 90 day
12 period, I believe an employee could miss up to eight
13 hours of time. Gosh, I believe it was eight hours of
14 time within a 90 day period to be within the limits.
15     So as I would look at 4.8 hours, that
16 wouldn't flag me because it's not over the eight hours.
17   Q. Was it your understanding that Cindy Heiman
18 was a satisfactory employee?
19   A. After seeing the document, yeah. I mean,
20 she's acceptable.
21   Q. Were you aware when you were working at
22 Masterbrands whether there were any particular
23 complaints about Cindy?
24   A. No.

Page 24

1   Q. Were you aware that she had complaints about
2 abusive language or conduct by fellow male employees?
3   A. No.
4   Q. I'm going to hand you a document that was
5 part of Deposition Group 6 in Matt Ohrt's deposition,
6 and I'm going to refer you specifically to Bates Number
7 0754 and 0755, and take a look at that document.
8   A. Continue onto the next page as well?
9   Q. Yes.
10   A. Okay.
11   Q. Does that document refresh your recollection
12 in any way about hearing any complaints that Cindy had
13 regarding employees using abusive language to her?
14   A. No.
15   Q. Do you recall ever receiving a copy of that
16 document which was just identified?
17   A. Do I recall receiving this document, no.
18   Q. Do you recall having any conversations with
19 John Winschief regarding that document or the
20 underlying incident that he referred to?
21   A. No.
22   Q. Since you have no recollection, is it fair to
23 say you can't testify that those statements contained
24 in that document are correct or incorrect?

Page 25

1  A. That would be a correct statement.
2  Q. Do you recall ever having any dealings with
3  an employee by the name of Dustin Hall?
4  A. No.
5  Q. Do you recall ever having any dealings with
6  an employee by the name of Allen Brickey?
7  A. I recall Allen Brickey's name. I can't
8  recall what kind of dealings I may have had.
9  Q. When employees were fired, as Human Resource
10 Manager did you have any responsibility in carrying out
11 that, telling the employees they were fired or
12 escorting them out of the plant or anything to do with
13 the firing decisions of?
14 A. In some instances, yes. In all instances,
15 no.
16 Q. Would somebody, like, for example, a manager,
17 John Winschief, have authority to fire employees under
18 his supervision on his own or would it have to go
19 through Human Resources before that decision would be
20 made?
21 A. It would need to go through his supervisor.
22 Q. I take it -- and that was Dave Pantier?
23 A. Yes. Dave was the superintendent at that
24 time, yes.

Page 26

1  Q. How would you get involved in a firing
2  decision, if you did?
3  A. It would typically be a very severe situation
4  where maybe safety was an issue and typically an
5  individual that would have been on day shift.
6  Q. Do you recall whether there were any women
7  who complained about John Winschief not giving them the
8  same opportunities to bid on jobs that men did?
9  A. Never remember a complaint about John.
10 Q. Do you ever recall a complaint about John
11 Winschief not exercising discipline over the male
12 employees on his shift?
13 A. Can you repeat that again?
14 Q. Do you ever recall complaints about John
15 Winschief not exercising sufficient discipline over the
16 male employees working underneath his supervision?
17 A. No.
18 Q. Cindy Smith has complained that she was not
19 allowed to drive a forklift truck even though it came
20 under her job description and at a previous place of
21 employment she was able to drive a forklift truck.
22 A. Uh-huh.
23 Q. Do you know anything about that complaint?
24 A. No.

Page 27

1  Q. Do you recall ever making any kind of written
2  notations regarding Cindy Heiman?
3  A. I don't recall anything, no.
4  Q. To your knowledge, was Cindy Heiman a
5  satisfactory employee?
6  A. Coming off of memory, yes.
7     MS. de SAINT PHALLE: I don't have any other
8  questions.
9           CROSS EXAMINATION
10          BY MS. CREVELING:
11 Q. While you served as the Employee Relations
12 Manager for Masterbrands, did you have an opportunity
13 to form an opinion as to John Winschief's performance
14 in his role as a team leader?
15 A. The dealings that I can recall with John as a
16 supervisor were very positive.
17 Q. Was Mr. Winschief hired while you were
18 there?
19    Is that right, he came in as a hirer?
20 A. Yes. He was hired while I was there.
21 Q. Okay. Did you have any concerns with respect
22 to the way John Winschief treated women in the plant?
23 A. No.
24 Q. Did you ever see or observe any inappropriate

Page 28

1  actions or comments by John Winschief against women?
2  A. No.
3  Q. Approximately how long did you work with Mr.
4  Winschief?
5  A. I'm guessing here, but maybe a year, year and
6  a half maybe.
7  Q. Okay. Were you available to Mr. Winschief if
8  he felt he needed assistance or consultation from HR?
9  A. Yes. Any second shift or third shift
10 supervisor had access to E-mail, had access to voice
11 mail, could call and schedule a time. They could
12 either come in earlier then their shift started and I
13 would set a time to meet or I would come in earlier
14 than my normal shift or stay later.
15    We would find a time that we could make
16 available if there were issues.
17 Q. Okay. While you served as the Employee
18 Relations Manager for Masterbrands, did you also have
19 an opportunity to work with Dave Pantier?
20 A. Yes.
21 Q. Okay. And did you form an opinion as to how
22 Dave Pantier performed in his role as a superintendent?
23 A. I've been in Human Resources at the time I
24 worked there approximately nine or ten years, and Dave

### Page 29

 1   Pantier is by far the best superintendent from a
 2   performance and a reliability and a consistent basis
 3   that I've ever seen.
 4      Q. Okay. Do you have any concerns with the way
 5   Dave Pantier treated women whom he supervised?
 6      A. Absolutely not.
 7      Q. Did you ever form any concerns about the way
 8   women were treated in the plant in general?
 9      Did you feel that there was a discrimination
10   issue in the plant?
11      A. No.
12      Q. Were you familiar with the bid system?
13      A. Yes.
14      Q. Can you give us an explanation as to how the
15   bid system worked?
16      A. When a position would come open, it would be
17   posted on a bulletin board, in a specific area for job
18   postings so that all employees knew where to go to view
19   them.
20      There was a form the employee would have to
21   complete in order to bid for the job. I may not have
22   all the information correct, but their name, their
23   current position, their date of hire, I believe that's
24   all, and they were not allowed to have any, I believe

### Page 30

 1   it was a written warning or above in their file at the
 2   time they were bidding or that disqualified them.
 3      It was based on a seniority system, so
 4   those -- the most senior employee would be the employee
 5   who is awarded the job, and that's off of memory so I
 6   may not have everything correct there.
 7      Q. Okay. But the bottom line basic is that the
 8   person who got the job, assuming they were not
 9   disqualified for discipline issues, the most senior
10   person got the job?
11      A. That is correct.
12      Q. Okay. And were the team leaders responsible
13   for determining who was the most senior and who was
14   going to get the job?
15      A. No. That was handled through the Human
16   Resource Office by one of the assistants.
17      Q. If the team leader decided they didn't want
18   or like the person who was awarded the job, did the
19   team leader have the ability to prevent that person
20   from getting the bid?
21      A. No. The team leaders have no control over
22   who was awarded the bid. When the bids were awarded,
23   that came from the Human Resource Office, which was
24   posted for all employees to see who was awarded the

### Page 31

 1   job. The team leader had no involvement in that
 2   bidding process.
 3      Q. Okay. Are you familiar with any job bids
 4   involving an employee by the name of Brenda Purcell?
 5      A. Again, I can recall Brenda Purcell as an
 6   employee, the name, but no, I can't recall a bid, no.
 7      Q. Do you recall receiving any complaint from
 8   Cindy Smith or anyone else that she had been poked in
 9   the chest by an employee named Allen Brickey?
10      A. No, I don't recall that.
11      Q. Do you recall receiving a complaint from
12   Cindy Smith or from anyone else that an employee by the
13   name of Art Decker had smacked Cindy Smith across the
14   back of the legs and rear end causing bruising?
15      A. No, I'm not aware of that.
16      Q. Okay. If you had received a complaint, what
17   would you, from a documentation standpoint, where would
18   that documentation have gone?
19      A. If I would have received a complaint such as
20   that, I would have wrote up the complaint as to the
21   facts that was given to me, and then I would have a
22   meeting with the supervisor, team leader of that
23   department, as well as whoever the superintendent would
24   be of that shift to determine who else should we talk

### Page 32

 1   with, are they aware of it, those type of things.
 2      Q. Okay. And if you had written up the
 3   complaint and made notes, where would you have placed
 4   those notes?
 5      A. It would have been in the employee's
 6   personnel file.
 7      Q. Okay. Were you consistent in that protocol
 8   so to speak?
 9      A. Yes, I believe I am. It's vital in cases
10   just like this where it's several years past. I talk
11   literally with hundreds of employees over the years.
12   If I don't make a documentation trail, I can't recall
13   situations, so it's beneficial for me to do that.
14      Q. If there are no documents in Cindy Smith's
15   file regarding a poking incident by Allen Brickey, for
16   example, or hitting incident with Art Decker, or
17   whatever other complaint she may have had, should we
18   understand from that that you did not receive a
19   complaint from her?
20      A. If I don't have documentation, that to me
21   says, I wasn't involved in knowledge of that.
22      Q. Okay. Were you aware of a complaint by Cindy
23   Smith that John Winschief would not cross-train her on
24   machinery?

Page 33

1  A. No, I'm not aware of that.
2  Q. Would it have been common for a material
3 handler such as Cindy Smith to have been cross-trained
4 on machinery in the plant?
5  A. Would she have been a Material Handler I or a
6 Material Handler II? That would be dependent --
7  Q. Okay.
8  A. -- at the time I was there.
9  Q. Okay. Material Handler I.
10  A. A forklift operator is considered a Material
11 Handler I, so it would be within the scope of that job
12 title, however, not every Material Handler I is a
13 forklift driver.
14  Q. Would it have been usual to cross-train a
15 Material Handler I on saws, like a chop saw, for
16 example?
17  A. No. That's a completely different pay grade
18 and job title function.
19  Q. Would it have been usual to cross-train a
20 Material Handler I on other machinery other than a chop
21 saw?
22  A. It would be very unusual.
23  Q. Okay. And why?
24  A. Because the skill sets required for those two

Page 34

1 type of positions are very different from one another.
2  Q. Okay. If a Material Handler I wanted to
3 operate machinery, could a Material Handler I bid on a
4 machine operator position?
5  A. Yes.
6  MS. CREVELING: Okay. I don't have any other
7 questions.
8  MS. de SAINT PHALLE: I just have a couple
9 follow-up questions.
10  REDIRECT EXAMINATION
11  BY MS. de SAINT PHALLE:
12  Q. When Ms. Creveling was asking you about
13 incidents of a smacking incident or a poking incident
14 regarding Cindy Smith, if those complaints were just
15 handled by John Winschief or Cindy's supervisors, you
16 wouldn't necessarily hear about it, correct?
17  A. I may not hear about them. However, in that
18 particular, a poking or a smacking, a physical contact
19 with two employees, it would be very rare that I
20 wouldn't know about that, because that would be very
21 serious to us.
22  Q. Well, in order for that to happen, either the
23 employee involved or the supervisor would have to make
24 a complaint to you, correct?

Page 35

1  A. That's correct.
2  Q. And so unless the employee or the supervisor
3 made a complaint to you about that incident, you
4 wouldn't know about it, correct?
5  A. That's correct.
6  Q. Did Becky Hardwick ever complain to you about
7 John Winschief?
8  A. What was her name again?
9  Q. Becky Hardwick, in terms of not being able to
10 get a job that she thought she was entitled to because
11 she was a woman?
12  A. Not that I recall.
13  Q. You mentioned that driving a forklift truck
14 was within the scope of a Material Handler's I
15 position?
16  A. That's correct.
17  Q. And so that a woman should have -- who was a
18 Material Handler I should have been equally eligible to
19 drive a forklift truck as a male, correct?
20  A. If their job title is a Material Handler I,
21 regardless of male or female, depending on what
22 department they are in, they may drive a forklift as a
23 Material Handler I.
24  Q. Was that discretion as to whether a Material

Page 36

1 Handler I could drive a forklift truck left up to the
2 discretion of the team leader?
3  A. Yes, yes.
4  Q. Were jobs ever given in the plant without
5 bidding?
6  A. Could you repeat it?
7  Q. Were jobs in the plant ever given without
8 going through the bidding process to your knowledge?
9  A. I would be able to remember within the
10 employee's 90 day probationary period, we may, at the
11 time that we hire them, hire them in as a Material
12 Handler II, for example. That may be their job title
13 that we hired them in for.
14  In that 90 day trial or probationary period,
15 there may be, if there is another position that was
16 open, there may be an opportunity for that supervisor
17 to place them in a different job as long as it is
18 within that 90 day period.
19  If it's beyond the 90 day period, then no, I
20 don't recall positions ever being. It would be under a
21 normal bid policy at that point.
22  MS. de SAINT PHALLE: Okay. I have no other
23 questions.
24

1        RECROSS EXAMINATION
2        BY MS. CREVELING:
3    Q. As I understand it, the Material Handler name
4 is a what, a classification of a job, is that accurate?
5    A. Uh-huh, yes. That's correct.
6    Q. And there are many different functions that
7 employees perform under the general classification
8 under the Material Handler I?
9    A. Yes.
10   Q. And although it's within the scope of, the
11 general job description for that classification, not
12 every Material Handler will necessarily need to drive a
13 forklift truck?
14   A. No, not at all. Well, I can't recall that.
15 No, that's accurate. There are several Material
16 Handler Is and only a certain number of those are
17 forklift drivers, and I don't recall what that number
18 is.
19        But if you were a Material Handler I, that
20 does not mean you're a forklift driver. It could be
21 one of your functions, but there are many other things
22 that you could do as a Material Handler I as well.
23        MS. CREVELING: Okay. No other questions.
24 Thank you.

Page 38

1  STATE OF ILLINOIS  )
2                    ) ss
3  COUNTY OF SANGAMON )
4       CERTIFICATE
5       I, Donna M. Dodd, Certified Shorthand
6  Reporter and Notary Public, in and for said County and
7  State, do hereby certify that the Deponent herein,
8  RHONDA GATONS, prior to the taking of the foregoing
9  deposition, and on December 21, 2005, was by me duly
10 sworn to testify to the truth, the whole truth and
11 nothing but the truth in the cause aforesaid; that the
12 said deposition was taken down by me in shorthand and
13 afterwards transcribed, and that the attached
14 transcript contains a true and accurate translation of
15 my shorthand notes referred to.
16      Given under my hand and seal this 6th day of
17 January, A.D., 2006.
18
19      Certified Shorthand Reporter
        and Notary Public
20      CSR# 084-003912
21
                "OFFICIAL SEAL"
                Donna M. Dodd
                Notary Public, State of Illinois
                My Commission Exp. 05/19/2006
22
23 My commission expires:
24 May 19, 2006