**E-FILED**
Wednesday, 22 March, 2006  03:29:30 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT B

**Page 1**

1

```
            IN THE UNITED STATES DISTRICT COURT
            FOR THE CENTRAL DISTRICT OF ILLINOIS
                        URBANA DIVISION

CINDY SMITH,                    )
                                )
        Plaintiff,              )
                                )
    vs.                         )   Case No. 04-2215
                                )
MASTERBRANDS CABINETS,          )
INC.,                           )
                                )
        Defendant.              )
```

Discovery deposition of CHERYL DOSS, taken at
the instance of the Plaintiff, on November 18, 2005
scheduled for the hour of 2:38 P.M., at 1201
Tuscola Blvd., Tuscola, Illinois, before Molly A.
Hobbie, Certified Shorthand Reporter and Notary
Public, pursuant to the attached stipulation.

```
                GOLEMBECK REPORTING SERVICE
                Connie S. Golembeck, Owner
                        (217) 523-8244
                        (217) 632-8244
```

**Page 2**

## S T I P U L A T I O N

It is stipulated and agreed, by and between
the parties hereto, through their attorneys, that
the deposition of CHERYL DOSS, may be taken before
Molly A. Hobbie, a Certified Shorthand Reporter,
upon oral interrogatories, on November 18, 2005 at
the instance of the Plaintiff, scheduled for the
hour of 2:38 P.M., at 1201 Tuscola Blvd., Tuscola,
Illinois.

That the oral interrogatories and the answers
of the witness may be taken down in shorthand by
the Reporter and afterwards transcribed.

That any requirement as to the reading over
and signing of the deposition by the witness or the
filing of the same are expressly waived.

That all objections are hereby reserved except
as to the form of the question which is waived
unless specifically noted.

That the deposition or any part thereof may be
used for any purpose for which depositions are
competent, by any of the parties hereto, without
foundation proof.

That any party hereto may be furnished copies
of deposition at his or her own expense.

**Page 3**

APPEARANCES:

MS. ALEXANDRA de SAINT PHALLE
Londrigan, Potter & Randle
Attorneys at Law
1227 South Seventh Street
Springfield, Illinois 62703

        Appeared on behalf of Plaintiff,


MS. KELLEY BERTOUX CREVELING
Baker & Daniels
Attorneys at Law
300 N. Meridian Street, Suite 2700
Indianapolis, Indiana 46204

        Appeared on behalf of Defendant.

ALSO PRESENT:
  Mr. Matthew Ohrt
  Ms. Cindy Smith

**Page 4**

## I N D E X

                                            PAGE

Direct Examination by Ms. de Saint Phalle  5
Cross Examination by Ms. Creveling         49

EXHIBITS                            MARKED

None

5

1   (The witness was sworn by the
2   Reporter.)
3   CHERYL DOSS,
called as a witness herein, at the instance of the
Plaintiff, having been duly sworn upon her oath,
6   testified as follows:
7   DIRECT EXAMINATION
8   BY MS. de SAINT PHALLE:
9   Q.  Could you please state your name and
10  address.
11  A.  **Cheryl Lynn York, 75 Lockhart Drive,**
12  **Neoga, Illinois, 62447.**
13  Q.  Previously did you go by a different name?
14  A.  **Yes, Cheryl Doss.**
15  Q.  And how long did you go by that name for?
16  A.  **About 30 years.**
17  Q.  Are you currently employed?
18  A.  **No.**
19  Q.  Who did you used to work for?
20  A.  **Masterbrands Cabinets in Arthur.**
21  Q.  How long did you work for Masterbrands?
22  A.  **About five and a half years.**
23  Q.  Before working for Masterbrands, where did
24  you work for?

6

1   A.  **Trail Mobile.**
2   Q.  How long did you work for them?
3   A.  **One month.**
4   Q.  Okay.  How about let's go one employer by
5   that, where did you work?
6   A.  **I worked at Hydrogear, Sullivan, Illinois.**
7   Q.  And how long did you work there?
8   A.  **Almost eight years.**
9   Q.  What did you do for them?
10  A.  **I was a team leader on an assembly line**
11  **and we assembled treds axles.**
12  Q.  What year did you start working for
13  Masterbrands?
14  A.  **January of 2000.**
15  Q.  When you started working for Masterbrands,
16  did you know anybody who was working at the plant
17  then?
18  A.  **Yes.**
19  Q.  Did you know Cindy Smith?
20  A.  **No, not before I started working there.**
21  Q.  When was the first time you met Cindy
22  Smith?
23  A.  **When she first came to work in the door**
24  **plant there at Masterbrands.**

7

1   Q.  What position did you hire in to at
2   Masterbrands?
3   A.  **A screw poker.  I was a screw poker?**
4   Q.  Okay.  As a screw porker (sic)?
5   A.  **I guess it would be, yeah.  I did that for**
6   **eight months.**
7   Q.  As a screw porker, P-O-R-K-E-R?
8   MS. CREVELING:  Poker I think.
9   MS. de SAINT PHALLE:  What?
10  MS. CREVELING:  Poker.
11  A.  **Poker.**
12  Q.  Poker.  Okay.  What was --
13  A.  **Material handling.**
14  Q.  Okay.  Material handling.
15  A.  **But the job was poking screws, screw**
16  **poker.**
17  Q.  Okay.  And you held that job for eight
18  months?
19  A.  **Yeah.**
20  Q.  And then did you bid on to a new job?
21  A.  **Yeah, I bid on to auditor.**
22  Q.  Was there a pay increase associated with
23  that job?
24  A.  **Yes.**

8

1   Q.  What were your responsibilities as
2   auditor?
3   A.  **My job as auditor was to -- I worked in**
4   **the door plant and I was to follow the processes**
5   **from the time the wood started in the department**
6   **until the door was finished at the end of the**
7   **department, and inspect, accept or reject or tell**
8   **them to repair the doors or the wood or whatever**
9   **was necessary.**
10  Q.  When you worked in the door plant, who was
11  your supervisor?
12  A.  **It was -- supervisors changed.  First it**
13  **was Bill Hinds on second shift and then he went to**
14  **first shift and then I think the next one was John**
15  **Winschief.**
16  Q.  Did you remain as an auditor the full time
17  you were employed by Masterbrands?
18  A.  **After I bid onto that job, yes.**
19  Q.  Did you recently quit working at
20  Masterbrands?
21  A.  **Yes, I did.**
22  Q.  And that was voluntary on your part?
23  A.  **Yes, it was.**
24  Q.  When is the first time that you met Cindy

9

1   Smith?
2       A.   When she -- I guess when she became
3   employed with Masterbrands and her job was in the
4   door plant.  I think it would have been a material
5   handling job because she loaded up the different
6   styles and rails and put them on carts.
7       Q.   So did Cindy Smith come in to Masterbrands
8   having the same job position that you initially
9   started as?
10      A.   No, I was in framing.  That's completely
11  different.
12      Q.   Okay.  When you -- when Cindy was working
13  in the material plant, did you have an opportunity
14  to see the quality of her work?
15      A.   Yes.
16      Q.   Did Cindy Smith appear to be a good
17  worker?
18      A.   Yes.
19      Q.   Did she appear to get along with the other
20  employees?
21      A.   Some of the employees she got along with.
22      Q.   Were there incidents of various male
23  employees calling her various names, four letter
24  words, and things like saying fucking bitch and

10

1   things like that to her?
2       A.   Yes, there was.
3       Q.   Could you tell me a little bit more about
4   that.  Who were the employees that called her that
5   and what were the occasions for that?
6       A.   Okay.  On several occasions a lot of the
7   men in the department, or guys in the department
8   let's say, did use the word fucking a lot to a lot
9   of people and just around in general.  Alan and
10  Dustin did a lot, said a lot a lot of the time.
11           I was back in the area that Cindy was
12  working in.  She had a paper that she loaded up her
13  rails and styles, put them on carts in order, and
14  if any of the wood ever did get mixed up, then a
15  lot of times she would take the brunt because they
16  would have to come back, get a piece of wood, and
17  she would take the brunt of that and they would
18  verbally abuse her.  At that point they would call
19  her fucking bitch.  I did hear that on more than
20  one occasion.
21      Q.   What was --
22      A.   More from Dustin than Alan.
23      Q.   Okay.  What was Cindy's reaction to that?
24      A.   She was shocked that it was even being

11

1   allowed to be said.
2       Q.   Did you ever know her to complain to John
3   Winschief regarding that type of language?
4       A.   Yes.
5       Q.   Were you actually there when she did it?
6       A.   Yes, one time I was there when Cindy was
7   complaining to John about the verbal abuse that she
8   was taking and he said he would discuss it with, I
9   think it was Alan.
10      Q.   Do you know whether John Winschief ever
11  discussed the language that Alan was using?
12      A.   Now that I don't know.
13      Q.   Did you ever hear whether Alan was upset
14  that apparently Cindy complained about the language
15  that he was using?
16      A.   And that I don't know either.
17      Q.   Did you ever witness in the plant that
18  doors and wooden parts were being thrown around or
19  kicked by the men in the plant?
20      A.   Oh, yeah.
21      Q.   What were specific incidents of that?
22      A.   The throwing of the parts, lots of times
23  that would be up at the building station, and at
24  that time I do believe it was Dustin and Alan.  I

12

1   can't remember who else was up there at the time.
2   And they would get fed up or frustrated or whatever
3   and they would just take the wood and said this is
4   a fucking piece of shitty wood and they would throw
5   it off to the side.
6           They would throw stuff down the
7   aisles, and it happened a lot, and I have
8   personally told them no, they should not be
9   throwing it.  We do have a policy that they're not
10  supposed to throw wood or anything.  I have
11  complained to John about it at that time and he
12  went up and talked to them, and there was a time I
13  came around they used to have aisles where Cindy
14  got the styles and rails, they had them according
15  to size, and Cindy was filling up a cart.
16           I would come through and double check
17  the carts when I could, and a guy by the name of
18  Art Decker came through and he had a long, I think
19  it was a style, it was pretty long, and he smacked
20  her with it in the butt and the back part of her
21  leg and you could hear it, it was very noticeable,
22  and he was laughing about it.  She told him to quit
23  hitting her, and I can't remember what he said
24  after that, but he left the aisle.

13

1    Q.   Do you remember whether a complaint was
2   made to John Winschief about that?
3    A.   I was told there was a complaint made.
4    Q.   Okay.  Who were you told by?
5    A.   Cindy told me.
6    Q.   What did Cindy say that John Winschief
7   said?
8    A.   I think she said that John would talk to
9   Art, have a talk with Art.  That's been a long time
10  ago.
11   Q.   Do you remember whether there were any
12  further repercussions of that incident?
13   A.   None that I can remember.
14   Q.   Do you recall whether Cindy showed you any
15  bruising that she had as a result of that incident?
16   A.   Yes, we did go to their restroom and she
17  said Cheryl look at this, and she pulled down her
18  jeans and she had a big welt, this was after that,
19  it was a big welt on the back of her leg.  I just
20  looked at her leg.
21   Q.   Was Cindy in tears at that time?
22   A.   Yes.
23   Q.   To your knowledge was anyone else told
24  about that incident in the plant, in the door

14

1   plant?
2    A.   Well, that she had told John, but I wasn't
3   present.  She told me she told John.
4    Q.   Do you know of the approximate time frame
5   in which that incident took place with Art Decker?
6    A.   No, I don't.
7    Q.   Okay.  Do you know whether Art Decker
8   experienced any discipline as a result of that?
9    A.   No, I don't.
10   Q.   Was an employee by the name of Brenda
11  Butts Morgan ever shot in the butt with a nail gun?
12       MS. CREVELING:  Shot in the butt with a
13  what?
14       MS. de SAINT PHALLE:  A nail gun.
15   A.   It was probably a staple gun.
16   Q.   Staple gun.
17   A.   Yes, she told me she was shot in the rear
18  with a staple gun.
19   Q.   Do you know what the circumstances about
20  that were?
21   A.   There was some goofing around going on and
22  one of the guys picked up a staple gun and shot it
23  at her.
24   Q.   Did she make any complaints about that

15

1   incident to John Winschief to your knowledge?
2    A.   I don't know about that.  Not to John
3   Winschief.  I think it was to Bill Hinds.
4    Q.   Who was Bill Hinds?
5    A.   He was a team leader that sometimes he
6   went to second shift, sometimes he went to first
7   shift, you know, kind of alternated back and forth.
8    Q.   Were there, besides Cindy Smith, were
9   there other women in the door plant that had
10  complaints the way the other male employees were
11  acting?
12   A.   Well, Brenda Butts was one of them.
13  Brenda Morgan now.  It used to be Butts.
14   Q.   Anyone else that you recall?
15   A.   Brenda Purcell.
16   Q.   What were Brenda Purcell's complaints?
17   A.   From what she would say to me is that she
18  felt that she had to do a lot of stuff that the
19  guys did not have to do for her job; that they do
20  the same job, but she was expected to do more.
21   Q.   What was her job position?
22   A.   When she was -- when I heard her complain
23  or talk about that she was, I think it would have
24  been operator, machine operator, because she ran

16

1   the saw.
2    Q.   Were there different pay grades of machine
3   operator?
4    A.   Yeah.
5    Q.   Did the men get greater pay grades as a
6   machine operator than she did?
7    A.   Yeah, I think so.  That's what she said.
8    Q.   Was that based on seniority or was it
9   based on -- did she say it was based on the fact
10  that they were men and she was a female?
11   A.   She said it was because she was female.
12   Q.   Is Brenda Purcell still working with
13  Masterbrands as far as you know?
14   A.   As far as I know I think she is.
15   Q.   Do you know what Brenda's first job was at
16  Masterbrands?
17   A.   No, I don't.
18   Q.   Do you know whether Brenda Purcell ever
19  had any complaints about Cindy?
20   A.   As far as I know she didn't.
21   Q.   Do you know whether there were any other
22  female employees that had complaints about Cindy?
23   A.   Mary Hackman.
24   Q.   Do you know what those complaints

**17**

1  concerned?

2  　A.　**Everything. Mary Hackman and Cindy did**
3  **not get along. It's -- sometimes Mary didn't have**
4  **the best of language and she would say things to**
5  **Cindy. She would come up to me and she'd say you**
6  **better get your girlfriend out of here because you**
7  **never know what will happen. She'd say that to me**
8  **a lot.**
9  　　　　**She used to a run a timesaver with a**
10 **stackdown and she'd come down off of two steps and**
11 **if I was auditing doors coming down the line then**
12 **she would do that depending on her mood, what day.**

13 　Q.　Other than Mary Hackman was she the only
14 other female employee that you're aware of that had
15 complaints about Cindy?

16 　A.　**I can't think of anybody else offhand.**

17 　Q.　Were you aware of whether an employee by
18 the name of Diana Risley complained about names
19 that other male co-employees called her?

20 　A.　**No, not about any name calling that I know**
21 **of.**

22 　Q.　Any discriminatory conduct that you're
23 aware of?

24 　A.　**There was one guy that kept coming by and**

**18**

1  **patting her on the bottom.**

2  　Q.　Was that while Cindy was employed?

3  　A.　**No, I don't think Cindy was there that I**
4  **know of. No, the machines were already turned**
5  **around. Cindy wasn't there at that time.**

6  　Q.　Okay. Did Brenda hire in as a machine
7  operator, Brenda Butts Morgan?

8  　A.　**No.**

9  　Q.　Or Brenda Purcell?

10 　A.　**No, I think she hired in as a material**
11 **handler builder.**

12 　Q.　Were you present at a time when John
13 Winschief made a comment about when new machinery
14 was being brought in and he made a comment about
15 Cindy couldn't operate the new machinery because
16 she might lose a fingernail?

17 　A.　**Yeah, yeah. There was a new machine**
18 **coming in. They said they were going to**
19 **cross-train people on it, and Cindy had asked if**
20 **she could be crossed -- she wanted to be**
21 **cross-trained on the machines and she'd like to be**
22 **-- she'd like to learn how to run that new saw that**
23 **come in.**
24 　　　　**And John laughed and he said we're not**

**19**

1  **going to train you on that, you might break a**
2  **fingernail.**

3  　Q.　What did Cindy say in response?

4  　A.　**I'm not -- I can't remember.**

5  　Q.　Did John also make the comment that he
6  didn't think women should be trained on this new
7  machine because that it was an expensive machine
8  and that women might be more likely to break it
9  than men?

10 　A.　**John has made that statement several**
11 **times.**

12 　Q.　What are some of the context in which he's
13 made that kind of comment that women might be more
14 likely to break a new machine than men?

15 　A.　**Well, he's made that statement to me, and**
16 **I can't remember which conversation it was, but he**
17 **has made that statement to Cindy also. We kind of**
18 **used to congregate around his desk there and talk**
19 **to him and he would make some of those statements.**

20 　Q.　Did Cindy ask on more than one occasion to
21 be cross-trained on some of the machines?

22 　A.　**To my knowledge yes, she has.**

23 　Q.　Was she ever given the opportunity to be
24 cross-trained on the machines?

**20**

1  　A.　**No, not that I know of.**

2  　Q.　Do you know why she was not given the
3  opportunity to be cross-trained?

4  　A.　**No, I don't know why, but the other people**
5  **that would come in after her would be**
6  **crossed-trained on them. Usually men, I know that.**

7  　Q.　Whose decision was it as to whether or not
8  an employee in Cindy's position would be
9  cross-trained?

10 　A.　**As far as I know it was the team leader.**

11 　Q.　And that was John Winschief?

12 　A.　**Yes.**

13 　Q.　Had you ever seen any instances where
14 Cindy was careless with any of the machinery or job
15 duties that she had?

16 　A.　**No, Cindy always did a good job. She**
17 **always tried -- she always worked hard. She even**
18 **went above and beyond a lot of times. A lot of**
19 **times she didn't have any help back there where she**
20 **was at.**

21 　Q.　After this incident about breaking the
22 fingernail, did Cindy indicate to you that she was
23 going to complain to human resources?

24 　A.　**Yes.**

21

Q. What specifically did Cindy say if you can recall?

A. She just wanted to be able to cross-train on the machines and she was going to go talk to human resources about it.

Q. Okay. To your knowledge did she do so?

A. Yeah, I think she did. I think at the time that was Rhonda Gatons I think.

Q. Okay. That was when Rhonda Gatons was human resource manager?

A. I think so.

Q. Okay. And did you ever have any meetings with Rhonda Gatons about Cindy wanting to cross-train on any machine?

A. I don't know if I went in there with Cindy for the cross-training of the machinery, but I did go in there one time with her because she was upset about a pushing incident out on the floor.

Q. Who did you go in there with her about this pushing incident out on the floor?

A. I think it was Rhonda Gatons, and Cindy had, I think it was the day before, she had been pushed in the chest, poked in the chest, and she was really upset about it and I think she went home

22

early and she felt like she was being -- it was counted against her I think at that point, and she wanted to go talk to Rhonda Gatons, and I told her I'd walk up there with her if she wanted to go.

Q. Okay. Was that fairly early in Cindy's employment?

A. I couldn't tell you that.

Q. Okay. Was that an incident when she was pushed by this -- when she was poked in the chest by a fellow employee?

A. Yes, I believe.

Q. A male employee?

A. Yes.

Q. And then did she go talk to John Winschief about that, if you know?

A. I know that she talked to Dave Pantier, but I don't know, I don't remember if she talked to John Winschief about it.

Q. When she talked to Dave Pantier, were you present?

A. No.

Q. Did you have any understanding about what happened when she talked to Dave Pantier after that?

23

A. The understanding that I got was that she wanted to contact the police and Dave told her that he would take care of the situation and he would not let her use the phone at that point; that he would take care of everything.

Q. Was that an instance in which Cindy was allowed to go home early because she was upset?

A. I think she was allowed to go home, but I think that it was going to be used against her for absenteeism because we have a percentage rate that had to be gone by.

Q. Do you know whether John Winschief had anything to do with that particular incident or was it just Dave Pantier?

A. If John was there he had something to do with it, but I couldn't tell you if John was there that day or not.

Q. Okay.

A. I just, I do know that Dave was involved.

Q. All right. Do you know whether Dorothy Jolley had any complaints about whether men were treated differently than women in the plant?

A. She had stated that several times that she felt that men were treated differently in the

24

plant, yeah.

Q. What specifically were her complaints?

A. You know, I don't know. I can't think of that.

Q. Okay.

A. But she has stated that.

Q. Okay. Was that specifically, were those complaints directed towards John Winschief?

A. She has stated on some occasions that John Winschief used to work in a different plant and he did treat women different than men, but I don't have any other knowledge of that.

Q. Was there an employee by the name of Carol Bogen who complained that John Winschief treated men differently than women?

A. Yes, I think Carol has stated that before.

Q. Do you know specifically what those complaints concerned?

A. The men always got extra help and she didn't.

Q. Did you have the opportunity to observe whether or not that was true or not?

A. Yes, on occasion that did happen. She was at the repair station at the end of the line and

**25**

1  the doors would get stacked up and she did need
2  help. And he wouldn't send anybody over there to
3  help her, but there is times whenever there would
4  be men over there and they would get backed up and
5  he'd send people over to help, and that's how she
6  would get upset I do believe.
7      Q.  Was there ever an instance involving an
8  employee named Billy Fusten (phonetic) and the new
9  machines?
10     A.  There was an incident with Billie Fusten,
11  she's been there I think 25 years, and she had bid
12  on a job, but something happened and the job was --
13  they didn't go ahead and go on with the posting of
14  the job. They took the job down and she didn't get
15  the job, but I'm not sure of all the details on
16  that.
17     Q.  Okay.
18     A.  But there was something.
19     Q.  Did that have to do with the fact that she
20  was a woman?
21     A.  I think she felt it was, yes.
22     Q.  What was the job that she was biding on?
23     A.  It was -- I think it was putting the
24  framing or the trim on the doors --

**26**

1      Q.  Was that --
2      A.  -- through one of the machines.
3      Q.  Was that a job in the door plant?
4      A.  Yeah.
5      Q.  Was that a job in which John Winschief
6  would have been supervisor for?
7      A.  Yeah.
8      Q.  Was there an incident in which an employee
9  by the name of the J.D. Wilder was shoved by Jeff
10  Bonatrigger?
11     A.  Yes, I heard that.
12     Q.  Was that reported to management?
13     A.  Yes.
14     Q.  To whom?
15     A.  J.D. Wilder told me that she had reported
16  that to Greg Finley and she had reported it to the
17  human resources department, and it was, from what I
18  heard, it was he was supposed to give her an
19  apology.
20     Q.  Greg Finley, is he a supervisor in the
21  position similar to John Winschief?
22     A.  No, he's a quality manager. He's higher
23  up than John I would say.
24     Q.  Okay.

**27**

1      A.  I don't know how else to put that. Greg
2  Finley is responsible for the quality, all the
3  quality of the whole plant and help with the
4  processes and handle customer complaints on it.
5      Q.  Now apparently Rhonda Gatons was the human
6  resource manager before Matthew Ohrt came in; is
7  that correct?
8      A.  I think so.
9      Q.  And to your knowledge did Cindy Smith make
10  complaints to Rhonda Gatons regarding instances of
11  where she felt the other men in the plant were not
12  treating her appropriately?
13     A.  I have heard Cindy say that, yes.
14     Q.  To your knowledge did Rhonda Gatons ever
15  conduct any investigation of those incidents?
16     A.  To my knowledge, no.
17     Q.  How long did Rhonda Gatons remain employed
18  with Masterbrands, if you can recall?
19     A.  I can't recall that.
20     Q.  Okay. Did Matthew Ohrt take over Rhonda
21  Gatons' position?
22     A.  I guess, I think he did.
23     Q.  Do you know whether Rhonda Gatons left
24  Masterbrands voluntarily or was she terminated by

**28**

1  the company?
2      A.  I do not know.
3      Q.  Did there come a time in which Cindy Smith
4  told you that she made a complaint to Matthew Ohrt?
5      A.  About?
6      Q.  About John Winschief.
7      A.  Yes, but I can't remember exactly what the
8  complaint was.
9      Q.  Did Matthew Ohrt ever come to you and
10  conduct an interview with you about Cindy Smith?
11     A.  Not that I recall.
12     Q.  Did Matthew Ohrt ever ask about an
13  incident when or about an incident when John
14  Winschief said to her that she couldn't work on the
15  new machines because she'd break a nail?
16     A.  That Matt Ohrt said that to me?
17     Q.  That Matt Ohrt asked you whether John
18  Winschief said that.
19     A.  No.
20              (Whereupon there was a brief
21              pause in the proceedings.)
22     Q.  I'm going to hand you a document that was
23  previously marked as part of Deposition Exhibit
24  Group 6 and I'm going to refer to a specific page

29

1  number 0745, Masterbrands 0745.  I want you to look
2  at that document and tell me -- just go through it
3  sentence by sentence and tell me whether it's
4  accurate or not accurate.
5                (Whereupon there was a brief
6                pause in the proceedings.)
7    A.  I'm sorry, none of that -- I don't
8  remember anything.  I don't know a Janette.  I'm
9  sorry.
10   Q.  First of all --
11   A.  I'm sorry, that is not familiar to me that
12 I can --
13   Q.  Okay.
14   A.  -- that I even ever remember saying at
15 all.
16   Q.  Okay.  Do you ever remember even talking
17 to Matthew Ohrt period?
18   A.  About anything like that?
19   Q.  Yes.
20   A.  No, ma'am, I don't.
21   Q.  Do you think that the statements that are
22 written on this page, this Page 745, are incorrect?
23   A.  Okay.  The quality issue?
24   Q.  Yes.

30

1    A.  Anytime we had a quality issue, it was my
2  job to report it to the team leader first so that
3  he would have a chance to correct the quality
4  before I ever went to Greg Finley, so that part
5  would be true.
6                (Whereupon there was a brief
7                pause in the proceedings.)
8    A.  We did have, or John did have a hard time
9  because the door plant, they were moving machines
10 around and stuff and yes, that would have been
11 true.
12               (Whereupon there was a brief
13               pause in the proceedings.)
14   A.  The part in here about John does favor
15 men, he will choose a man to do a job over a woman
16 at that time in the plant.  Yes, he did that.  I
17 don't know, but I don't even remember having that
18 conversation ever with you at all.
19   Q.  Did you ever tell Matthew Ohrt that Cindy
20 wants everything her way or no way?
21   A.  No, and I don't know anything about
22 Janette.  I don't even know who that person is.  I
23 can't picture the face.
24   Q.  Here, I'll give it to you so you can refer

31

1  to it.
2                Okay.  At some point in January did
3  you ever participate in a meeting in which Matthew
4  Ohrt was present and you were present and Cindy was
5  present and John Winschief was present and Dave
6  Pantier was present?
7    A.  I was called into a meeting just to sit,
8  yeah.
9    Q.  Do you recall what happened during that
10 meeting?  Who said what?
11   A.  Okay.  I was asked to come into the
12 meeting and was just asked to sit, to listen, and
13 Matt asked Cindy or said to Cindy I've heard that
14 you prefer married men.  And let's see, what else
15 was said.
16   Q.  Was that the first thing that you recall?
17   A.  That was the first that was kind of a
18 shock.  And I can't remember exactly what Cindy
19 said, but it come -- it had something to do with
20 John Winschief and John had said -- I think John
21 had made a complaint on Cindy for harassment of
22 some type for notes on his vehicle.
23   Q.  Did John Winschief say that Cindy had left
24 notes on his vehicle?

32

1    A.  Yes, in that meeting he said that, yes.
2    Q.  Do you know for a fact whether Cindy did
3  ever leave notes on his vehicle?
4    A.  I have never known Cindy to leave messages
5  on his vehicle.
6    Q.  Did you work the same hours as Cindy did?
7    A.  Yes, I did.
8    Q.  Did you and she generally leave the plant
9  together at the end of the shift?
10   A.  Yes.
11   Q.  Would you generally park your cars in the
12 same place?
13   A.  Yes.
14   Q.  When you heard that comment about John
15 Winschief complaining about somebody leaving notes
16 on his vehicle, did you and Cindy discuss that
17 later?
18   A.  Yeah.
19   Q.  And what did Cindy say about that?
20   A.  We don't know where it came from.  I just
21 have never seen her write a note to John or put
22 anything on his vehicle.  I personally couldn't
23 even tell you what kind of a vehicle he even had.
24 I don't know where it ever came from.

33

1    Q.  Okay.  Did you try and make any inquiry as
2  to who might have put notes on his vehicle?
3    A.  No, no.
4    Q.  Was that ever discussed in the plant as to
5  who may have done so?
6    A.  Not that I know of.
7    Q.  Okay.  All right.  Let's go back again to
8  the meeting on the notes on the vehicle.  What else
9  was said during that meeting?
10    A.  John, I think, mentioned that Cindy had
11  asked him out to the bar, and I think Cindy stated
12  that she asked a lot of people out to the bar.  It
13  was just on a friendship thing.  It wasn't a sexual
14  thing.  It was just kind of like socialization
15  after work.  A lot of people were asked out.
16    Q.  Did you ever know Cindy to proposition
17  John Winschief?
18    A.  Not to my knowledge.
19    Q.  Did you ever know Cindy to make any
20  inappropriate remarks to John Winschief?
21    A.  Not that I know of.
22    Q.  Do you know whether Cindy ever asked John
23  Winschief to go to the bar one on one occasion?
24    A.  Just for him and her; is that what you're

34

1  talking?
2    Q.  Right.
3    A.  Not that I know of.
4    Q.  Do you know whether Cindy ever had a crush
5  on John Winschief?
6    A.  Oh, no, no, I don't think she ever had a
7  crush on him.  I don't really know.
8    Q.  Going back to this meeting, what else did
9  Matthew Ohrt say to Cindy if you can recall any
10  other details that transpired during that?
11    A.  John got pretty upset in the meeting
12  because Cindy, I do believe, stated that she did
13  not put notes on his vehicle and he started to
14  stand up because they were sitting next to each
15  other.
16          Dave Pantier come over and put his
17  hands on John's shoulder to I guess calm him down,
18  and John was very upset because Cindy said that she
19  did not put a note on the car.  And I think John
20  stated that he did not want Cindy to ask him out to
21  the bar anymore, and there might be something else
22  but I can't think of it at this point.
23    Q.  You said that John was very upset.  Was it
24  simply upset because Cindy said she didn't write

35

1  the notes?
2    A.  I think Matt asked her if -- I think Matt
3  asked her if she had written notes and put them on
4  John's truck and she said that she had not written
5  any notes and left them on the truck or car or
6  whatever, and John got upset at that point once she
7  made her -- once she talked.
8    Q.  Do you recall anything else that John
9  Winschief said during that meeting?
10    A.  I know that he said that he just did not
11  want her to ask him to the bar anymore.
12    Q.  Did John Winschief deny that he treated
13  men differently than women during that meeting?
14    A.  I can't remember that.  I don't remember
15  that at all.
16    Q.  Was there a discussion of the fingernail
17  incident and that in fact that he said that he
18  didn't think or that there was an allegation at
19  least that he didn't think that women should be
20  able to work on the new machines?
21    A.  I don't remember that in that meeting.
22    Q.  Okay.  Did Matt Ohrt ever -- when Matt
23  Ohrt said to Cindy I hear you prefer married men,
24  do you know what that was referring to?

36

1    A.  No, actually I don't.
2    Q.  Okay.  Did Matt Ohrt ever say something to
3  the affect that Cindy was going to have to make
4  things right with God?
5    A.  I don't think he ever said that in front
6  of me.
7    Q.  Okay.  Did Matt Ohrt ever say anything to
8  Cindy that she should not make false accusations
9  during that meeting?
10    A.  I think it was stated that false accu,
11  whatever, are very serious and could have
12  consequential -- a lot of serious consequences.
13    Q.  What was the last thing that happened in
14  that meeting, if you recall?
15    A.  I don't recall.
16    Q.  Do you remember an incident in which
17  Dustin Hall was apparently throwing a stool that
18  Cindy was sitting on in the plant?
19    A.  I remember the incident.  I did not see
20  the stool being thrown, but Cindy had a stool, she
21  was kind of like on light duty or of some type that
22  she could only stand for so long and sit for so
23  long, and there was a stool next to the conveyer
24  belt there and she stood up and did something.

37

1       I had left to go check other doors,
2  and when I come back the stool was across the line
3  and it was knocked over, and Cindy had stated that
4  I think Dustin threw the stool across the line and
5  they did throw a lot of stuff.
6       Q.  When you saw the stool across the line,
7  was it actually tipped over?
8       A.  When I seen it it wasn't tipped over.
9       Q.  It was --
10      A.  It was upright.
11      Q.  Upright.  Do you know whether anybody had
12  placed the stool back upright?
13      A.  I had just walked back up to the building
14  area and the girl that runs the timesaver had it in
15  her hand.  She was picking it up or moving it, but
16  I never seen it down.
17      Q.  Okay.  You say the girl that runs the
18  timesaver had the stool in her hands?
19      A.  Uh-huh, Mary Hackman.
20      Q.  Mary Hackman had the stool in her hands?
21      A.  Uh-huh.
22      Q.  And what was she doing with it?
23      A.  She was just placing it closer to the line
24  on the opposite side.

38

1       Q.  Do you know why she was doing that?
2       A.  No, I don't.
3       Q.  Okay.  Did you see Dustin then after you
4  saw Mary placing it closer to the line?
5       A.  Yeah, Dustin was working the area.
6       Q.  Did you hear Dustin say anything?
7       A.  Dustin said he didn't want that fucking
8  stool in his way.
9       Q.  And was that after he had already moved
10  the stool?
11      A.  That would have been after, yeah.
12      Q.  Do you know whether Dustin moved the stool
13  on more than one occasion that evening?
14      A.  I didn't see him move the stool so I don't
15  know.
16      Q.  Okay.  The situation where Cindy was using
17  the stool to do part of her duties some of the time
18  and then she'd get up and get back on the stool or
19  something?
20      A.  She could only stand for a certain length
21  of time and sit for a certain length of time.  That
22  was doctors orders or whatever I think, and she was
23  wiping glue off the doors.  She would wipe them off
24  on this side, wipe the excess glue off on the other

39

1  sides.  When the rails and styles would clamp
2  together the glue would squirt out and that was her
3  job.
4       Q.  Okay.  Now this stool, in order to get it
5  to move to the other place was it possible to
6  actually pick it up or --
7       A.  It would -- you mean what?  Was it thrown?
8       Q.  Yeah.
9       A.  It would be hard to pick the stool up and
10  sit it down on the other side.
11      Q.  Why was that?
12      A.  Because of the width of the conveyer.
13      Q.  Okay.  So in other words, the stool was
14  taken from one side of the conveyer belt and put
15  over on the other side.
16      A.  Uh-huh.
17      Q.  And then you're saying that just because
18  of the width of the conveyer belt you couldn't
19  exactly --
20      A.  I couldn't reach across it.  Someone with
21  real long arms probably could, but there is no way
22  they could, in my opinion, they could not sit it
23  down.
24      Q.  Okay.  And apparently then after the stool

40

1  had been put on the other side of the conveyer belt
2  then Mary Hackman came and picked it up?
3       A.  When I came back from looking at doors --
4       Q.  Yeah.
5       A.  -- Mary kind of had it in her hand and it
6  was just like a brief minute.  I said Cindy, what's
7  your stool doing over there?  And she said Dustin
8  threw it, and that's all I know.
9       Q.  Okay.  And then Mary Hackman was there at
10  the time?
11      A.  Yeah.
12      Q.  And what did she say about it?
13      A.  I couldn't tell you what Mary said.  I
14  don't know what Mary said, no.
15      Q.  Okay.  Did she use some four letter
16  language?
17      A.  She if she said anything I don't know if
18  she said anything.
19      Q.  Okay.  After this incident with the stool,
20  what did Cindy do, if anything?
21      A.  I think she said she was going up to tell
22  John.
23      Q.  Okay.  Did she tell John about it, to your
24  knowledge?

41

1    A.   She said she told John, and I do believe
2  John came back to the department or to the little
3  work area.
4    Q.   Were you present when John Winschief came
5  back to the department?
6    A.   I can't remember.  I don't think I was.
7    Q.   To your knowledge did John Winschief talk
8  to Dustin about the stool incident?
9    A.   I think if he come back to the work area
10  he probably did talk to him about it, but I don't
11  remember being there for that.
12    Q.   Okay.  Do you know whether Matthew Ohrt
13  got involved in investigating that incident with
14  the stool?
15    A.   I think Matt did come out there.
16    Q.   Do you know what the instigation was for
17  that?  Was that Cindy requesting Matt Ohrt to come
18  or was that John Winschief?
19    A.   I'm not sure.  I'm really not sure.  I do
20  believe Matt came out there.
21    Q.   What happened when Matt came out there, to
22  your knowledge?
23    A.   I can't -- I think he asked them what
24  happened, but I don't remember being there the

42

1  whole time.
2    Q.   Okay.  Well, do you remember anything that
3  took place that you saw?
4    A.   No.  I just seen Matt walk up and I don't
5  think I was there the whole time.
6    Q.   Okay.  Do you know whether he talked to
7  Dustin about it?
8    A.   No.
9    Q.   Do you know whether he talked to John
10  Winschief about it?
11    A.   No.
12    Q.   Do you know whether he talked to Mary
13  Hackman about it?
14    A.   No.
15    Q.   After Matt Ohrt came out, did you
16  participate in a meeting or sit through a meeting
17  in which Cindy met with Matt Ohrt and John
18  Winschief?
19    A.   About that incident?
20    Q.   Yes.
21    A.   No, I don't remember that.
22    Q.   Did Cindy tell you about any meeting that
23  she had with Matthew Ohrt and John Winschief
24  concerning the stool throwing incident?

43

1    A.   She probably did, but I can't remember
2  that either.
3    Q.   Were you aware of an incident where Alan
4  Brickey shoved Cindy?
5    A.   I was aware of the situation, yeah.
6    Q.   What happened in that incident?
7    A.   I was told by Cindy that Alan got upset
8  because there was some styles and rails that were
9  mixed up and because he had to come back and get
10  parts that he was upset and he poked her in the
11  chest and called her some names, and that's all I
12  can remember that Cindy said, and then I thought
13  she contacted Dave Pantier.
14    Q.   Do you remember the circumstances on what
15  occurred on Cindy's last day at work at the
16  Masterbrands?
17    A.   No, I don't recall her last day.
18    Q.   Was there something about there was
19  another employee that was using her initials to --
20  use -- putting her initials in the computer?
21    A.   Yeah, somebody was using her -- yes, that
22  is right.  She had mentioned something that
23  somebody was using her initials to get into I guess
24  the transactions, for transactions.  No one is

44

1  supposed to use anybody else's initials.
2    Q.   Do you know what employee that was that
3  was using her initials?
4    A.   I think it was Scott Stewart, but I'm not
5  sure on that.
6    Q.   Did Cindy complain to John Winschief that
7  Scott Stewart was using her initials to use the
8  computer?
9    A.   Yes, she told me she complained to John.
10    Q.   Did she tell you or did you see what John
11  Winschief said or did about it or said?
12    A.   He was supposed to have gotten it changed
13  and whoever was using her password was supposed to
14  not be using it anymore.  He was supposed to have
15  gotten it changed and he would put a stop to it I
16  think.
17    Q.   Do you know whether that ever, a stop to
18  it was put?
19    A.   No, I don't know if it ever was.
20    Q.   Do you know why Cindy did not come back to
21  Masterbrands or left Masterbrands in April of 2003?
22    A.   I think she was on workmen's comp.  I
23  think it was a work injury of some type.
24    Q.   The last day that Cindy was there had the

45

1  stress being piling up and she was stressed out and
2  just could not stand it anymore?
3      A.  Yes, I think she was stressed out.
       Q.  Do you recall in particular what she was
    stressed out about?
6      A.  I do believe Cindy has stated to me that
7  she was stressed out about being discriminated
8  against.  She felt like women didn't have as much
9  of a opportunity as men.  She was upset because her
10  injuries she didn't feel like were maybe being
11  treated as well as she felt that they would.  She
12  was stressed out about the extra work load.  There
13  was a lot of it.
14      Q.  Did Cindy ever pass out any notebooks?
15      A.  Yeah, Cindy brought a bag of notebooks in,
16  like little, just small little, you know, the kind
17  that you put in your pocket I think.
18      Q.  Did she give those out before work or
19  something or indicate that she had them available
20  if anyone wanted them?
21      A.  Yeah.
22      Q.  What did she want other employees to write
23  down?
24      A.  Well, I don't know.  She gave me mine and

46

1  actually she didn't give it to me.  I went over and
2  picked it out of the bag, and I used it to write
3  down quality issues in it.  But she didn't really
4  tell me.  She said I could use it for anything I
5  wanted.
6      Q.  Did any of the other women take notebooks
7  and write down things?
8      A.  I think Sue Gonzalez got a notebook, but I
9  don't know about anybody else.
10      Q.  Did she ever say that it was to write down
11  the discriminatory acts that John Winschief did?
12      A.  I don't recall her saying that to me.
13      Q.  Did you keep your notebook?
14      A.  No, I used it and -- well, actually I
15  think I laid it down someplace and it got swiped.
16      Q.  Okay.  Did you ever keep any sort of
17  calendar or anything like that?
18      A.  I used to keep a daily everything that
19  happened in the day that I did.  Some of these
20  things were in there and then I moved and I
21  misplaced it and I cannot find it.
22      Q.  Did you ever know Cindy to be a
23  troublemaker at the plant?
24      A.  I never knew her to be a troublemaker.

47

1      Q.  Oh, did you ever know of an incident where
2  Dustin Hall nailed Cindy's gloves to a table?
3      A.  No, but it sounds like something he would
4  do.  No, I didn't.
5      Q.  You didn't see that?
6      A.  I did not see that.
7      Q.  All right.  Is that the type of things
8  that Dustin would do?
9      A.  Oh, yeah.
10      Q.  Did you attend a corporate meeting, office
11  meeting, regarding matters of sexual discrimination
12  and the like when Betty Burns was present?
13      A.  I was in a meeting.  I'm not sure exactly
14  what they called it.  I think there was just random
15  people invited in there and there were some people
16  from corporate I think and they would ask anything
17  that you were upset about, and Betty Burns was one
18  of them in that meeting, yeah.
19      Q.  Was she indicating that she was upset
20  because she thought that men were treated more
21  favorably than women?
22      A.  In that meeting I think she did, yes.
23      Q.  Did you ever make a comment that you
24  thought that men were treated more favorably than

48

1  women too?
2      A.  Yes.
3      Q.  And what was that based on?  Why did you
4  feel that way?
5      A.  Why do I feel that in the plant when I
6  worked there?  In the door plant there were --
7  well, there was on more than one occasion that men
8  were allowed to walk around, they didn't have to
9  get their jobs completed, and very little was said
10  to them.
11          It was -- it's hard to pinpoint how to
12  describe that, but if they didn't want to do it
13  they didn't have to do it.
14      Q.  And on the other hand were women allowed
15  to do the same thing?
16      A.  Oh, no, no.
17      Q.  And that was basically the policy that was
18  set by John Winschief?
19      A.  I don't know if it's the policy, but
20  that's the way a lot of it was handled.
21          MS. de SAINT PHALLE:  I don't have any
22  other questions.
23          MS. CREVELING:  I have a lot, so let's
24  take a break.

49

1          (Whereupon there was a recess
2             taken.)
3          CROSS EXAMINATION
BY MS. CREVELING:
6     Q.  Ms. York, you said you were hired in
January of 2000; is that right?
7     A.  **Yes.**
8     Q.  Okay.  And that was in the framing
9 department as a material handler?
10    A.  **Yeah.**
1     Q.  Okay.  I think you told us that you were
2 there for roughly eight months?
3     A.  **Yeah, I think it was like eight or nine**
4 **months.  I think it was nine months at the time**
5 **before you could bid on another job.**
6     Q.  Okay.  If your records show that you bid
7 into the auditor position in Department 206 in
8 March of 2001, would you have any reason to dispute
9 that?
20    A.  **2001?**
21    Q.  Uh-huh.
22    A.  **No, that's probably right.  I don't know**
23 **exactly.**
24    Q.  But no reason to think that would be

50

1 incorrect?
2     A.  **I don't know the exact date that I got the**
3 **auditors job.**
4     Q.  Okay.  So you worked in framing from
5 January of 2000 until roughly March 2001, and then
6 what's Department 206?
7     A.  **That would be the door plant.**
8     Q.  Okay.  Ma'am, the door plant is Department
9 218.
10    A.  **Oh, 218.**
11    Q.  Uh-huh.  Do you know what Department 206
12 was?
13    A.  **No, not unless it was the, I don't know, I**
14 **didn't go by department numbers actually.**
15    Q.  Okay.  And your records reflect that it
16 wasn't until December of 2002 that you were an
17 auditor in Department 218 which is the door plant;
18 would you have any reason to dispute that?
19    A.  **2002?**
20    Q.  December 2002.
21    A.  **That would have been two years.  I didn't**
22 **work two years -- yeah, that's not correct I don't**
23 **believe.**
24    Q.  Okay.  What do you think is incorrect

51

1 about that?
2     A.  **Because I didn't work two years in**
3 **framing.**
4     Q.  No, no, you're right.  Your records
5 reflect that you --
6     A.  **And then I went directly from screw poking**
7 **or material handling or whatever they classified it**
8 **as to --**
9     Q.  To the auditor?
10    A.  **--auditor.**
11    Q.  That's right, and the records support
12 that.  However the records support that you first
13 were an auditor in Department 206 from March 2001
14 until December 2002.  Then you were an auditor in
15 Department 218 starting in December 2002.
16    A.  **I don't know what the difference is there**
17 **because I've always been in the door plant.**
18    Q.  Okay.  And you've identified John
19 Winschief as your supervisor as an auditor; is that
20 right?
21    A.  **No.  John Winschief was a team leader in**
22 **the door plant.**
23    Q.  But not your supervisor?
24    A.  **And I guess I did talk to him, so for**

52

1 auditors it's a little bit different --
2     Q.  Uh-huh.
3     A.  **-- because auditors do have to answer to a**
4 **team leader.  They also have to answer to Dave**
5 **Pantier, and then they also have to answer to at**
6 **the time Greg Finley.  I think there is somebody**
7 **else in there now, but I don't know what his name**
8 **is.**
9     Q.  Okay.  So Winschief was not your
10 supervisor.  Recognizing that he was a supervisor
11 and supervisors have authority in the plant, but he
12 was not your direct supervisor?
13    A.  **No, Greg Finley was my direct supervisor.**
14    Q.  Okay.  And in fact Greg Finley is the
15 supervisor who did your evaluations in 2001, 2002,
16 2003 and 2004?
17    A.  **Right.**
18    Q.  Okay.  Tell me what an auditor does?
19    A.  **An auditor inspects the product, they go**
20 **through the processes.  If you have a problem with**
21 **your quality of your door, then you go back to the**
22 **process that the quality is lacking in and to see**
23 **if that process that's set in place is being**
24 **followed so you can get a quality door within**

53

1 specification.

2    Q.   Okay.  Were you only in the door plant?
3 Is that the only place you ever had to be in the
4 facility?

5    A.   Up until oh, I think it was like three or
6 four months I think, they put us over into -- they
7 took all auditors out of door plant and they put us
8 into, I can't think of the name of the department, but
9 I can't think of the name of the department, but
10 all auditors were taken out of the door plant and
11 they were put into this other department.

12    Q.   Okay.  And when did that happen?

13    A.   Oh, let's see.  I left in August.  I'm not
14 sure.  Maybe April, March or April.

15    Q.   Of '05?

16    A.   Yeah, '05 because it was this year.

17    Q.   Okay.  When you were an auditor in the
18 door plant on an average day did you have occasion,
19 as part of your duties, to be outside of the door
20 plant?

21    A.   Yes.

22    Q.   Okay.  Doing what?

23    A.   Sometimes before they changed the door
24 plant around and moved a lot of machines I would

54

1 get called down to inspect doors that maybe salvage
2 had or if another auditor had a question about a
3 door or they were unsure, then they would call me
4 down to see if there was -- if it was acceptable
5 within the specifications or not.

6    Q.   Uh-huh.

7    A.   There was also times when I had to do
8 daily audits or weekly audits.  I would get call
9 away for that.  We had auditors' meetings.  I would
10 do that.  Also I was on the safety committee and
11 sometimes I would do that too.

12    Q.   Okay.  What percentage of your time did
13 you spend on those other components of your job
14 that took you out of the door plant?

15    A.   Well, let's see.  It was like one hour for
16 safety meeting.  Probably 5 percent or less.

17    Q.   Of a given day or what's your measure?

18    A.   I would say a week.

19    Q.   Okay.  So less than 5 percent a week you
20 spent outside of the door plant?

21    A.   Yeah, and only if Greg Finley knew about
22 it.

23    Q.   Okay.  Can you describe the door plant?
24 What kind of space is it?  What's it look like?

55

1    A.   When I left, I don't know how big it is,
2 we have a saw over here, we have a sander, we have
3 different coping machines, we have a conveyer belt,
4 we have a builders table, we have clamps.  I'm not
5 sure what --

6    Q.   How large of a space was this?

7    A.   It was a pretty big area.

8    Q.   Okay.

9    A.   But there was a lot of machinery.  A lot
10 of work going on there.

11    Q.   Okay.  Is it like a typical factory where
12 it's just a bunch of stuff out in the middle of
13 this giant area, this giant room?

14    A.   Yeah.

15    Q.   Okay.  Did you have an office?

16    A.   No.

17    Q.   Did you have a work station?

18    A.   Wherever I was needed.  I didn't really
19 have a work station.  I'd put my books down,
20 sometimes it would be on John's desk, or depending
21 on what I needed to do.

22    Q.   Okay.  Where was John's desk located
23 within the department?

24    A.   At what time?

56

1    Q.   You tell me, did it change over time?

2    A.   It has changed.

3    Q.   Okay.

4    A.   One time it was sitting back by the saw,
5 oh let's see, facing west --

6    Q.   Okay.

7    A.   -- towards one of the saws.

8    Q.   Okay.  And when it was in that location
9 from the desk did that give him a view of the
10 department?

11    A.   No, it gave him a view of the saws.

12    Q.   Okay.  And then did change then after
13 that?

14    A.   And then it moved -- yeah, it moved up
15 towards the front.

16    Q.   Front of the door plant?

17    A.   To the -- his desk would have been here
18 before, and then they left it there for two or
19 three months I think, and then when they got more
20 machinery moved around then it moved up by the
21 where we store the doors.

22    Q.   Okay.  And what kind of view of the
23 department did he have once that desk was moved?

24    A.   Actually if you're sitting there at the

57

1  desk you can only see just certain people.  Right
2  now you can see, at the time when I left, you could
3  have seen the two people chopping, a couple people
4  -- one person running a machine and what was coming
5  down the line I think.  Not a real good view
6  because of where the doors are I think.
7       Q.  When the desk was back with a view of the
8  saw, who was running the saw at that point in time?
9       A.  That would have been Scott Stewart.
10      Q.  Okay.  And when the desk initially got
11  moved, would that have been in January of 2003,
12  that time frame?
13      A.  I have no idea.  They started changing
14  things.  I couldn't tell you the date.
15      Q.  Okay.  When the desk got moved, who would
16  you be able to see if you were sitting at the desk?
17      A.  Well, if you were sitting right at the
18  desk you would just be looking at a board.
19      Q.  Why?
20      A.  Because that's the way the desk is facing.
21  It's sitting there.  The board would be here.
22      Q.  Like a bulletin board type thing?
23      A.  It's kind of like a block.  They've got
24  stuff up there.  There is supposed to be a machine

58

1  there on the other side so I guess it's a
2  protective measure.  They've got a clock hanging up
3  there.  I guess they use it for whatever.
4       Q.  Okay.  And if you were sitting at the desk
5  and you turned around, what would you see behind
6  you?
7       A.  You would see a whole rack full of doors.
8       Q.  Okay.  And who worked in that rack?
9       A.  There was a girl that worked on the other
10  side and she sequined them.
11      Q.  Okay.  Do you remember her name?
12      A.  No, because they changed hands several
13  times.
14      Q.  Okay.
15      A.  That girl changed.
16      Q.  And if you sat at that desk and looked off
17  to your right what would you see?
18      A.  Mail aisle.
19      Q.  Okay.  Anybody working in that main aisle?
20      A.  No, it was just a walkway.  You could see
21  the timesaver for the other doors.
22      Q.  Okay.  And who works the timesaver machine
23  at that time?
24      A.  Well, I worked over there in that

59

1  department, but I don't know about that time.
2  Whenever I was in door plant I don't know who
3  worked over there.
4       Q.  So that wasn't the door plant -- that
5  timesaver machine wasn't in the door plant?
6       A.  No.
7       Q.  Okay.  And if you were to sit at that desk
8  in that position and looked to your left what would
9  you be able to see?
10      A.  You would be able to see two chop saws and
11  Becky Hardwick running that machine, coper, and
12  John Freeman running another machine on another
13  side.
14      Q.  Okay.  How often did you interact with
15  John Winschief in your position as an auditor?
16      A.  Every day.
17      Q.  Okay.  How much time as an auditor would
18  you spend at any one given location in the door
19  plant in a day?
20      A.  At any one location?
21      Q.  Uh-huh.  I'm trying to get an
22  understanding of do you come in and have a special
23  project and so you're in one area of the door plant
24  for a considerable amount of time or are you

60

1  constantly checking or moving around the
2  department?
3       A.  It depends on if I'm left a message from
4  Greg Finley.
5       Q.  Okay.
6       A.  If he says he wants me to check doors
7  before they leave the department, then that's where
8  I have to be.
9       Q.  Okay.
10      A.  And there was several times when I just
11  rotated around the department, checked the
12  processes and checked the quality of the wood or
13  the doors going through, and that's what an auditor
14  is supposed to do unless they're told differently.
15      Q.  Okay.  Since, as an auditor you're
16  checking quality, do you keep logs of the checks
17  that you make and what you find?
18      A.  They never required it unless you come
19  across a problem that oh, we had 100 doors with
20  like splits in the panels or they were wavy or they
21  had machine marks on them or something along those
22  lines, then you would mark that down.
23      Q.  Okay.
24      A.  And there were times that I did write down

61

1    other things.
2        Q.  Okay.  Is there any document that would
3    reflect during a day at which part of the door
4    plant you were working or what specifically you
5    were looking at?
6        A.  You mean -- no.
7        Q.  Is there any way to reconstruct your day?
8        A.  I was responsible for the whole door
9    plant.
10       Q.  Okay.  But is there anything that would
11   reflect well, in the morning you were working on an
12   issue of whatever was happening on the chop saw and
13   in the afternoon you were inspecting things on the
14   line.  Is there anything that would reflect what
15   tasks you were performing throughout a day?
16       A.  No, not that I know of.
17       Q.  Were you paid hourly or were you a salary
18   employee?
19       A.  Hourly.
20       Q.  Okay.  What kind of personal protective
21   equipment were required as an auditor?
22       A.  You had to have safety glasses, earplugs
23   and you had to keep your shirt tucked in or wear an
24   apron.  No rings, no watches, no earrings.

62

1        Q.  And were you typically wearing your PPE?
2        A.  Yes.
3        Q.  Have you worked anywhere since leaving
4    Masterbrands?
5        A.  No.
6        Q.  And you left in August 2005; is that
7    right?
8        A.  Uh-huh.
9        Q.  And in your resignation letter you told
10   the company you were leaving to care for your
11   mother?
12       A.  Yes, my mother still is very ill.
13       Q.  You may have been asked this at the
14   beginning and I may have just missed it, where do
15   you live?
16       A.  I live at 75 Lockhart Drive, Neoga,
17   Illinois.
18       Q.  Has Cindy Smith ever lived in Neoga,
19   Illinois, to your knowledge?
20       A.  I think -- well, I don't know if she lived
21   in Neoga.  She lives on the lake.  I live at Lake
22   Mattoon but it's a Neoga address.  She lives on the
23   lake too but I think it's the other side, it's the
24   north cut, but I don't know if he's Neoga or it

63

1    might even be Shelbyville.  I'm not sure.
2        Q.  Have you ever been to her home?
3        A.  Yes.
4        Q.  How many times?
5        A.  Oh, probably about ten.
6        Q.  Over what period of time?
7        A.  I've lived out there for about a year.
8    You know, it's probably been more than ten.  It's
9    probably been about 15, and I'd say ten of that's
10   probably in the past year.
11       Q.  Did you ever visit with Cindy Smith at
12   home when she lived in Windsore?
13       A.  Yes.
14       Q.  Okay.  How many times would you say or how
15   often would you say you were at her home?
16       A.  I would say I've probably been to her
17   house about five times when she lived in Windsore.
18       Q.  For what purpose over the last year have
19   you been to Ms. Smith's house?
20       A.  Oh, let's see.  I went over there for a
21   grill out.  Took the boat over there.  Checked on
22   curtains and wallpaper.  Had her look some stuff up
23   on the computer for me and just chat one night.  We
24   played cards.  I lost.

64

1        Q.  Have you been boating with the Smiths?
2        A.  No.
3        Q.  Has Cindy Smith been out on your boat?
4        A.  No.
5        Q.  For what purpose did you take your boat
6    over?
7        A.  We just went across the lake on our boat.
8        Q.  Gotcha.
9        A.  Went over there.
10       Q.  When was the last time before today's
11   deposition that you saw Ms. Smith?
12       A.  Yesterday.
13       Q.  For what purpose?
14       A.  To go to Menards, pick up a phonebook, get
15   my hair done, go out to eat, girl chat.
16       Q.  Did you discuss the deposition?
17       A.  I've told her I was nervous about it.
18       Q.  What did she tell you about her
19   deposition?
20       A.  She said just tell them what you remember
21   and the truth.
22       Q.  Okay.  Did the two of you discuss any of
23   the incidents at the plant?
24       A.  No.

65

1    Q.   Okay.  Did the two of you look over any
2    documents?
3    A.   No.
    Q.   Have you spoken with Ms. de Saint Phalle
    before today?
6    A.   With who?
7    Q.   Her attorney.
8    A.   Oh, no.
9    Q.   Okay.
10    A.   Wait a minute, I did talk to -- she called
11    me on the phone and asked me what my address was.
12    Q.   Okay.
13    A.   So I guess yes.
14    Q.   Okay.  Have you had any other discussions
15    with Cindy Smith about her lawsuit?
16    A.   Yeah, it has come up.
17    Q.   Okay.  Tell me in what context?
18    A.   I asked her how it was going and she said
19    she's contacted an attorney and that I would
20    probably be called in, and she asked me if I would
21    testify or tell whatever I knew and I told her yes,
22    I would.
23    Q.   Okay.
24    A.   I told Cindy I would.

66

1    Q.   Have you and Cindy Smith talked about
2    specific incidents that are part of her lawsuit
3    outside of this room?
4    A.   I'm not even sure I know what the whole
5    lawsuit is about, but no, I don't think so.
6    Q.   Okay.  How regularly do the two of you get
7    together or let's say how regularly have the two of
8    you gotten together since her last day at
9    Masterbrands in April of 2003?
10    A.   Oh, maybe six times.
11    Q.   Okay.  In total?
12    A.   Yeah, I think.
13    Q.   Okay.
14    A.   As far as just getting together and doing
15    something.
16    Q.   Other than going to her house?
17    A.   Yeah, I've been really busy and stressed.
18    Q.   When you guys get together, what types of
19    things do you do?
20    A.   Sometimes we go out to eat.  I'm just
    newly married and we've discussed how to place what
22    where and whose stuff is going to storage and whose
23    isn't, that type of thing.  Grandchildren,
24    grilling.

67

1    Q.   Have you taken any vacations together?
2    A.   No.
3    Q.   Are you acquainted with Cindy Smith's
4    husband?
5    A.   Yes.
6    Q.   Okay.  Did you talk to him today while you
7    were waiting your turn so-to-speak?
8    A.   Yes.
9    Q.   Did the two of you talk about the lawsuit?
10    A.   I asked him how it was going and he said
11    it's going okay, and we talked about grilling
12    onions on the grill and fried turnips and a lot of
13    stuff like that, but I didn't want to talk about
14    anything.
15    Q.   Okay.  Did you talk with him about
16    anything that happened at the plant or that was
17    alleged to have happened at the plant?
18    A.   Today?
19    Q.   Today.
20    A.   No.
21    Q.   Have you in the past?
22    A.   Yeah, I've complained once in awhile in
23    the past.
24    Q.   Okay.  Let's talk about the comment about

68

1    breaking a nail.  Well, let me back up in a minute.
2    I'm just going to go in order of what you testified
3    to.  That's probably going to be a bit easier
4    because we jumped around a bit.
5        You were asked if male employees
6    called Cindy Smith names and I think your answer
7    was yes, and you said on several occasions guys
8    used the word fuck a lot to a lot of people and
9    around in general.
10    A.   That's true.
11    Q.   Who specifically are you talking about?
12    A.   It seems like to me at that point in time
13    it was usually Dustin and Alan and --
14    Q.   Do you know Dustin's last name?
15    A.   I want to say Hall.  I think it's Hall.
16    Q.   Okay.  And Alan who?
17    A.   Brinkley, Brickey.
18    Q.   Okay.  And during what period of time are
19    you talking about?
20    A.   Ever since I was out there and they were
21    out there.  That has never stopped.
22    Q.   Okay.  Were they in the door plant when
23    you started working in the door plant?
24    A.   You know, I don't remember if they came

69

1 later or I'm not sure.
2    Q.   Okay.  Were they still there when you
3 left?
4    A.   No, neither one was there when I left.
5    Q.   Okay.  Can you give me any better idea
6 then of what time period we're talking about?
7    A.   No.  I think Alan was separated from the
8 company before I was ever changed over to a
9 different department.
10    Q.   Okay.
11    A.   And Dustin, I think he transferred to day
12 shift, but I heard he wasn't working there anymore.
13    Q.   Okay.  When you said on several occasions,
14 can you quantify for me how many times we're
15 talking about?
16    A.   It was an every day thing.  I don't know
17 how to give you a quantity on that.
18    Q.   Okay.  When you say an every day thing, do
19 you mean an every day thing that you personally
20 heard?
21    A.   I have heard them say it.
22    Q.   Did you hear it every day?
23    A.   Did I hear the word fuck every day?
24    Q.   From Alan and Dustin?

70

1    A.   Oh, yeah.  I just told them that they were
2 not to talk to me that way.
3    Q.   Okay.
4    A.   And so after that when I was around they
5 usually did not say that.
6    Q.   Okay.  You said they used it to a lot of
7 people and around in general.  Was that just part
8 of their usual vocabulary?
9    A.   Yeah, they said that a lot.
10    Q.   Okay.  Did they -- obviously they said it
11 to women.  Did they say it to men?
12    A.   Well, they said it to each other too.
13    Q.   Okay.  Were there any women who cussed?
14    A.   Erica Wheeler.
15    Q.   Any other women who cussed?
16    A.   Not that I can think of.
17    Q.   Okay.  You indicated there was a time when
18 you heard Cindy Smith called a fucking bitch.
19    A.   Yeah.
20    Q.   Okay.  How many times did you hear that?
21    A.   I only heard once with I think it was
22 Dustin.
23    Q.   Okay.  And when was that?
24    A.   I think that was over the stool throwing

71

1 or the misplacement of the stool or whatever that I
2 actually heard that.
3    Q.   Okay.  You indicated that Cindy Smith
4 complained to John Winschief, and did I understand
5 correctly that you overheard her do that?
6    A.   Oh, complained about what?
7    Q.   About being called a fucking bitch.
8    A.   I think Cindy told me that she complained
9 to John Winschief.
10    Q.   Okay.  Were you present to hear her
11 complain to John Winschief?
12    A.   I have been present around the desk
13 whenever she has complained to John Winschief.
14    Q.   Okay.  Were you present when she
15 complained about being called a fucking bitch by
16 Dustin with respect to the stool issue?
17    A.   Whenever I come back, yeah.
18    Q.   Okay.  I'm a little confused.
19    A.   I may be too.
20    Q.   I've understood you to say that Cindy told
21 you that she complained and I've understood you to
22 say that you personally heard Cindy.
23    A.   Well, it has happened more than one time.
24    Q.   What has happened more than one time?  I'm

72

1 sorry, I just want to make sure I understand.
2    A.   The word fucking bitch.
3    Q.   Okay.
4    A.   If you're talking about in front of
5 Dustin, yes.  If you're talking about in front of
6 John, I think she told me about John.  I've heard
7 Dustin call her a fucking bitch.
8    Q.   Okay.  You heard her called a fucking
9 bitch by Dustin on one occasion.
10    A.   One occasion that I remember.
11    Q.   Okay.  And in conjunction with that
12 occasion where you heard him say that, did you also
13 hear Cindy Smith complain to John Winschief about
14 that?
15    A.   In conjunction?  No, I can't say that.
16    Q.   Okay.
17    A.   That was probably separate times.
18    Q.   Okay.  That's just what I want to be clear
19 on.
20    A.   Okay.  That's confusing.
21    Q.   It is.  That's why I wanted to make sure
22 we understood each other.  Were there occasions
23 other than the time where you personally heard
24 Dustin call Cindy Smith a fucking bitch that Cindy

73

1  reported to you that it had happened?
2      A.    That Cindy reported -- that I heard Dustin
3  say?
4      Q.    No.  Were there other times that Cindy
5  Smith told you it had happened but you hadn't been
6  there to hear it?
7      A.    Yes.
8      Q.    Okay.  How many?  How many other times did
9  she tell you it had happened?
10     A.    I would say that I can probably -- I would
11 say two or three times that I can remember.
12     Q.    Okay.  So two to three times that Cindy
13 told you it happened and then one time that you
14 personally heard it?
15     A.    I personally heard it.
16     Q.    Okay.  We know that the complaint about
17 the stool happened in March of 2003.  We've all
18 pretty well agreed on that.
19     A.    Okay.
20     Q.    Does that help you place for me in time
21 when these other two to three times that Cindy
22 reported to you when those would have occurred?
23     A.    No.
24     Q.    Okay.  Are you able to tell me at all when

74

1  those other times occurred?
2      A.    No.
3      Q.    Okay.  Tell me about what you heard Cindy
4  Smith complain to John Winschief about; what you
5  were personally present for?
6      A.    About an incident?
7      Q.    I don't know.  I understood that there
8  were times when you were at John Winschief's desk
9  and that you heard Cindy Smith make a complaint.
10 What I don't know is what the nature of her
11 complaint was.  What did you personally hear her
12 complain about?
13     A.    There was one complaint that comes to mind
14 of T-shirts cut way down and that we had men on the
15 line that their T-shirts would be cut way down and
16 a complaint was why aren't they being made to
17 follow the safety rule, and John said something to
18 the affect of well, they're not hurting anybody,
19 they're not hurting anybody.  And Cindy said well,
20 what if I wore a top like that, and he said he'd
21 send her home.
22     Q.    Okay.
23     A.    But I don't know.
24     Q.    And would you disagree that if a woman

75

1  wore a very low cut T-shirt, that that's different
2  from a man wearing a very low cut T-shirt?  Expose
3  different parts of the body.
4      A.    If the rules say everybody has to wear the
5  same kind of shirts and they're not supposed to cut
6  them down, nobody should be wearing them.
7      Q.    Was there a dress code in place?
8      A.    I'm not sure.  I just know that's what the
9  safety team come up with.
10     Q.    Okay.  What did the dress -- what did
11 somebody wears to work have to do with the safety
12 team?
13     A.    That was just part of it for entanglement
14 policies.
15     Q.    So if you have a low cut T-shirt, what
16 does that got to do with the entanglement policy?
17     A.    Low cut like they're cutting down -- well,
18 their T-shirts were cut way down.
19     Q.    So that it had giant arm holes; is that
20 what you're demonstrating?
21     A.    Uh-huh.
22     Q.    Are these tank top style T-shirts?
23     A.    They were all kinds.  Any kind.
24     Q.    Or giant armpits or arm holes?

76

1      A.    Yeah, that's silly.
2      Q.    Okay.  What else did you hear Cindy Smith
3  complain to John Winschief about?
4      A.    I can't think of anything right now.
5      Q.    Okay.  Now, were there other instances
6  where Cindy Smith told you she had complained to
7  John Smith, or John Winschief?
8      A.    Yeah, she has told me that she has
9  complained to John or told John about some things,
10 but I'm not sure what they were right now.  I can't
11 think of what they are right now.
12     Q.    Did she ever tell you that she had
13 complained to John Winschief about verbal abuse or
14 obscenities by male employees?
15     A.    I do believe she has told me that, yes.
16     Q.    Okay.  Did she tell you the specifics of
17 her complaint?
18     A.    I do believe that she told John Winschief
19 or that she told me she told John that she had some
20 male employees call her fucking fat ass, cunt,
21 fucking bitch, and I think she told him she'd like
22 for the name calling or verbal abuse to stop.
23     Q.    Okay.  Did she tell you which male
24 employees she had complained about?

77

1     A.  I think at that time I think it might have
2  been Alan at that time.
3     Q.  Okay.  And when did she register this
4  complaint?
5     A.  I don't know.
6     Q.  When did the complaint of conduct occur?
7     A.  You mean the date?
8     Q.  A year, month, time period, season, any of
9  that would do.
10    A.  Oh, I couldn't tell you.
11    Q.  Okay.  Did she say what John Winschief's
12 response was?
13    A.  I think she told me that he would discuss
14 it with them.
15    Q.  Okay.  Did she tell you whether she was
16 satisfied with that response, dissatisfied with
17 that response?
18    A.  I don't remember if she ever told me
19 anything like that.
20    Q.  Okay.  Where were you when she told you
21 this?
22    A.  Someplace in the door plant.
23    Q.  Okay.  During work hours?
24    A.  Yeah.

78

1     Q.  Okay.
2     A.  I'm sure.
3     Q.  Okay.  Were there any other occasions on
4  which Cindy Smith told you that she had complained
5  to John Winschief?
6     A.  I think she has about -- I know she did
7  whenever Art Decker hit her with the board.
8     Q.  So she told you that she had complained to
9  John Winschief that Art Decker had hit her with the
10 board?
11    A.  Yeah.
12    Q.  Okay.
13    A.  But I had walked around the corner there
14 where she was working and I seen him do that.
15    Q.  So you saw Art Decker hit her with the
16 board?
17    A.  I seen it.
18    Q.  Okay.  And tell me what -- describe for me
19 what you saw?
20    A.  I was going over to the check the carts,
21 the parts in the carts, and I come around the
22 corner, Art had a board in his hand.  I thought he
23 was just going to walk by.  Cindy was bent over
24 getting some, I think it was styles or rails off

79

1  the bottom shelf, and he whacked her one.
2     Q.  Okay.
3     A.  Whacked her with the board.
4     Q.  Did you see his face when he did that?
5     A.  Yeah.
6     Q.  Okay.  What was the expression on his
7  face?
8     A.  He was smiling.
9     Q.  Okay.  And you say he whacked her one.
10 How hard did he whack her?
11    A.  It made noise.
12    Q.  Okay.
13    A.  It was hard.
14    Q.  Okay.  What else do you recall about that?
15    A.  He walked on down the aisle.
16    Q.  Okay.  What did she do?
17    A.  I do believe she went and reported it to
18 John.  I don't recall seeing her do that.
19    Q.  Okay.  So that would have been an instance
20 where she told you she had reported it to John?
21    A.  Yeah.
22    Q.  Okay.  Do you know when this incident
23 occurred?
24    A.  No.

80

1     Q.  Okay.  Mr. Decker's employment with the
2  company ended in September of 2002.  Does that help
3  you place that any better?
4     A.  No, I couldn't place it.
5     Q.  Okay.  Do you know how close to
6  Mr. Decker's -- the end of Mr. Decker's employment
7  that incident occurred?
8     A.  No.
9     Q.  Okay.  Do you believe that Mr. Decker was
10 horsing around when he did that?
11    A.  I think he was just being mean.
12    Q.  Okay.  Was that his personality?
13    A.  No.  Well, it depends on what day of the
14 week it was.
15    Q.  Okay.  Did you report to John Winschief
16 what you had seen?
17    A.  I can't -- no, I don't think I did.
18    Q.  Did you report to anyone what you had
19 seen?
20    A.  No.
21    Q.  Were you concerned by what you had seen?
22    A.  Well, yeah.  Anytime anybody gets hit it's
23 a very big concern.
24    Q.  Okay.  Why not report it?

81

1    A.    But I didn't report it.
2    Q.    Okay.
3    A.    The person who got hit was supposed to
report it.
5    Q.    Who was in HR at this time?
6    A.    I do not know.
7    Q.    Okay.  How many times did you observe Art
8  Decker hit Cindy Smith with that style?
9    A.    I seen it once.
10    Q.    Okay.  Who else witnessed that?
11    A.    I don't know.
12    Q.    Okay.  Did Art Decker say anything as he
13  did it?
14    A.    If he did I can't recall it.
15    Q.    Now you said that at some point you and
16  Cindy Smith were in the bathroom and she pulled
17  down her jeans and showed you the bruising?
18    A.    Yes.
19    Q.    When did that happen?
20    A.    It would have been that same day probably.
21    Q.    Okay.  Anyone else in the bathroom with
22  you?
23    A.    No, I don't think so.  I don't know.
24  There might have been somebody in the stall.  I

82

1  don't know.
2    Q.    Do you know if she showed the bruising to
3  anyone else?
4    A.    No, I don't know.
5    Q.    Did she tell you she had shown the
6  bruising to anyone else?
7    A.    Not that I can recall.
8    Q.    Is there any other occasion that Cindy
9  Smith told you she had reported some sort of male
10  misconduct to John Winschief?
11    A.    I can't recall if there was more.
12    Q.    Okay.  When you heard Dustin Hall call
13  Cindy Smith a fucking bitch, did you report that to
14  anyone?
15    A.    No.
16    Q.    You also mentioned that parts were thrown
17  or kicked by men in the plant.
18    A.    Uh-huh.
19    Q.    What's that about?
20    A.    They'd just get angry and frustrated and
they'd throw something.
22    Q.    Okay.  Did you ever see a woman throw any
23  wood or anything?
24    A.    I have never seen -- yes, I have, wait a

83

1  minute, I have.  Mary.
2    Q.    Mary Hackman did you say?
3    A.    Mary Hackman.  She'd get angry if the
4  timesaver would bet backed up and she'd pick the
5  doors up and throw them down the line.
6    Q.    Okay.  Did you personally see Dustin or
7  Alan throwing or kicking pieces of wood?
8    A.    Yeah.
9    Q.    And did you personally see Mary Hackman
10  throw pieces of wood or shove them out of the way
11  as you demonstrated?
12    A.    Yes.
13    Q.    Did you report what you observed about
14  Dustin to anyone?
15    A.    About --
16    Q.    Throwing the wood.
17    A.    Oh, yeah, several times to John and to
18  Greg Finley.
19    Q.    Okay.  Did you ever see anyone get hit by
20  the wood that was being kicked or thrown?
21    A.    No.
22    Q.    Did you ever report what you saw Alan do
23  in terms of kicking or throwing wood to anyone?
24    A.    Yes.

84

1    Q.    To whom?
2    A.    To -- anytime there was wood thrown,
3  kicked, or if they're just plain working too hard
4  with it and you can hear it over your ear plugs, I
5  would report it.
6    Q.    Okay.  And who typically were you
7  reporting it to?
8    A.    It would be the team leader.  So if John
9  Winschief was there it would be him.  If it was
10  Bill Hinds it would be him.  Whoever was in charge
11  of that department I would ask them to stop.
12    Q.    Was there ever a period when that then
13  stopped?
14    A.    Well, it stopped for a little bit.
15    Q.    Okay.  And --
16    A.    And then a few days might go by or a day
17  and then they'd start it again.
18    Q.    Okay.  For how long a period of time were
19  they throwing or kicking wood overall?
20    A.    They still do it.  It still happens.
21    Q.    Okay.  And did you ever report what you
22  observed Mary Hackman doing with the wood to
23  anyone?
24    A.    Yes.

85

1    Q.   And who did you report her to?
2    A.   **John Winschief.**
3    Q.   Okay.
4    A.   **Or Bill Hinds. Whoever was there.**
**Sometimes they swapped shifts.**
6    Q.   Okay. Did you ever see anyone get hit by
7    any of the wood or parts thrown or kicked by Alan
8    Brickey?
9    A.   **I never seen him hit anybody.**
10   Q.   Okay. How about Mary, did anybody get hit
11   by the wood that Mary was shoving around?
12   A.   **Well, yeah, she shoved them doors back,**
13   **smashed his fingers.**
14   Q.   Whose fingers?
15   A.   **Well, mine for one.**
16   Q.   Did that ever happen?
17   A.   **Yeah.**
18   Q.   And did you report that?
19   A.   **Yep.**
20   Q.   Okay. Did you see anybody else get
21   injured by what Mary did?
22   A.   **Well, she did that a lot. No, I can't say**
23   **I've seen -- no, I can't, no.**
24   Q.   Okay. How many times did your fingers get

86

1    smashed by Mary?
2    A.   **At least three.**
3    Q.   Did you report that each time?
4    A.   **Yeah, I would go to John.**
5    Q.   Did you have to go to the nurse or first
6    aid?
7    A.   **Oh, no, no. It just hurts.**
8    Q.   Okay. And when you reported Dustin, what
9    did John do or say?
10   A.   **Whenever I reported if Dustin was throwing**
11   **I always asked them first and then if they didn't**
12   **stop I would go to John and tell him and he would**
13   **say he would talk to them.**
14   Q.   Okay. Do you know whether he did talk to
15   them?
16   A.   **No, I don't.**
17   Q.   Same true for your complaints about Alan?
18   A.   **Yeah.**
19   Q.   He said he would talk to Alan?
20   A.   **That was the procedure.**
21   Q.   Okay. How about when you complained about
22   Mary?
23   A.   **He would talk to her.**
24   Q.   Okay. Were you reporting Dustin and

87

1    Alan's conduct -- well, let me ask you this, why
2    were you reporting Dustin and Alan's conduct? What
3    was of concern to you?
4    A.   **The quality of the door.**
5    Q.   Okay. I think you said this happened when
6    Dustin and Alan were at the building station; did I
7    understand that correctly?
8    A.   **That's where they put the doors together.**
9    Q.   It's like an assembly area?
10   A.   **Yeah, it's like a plant.**
11   Q.   Okay.
12   A.   **Does somebody have a cracker?**
13   Q.   There is some in the vending machine if
14   you want to take a break.
15              (Whereupon there was an off the
16              record discussion.)
17   Q.   Other than Art Decker, did you ever see
18   anyone else hit Cindy Smith?
19   A.   **Not that I can -- not that I can recall.**
20   Q.   Okay. You were asked about an incident
21   involving Brenda Morgan that she was shot in the
22   butt with a staple gun --
23   A.   **Yes.**
24   Q.   -- and every time you've been asked about

88

1    it you laugh. Was that a funny incident?
2    A.   **No, it's just -- it actually happened**
3    **before I came to the door plant, and it was the way**
4    **the story was told is all that's funny.**
5    Q.   Okay. Told by whom?
6    A.   **By her.**
7    Q.   Okay.
8    A.   **By Brenda.**
9    Q.   Did you actually see this happen to
10   Brenda?
11   A.   **No, I did not see that happen to Brenda.**
12   Q.   Okay. Did Brenda file charges against
13   anyone as a result of that incident?
14   A.   **I think -- I don't know if she did or not.**
15   Q.   Okay. When you were asked about it
16   initially you said that she or somebody was goofing
17   around.
18   A.   **I think --**
19   Q.   Was this horseplay?
20   A.   **Yeah, from what she told me this guy was**
21   **horsing around and shot her with the staple gun.**
22   Q.   Okay.
23   A.   **She told me she turned it in to the team**
24   **leader at the time and that was Bill Hinds.**

89

1    Q.   Okay.  This was before you came into the
2  door plant?
3    A.   I think this was before I ever came in.
4    Q.   Okay.  Do you know whether Cindy Smith was
5  present to witness that?
6    A.   I don't know.
7    Q.   Okay.  Who was the person who stapled
8  Brenda Morgan?
9    A.   Oh, God, his name was Donnie.  I can't
10  think of his last name.  It was Donnie.
11    Q.   By Donnie somebody?
12    A.   Yeah.
13    Q.   Okay.
14    A.   He doesn't work there anymore.
15    Q.   Okay.  Did you ever hear Cindy Smith
16  complain about this Donnie person?
17    A.   No, I can't recall anything.
18    Q.   Okay.  You were asked about other women
19  who complained to John Winschief and you indicated
20  that Brenda Purcell complained to John Winschief;
21  did I write that down correctly?
22    A.   I know Brenda complained to me and she
23  told me she went to John Winschief.
24    Q.   Okay.  How many times did Brenda complain

90

1  to John Winschief?
2    A.   I think for awhile it was an every day thing,
3  but I don't know how many times exactly and she was
4  usually complaining about the amount of work or
5  there was a number of things.
6    Q.   Okay.
7    A.   I guess you'd have to --
8    Q.   What else besides the amount of work?
9    A.   That's just what she told me.
10    Q.   Okay.  Did you ever hear her complain to
11  John Winschief about that?
12    A.   No, I don't think I really ever -- maybe
13  in a passing by, but not really enough to know
14  enough about the conversation, no.
15    Q.   Okay.  What was Brenda Purcell's job
16  classification at the time she was telling you she
17  had made these complaints?
18    A.   Well, she was working on the saw and I
19  can't remember.  I know there was a disagreement
20  over who should have got that job and the job was
21  given to another guy but they had to take it away
22  from him because she had more seniority and she had
23  complained about that, and I'm not real clear on
24  all of the whole situation.

91

1    Q.   Okay.  Did you know whether her complaints
2  about the amount of work she was doing was a valid
3  complaint?
4    A.   It appeared to be.
5    Q.   Based on what?
6    A.   Just looking.
7    Q.   At what?
8    A.   At what she was doing.
9    Q.   Which was what?
10    A.   Cutting wood.
11    Q.   And she just had a lot of wood to cut?
12    A.   She had a lot of wood to cut and that's
13  all it is, a lot of wood to cut.
14    Q.   Okay.  Was her complaint that she had a
15  lot of wood to cut because she was a woman?
16    A.   I don't know.  You could ask her.
17    Q.   Okay.  Did she ever tell you that?
18    A.   It was the whole job.  It wasn't just
19  cutting wood.
20    Q.   Okay.  What other component was there to
21  her job if she was on a saw besides cutting wood?
22    A.   She had to retrieve the wood, divide up
23  work orders --
24    Q.   Was that part of --

92

1    A.   -- straighten the area.  It was both
2  cutters are responsible for all of it.
3    Q.   Okay.  So she was feeling overworked?
4    A.   Yeah.
5    Q.   Okay.  Did she tell you anything about
6  Winschief's response to her complaint?
7    A.   No.
8    Q.   Okay.  You also indicated that Brenda
9  Morgan had complained to John Winschief.  Did you
10  hear Brenda Morgan complain to John Winschief?
11    A.   About?
12    Q.   I think you said that Brenda Morgan ran a
13  saw as well.
14    A.   Brenda Morgan never ran a saw.
15    Q.   Okay.  That's what I wrote down.  What job
16  did Brenda Morgan have?
17    A.   She was repair station.
18    Q.   Was she in repair station the whole time
19  you were there?
20    A.   Until she bid out.
21    Q.   Okay.  When did she bid out?
22    A.   I don't know.
23    Q.   What did she bid out to?
24    A.   I think it was salvage department.

93

1    Q.  Okay.  I apologize if I asked you this,
2  did you hear Brenda Morgan complain to John
3  Winschief?
4    A.  No.
5    Q.  Okay.  How do you know that Brenda Morgan
6  complained to John Winschief?
7    A.  I don't know that Brenda ever complained
8  to John Winschief.
9    Q.  Did she tell you --
10   A.  Well, there was a time whenever she
11 complained to Bill Hinds because a guy on the line
12 crapped his pants and wouldn't go home.  And that
13 was to Bill Hinds and John Winschief.
14   Q.  Okay.  Let's take it one step at a time.
15   A.  Okay.
16   Q.  So you personally didn't hear Brenda
17 Morgan complain to John Winschief?
18   A.  I'm not sure where Brenda Morgan comes.
19 Evidently not.
20   Q.  Okay.  I wrote down from your direct
21 testimony that you answered in the affirmative
22 Brenda Purcell complained to John Winschief and
23 that Brenda Morgan complained to John Winschief.
24   A.  I don't know what Brenda Morgan -- I don't

94

1  know where Brenda Morgan came from.
2    Q.  Okay.  Are you aware of any complaints
3  Brenda Morgan made?
4    A.  About that guy.
5    Q.  Okay.  Tell me about that guy?
6    A.  Well, he was standing in front of a big
7  fan and he had an accident in his pants and he
8  wouldn't go home and she complained to John
9  Winschief and Bill Hinds.
10   Q.  And what happened?
11   A.  Well, he got to stay and they talked to
12 him and that's it and that's all I know.
13   Q.  Okay.
14   A.  And I did see him and I know she
15 complained about it.
16   Q.  Okay.
17   A.  Yes.
18   Q.  How do you know she complained about it?
19   A.  Oh, God, I don't believe so.  Because I
20 heard her complain.
21   Q.  Okay.  Did you hear her complaining in
22 general or did you hear her complaining to Hinds
23 and Winschief?
24   A.  I was standing there and everybody was

95

1  standing there.
2    Q.  Okay.  And so they complained and what
3  happened to the guy?
4    A.  Nothing.  He got to stay.  He got to
5  finish his shift.  He only had two hours.
6    Q.  Okay.
7    A.  I'm sorry.
8    Q.  And do you believe that that is some
9  evidence of gender discrimination?
10   A.  No.
11   Q.  Okay.  You made a comment in your
12 testimony that men had greater pay grades,
13 according to Brenda, than women.
14   A.  There was --
15   Q.  Which Brenda are we talking about?
16   A.  See, you're confused on the Brendas or I
17 didn't explain it correctly.  The pay grade deal
18 would have been Brenda Purcell.
19   Q.  The pay grade deal is Brenda Purcell?
20   A.  Yeah.
21   Q.  So Brenda Purcell complained about the
22 amount of work and the pay grade?
23   A.  Right.
24   Q.  Okay.

96

1    A.  Yeah.
2    Q.  Okay.  What was Brenda Purcell's complaint
3  about the pay grades?
4    A.  She was working next to an operator and
5  this is just what she told me.
6    Q.  This is when, I'm sorry, when she was at
7  the repair station?
8    A.  No, that's Brenda Butts.  We need to get
9  her off there.
10   Q.  Okay.  I'm sorry, we've got too many
11 Brendas there.
12   A.  I know and it's getting confusing because
13 it's not.
14   Q.  I'm sorry.  This one goes over here.
15 Okay.  So Brenda Purcell, I'm with you now.
16   A.  Brenda, this really isn't, I don't really
17 know about this, but Brenda Purcell was standing
18 next to another operator that's doing the same
19 exact job but her pay grade she was getting less
20 pay than he was.
21   Q.  Okay.
22   A.  That was her complaint.
23   Q.  They were both --
24   A.  Now I don't know this for a fact.  That's

97

1  just what she had said.
2      Q.   Okay.  Were they both of the same job
3  classification?
4      A.   I assume so.  She was running the -- she
5  may not have been because she was running a saw and
6  he was running a saw.
7      Q.   Okay.  There were --
8      A.   So I don't know.
9      Q.   There were different grades of machine
10  operators, right?
11     A.   Yeah.
12     Q.   Okay.  And did employees get merit
13  increases as a general rule at Masterbrands?
14     A.   Merit?
15     Q.   Merit increases.
16     A.   No.
17     Q.   Annual increases?
18     A.   Well, they had a schedule so many months
19  you got so much of a raise and it was usually --
20     Q.   Is that called a step increase?
21     A.   Yeah, I think so.
22     Q.   Okay.
23     A.   And then after a year I think maybe two, I
24  don't remember what it is, then you top out and

98

1  then you only get the cost of living raise every
2  year.
3      Q.   Okay.  And do you have any idea whether
4  Brenda Purcell's allegations about the pay grade
5  was accurate?
6      A.   I have no idea.
7      Q.   Okay.  What man was she comparing herself
8  to?
9      A.   I think it was Juan.
10     Q.   Juan?
11     A.   And I don't know his last name.  There was
12  more than one guy on that saw.  They were all --
13     Q.   Which saw was it?
14     A.   The second chop saw.  There's two of them.
15     Q.   Okay.  And did you hear Brenda Purcell
16  complain about the pay grade differential to anyone
17  in management?
18     A.   No.
19     Q.   Okay.  Did she tell you that she had?
20     A.   She told me she had.
21     Q.   Who did she tell you she'd complained to?
22     A.   She just said that she had complained.  I
23  didn't ask her who to.
24     Q.   Okay.

99

1      A.   She's very verbal.  I have no reason not
2  to believe that.
3      Q.   Okay.  Did she tell you what the response
4  had been when she complained?
5      A.   No.
6      Q.   Okay.  Do you have any information that
7  would indicate that female chop saw operators were
8  paid inappropriately or impermissibly less than
9  male chop saw operators?
10     A.   I don't have any information about that.
11     Q.   Okay.  The next thing I wrote down that
12  you talked about was Mary Hackman and that Mary
13  Hackman had complaints about Cindy Smith.
14     A.   They didn't get along.
15     Q.   Okay.  Do you know why?
16     A.   No, actually I don't know really why they
17  didn't get along.
18     Q.   You said that she ran the timesaver.  What
19  is the timesaver?
20     A.   When the doors are built, they go on
21  rollers and they go through and they sand the tops
22  and the bottoms as a timesaver.
23     Q.   So it's like a sanding machine?
24     A.   Yeah, of the doors.

100

1      Q.   Okay.  You also said that Mary didn't have
2  the best of the language.  What do you mean by
3  that?
4      A.   Well, she would tell people off or make
5  snide remarks, and she cussed once in awhile.  Not
6  a lot, but she just did.
7      Q.   Okay.  Did you ever hear her get
8  reprimanded for cussing?
9      A.   No, I never heard it.
10     Q.   Okay.  Do you know whether anybody
11  complained about her cussing?
12     A.   I do not know.
13     Q.   Okay.  Other than Mary Hackman I
14  understand you to say that to your knowledge no
15  other females in the department had complaints
16  about Cindy or made complaints about Cindy?
17     A.   To my knowledge.
18     Q.   Okay.  Can you tell me what time period
19  we're talking about or is that just in general?
20     A.   Well, I don't even know how long Cindy was
21  in the department --
22     Q.   Okay.
23     A.   -- or how long she was there.
24     Q.   Okay.  Cindy was in the department from,

101

1    oh, say May or June 2001 until April of 2003.
2        A.   I would probably -- I don't really know.
3        Q.   Okay.  So when you're contemplating on
4    saying no other females had complaints about Cindy,
5    can you tell me the names of the other females in
6    the department who were without complaints?
7        A.   At that time, no, I can't.
8        Q.   Okay.
9        A.   I can't recall.
0        Q.   How many other women --
1        A.   I'm sorry.  That's a long time.  I don't
2    recall that.
3        Q.   Okay.  How many other women were there in
4    door plant besides Cindy Smith and Mary Hackman?
5    We've got a couple Brendas.
6        A.   Okay.  Let's see.  Well, there was Becky,
7    Mary, me, I think Carol Bogen.  Let's see when
8    Carol was there Brenda wasn't there.
9        Q.   Which Brenda?
0        A.   Brenda Butts.
1        Q.   Okay.
2        A.   I couldn't tell you.
3        Q.   Okay?
4        A.   If I had a list maybe I could.

102

1        Q.   Okay.  Were you on speaking terms with all
2    the other women in the department?
3        A.   Yes.
4        Q.   Did you speak with them regularly?
5        A.   Oh, yes.
6        Q.   If they had a complaint about Cindy, do
7    you believe you would have known it?  Do you
8    believe they would have told you?
9        A.   I heard a lot rotating around the
0    department.
1        Q.   Okay.  Were you known to be a friend of
2    Cindy Smith?
3        A.   Yes.
4        Q.   Okay.  Do you think that if somebody had a
5    complaint about Cindy Smith, knowing that you were
6    her friend, that they would come tell you that?
7        A.   Yes.  It depends on what type of
8    complaint.
9        Q.   Okay.  You said Diana Risley had a
0    complaint about a guy who kept patting her on the
     butt.
2        A.   Uh-huh.
3        Q.   Did I write that down correctly?
4        A.   Yeah.

103

1        Q.   And you told us that did not occur while
2    Cindy Smith was employed?
3        A.   I don't know.  That machine -- I don't
4    think Cindy was there when Diana was in the
5    department.
6        Q.   Okay.  Can you give me an estimation of
7    when that happened?
8        A.   No.
9        Q.   Okay.  How do you know that it happened?
10       A.   Well, Earl always went by her and --
11       Q.   Earl is the guy who patted her?
12       A.   Yeah.
13       Q.   What's Earl's last name?
14       A.   You know, they already worked that out and
15   I don't want to tell that.
16       Q.   Well, I understood today, and I assumed
17   today the reason why you were asked to mention that
18   comment was somehow to demonstrate that there is
19   some pattern of discrimination at the plant.  So I
20   think it's relevant for us to understand what this
21   is about.
22       A.   I wasn't to the understanding that I was
23   just here to answer some questions.
24       Q.   Okay.  So who is Earl?

104

1        A.   Earl is the guy that patted Diana Risley
2    on the butt every once in awhile when she walked by
3    and she would complain about it.
4        Q.   Do you know Earl's last name?
5        A.   Dobbs.
6        Q.   And did you ever witness this happen?
7        A.   No.
8        Q.   How do you know that it even occurred?
9        A.   Diana Risley's very verbal and I think she
10   made a complaint to John by her telling that.
11       Q.   Uh-huh.  So Diana told you --
12       A.   And John took care of that.  Diana told me
13   that.
14       Q.   Okay.  So Diana told you that this had
15   happened and Diana told you that she had reported
16   it to John?
17       A.   Uh-huh.
18       Q.   I'm sorry, you need to answer yes or no
19   for the transcript.
20       A.   Yes.
21       Q.   And Diana told you that John had taken
22   care of it?
23       A.   Right.
24       Q.   Okay.  Was it your impression that Diana

105

1  was satisfied with the fact that John had taken
2  care of it?
3      A.  Yes.
       Q.  And we're talking about John Winschief?
       A.  Yes.
6      Q.  Okay.  I think the next thing that we
7  talked about was this breaking a nail comment, and
8  I think we've all pretty well established that that
9  happened -- that that complaint was raised in
10 January of 2003; does that seem about right to you?
11     A.  I couldn't tell you.
12     Q.  Okay.  If I told you that Matt Ohrt
13 conducted an investigation based on Cindy Smith's
14 complaint in January of 2003, would you have any
15 reason to dispute that?
16     A.  Oh, for the fingernail?
17     Q.  Yeah.
18     A.  No, I would have no reason to dispute
19 that.
20     Q.  Okay.  When you were asked if you were
21 present for the breaking the nail comment I wrote
22 down that you laughed and you said yeah.  Can you
23 tell me about what you heard?
24     A.  John had said that more than once --

106

1      Q.  Okay.
2      A.  -- that comment more than once.  Now
3  whether it was the same time that Cindy -- it may
4  have been there and she at one point yes, he did
5  say that to Cindy.
6      Q.  And you heard that?
7      A.  And I have heard that, yes.
8      Q.  Okay.  So --
9      A.  But it was kind of like a conversation
10 around a desk.
11     Q.  Okay.  So you heard him make that comment
12 to Cindy?
13     A.  Uh-huh, at the desk.
14     Q.  At the desk.  And you otherwise heard him
15 make that comment?
16     A.  Yeah.
17     Q.  To whom?
18     A.  Just conversation.  I don't know.
19     Q.  Who else was part of that conversation?
20     A.  I don't know.
21     Q.  Okay.  How many other times have you heard
22 this said when Cindy Smith wasn't involved?
23     A.  How many other times?  I don't recall.  I
24 don't recall.

107

1      Q.  Can you give me an estimate?
2      A.  No, no, I can't recall.
3      Q.  Okay.  Did you ever complain to anyone
4  about John Winschief making a comment about
5  somebody breaking a nail?
6      A.  No.
7      Q.  Okay.  Did you believe when you heard John
8  Winschief make that comment that he was doing so in
9  a derogatory manner?
10     A.  Well --
11     Q.  Do you believe he was intending to be
12 malicious about it?
13     A.  He sent a message out.
14     Q.  What do you mean by that?
15     A.  That the cross-training was not going to
16 be on that machine for a woman I do believe.
17     Q.  Okay.  And how did he send that message
18 out?
19     A.  Just by saying that.
20     Q.  To you and to Cindy Smith?
21     A.  There was a group of us there.
22     Q.  How many --
23     A.  But I can't remember.
24     Q.  Okay.  Can you tell me how many roughly?

108

1      A.  How many people around the desk?
2      Q.  Yes.  Strong words to say he sent a
3  message so I think it's important to know how many
4  people were there.
5      A.  Well, I'm not sure.
6      Q.  Okay.  So just we're perfectly clear.  You
7  heard him say this.  You heard him say this to
8  Cindy Smith.  You're not certain how many other
9  times not involving Cindy Smith he said it, and you
10 can't tell me who else witnessed it or when it
11 happened?
12     A.  I do not have a date.  It's been more than
13 three years ago or three years ago, no.
14     Q.  Okay.  Did anyone else besides Cindy Smith
15 complain about John Winschief making that comment?
16     A.  I have no idea.
17     Q.  Why would you believe that John Winschief
18 didn't want to cross-train women on the machine,
19 the new machine, or train women on the new machine?
20 There were women in the department running
21 machines, right?
22     A.  Not very many.
23     Q.  There were women in the department running
24 machines?

109

1    A.  There were.  Mary was running a machine
2  and Sophie was running a back side of a machine.
3    Q.  And employee placement in jobs was on a
4  bid system, right?
5    A.  Yeah, unless the team leader wants to put
6  them elsewhere in the department in their own
7  department.
8    Q.  And give me examples where John Winschief,
9  rather than giving a job to someone who had won the
0  bid in the job they had bid on, put them somewhere
1  else?
2    A.  Do you mean on different machines like
3  somebody out of the department comes in and bids on
4  a job?
5    Q.  Well, you've said that team leaders can
6  decide who gets what job.
7    A.  They can put you anyplace in the
8  department, yes, they can.
9    Q.  Okay.  Give me examples of where someone
0  who bid on a job did not get the job they were bid
1  because of the action of a team leader?
2    A.  There is people that's bid and won bids on
3  that chop saw and they've been put down to build
4  and were left there.

110

1    Q.  Okay.  Give me a specific example.
2    A.  Juan.
3    Q.  Okay.
4    A.  I don't know his last name, and then he
5  went to build and he didn't get to be on the saw
6  for I don't know how long.
7    Q.  Okay.  Anyone else?
8    A.  And finally he got to go back on the saw
9  for a little bit and then he bid the day shift.
0    Q.  Okay.  Any other examples you can give me?
1    A.  Not right off.
2    Q.  Okay.  Did that ever happen to you?
3    A.  For auditor, no.
4    Q.  Okay.  So when you heard John make the
5  comment to Cindy about breaking a nail, give me the
6  context.  Tell me what the conversation was?
7    A.  Cindy asked him, because the new machine
8  was coming in and it was just, I think it was about
9  a set up, and Cindy made the comment to John that
0  she would like to train on the saw and to learn the
1  job, and that's when he stated that she'd probably
2  break a fingernail doing that, he probably wouldn't
3  do that.
4    Q.  Did you think he was kidding?

111

1    A.  No, I don't think he was kidding.
2    Q.  Do you think he thought he was kidding?
3    A.  I don't know.
4    Q.  Okay.  Does Cindy Smith have long
5  fingernails?  Did she keep them long?
6    A.  At the time she did.
7    Q.  Okay.  What did Cindy Smith do?  What did
8  she say in response?
9    A.  I can't remember.
10    Q.  Okay.  Did you complain to anyone that he
11  had said this?
12    A.  No.
13    Q.  Did you hear her complain to anyone that
14  John Winschief had said this?
15    A.  I don't know, no.  She may have.  I don't
16  know.
17    Q.  Okay.  Let me have you direct our
18  attention to Exhibit 6, and I'll represent to you
19  that the pages that are marked 0733 through 0753
20  pertain to Matt Ohrt's investigation into the
21  breaking a nail comment.
22        Were you aware that Matt Ohrt had
23  conducted an investigation into that?
24    A.  I don't remember if he did or not.

112

1    Q.  Okay.
2    A.  You just said he did.
3    Q.  Matt Ohrt's notes indicated that he had a
4  meeting with Cindy Smith and Dave Pantier on
5  January 9, 2003 to talk to Cindy Smith about the
6  results his investigation, and that when they had
7  finished talking about that he asked John Winschief
8  to step into the meeting and at that point Cindy
9  Smith asked you to step into the meeting.  Does
10  that mesh with your recollection?
11    A.  Yeah, I was in that meeting.  I was called
12  into that meeting.
13    Q.  Okay.
14    A.  But I didn't know it was over a broken
15  fingernail.
16    Q.  Okay.  So you weren't present for that
17  portion of the discussion?
18    A.  No.
19    Q.  Okay.  Did you think it was unreasonable
20  for Matt to have conducted an investigation?
21    A.  Well, I wasn't there to do anything.  I
22  was just there to listen.
23    Q.  Oh, I understand that.  I'm asking if in
24  your opinion it was unreasonable for Matt to have

113

1  conducted an investigation into, as you said, a
2  broken nail?
3    **A. If it went as far as to Matt then yeah, I**
**guess. I don't really have an opinion about what**
**other people do with their jobs.**
6    Q. Okay.
7    **A. I tried not to.**
8    Q. Well, you were an employee of the company.
9  You're aware that another employee of the company
10  reported what she believed to be gender
11  discrimination. On that basis, did you believe it
12  was appropriate for Matt Ohrt to have conducted an
13  investigation in that type of allegation?
14    **A. If he wants to investigate, yeah.**
15    Q. Okay. Beyond what he wants, do you think
16  that's a proper function for a human resources
17  person?
18    **A. That's what they're supposed to do I**
**think.**
20    Q. Okay. Do you know whether Matt talked to
21  women in the door plant as a result of the
22  complaint about John Winschief making the break the
23  nail comment?
24    **A. I don't know if he did or not.**

114

1    Q. Okay. Did you have any discussions with
2  Karen Sinclair as to whether or not she had given a
3  statement to Matt Ohrt?
4    **A. Not that I'm aware of.**
5    Q. Okay. Did you have any conversations with
6  Dorothy Jolley about the fact that she had given a
7  statement to Matt Ohrt?
8    **A. About cross-training; is that what we're**
**talking about?**
10    Q. No, about whether or not they had given a
11  statement to Matt Ohrt in the course of his
12  investigation into the break a nail comment.
13    **A. Oh, I'm not aware of it.**
14    Q. Okay. Did you ever have any conversation
15  with Dorothy about that?
16    **A. Not that I'm aware of.**
17    Q. Did you ever have any conversation
18  with Carol Bogen about the statement she gave to
19  Matt Ohrt?
20    **A. No.**
21    Q. Okay. Did you ever have a conversation
22  with Mary Hackman about the statement she gave to
23  Matt Ohrt?
24    **A. No.**

115

1    Q. How about with Brenda Purcell?
2    **A. Not that I'm aware of, no.**
3    Q. How about with Sue Gonzalez?
4    **A. No.**
5    Q. How about with Becky Hardwick?
6    **A. No.**
7    Q. How about with Deb Gill?
8    **A. No.**
9    Q. John Winschief?
10    **A. I didn't even know he was investigating.**
11    Q. Okay. Matt Ohrt took notes reflecting
12  that he talked to you about this allegation and you
13  talked a bit about that in your direct testimony
14  that you didn't recall that.
15        Am I to understand from that that are
16  you saying that Matt Ohrt is lying when he says he
17  talked to you in the course of that investigation?
18    **A. No, ma'am. I'm just saying I do not**
**remember anything that was on that paper --**
20    Q. Okay.
21    **A. -- and I can't even remember that there**
**was an investigation for that comment on a**
**fingernail.**
24    Q. Okay. Do you think having heard the

116

1  people that Matt Ohrt talked to in the course of
2  his investigation, is there anybody that you
3  believe he should have talked to in order to get a
4  better understanding of the comment that was made?
5    **A. I have no idea.**
6    Q. Well, were you present when you heard the
7  comment made, so did Matt miss anybody?
8    **A. I don't know. If he interviewed everybody**
**then he guess he did. I don't know.**
10    Q. Well, I'm asking you is this everybody?
11  Is this everybody who would be relevant, the names
12  that I read off to you?
13    **A. I don't recall.**
14    Q. Okay. When you were in -- once you
15  arrived in the January 2003 meeting, I want to make
16  sure I understand who was there. You were there,
17  John Winschief was there, Cindy Smith was there,
18  Dave Pantier was there, and Matt Ohrt was there.
19  Is that everybody?
20    **A. Yes, I believe that's true.**
21    Q. Where did that meeting take place?
22    **A. I think it was in the human resources**
**office.**
24    Q. Okay. What was Dave Pantier's position at

117

1   that time?
2       **A.  Position?**
3       Q.  Yeah, what was his job.
        **A.  Supervisor, nighttime supervisor.**
        Q.  Superintendent?
6       **A.  Superintendent.**
7       Q.  Okay.  Had you worked with Dave Pantier
8   for a period of time as of January of 2003?
9       **A.  2003?**
0       Q.  Yeah.
1       **A.  Dave has been around since I started**
2   **working there in 2000.**
3       Q.  As auditor did you have occasion to
4   interact with him?
5       **A.  Yes.**
6       Q.  Did you have any complaints about Dave
7   Pantier's conduct?
8       **A.  No.**
9       Q.  Did you have any concerns or complaints
0   about Matt Ohrt's conduct?
1       **A.  Towards quality?**
2       Q.  Towards women in the plant.
3       **A.  No.**
4       Q.  Okay.  Do you have any concerns or

118

1   complaints about John Hinds' conduct towards women?
2       **A.  Who?**
3       Q.  I'm sorry, Bill Hinds.
4       **A.  No.**
5       Q.  Okay.  Do you have concerns or did you
6   have concerns or complaints about John Winschief's
7   conduct towards women?
8       **A.  No.**
9       Q.  In the meeting in January of 2003 I
10  understand that it was raised that Cindy Smith had
11  asked John Winschief to go to a bar for drinks.
12          How many times did you hear her give
13  that invitation to John Winschief?
14      **A.  I don't know how many times that would**
15  **have happened because there was a lot of people**
16  **invited.**
17      Q.  Okay.
18      **A.  I don't know.**
19      Q.  I understand that there were other people
20  invited.  I'm curious as to how many times you
        heard her invite John Winschief?
        **A.  I couldn't tell you.  I don't know.**
23      Q.  Do you recall John Winschief's responses?
24      **A.  He never went because -- I don't know.**

119

1       Q.  Okay.  Had you ever heard anybody out on
2   the floor of the factory talk about Cindy Smith's
3   personal life or dating habits, for example, her
4   social life?
5       **A.  Out on the floor?**
6       Q.  Yeah, out on the door plant while you were
7   out doing your job.
8       **A.  No.**
9       Q.  Okay.  Did Cindy Smith ever date anybody
10  who worked at the factory?
11      **A.  No, I don't think so.**
12      Q.  Okay.  Did you ever hear anyone mention
13  that Cindy Smith had commented about how she was
14  dating or sleeping with two married men that worked
15  in the factory?
16      **A.  No.**
17      Q.  Okay.  Do you have any idea whether Cindy
18  Smith had a sexual relationship with any men in the
19  door plant?
20      **A.  Not that I'm aware of.**
21      Q.  Okay.  Was it ever the subject of talk out
22  on the factory floor?
23      **A.  Well, no.**
24      Q.  Okay.  Did you ever tell John Winschief

120

1   that Cindy Smith thought he was attractive?
2       **A.  No.**
3       Q.  Did Cindy Smith ever talk about John
4   Winschief, about his looks or anything of that
5   nature?
6       **A.  No.**
7       Q.  Do you think she desired any kind of
8   relationship with him?
9       **A.  No.**
10      Q.  You mentioned, or at least I wrote down
11  from your direct testimony, that Cindy Smith asked
12  to be cross-trained several times.  Tell me about
13  that.  When did you overhear her, other than the
14  break the nail comment, when did you hear her asked
15  to be cross-trained?
16      **A.  She told me she has asked John to learn**
17  **some different machines.**
18      Q.  Okay.  Did you personally --
19      **A.  I guess cross-trained if you want to call**
20  **it.**
21      Q.  Did you personally ever hear that, aside
22  from the break a nail incident?
23      **A.  No.**
24      Q.  Okay.  Did Cindy indicate which machines

she had asked John to be trained on?
**A. I can't recall which ones. I know the big saw.**
Q. Is the big saw different from the chop saw?
**A. Yeah.**
Q. Okay. I don't know. How many kinds of saws were there in the door plant?
**A. Several.**
Q. Okay. So she reported to you that she wanted to be trained on the big saw --
**A. Uh-huh.**
Q. -- and that she had told that to John?
**A. Yeah, that was the over the fingernail comment.**
Q. Oh, that was the new machine was the big saw?
**A. Yeah.**
Q. How about any other times separate from that, did she tell you that she had asked to be trained on any other machines?
**A. Yeah, she told me she had asked, but I'm not sure which ones.**
Q. Okay.

**A. But I think it was the small chop saws. It was to probably get away from the putting wood in the cart, material handling.**
Q. Did she ever bid on a machine operator position?
**A. I have no idea.**
Q. So other than the chop saws, small chop saw, did she ever indicate what other machines she asked to be cross-trained on?
**A. I can't remember.**
Q. Okay. Did she indicate to you how many times she asked Winschief to be trained on the machine other than the nail incident?
**A. No, not a certain amount that I can recall, no.**
Q. Okay. Did you have any impression about whether this was an isolated thing or a frequent thing?
**A. No, I don't know.**
Q. Okay. Did she tell you what John's response was?
**A. To when she asked?**
Q. Yeah, yeah.
**A. I don't know. She never said anything.**

Q. Okay. Did she ever tell you she thought she wasn't getting to learn how to use those saws because she's a woman?
**A. I want to say yes, but I can't think of a specific time that she said that so I'm not sure.**
Q. Okay. You also indicated that other people after Cindy Smith were cross-trained and you said it was men. What did you mean by that?
**A. They were, they are cross-training. They have cross-trained several people and on those saws and things.**
Q. Okay. Can you tell me who?
**A. Who they are?**
Q. Yes.
**A. Earl Smith, Dustin Hall, Alan Brickey, Paul Harrington. That's all I can think of right now. There is more though.**
Q. Okay. Any women?
**A. Not that I can recall.**
Q. Okay. Think of any women ever being trained on machines?
**A. Mary. She was there whenever I started and it was a big machine. It was a sander.**
Q. Okay. That was a timesaver that she was

on?
**A. Timesaver.**
Q. Okay. What were the job classifications of these four men who were trained on machines?
**A. Oh, which ones?**
Q. Oh, Earl Smith.
**A. He was material handler I think.**
Q. Okay. Dustin Hall?
**A. Material handler.**
Q. Alan Brickey?
**A. Material handler I do believe.**
Q. And Paul Harrison.
**A. Now, he might have been a machine operator, but I'm not sure what he hired in at.**
Q. Okay. Do you know of any other women who wanted to be trained on machines in door plant?
**A. No, not that I can think of.**
Q. Okay. Is it your understanding that Cindy Smith was not trained on machines?
**A. As far as I know she wasn't.**
Q. Okay. Do you know why?
**A. No, I don't.**
Q. Okay. Do you have an opinion as to why?
**A. No, I don't.**

125

1    Q.  I think you indicated you thought perhaps
2  that Cindy Smith had complained to Rhonda Gatons
3  about the nail break comment.  If all the company
records show that that complaint went to Matt,
would you have any reason to disagree with that?
6        MS. de SAINT PHALLE:  I'm going to object.
7  That question assumes that the complaint about that
8  was made only once, and I think that the witness
9  has indicated it occurred on more than one
0  occasion.
1  BY MS. CREVELING:
2    Q.  Is it your understanding that Cindy Smith
3  complained to Rhonda Gatons about the nail breaking
4  incident?
5    **A.  I think the incident about the poking in**
6  **the chest was at Rhonda Gatons.**
7    Q.  Okay.  Do you think there were any other
8  complaints that Cindy Smith made to Rhonda Gatons?
9    **A.  I don't know.**
0    Q.  Okay.
1    **A.  I'm, you know, she may have gone up there**
2  **and talked to her.  I don't know.**
3    Q.  Okay.  Do you recall when Rhonda left?
4    **A.  No, I don't.**

126

1    Q.  Okay.  Was there a period when Jerry Ray
2  filled in as HR manager?
3    **A.  Jerry Ray used to be HR manager.**
4    Q.  And then he was safety for awhile?
5    **A.  Then he was safety.**
6    Q.  And then did he go back to HR for awhile?
7    **A.  I don't know.**
8    Q.  Rhonda was HR for awhile?
9    **A.  I think Rhonda was HR.**
10   Q.  You remember a guy named Kord Kozma at
11 some point after Rhonda?
12   **A.  Yeah, I remember the same, yeah.  He**
13 **wasn't there very long either.**
14   Q.  So tell me about this poking incident.
15 I've heard it described both as Cindy Smith being
16 pushed in the chest and Cindy Smith being poked in
17 the chest.  Tell me what you observed?
18   **A.  I didn't observe that.**
19   Q.  Okay.  Tell me how you know of this
20 incident?
    **A.  I was told of it.**
    Q.  By whom?
23   **A.  I think Cindy.**
24   Q.  Do you know of anyone who witnessed that

127

1  incident?
2    **A.  Not to my knowledge.**
3    Q.  Do you know when this incident occurred?
4    **A.  No.**
5    Q.  This is the incident that you believe was
6  reported to Rhonda Gatons?
7    **A.  Yeah.**
8    Q.  What did Cindy tell you about this
9  particular incident?
10   **A.  She told me that Alan was upset because**
11 **some rails or styles got mixed up and he was**
12 **blaming it on her and he started poking her in the**
13 **chest.  I thought she said poking.**
14   Q.  Like with a pointed finger type poking?
15   **A.  Yeah.**
16   Q.  Index finger.  Okay.
17   **A.  And --**
18   Q.  Did she show you any bruising from that?
19   **A.  No.**
20   Q.  Did she show you any marks at all from
21 that?
22   **A.  No.**
23   Q.  Did she complain that it left any marks?
24   **A.  I don't recall that.**

128

1    Q.  Okay.  And --
2    **A.  But I do think she went to Dave Pantier.**
3    Q.  Okay.  Why do you think she went to Dave
4  Pantier?  What's that information based on?
5    **A.  She said she went to Dave Pantier.**
6    Q.  Okay.  So she went to Dave Pantier and she
7  also went to Rhonda?
8    **A.  Yeah, but I don't know which order.**
9    Q.  Okay.  What's your understanding of the
10 resolution of that complaint?
11   **A.  The resolution?**
12   Q.  Yes.
13   **A.  Cindy told me she wanted to call the**
14 **police and Dave told her that nobody was going to**
15 **call the police because he would handle it and**
16 **that's all I know about it.**
17   Q.  Did he handle it?  Did Cindy Smith ever
18 complain that it happened again?
19   **A.  I don't think it happened again.  I didn't**
20 **hear her complain.**
21   Q.  Okay.  Did she say what Rhonda Gatons'
22 response to the complaint had been?
23   **A.  No, I don't think so.**
24   Q.  Okay.  Did you ever talk to Dave Pantier

129

1 about her complaint?
2 **A. No.**
3 **Q.** Okay. Did you ever talk to Rhonda Gatons
about her complaint?
5 **A. I went to the -- I walked with her to the**
6 **human resources office because she was concerned**
7 **about -- she was so upset, I think she went home**
8 **four hours early or something that it would go**
9 **against her absentee sim or attendance.**
10 **Q.** Okay. So she was allowed to go home, but
11 it was going to count against her?
12 **A. Yeah.**
13 **Q.** So she wasn't counted as like a job
14 abandonment walking out type situation.
15 Did Cindy Smith call the police once
16 she got home?
17 **A. I have no idea. I don't know.**
18 **Q.** Okay. Did you ever talk to Alan Brickey
19 about the incident?
20 **A. No.**
21 **Q.** Do you know whether there were any
22 witnesses to the incident?
23 **A. No.**
24 **Q.** Okay. John Winschief doesn't seem to play

130

1 a role in this one. Do you know, did John figure
2 into this particular complaint?
3 **A. I have no idea.**
4 **Q.** Okay. I think you next were asked about
5 Dorothy Jolley, and you indicated that you believe
6 Dorothy Jolley feels that women are treated
7 differently than men; did I understand you to say
8 that?
9 **A. That's what -- she has said stuff like**
10 **that on the line.**
11 **Q.** Okay. Can you give me some examples of
12 what she said?
13 **A. I can't think of any right now.**
14 **Q.** Did you put much stock in Dorothy Jolley's
15 comments?
16 **A. Well, I listened to what she had to say.**
17 **I looked at her quality and did that.**
18 **Q.** I'm sorry, I missed the last part.
19 **A. And did my job.**
20 **Q.** Yeah, I understand that, but when Dorothy
21 Jolley says she feels that women are treated
22 differently than men, do you say oh, that's a
23 person I believe or what was your opinion of her
24 comments?

131

1 **A. Usually Dorothy was pretty**
2 **straight-forward I would think.**
3 MS. de SAINT PHALLE: Do you have much
4 more to go? It is almost 6 o'clock.
5 **A. I'm really having a problem here because**
6 **I'm diabetic and I'm really --**
7 MS. CREVELING: I'm more than happy to
8 take a break. Any time you want to take a break
9 just let me know.
10 THE DEPONENT: No, I'm ready to go home.
11 My husband is ready. My husband is waiting on me
12 and he's probably worried.
13 MS. CREVELING: You gave significant
14 testimony and you gave significant testimony about
15 what women complained about and I still have a few
16 pages of notes to go through. So we can reconvene
17 for another time if you prefer.
18 THE DEPONENT: No.
19 MS. CREVELING: Okay. We can take a break
20 if you'd like. I certainly don't want to --
21 THE DEPONENT: No.
22 MS. CREVELING: We can take a dinner break
23 if that would help.
24 THE DEPONENT: No.

132

1 BY MS. CREVELING:
2 **Q.** If the notes from the January of '03
3 investigation indicate that Dorothy Jolley told
4 Matt Ohrt that in her opinion John was a by the
5 book guy, do you have any reason to doubt that?
6 **A. She said what?**
7 **Q.** That John is a by the book kind of guy?
8 **A. She may have said that for -- yeah.**
9 **Q.** Okay. Did she give you any specific
10 examples of what had happened to lead her to
11 believe that women or lead her to comment that
12 women were treated differently than men?
13 **A. I never heard her state any specific**
14 **examples except for that she used to work at the**
15 **same place that he worked before and he treated**
16 **women the same way as he did then.**
17 **Q.** Okay. Do you know where it was that they
18 had worked together before?
19 **A. No, I don't.**
20 **Q.** Okay. Did you ever hear Dorothy Jolley
21 complain to anyone about women being, I'm sorry,
22 complain to anyone in management being women being
23 treated differently from men?
24 **A. I have no idea.**

133

1    Q.  Okay.  When she says that she felt women
2  were treated differently than men, who specifically
3  was -- whose conduct specifically was she
   complaining of?
   A.  I don't know.
6    Q.  Okay.  I believe you also mentioned that
7  Carol Bogen you thought had complained that women
8  were treated differently from men; did I write that
9  down correctly?
10    A.  Yeah, I think you got that right.
11    Q.  Okay.  Who did she complain about or what
12  did she complain about?
13    A.  She didn't have any help.
14    Q.  This is different from the lady who was on
15  the saw that we talked about before, right.  Okay.
16  What was Carol Bogen's job at the time she was
17  making these complaints?
18    A.  Repair, and she's still there as far as I
19  know.
20    Q.  Okay.  Did she give you any specific
21  examples of why she believes that women are treated
22  differently?
23    A.  No.
24    Q.  And when you say she's complaining about

134

1  the amount of work, can you give me any --
2    A.  No, not Carol's.  Not complaining about
3  the amount of work.  She complained about that she
4  needed help to finish her work because sometimes at
5  the end of the night everything gets piled up on
6  her because she's the last person in line before it
7  gets shipped.
8    Q.  Okay.  Were there other people who worked
9  in the repair station before or other than her?
10    A.  You mean -- there used to be two people
11  down on that end and they switched it.
12    Q.  And it became just Carol?
13    A.  It became a one person job.
14    Q.  Okay.  And was Carol the one person doing
15  it?
16    A.  At this point, yeah.
17    Q.  Okay.  What time period are we talking
18  about?
19    A.  I have no idea.
20    Q.  Okay.  And her contention was that men got
   extra help and she didn't?
   A.  I do believe that's correct.
   Q.  Okay.  What men got extra help?
   A.  The builders.

135

1    Q.  Can you give me names.
2    A.  Alan, Dustin, Paul, Dave.
3    Q.  I don't think we've talked about Dave.
4  What's Dave's last name?
5    A.  Grovier.
6    Q.  And so who was it that wasn't giving her
7  the extra help?
8    A.  Well, the only person that give her extra
9  help is the team leader.
10    Q.  Winschief?
11    A.  Uh-huh.
12    Q.  Okay.  Can you cite an occasion for me or
13  give me an example where there were people
14  available to help and when John Winschief refused
15  to assign them to her?
16    A.  No, I can't cite that.
17    Q.  When you say the complaint was that men
18  got extra help, give me an example of those
19  incidents and how often that occurred?
20    A.  It happens all the time.  If the builders
21  are behind they always get help.
22    Q.  Why?
23    A.  Because they won't get the product out.
24    Q.  Okay.  Is Billie Fusten a woman?

136

1    A.  Yep.
2    Q.  And you said Billie bid on a job that was
3  then taken down?
4    A.  She bid on a job and for some reason she
5  didn't get it.  She was eligible for it, but she
6  didn't get it.
7    Q.  When you say eligible, what does that
8  mean?
9    A.  That means she hadn't had an absenteeism
10  problem or hadn't been in trouble or whatever.
11    Q.  Okay.  So the fact that she was eligible
12  doesn't mean that she was the person with the most
13  seniority who would therefore get the job?
14    A.  Right.  She had been there 25 years.
15  There's not many people biding on --
16    Q.  Okay.  And what's your understanding of
17  what happened with this job?
18    A.  I'm not sure everything.  I just know she
19  said that she didn't get the job.
20    Q.  And this is what Billie told you?
21    A.  Yeah.
22    Q.  Okay.  And Billie felt that she didn't get
23  the job because she was a woman?
24    A.  Yeah, I think that's how she felt about

137

1    it.

2       Q.   Who did get the job?

3       A.   **Well, I'm not really sure.**

        Q.   Did I ask you do you know what job it was?

        A.   **Yeah, I know which job it was.**

6       Q.   What job was it?

7       A.   **It was putting on the, oh, the outside of**

8    **the doors.  I can't think of what it is.  Putting**

    **on the style of the doors, run them through the**

0    **machine.**

1       Q.   Was this a door plant job?

2       A.   **Yeah.**

3       Q.   Okay.

4       A.   **Vernon Schrock is there now, but I can't**

5    **think.  There was somebody else that I can't think**

6    **about it.**

7       Q.   Okay.  So was it that the bid was taken

8    down or was it that she just didn't -- she wasn't

9    awarded the job?

0       A.   **The bid wasn't taken down.  The bid was**

1    **there.  Her name got up there, but she did not get**

2    **the job.**

3       Q.   Okay.

4       A.   **And I'm not sure the whole situation.**

138

1    **Somebody would have to ask Billie about that.**

2       Q.   Okay.  You then said that you heard that

    J.D. Wilder was shoved by John Bonatrigger?

4       A.   **Yeah.**

5       Q.   Okay.  J.D. Wilder a door plant employee?

6       A.   **No, she's an auditor.**

7       Q.   Was John Bonatrigger a door plant employee

    when this happened?

9       A.   **It's Jeff.**

0       Q.   I'm sorry, Jeff.

1       A.   **He was -- I think at that time he was like**

    Dave Pantier only on day shift I think.  Day shift

3    supervisor or whatever.  I'm not sure.

4       Q.   Superintendent or something.  Was this an

5    incident that happened on first shift?

6       A.   **No, I think it happened on second shift.**

7       Q.   Okay.  Did you see it?

8       A.   **No.**

9       Q.   Is J.D. a man or a woman?

0       A.   **A woman.**

        Q.   Did J.D. tell you about this?

2       A.   **Yeah.**

3       Q.   She told you she reported it to Greg

4    Finley?

139

1       A.   **Yes.**

2       Q.   And to HR?

3       A.   **Yes.**

4       Q.   Finley would have been her supervisor same

5    as yours?

6       A.   **Uh-huh.**

7       Q.   Okay.  Did she tell you what the

8    resolution was?

9       A.   **Jeff Bonatrigger was supposed to give her**

10   **an apology.**

11      Q.   Do you know who in HR that she complained

12   to?

13      A.   **No, I don't.**

14      Q.   Do you know when this occurred?

15      A.   **No, I don't.**

16      Q.   What happened between these two that had

17   escalated into some kind of shove, if that in fact

18   happened?

19      A.   **To my knowledge Jeff Bonatrigger asked her**

20   **to go to a different section or move from the area**

21   **she was at or to help them work, do something**

22   **different than she was, and we had been told that**

23   **we have to do what we're told by upper management,**

24   **but we just have to let Greg Finley know what's**

140

1    **going on.**

2                **And she went over to use -- she said I**

3    **would be glad to do that, I'm going over to use the**

4    **phone to call Greg and tell him what's going on and**

5    **I'll be glad to do it, and when she went to the**

6    **phone he got, I think she said upset, and shoved**

7    **her and said I told you you didn't have to do that,**

8    **and that's my understanding of it.**

9       Q.   Okay.  Was it your understanding that that

10   happened because he was mad about the situation, he

11   was angry about her using the phone apparently?

12      A.   **I think he was angry because he didn't --**

13   **he just wanted her to go and do what he told her to**

14   **do.  He didn't want her to stop and make the phone**

15   **call to Greg.**

16      Q.   Okay.  Did this have anything to do with

17   J.D. Wilder being a woman and Jeff Bonatrigger

18   being a man?

19      A.   **I have no idea.**

20      Q.   Okay.  Did Cindy Smith report to you that

21   she had made any complaints to Matt Ohrt?

22      A.   **About?**

23      Q.   Anything.

24      A.   **I think she told me she had talked to**

141

1 **Matt.**

2    **Q.**  Okay.  She didn't indicate what it was

3 about?

   **A.  Not really.**

   **Q.**  Okay.  Did she indicate whether she was

6 satisfied with Matt's response to whatever it was

7 she talked to him about?

8    **A.  No, I don't know.**

9    **Q.**  Okay.  You made I think a comment when we

10 were talking about the investigation materials and

11 you were asked to review the statement that's in

12 here as having come from you to Matt Ohrt and you

13 made a comment that John Winschief chose men over

14 women to do a job; did I understand that correctly?

15 Do you believe that John Winschief chose men over

16 women to do jobs?

17    **A.  To do -- to do what?  I don't know what**

18 **you're talking about.**

19       MS. de SAINT PHALLE:  I think we need to

20 take a break at this point in time.  I think

21 everybody needs a break.  I mean this is

22 ridiculous.  We've been going since 9:30 this

23 morning.

24       MS. CREVELING:  Yes, we have.

142

1       (Whereupon there was an off the

2         record discussion.)

3       (Deposition continued.)

143

1 STATE OF ILLINOIS  )

2             )

3 COUNTY OF SANGAMON )

4       C E R T I F I C A T E

5    I, MOLLY A. HOBBIE, a Certified Shorthand

6 Reporter and Notary Public, in and for said County

7 and State, do hereby certify that the Deponent

8 herein, CHERYL DOSS, prior to the taking of the

9 foregoing deposition, and on November 18, 2005 was

10 by me duly sworn to testify to the truth, the whole

11 truth and nothing but the truth in the cause

12 aforesaid; that the said deposition was taken down

13 by me in shorthand and afterwards transcribed, and

14 that the attached transcript contains a true and

15 accurate translation of my shorthand notes referred

16 to.

17    Given under my hand and seal this 9th day

18 of December, A.D., 2005.

19       

20       Certified Shorthand Reporter

21       and Notary Public

22       CSR # 084-003897

23

24 My commission expires April 14, 2006.

OFFICIAL SEAL
Molly A. Hobbie
Notary Public, State of Illinois
My Commission Exp. 04/14/2006