E-FILED
Wednesday, 22 March, 2006  03:31:10 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT C

---

**Page 1**

```
                IN THE UNITED STATES DISTRICT COURT

                FOR THE CENTRAL DISTRICT OF ILLINOIS

                         URBANA DIVISION

CINDY SMITH,              )
                          )
          Plaintiff,      )
                          )
     vs.                  )   Case No. 04-2215
                          )
MASTERBRANDS CABINETS,    )
INC.,                     )
                          )
          Defendant.      )


          Discovery deposition of JOHN WINSCHIEF, taken

     at the instance of the Plaintiff, on November 18,

     2005 scheduled for the hour of 9:30 A.M., at 1201

     Tuscola Blvd., Tuscola, Illinois, before Molly A.

     Hobbie, Certified Shorthand Reporter and Notary

     Public, pursuant to the attached stipulation.




                  GOLEMBECK REPORTING SERVICE
                   Connie S. Golembeck, Owner
                        (217) 523-8244
                        (217) 632-8244
```

---

**Page 3**

APPEARANCES:

MS. ALEXANDRA de SAINT PHALLE
Londrigan, Potter & Randle
Attorneys at Law
1227 South Seventh Street
Springfield, Illinois 62703

          Appeared on behalf of Plaintiff,


MS. KELLEY BERTOUX CREVELING
Baker & Daniels
Attorneys at Law
300 N. Meridian Street, Suite 2700
Indianapolis, Indiana 46204

          Appeared on behalf of Defendant.


ALSO PRESENT:
Mr. Matthew Ohrt
Ms. Cindy Smith

---

**Page 2**

### S T I P U L A T I O N

It is stipulated and agreed, by and between the parties hereto, through their attorneys, that the deposition of JOHN WINSCHIEF, may be taken before Molly A. Hobbie, a Certified Shorthand Reporter, upon oral interrogatories, on November 18, 2005 at the instance of the Plaintiff, scheduled for the hour of 9:30 A.M., at 1201 Tuscola Blvd., Tuscola, Illinois.

That the oral interrogatories and the answers of the witness may be taken down in shorthand by the Reporter and afterwards transcribed.

That any requirement as to the reading over and signing of the deposition by the witness or the filing of the same are not expressly waived.

That all objections are hereby reserved except as to the form of the question which is waived unless specifically noted.

That the deposition or any part thereof may be used for any purpose for which depositions are competent, by any of the parties hereto, without foundation proof.

That any party hereto may be furnished copies of deposition at his or her own expense.

---

**Page 4**

### I N D E X

|                                              | PAGE |
| -------------------------------------------- | ---- |
| Direct Examination by Ms. de Saint Phalle    | 5    |
| Cross Examination by Ms. Creveling           | 67   |
| Redirect Exam. by Ms. de Saint Phalle        | 72   |
| Recross Examination by Ms. Creveling         | 75   |

| EXHIBITS                    | MARKED |
| --------------------------- | ------ |
| Deposition Exhibit 1        | 20     |
| Deposition Exhibit 2        | 22     |
| Deposition Exhibit 3        | 38     |
| Deposition Exhibits 4 & 5   | 56     |
| Deposition Exhibit 0749     | 75     |

(Exhibits attached.)

---

5

1           (The witness was sworn by the
2           Reporter.)
3           JOHN WINSCHIEF,
4  called as a witness herein, at the instance of the
5  Plaintiff, having been duly sworn upon his oath,
6  testified as follows:
7           DIRECT EXAMINATION
8  BY MS. de SAINT PHALLE:
9      Q.  Could you please state your full name and
10 your current address.
11     A.  **My name is John Winschief.  My address is**
12 **114 West Third in Rockton, Illinois.**
13     Q.  Could you spell your last name for the
14 Court Reporter?
15     A.  **W-I-N-S-C-H-I-E-F.**
16     Q.  What is your telephone number?
17     A.  **(217) 385-2274.**
18     Q.  Are you currently employed?
19     A.  **Uh-huh.**
20     Q.  Who is your current employer?
21     A.  **GSI Grain Systems in Paris, Illinois.**
22     Q.  How long have you worked for Grain Systems
23 in Paris, Illinois?
24     A.  **About three weeks.**

6

1      Q.  What do you do for Grain Systems,
2  Incorporated?
3      A.  **I'm a supervisor.  They call a sale**
4  **manager.**
5      Q.  What does Grain Systems, Inc. do?
6      A.  **Well, actually it's kind of what they --**
7  **we've got a parent plant that does the actual grain**
8  **bins or grain systems you'd call it, and then we**
9  **build the buckets that carry the grain up to the**
10 **top of the elevators and things like that so.**
11     Q.  How many employees do you supervise?
12     A.  **Right now probably, when they ramp back**
13 **up, I'm going to say probably in the neighborhood**
14 **of 50 maybe.  They're kind of in between a slow**
15 **season right now so they had a lay-off and then**
16 **they'll ramp back up until they get busy.**
17     Q.  Let me go back and try and sort of track
18 your employment history.
19     A.  **Uh-huh.**
20     Q.  Did you graduate from high school?
21     A.  **Yes, ma'am.**
22     Q.  When did you graduate from high school?
23     A.  **1976.**
24     Q.  After completing high school, did you

7

1  receive any further education?
2      A.  **Had -- really not until I was employed,**
3  **and then I had like supervisory training classes**
4  **and things such as that nature.**
5      Q.  After graduating from high school, did you
6  go to work then?
7      A.  **Probably within about six months, yes.**
8      Q.  Who did you work for then?
9      A.  **A company that's out of business now but**
10 **it was Midwest Grain Bodies in Paris.**
11     Q.  How long did you work for them?
12     A.  **About 12 years.**
13     Q.  What was the last job position that you
14 had with them?
15     A.  **The last one was a, I guess you'd call it**
16 **a, not a plant manager but -- well, I guess you**
17 **would call it a plant manager.  Not over the entire**
18 **plant, but over several departments.**
19     Q.  Then did you leave them because the
20 company went out of business?
21     A.  **Uh-huh.**
22         MS. CREVELING:  I'm sorry, if I could just
23 interrupt and remind you if your answer is yes or
24 no, please say yes or no as opposed to uh-huh or

8

1  huh-uh.  It makes it tough for the Court Reporter.
2      A.  **Okay.  All right.**
3      Q.  After Midwest, where did you go to work?
4      A.  **Let me stop to think.  That would have**
5  **been Arcola at the Thomas Monahan Company.**
6      Q.  How long did you work for them?
7      A.  **About the same amount of time.  I know at**
8  **least 11 years.**
9      Q.  Okay.  So that's probably taking you up to
10 mid 90s; is that correct?
11     A.  **Uh-huh.**
12     Q.  What did you do for the Thomas Monahan
13 Company?
14     A.  **Started out as a supervisor in the wood**
15 **handle division.  They made handles.  And then from**
16 **there I went to kind of the plant manager of the**
17 **metal handle division.**
18     Q.  What was your reason for leaving that
19 company?
20     A.  **Just to better myself, and that's when I**
21 **went to Masterbrands.**
22     Q.  When did you first become employed with
23 Masterbrands?
24     A.  **Probably June -- I'm thinking June of**

**11**

1    Q.  Did you acquire new duties?

2    **A.  No.  Just at my time at Masterbrands I**

3  **went from second shift to first shift.  That's why**

4  **I asked what you meant by that.**

5    Q.  Okay.  What was the reason from going from

6  second shift to first shift?

7    **A.  Got more of a life on first shift.  If**

8  **you're an evening person, you want to go to ball**

9  **games or something like that, you're able to do it.**

10    Q.  I see.  So in other words, going to first

11  shift is a bit of a perk or a promotion

12  so-to-speak?

13    **A.  Yes, yes, especially if you're a family**

14  **man.  You've got your evenings home to do whatever**

15  **you please.**

16    Q.  When did you go switch to first shift?

17    **A.  Approximately a year ago.**

18    Q.  Now, apparently you have left Masterbrands

19  three weeks ago.

20    **A.  Uh-huh.**

21    Q.  What was the reason for leaving

22  Masterbrands?  Was that voluntary on your part?

23    **A.  Yes, yes.  Shorter drive one of the**

24  **reasons.  The biggest reason is my family is in**

---

**9**

1  **2001, somewhere around there.  It may not be June,**

2  **but I'm pretty positive it was 2001.**

3    Q.  Did you get a better rate of pay at

Masterbrands than at Thomas Monahan?

5    **A.  Yes.**

6    Q.  How did you find out about the job at

7  Masterbrands?

8    **A.  I actually knew someone that had worked**

9  **there or was working there, but I seen it in the**

10  **News Gazette, Champaign paper.**

11    Q.  When did you apply for the job?

12    **A.  I don't recall.**

13    Q.  Did it take long for you to get accepted?

14    **A.  No.**

15    Q.  In June of 2001, what was the position

16  that you were hired in to?

17    **A.  It was a team leader's position.  It was a**

18  **second shift position.**

19    Q.  As team leader second shift, approximately

20  how many employees were under your supervisory

21  role?

22    **A.  I don't recall exactly.  I'm going to**

23  **guess in the neighborhood of 20, maybe 25.**

24    Q.  Who was your boss or who did you report

---

**12**

1  **poor health.  My -- not only my mother and father,**

2  **but my wife's parents, her mother.  So it just**

3  **works out better.  I can check on them in evenings**

4  **when I get off work and it just -- and the shorter**

5  **drive makes a difference too, so 15 minutes versus**

6  **an hour.**

7    Q.  Do you make the same salary?

8    **A.  Uh-huh.**

9    MS. CREVELING:  I'm sorry, is that yes?

10    **A.  Yes.**

11    Q.  So in other words you get the same rate of

12  pay now that you did at Masterbrands?

13    **A.  Yes.**

14    Q.  When you were working at Thomas Monahan,

15  were there ever any complaints against you about

16  sexual harassment claims?

17    **A.  Not to my knowledge.**

18    Q.  As a supervisor at Thomas Monahan, did you

19  have to intervene or act upon any sexual harassment

20  claims?

21    **A.  I don't recall.  It's been awhile ago.**

22    Q.  Do you know whether there were any women

23  at Thomas Monahan that made complaints about sexual

24  harassment?

---

**10**

1  to?

2    **A.  My boss would have been David Pantier.**

3    Q.  How long had Dave Pantier worked at

4  Masterbrands?

5    **A.  A long time, but I don't recall exactly.**

6    Q.  Is he still working there?

7    **A.  As far as I know.**

8    Q.  Did Dave Pantier work second shift?

9    **A.  Yes.**

10    Q.  What are the hours of the second shift?

11    **A.  3:00 to 11:30 it started out and then it**

12  **went from 3:30 to midnight I believe.**

13    Q.  Does Masterbrands have three shifts

14  working?

15    **A.  Not a true three shifts, but yes.**

16    Q.  While you were at Masterbrands, did your

17  position ever change?

18    **A.  No.**

19    Q.  What was --

20    **A.  Well, I take that -- I guess how do you**

21  **mean change?**

22    Q.  Well, by that I mean did you get any

23  promotions?

24    **A.  No, no.**

---

---

**13**

1    MS. CREVELING:  About Mr. Winschief
2  specifically or --
3    Q.  Or at that company that you were involved
in investigating or had any role in looking into or
arbitrating or dealing with?
6    A.  **Right now I don't recall just due to the**
7  **time period that, you know, I'm just not 100**
8  **percent sure.**
9    Q.  When you came to Masterbrands, do you know
10  who was the previous supervisor that held the
11  position that you were taking on?
12    A.  **I don't know the previous.  I was trained**
13  **by a first shift supervisor and that was Bill**
14  **Hinds.**
15    Q.  Do you know whether the supervisor that
16  you replaced, whether he left voluntarily or had
17  been fired?
18    A.  **I don't have a clue.**
19    Q.  As supervisor at Masterbrands, what
20  essentially were your responsibilities?
21    A.  **Just to manage the department as far as**
22  **efficiency goes and just oversee the activities of**
23  **the department, make sure we meet our goals and**
24  **things such as that nature.**

---

**14**

1    Q.  Did you actually have to work on any of
2  the machines yourself or did you just --
3    A.  **I didn't have to work on any of the**
4  **machines, but I did several times just to help the**
5  **department help us meet our goals.**
6    Q.  When was the first time that you met Cindy
7  Smith?
8    A.  **Probably you could say right when I hired**
9  **in.  I mean I met everybody in the department so.**
10    Q.  Did you know any of the employees working
11  on second shift before you started?
12    A.  **I don't think so.**
13    Q.  At the time you started at Masterbrands in
14  I think you said June of '01?
15    A.  **Uh-huh.**
16    Q.  So Cindy Smith had already been working
17  there for several months; is that correct?
18    A.  **I'm not sure.  I don't know.**
19    Q.  What was the first time that you recall
20  having any dealings with Cindy Smith, any
particular dealings?
22    A.  **Dealings as in -- I guess I don't**
23  **understand your question.**
24    Q.  In which she came to your attention as an

---

**15**

1  employee working in the department.
2    A.  **Actually when I first got there it wasn't**
3  **long after that there was a dealing with Cindy and**
4  **another employee that I had to get involved with.**
5  **The other supervisor was still there then so, but I**
6  **had to sit in on that.**
7    Q.  You're saying there was an incident with
8  another employee?
9    A.  **Uh-huh, it was --**
10    Q.  I think you need to say yes for the Court
11  Reporter.
12    A.  **Yeah.  Well, I'm not sure of your**
13  **question.**
14    Q.  Okay.  Okay.  What was the name of the
15  other employee?  Was it Dustin Hall?
16    A.  **No, no.**
17    Q.  Do you recall the name of the employee
18  that this incident involved?
19    A.  **No, I don't.  I know he ended up being**
20  **terminated, but I don't recall his name.**
21    Q.  All right.  Did it involve an employee by
22  the name of Jason Gene (phonetic)?
23    A.  **First name sounds familiar but I'm not**
24  **sure about the last name.**

---

**16**

1    Q.  Do you know what the incident concerned?
2    A.  **Let me think.  If I recall it was -- I**
3  **think he was yelling at Cindy or something to that**
4  **nature.  If I remember.  I'm not 100 percent.**
5    Q.  He was yelling at Cindy?
6    A.  **Well, I think that was Cindy's complaint,**
7  **and there again, like I say, it's been a long time.**
8  **So I know there was a complaint.**
9    Q.  Okay.  And who had Cindy made this
10  complaint to?
11    A.  **I'm not sure.  It could have been Bill**
12  **Hinds, it could have been both of us.  I really**
13  **don't recall.**
14    Q.  Did it concern a complaint that Jason Gene
15  had threatened to take Cindy out to the parking lot
16  and beat her up?
17    A.  **I'm not sure.  I don't know.**
18    Q.  There was a supervisor or was there a
19  supervisor named Kord Kozma?
20    A.  **Not a supervisor.  He was a human resource**
21  **manager at one time.**
22    Q.  Okay.  So he would not have been involved
23  on this initial incident where Cindy was
24  complaining about this fellow employee yelling at

---

1  Cindy?
2      A.  I'm not sure whether he was or not.  It
3  could have been Dave Pantier as well because there
4  is nobody -- there's no HR person on duty at night
5  so, you know, I'm not real clear on that.  I'm not
6  sure.
7      Q.  Was this employee apparently calling Cindy
8  things like fucking bitch and other four letter
9  words?
10      A.  I don't know.
11      Q.  This particular incident occurred while
12  you were still in training to become a supervisor;
13  is that correct?
14      A.  Yes, yes.  It was probably within a month
15  after I was hired or something like that I would
16  say.
17      Q.  What came of that complaint?
18      A.  I know the employee was terminated.
19      Q.  Was the employee terminated as a result of
20  that incident?
21      A.  Yes.
22      Q.  Whose decision was it to terminate that
23  employee?
24      A.  I'm not sure.  It may have been a group

1  decision.
2      Q.  Did you participate in the decision?
3      A.  I'm sure I did to some degree, but once
4  again, that's been several years ago and I don't
5  recall 100 percent on all the details.
6      Q.  What was the next time that Cindy came to
7  your attention as the supervisor?
8      A.  I don't recall.
9      Q.  Did you make any notes of this complaint
10  that Cindy had made about this employee yelling at
11  her?
12      A.  Which employee are you referring to?
13      Q.  This Jason Gene.
14      A.  No.
15      Q.  Do you know whether Dave Pantier or the
16  other supervisor made any notes?
17      A.  They could have.  If he was terminated
18  there would have had to been some documentation I
19  would think.
20      Q.  How long after this incident occurred was
21  this Jason employee fired?
22      A.  I would say it was almost immediately.  I
23  don't know if it was the same night or anything
24  like that, but I know it wasn't very long.

1      Q.  What was the reason for his termination?
2      A.  Probably behavior.
3      Q.  Was it because of behavior directed
4  towards Cindy alone?
5      A.  I would say yes.
6      Q.  Did you have occasion where there was an
7  incident with Cindy complaining about a employee by
8  the name of Dustin Hall?
9      A.  I don't recall on that.
10      Q.  What position did Dustin Hall have?
11      A.  He was a I believe a machine operator or
12  an assembler.  I'm not real sure.
13      Q.  Did he work in the same work area as Cindy
14  Smith?
15      A.  He could have.  They all work in different
16  areas at one time or another.
17      Q.  Did Dustin Hall have the same job position
18  as Cindy?
19      A.  I don't recall on that.
20      Q.  Do you recall an incident in which Dustin
21  Hall started calling Cindy names like fucking bitch
22  and other four letter words concerning about he was
23  claiming that she was putting wrong parts in tubs?
24      A.  No, I don't.

1      Q.  Do you recall an incident -- was Dustin in
2  a job position in which he was building doors?
3      A.  Yes, yes.
4      Q.  And was Cindy also building doors?
5      A.  She could have.  I'm not real sure.
6      Q.  Do you recall an incident where Cindy came
7  to you and she was crying and you said to her let's
8  go outside so we can get some fresh air by the
9  picnic table?
10      A.  No, I don't.
11      MS. de SAINT PHALLE:  Let's mark this as
12  Deposition Exhibit Number 1.
13          (Deposition Exhibit No. 1 was
14          marked for identification.)
15      Q.  Could you tell me what Deposition Exhibit
16  Number 1 is?
17      A.  This is an evaluation form.
18      Q.  Did you fill out any portions of that
19  form?
20      A.  Yes.
21      Q.  What portions of that form did you fill
22  out?
23      A.  Whatever is checked as acceptable and
24  probably the comments.

1    Q.   Okay.  There is an incident of 4.8 hours
2  of early exit; do you see that?
3    A.   Uh-huh.
4    Q.   Do you have handwriting there by that
5  4.8 hours or --
6    A.   Yes, yes.
7    Q.   What did you write there indicating by
8  that as a reason for that 4.8 hours?
9    A.   I'm not sure what that is.
10   Q.   Could you hand me the deposition exhibit.
11   A.   Yeah.
12   Q.   And general comments under attendance.
13   A.   Uh-huh.
14   Q.   Did you write in the notation Cindy
15  understands the absenteeism policy and under
16  different circumstances I don't think she would
17  have missed any time?
18   A.   Yes.
19   Q.   That's your handwriting?
20   A.   Yes.
21   Q.   Could you tell me what you meant by the
22  comment and under different circumstances I don't
23  think she would have missed any time?
24   A.   She must have missed -- she must have

1  missed some time that for whatever reason or for a
2  reason that she couldn't do anything about would be
3  my guess.
4    Q.   Does that notation of yours refresh your
5  recollection that there may have been an incident
6  with a fellow employee that was calling her names
7  and got her upset?
8    A.   It could be.  Like I say, it's been years
9  ago so I can't recall things 100 percent.  I deal
10  with a lot of employees, but it is, it's a
11  possibility.
12   Q.   If Cindy testified to that, would you have
13  any reason to dispute her testimony?
14   A.   No.
15        MS. de SAINT PHALLE:  Let's mark this as
16  Deposition Exhibit Number 2.
17            (Deposition Exhibit No. 2 was
18            marked for identification.)
19   Q.   Could you identify what Deposition Exhibit
20  Number 2 is?
21   A.   It looks like it's a 75-day evaluation.
22  It looks like before her full-time.  This first one
23  was a full-time evaluation.
24   Q.   Could I see that back.

1    A.   Uh-huh.
2    Q.   Now both of these evaluations are dated
3  August 18th of '01, are they not?
4    A.   I didn't look at that part of it.
5        MS. CREVELING:  Can you hand him the
6  exhibit so he can see.
7        MS. de SAINT PHALLE:  Sure.
8    Q.   And there are also some differences
9  between the two documents.  Could you explain to me
10  why there are differences in the notations as far
11  as acceptable or not acceptable and the like.
12   A.   A lot of times they don't get -- we don't
13  get evaluations out in the time period that they
14  should be out to evaluate an employee so there is a
15  chance that they could have been done on the same
16  day or within -- well, wait a minute.  No, one is
17  dated evaluation date is dated 8/1 and the other is
18  8/18, so that's why.
19   Q.   Well, why would the evaluations be so
20  different two weeks apart?
21   A.   Well, because people progress at different
22  rates.
23   Q.   Okay.
24   A.   Her full-time evaluation it looks like she

1  got an acceptable evaluation, which shows
2  progression.
3    Q.   Did you make the notations acceptable or
4  non-acceptable on both of those?
5    A.   Yes.
6    Q.   Okay.  So I take it from the change from
7  August 1, '01 where there were several things where
8  you marked needs improvement, by two weeks or two
9  and a half weeks later, by August 18th of '01, she
10  was indicating that she was acceptable in every
11  department?
12   A.   Yes.
13   Q.   Do you ever recall telling Cindy that you
14  would try to see that that 4.8 hours would be
15  regarded as an excused absence?
16   A.   I could have.  I'm not -- once again
17  that's something that I don't recall.
18   Q.   Did you ever speak with a human resource
19  person by the name of Rhonda Gatons about those
20  four hours?
21   A.   I don't recall.
22   Q.   Rhonda Gatons worked as a human resource
23  person; is that correct?
24   A.   When I hired in there she did, yes.

25

1    Q.   How long did she remain as human resource
2  person?
3    A.   I don't recall.
4    Q.   Did you have many dealings with her?
5    A.   No.
6    Q.   Would the human resources just work during
7  the daytime hours?
8    A.   Yes.
9    Q.   So you'd never have occasion to meet with
10 them?
11   A.   Huh-uh, no.
12   Q.   Were you aware that Cindy wanted to drive
13 a forklift truck?
14   A.   I don't recall.  I think Cindy did drive a
15 forklift truck at one time.  I'm not 100 percent
16 sure.
17   Q.   Was it your understanding that she drove a
18 forklift truck at her prior employment?
19   A.   I'm not sure.
20   Q.   Do you know whether she took the test at
21 Masterbrands to be able to drive a forklift truck?
22   A.   No, I don't.
23   Q.   Was driving a forklift truck part of the
24 job description that she had for her position?

26

1    A.   If she was a material handler yes, it
2  would be.  I don't know that it was required, but
3  it would be helpful.
4    Q.   Do you know why she was not given the
5  opportunity to drive a forklift truck?
6    A.   No, I don't.
7    Q.   Who would be responsible for making a
8  determination as to whether or not she could drive
9  a forklift truck?
10   A.   It would be my determination, especially
11 if it was part of her job description, to see that
12 she get a forklift license.
13   Q.   Do you know whether she took the written
14 test?
15   A.   No, I don't know.
16   Q.   If she took the written test, should there
17 be records of that at Masterbrands?
18   A.   If she took the written test and passed
19 there should be, yes, because that's how you get a
20 license.  There is a written and a driven test.
21   Q.   Do you know whether she was permitted to
22 take the driven test, the driving test?
23   A.   I don't know why she wouldn't have been.
24   Q.   Was there a woman by the name of Becky who

27

1  also wanted to drive a forklift truck?
2    A.   There was a Becky Hardwick that worked for
3  me.
4    Q.   Did Becky Hardwick apply to take the
5  written and driving test to drive a forklift truck?
6    A.   I don't think she did.
7    Q.   Do you know whether Cindy acquired a
8  temporary license to drive a forklift truck?
9    A.   I don't recall 100 percent.  I'm thinking
10 Cindy did drive a forklift truck at times, but I'm
11 not 100 percent.  It's been too many years ago.
12   Q.   Prior to this deposition did you review
13 any documents?
14   A.   No.
15   Q.   Are you appearing voluntarily at the
16 request of Masterbrands for this deposition?
17   A.   I'm appearing because I was asked.
18   Q.   By Masterbrands?
19   A.   Yes.
20   Q.   Are you being paid at all for your time
21 appearing today?
22   A.   Not that I'm aware of.
23   Q.   Are you taking time off from work?
24   A.   Yes, I'm taking time off from work.

28

1    Q.   You're not being compensated for that
2  time?
3    A.   No.
4    Q.   How much notice did you give to
5  Masterbrands that you were leaving their
6  employment?
7    A.   Two weeks.
8    Q.   When did Masterbrands approach you about
9  appearing for this deposition?
10   A.   I'm not sure about this deposition.
11 Probably within the last few weeks.  I did receive
12 mail of another disposition (sic) or a work comp
13 hearing but.
14   Q.   Work comp hearing regarding Cindy Smith?
15   A.   Yes.  Actually it was a subpoena is what
16 it is.
17   Q.   Do you recall Cindy Smith making
18 complaints to you about the behavior of other male
19 employees at Masterbrands?
20   A.   No, I don't.
21   Q.   Was there -- do you recall Cindy Smith
22 ever making a complaint to you about an employee by
23 the name of Alan Brickey?
24      MS. CREVELING:  B-R-I-C-K-E-Y.

29

1    A.   I can only remember one incident of that
2 name and I don't remember if it was Alan Brickey or
3 another associate.
4    Q.   What do you recall about this particular
5 incident?
6    A.   The only thing I can remember is, if I'm
7 thinking of the right incident or this incident, of
8 a chair being thrown or something about a chair
9 being thrown at Cindy or in the neighborhood of
10 Cindy or something to that nature.
11    Q.   Did Cindy complain to you that a chair had
12 been thrown?
13    A.   Well, she must have or I wouldn't have
14 remembered it so.
15    Q.   What did you do about that incident?
16    A.   I don't recall.  I believe I addressed it,
17 but I don't, you know, once again I'm not 100
18 percent.
19    Q.   Did you talk to the particular employee
20 involved?
21    A.   I think I did, and this is one where you
22 tell them behavior like that is unacceptable and it
23 better not happen again or there would be
24 disciplinary action.

30

1    Q.   Did you write-up this particular employee
2 for the incident?
3    A.   I don't think so.  If I did there would
4 probably be record of it.
5    Q.   Was there ever complaints by Cindy that
6 she had been shoved by an employee Alan Brickey or
7 another male employee?
8    A.   Not that I recall.
9    Q.   Were you ever aware of complaints by Cindy
10 Smith that she had been patted in the butt or hit
11 with a wooden plank on the butt by another male
12 employee?
13    A.   Not to my knowledge.
14    Q.   Were there other women under your
15 supervision that complained about male employees
16 calling them four letter words, fucking bitch,
17 cunts, other assorted language like that?
18    A.   No, because as a manager that's part of my
19 job to see that that doesn't happen, or if it does
20 happen to address it so that it doesn't happen
21 again because that's something I don't tolerate.
22    Q.   Were you aware of that happening on the
23 floor?
24    A.   No.

31

1    Q.   Are you saying that the male employees
2 never called the women fucking bitches and similar
3 type language?
4    A.   I'm saying that I don't recall.
5    Q.   How large was the area that you had
6 supervisory responsibility over?
7    A.   Oh, probably three or four times the size
8 of this room I would say.
9    Q.   How many employees worked in that area?
10    A.   At that time probably 20 to 25, somewhere
11 in that neighborhood.
12    Q.   Was the area all open so that you could
13 see all the employees working at a time?
14    A.   It was open, but there were areas that
15 where there were racks and things like that that
16 you couldn't actually see what was going on in
17 every area, no.
18    Q.   Did you also have like a separate little
19 office that was closed off from the main floor
20 where the employees were working?
21    A.   No, no.  I didn't have an office, I just
22 had a desk and it was out on the main floor
23 basically.
24    Q.   And so apparently would you always be

32

1 aware of what was going on on the floor?
2    A.   I tried to be because that's my job to be
3 aware, but there is times that I'm not out.  There
4 is times that I have to go to a meeting or, you
5 know, something of that nature, so no, I'm not out
6 there 100 percent.
7    Q.   Did you observe instances where, for
8 example, you'd have to go out to a meeting and then
9 you'd come back and find employees acting up or --
10    A.   Not usually.
11    Q.   It wasn't like teacher leaves the room?
12    A.   No, no.  I'd like to think that I run a
13 good department and I feel that way.
14    Q.   Was there a time when you were getting new
15 machinery in the plant?
16    A.   We got new machinery occasionally, yes.
17    Q.   Was there -- do you recall a specific time
18 when there was going to be a major shipment of new
19 machinery coming in?
20    A.   No, they completely redone the area that
21 we were in, but I don't know, there was no specific
22 time period.  But it did happen.  We did have
23 machinery.
24    Q.   When the new machinery came in, were the

33

1  employees going to get new job duties?
2     **A.   If they were on a machine that was going**
3  **to be -- if they were going to get a new machine,**
4  **yes, but they had to be in that job classification**
5  **to be able to run them or could bid on them.**
6     Q.   Did Cindy's job as a material handler,
7  would she have been eligible to work on a new
8  machine?
9     **A.   No.**
10    Q.   When the new machines were coming in, was
11 there a discussion in the plant about which
12 employees would be able to get to work on the
13 machines?
14    **A.   No.  The only way the employees get to**
15 **work on the machines is if they bid on a job or**
16 **they're already in that job position.**
17    Q.   Do you recall having a general discussion
18 with Cindy Smith and Cheryl Doss about what was
19 going to happen when the new machines came in?
20    **A.   We talk about a lot of things.**
21    Q.   What position did Cheryl Doss have?
22    **A.   She was an inspector I believe, quality**
23 **inspector.**
24    Q.   Was she under your supervisory control?

34

1     **A.   No, she would be under quality.**
2     Q.   Did she work on the floor though?
3     **A.   Yes, yes.**
4     Q.   Who would have been her supervisor?
5     **A.   It would have been a Greg Finley would**
6  **have been his name.**
7     Q.   Did Greg Finley work second shift?
8     **A.   No, no.**
9     Q.   In terms of the employee hierarchy
10 so-to-speak, where did Cheryl Doss's position fit
11 vis-a-vis your position?
12    **A.   She would just see that the goods or the**
13 **doors that we were putting out met quality**
14 **specifications.**
15    Q.   If she had been late to work or something
16 like that --
17    **A.   Uh-huh.**
18    Q.   -- would it have been your responsibility
19 to write her up or do anything like that?
20    **A.   No, no.**
21    Q.   But, for example, Cindy Smith or any other
22 employee, any other material handler or the machine
23 workers, you did write those people up if they were
24 late to work or something like that?

35

1     **A.   No, they've got to miss a period of time**
2  **before they're written up.**
3     Q.   I see.
4     **A.   Yeah.**
5     Q.   Just so I understand, you could, I mean
6  obviously if the circumstances warranted,
7  discipline a material handler or a machine worker,
8  right?
9     **A.   Right, right.**
10    Q.   But so I understand the hierarchy, if
11 Cheryl Doss had been doing something wrong or
12 something or other, is it true that you could not
13 write-up Cheryl Doss?
14    **A.   No, she would have to be written up by her**
15 **superior.**
16    Q.   Okay.  Do you know whether or not Cheryl
17 Doss and Cindy Smith were friends?
18    **A.   Yes.**
19    Q.   They were friends?
20    **A.   Yes, as far as I know.  I mean I don't**
21 **know what your description of friends is, but they**
22 **knew each other.**
23    Q.   Do you recall having a general
24 conversation with Cheryl Doss and Cindy Smith about

36

1  what was going to happen when the new machines came
2  in?
3     **A.   No, I don't recall.**
4     Q.   Do you recall whether there was a decision
5  that would have to be made as to who would work on
6  the new machines?
7     **A.   No.  There again, that's not my decision**
8  **as to who works on the machines.  I mean that's**
9  **something that's set in place.  It's either a**
10 **machine operator or the person has the right to bid**
11 **on a machine to be able to do that.  So it's not**
12 **really my decision.**
13    Q.   Were all the machine operators going to be
14 eligible to work on the new machines?
15    **A.   Yeah, if they were here, that would be**
16 **their job.  I mean if their machine was taken out**
17 **and a new one put in its place they would be**
18 **required to run it.**
19    Q.   Who were the machine operators on the old
20 machines?
21    **A.   We had several operators.  I can't recall**
22 **all their names.**
23    Q.   Do you recall if there were any women
24 machine operators?

1    A.  Well, at that time -- we had women machine
2  operators at one time, but I don't recall at what
3  point.
4    Q.  Did Dustin Hall or Alan Brickey ever run
machines?
6    A.  I think before I left Dustin Hall ran a
7  machine and Alan Brickey may have.  I can't recall.
8    Q.  Were Dustin Hall and Alan Brickey both
9  material handlers?
10   A.  I think they were both material handlers
11  at one time and then Dustin become a machine
12  operator at one point, but I'm, you know, there
13  again I'm not sure when.
14   Q.  Did either Dustin or Alan Brickey work as
15  machine operators while Cindy was still employed?
16   A.  I don't recall.
17   Q.  In order for them to work on a machine,
18  did they have to bid on the job?
19   A.  Did they have to bid on the job?  If they
20  wanted to run the machine permanently, yes, they
21  would have to bid on the job.
22   Q.  As far as in order to work on a machine
23  temporarily, did they have to bid on the job?
24   A.  The only way that I would use somebody

1  temporarily was if they had training or
2  knowledgeable of the machinery and in an emergency
3  situation.  If they knew how to run it then I might
4  use somebody on a machine, yes.
5    Q.  Were all the employees, for example in
6  Cindy's job position as a materials handler,
7  supposed to be cross-trained?
8    A.  Cross-trained to some degree.  It's always
9  valuable to the department.
10   Q.  Did you ever cross-train Cindy on any of
11  the machines?
12   A.  I don't think so.  I don't think she ever
13  expressed interest in wanting to run machines or I
14  probably would have considered it.
15       MS. de SAINT PHALLE:  Let's mark this as
16  Deposition Exhibit 3.  I think it's a two-page
17  exhibit.
18           (Deposition Exhibit No. 3 was
19           marked for identification.)
20  BY MS. de SAINT PHALLE:
     Q.  Could you tell me what that document is?
22           (Whereupon there was a brief
23           pause in the proceedings.)
24   A.  It looks like it's a self assessment and a

1  leader assessment.  I don't know if this is an
2  evaluation or just a -- but it looks like something
3  that I've got feedback on or that I have filled
4  out.
5    Q.  Is it something -- is it an evaluation
6  that you filled out?
7    A.  Well, I don't know that it's an actual
8  employee evaluation because they've changed.  This
9  may have been the original evaluations before they
10  changed.  That's what I'm not sure of.
11   Q.  Well, what does --
12   A.  But it's definitely different between that
13  there so.
14   Q.  What's the date that Exhibit 3 comprises?
15   A.  This looks like it says '01 to '02, so it
16  would have been the first year that I was there
17  basically.
18   Q.  But that Exhibit 3 is a later evaluation
19  than Exhibit 1 and 2; is it not?
20   A.  Yeah, these are -- okay.  I see what it
21  is.  These looks like from where an employee
22  becomes full-time so this would be a yearly
23  evaluation.  These are kind of probationary
24  evaluations.  That's what it is.

1    Q.  Okay.  So in other words, what you're
2  saying is Exhibit 3 is a yearly evaluation?
3    A.  Yes, that's what it appears to be, yes.
4    Q.  And did you complete all those
5  evaluations, did you make all the markings in terms
6  of what her performance was?
7    A.  Yes.
8    Q.  Did you indicate at the time that she was
9  a satisfactory employee?
10   A.  Yes, Cindy was.
11   Q.  On Exhibit 3, do you have any reference
12  there as to whether or not Cindy could be or was
13  cross-trained?
14   A.  I've got her down as improvement or
15  developmental opportunities as a raised panel
16  aisle, flat panel aisle and a costa machine.
17   Q.  Does that indicate that she wanted to be
18  cross-trained?
19   A.  No, that's just saying that that's an
20  opportunity for her.  It's not necessarily saying
21  that she wants to.  It's saying that that's an
22  opportunity for her that I see that she could be
23  more valuable at if she were to learn that.
24   Q.  Do you know why she did not get that

41

1   opportunity to be cross-trained?
2       MS. CREVELING:  Objection.  Assumes facts
3   not in evidence.  You can answer.
4       A.  Oh, okay.  A lot of it's based on whether
5   you've got -- a lot of times you don't have the
6   people there to do what you want to do and you just
7   don't get to move people around like you want to.
8   You know, it's just hard.  I can't really give you
9   a, you know, a good answer as to why she wasn't or
10  why she wasn't so just I don't recall.
11      Q.  Do you, going back to the time when there
12  was the new machinery, do you ever recall having a
13  conversation with Cheryl Doss and Cindy being
14  present in which you stated something to the effect
15  that you did not think that women could operate the
16  new machinery because the new machinery was very
17  expensive?
18      A.  No, if someone is properly trained it
19  shouldn't matter whether it was expensive machinery
20  or not.
21      Q.  Did you ever express the point of view
22  that women should not operate the new machinery?
23      A.  No.  I've had women that operated
24  machinery before so.

42

1       Q.  Did you ever express to Cindy that she
2   shouldn't work on the new machinery because she
3   would break a fingernail?
4       A.  No.  I kid people from time to time
5   because I like to have a relationship where people
6   feel comfortable coming to me so, and you've got to
7   be able to joke around such as that.  So I could
8   have said that.
9           But once again, if Cindy would have
10  wanted to bid on something, she could have had the
11  right to bid on something.  It's not my decision on
12  whether she gets to run a machine or not.
13      Q.  You say that it wasn't your decision as to
14  whether or not she gets to run a machine?
15      A.  Right.
16      Q.  Why?
17      A.  Because if she bids on a machine, I can't
18  stop her from running a machine.  That's her
19  responsibility or the company's responsibility to
20  see that she gets to run the machine if she puts a
21  bid in to where she's a machine operator.
22      Q.  This plant was not union, correct?
23      A.  Right.
24      Q.  But there was a quote biding process?

43

1       A.  Right.
2       Q.  How did that biding process operate?
3       A.  If you were there after a certain time
4   period you had the opportunity to advance yourself
5   or to make more money.
6       Q.  And that was by the process of biding?
7       A.  Right.
8       Q.  Was the biding determined solely on the
9   basis of seniority?
10      A.  Yeah, I would say for the most part
11  seniority, and there had to be an opening, I mean.
12      Q.  Do you recall whether there was an
13  incident in which Cindy went to the human resource
14  manager Matt Ohrt regarding a comment that you
15  allegedly made about breaking a nail and not being
16  able to work on the new machinery?
17      A.  Not that I recall.
18      Q.  Do you recall whether Matt Ohrt ever made
19  any type of investigation of a complaint of sexual
20  discrimination or harassment by Cindy?
21      A.  I had talked to Matt before.  There once
22  again it's been a couple years so there is a
23  possibility, yes.
24      Q.  What did you talk to Matt Ohrt concerning

44

1   Cindy?
2       A.  I don't recall.
3       Q.  Did you ever attend a meeting at which
4   Matt Ohrt was present and John, you were present,
5   and Dave Pantier and Cheryl Doss and Cindy Smith?
6       A.  Yes, yes.
7       Q.  Could you tell me, first of all, what was
8   the purpose of that meeting?
9       A.  I don't know the exact details, but I
10  remember the meeting.  It's been too many years
11  ago, but I remember the meeting, yes.
12      Q.  Could you tell me what happened during
13  that meeting?
14      A.  I don't know if it was this incident that
15  was discussed or what.  I really don't recall.
16      Q.  Well, Matt Ohrt was present?
17      A.  Yes.
18      Q.  Do you recall anything that Matt Ohrt said
19  during that meeting?
20      A.  No.
21      Q.  Do you recall anything that Dave Pantier
22  said during that meeting?
23      A.  No, I don't.
24      Q.  Do you recall anything that Cindy Smith

45

1 said during that meeting?
2 **A. No, I don't. I remember the meeting, but**
3 **I don't recall anything.**
4 Q. You say you remember the meeting.
5 **A. I remember having a meeting, yes.**
6 Q. Well, what do you recall happening about
7 that meeting?
8 **A. I don't remember. It's been too many**
9 **years ago. I remember having the meeting.**
10 Q. Do you recall anything that transpired
11 during that meeting?
12 **A. No.**
13 Q. Do you recall that Matt Ohrt said things
14 that like Cindy preferred married men?
15 **A. I don't recall Matt saying that.**
16 Q. Do you ever recall hearing that comment at
17 any time or any place while you were working at
18 Masterbrands?
19 **A. Yes.**
20 Q. What was the context in which you heard
21 that comment?
22 **A. What do you mean by context?**
23 Q. Well, when did you first hear that
24 comment?

46

1 **A. I don't recall. I've heard it throughout**
2 **the department when I was working there.**
3 Q. Who did you hear it from?
4 **A. I don't recall.**
5 Q. Did you hear it from male employees?
6 **A. No. It was just employees in general and**
7 **not necessarily in my department. It could have**
8 **been other departments too.**
9 Q. Do you know what that was referring to?
10 **A. Well, it was pretty much self-explanatory.**
11 Q. Did you ever have any discussions with
12 Cindy about that?
13 **A. No, not that I recall.**
14 Q. Are you aware of any instances where Cindy
15 was propositioning men who worked in your
16 department?
17 **A. Yes.**
18 Q. What specifics are you aware of there?
19 **A. Cindy propositioned me.**
20 Q. What specifically do you mean by she
21 propositioned you?
22 **A. Wanted me to go after work for drinks,**
23 **which as a manager you don't do. It's a big no no.**
24 **Had notes left on my vehicle in the parking lot.**

47

1 Q. Do you know for a fact that those notes
2 that were left on your vehicle were in fact written
3 by Cindy?
4 **A. No, I don't know that for a fact.**
5 Q. What makes you think that they were
6 written by Cindy?
7 **A. Because they said come to Windsor,**
8 **Illinois which is where Cindy lived.**
9 Q. Do you know whether there was ever an
10 incident in which Wes Wickart (phonetic) found a
11 note on his car windshield?
12 **A. Wes Wickart. Not to my knowledge.**
13 Q. Do you recall an employee by the name of
14 Kevin Gibson?
15 **A. Vaguely, yes.**
16 Q. Do you recall him talking about being
17 shown notes that apparently had been left on Wes
18 Wickart's car?
19 **A. No.**
20 Q. Do you recall Kevin Gibson ever said that
21 Mary Hackman had apparently left a note on Wes
22 Wickart's car inviting him for drinks or the like?
23 **A. No, not that I'm aware of.**
24 Q. Do you know whether Mary Hackman may have

48

1 written a note left on your car that said come to
2 Windsor, Illinois?
3 **A. No.**
4 Q. Do you have any reason to believe that did
5 not happen?
6 **A. No, I never had any dealings with Mary**
7 **Hackman. I don't know why she would leave a note**
8 **on my vehicle.**
9 Q. Was she an employee under your
10 supervision?
11 **A. Yes.**
12 Q. Do you know whether there was ever any
13 friction between Mary Hackman and Cindy Smith?
14 **A. I think there was to some degree.**
15 Q. Do you know what that friction involved?
16 **A. I don't know for sure. If I'm not**
17 **mistaken we had a meeting with the plant**
18 **superintendent on the night shift before but I**
19 **don't remember the exact details. I don't know**
20 **what caused it. I know it was a disagreement**
21 **between Mary and Cindy, but I can't recall what it**
22 **was about.**
23 Q. Other than asking you to go out after work
24 for drinks, was there any other conduct that Cindy

51

1  things that I just ignore when I hear.

2      **Q.**  Did you ever have any dealings with an

3  employee by Karen Sinclair?

4      **A.  Any employees by Karen Sinclair?**

5      **Q.**  Did you ever have an dealings with an

6  employee by the name of Karen Sinclair?

7      **A.  Karen Sinclair worked for me, yes.**

8      **Q.**  Did she ever express any complaints about

9  Cindy?

10     **A.  I don't recall on that.**

11     **Q.**  Did she ever complain about sex

12  discrimination?

13     **A.  Towards Cindy?**

14     **Q.**  No, towards anyone that there was acts of

15  sex discrimination taking place in the department

16  or harassment.

17     **A.  Not to my knowledge.**

18     **Q.**  Do you know whether Matt, before this

19  meeting took place with Matt Ohrt in which you and

20  Dave Pantier and Cheryl Doss were present, whether

21  Matt Ohrt had conducted any type of investigation?

22     **A.  Matt's pretty thorough in what he does as**

23  **far as investigations.  So, I mean, I can't say 100**

24  **percent but I'm sure he did.**

---

1  manifested towards you that you viewed as

2  inappropriate?

3      **A.  No.**

4      **Q.**  When she asked you to go after work for

5  drinks, was that with a group of other employees or

6  was it just simply she wanted you one on one to go

7  out for drinks after work?

8      **A.  Sometimes it was with a group of employees**

9  **or friends as she might call them.**

10     **Q.**  Was there ever an occasion where she asked

11  you one on one just to go out for a drink after

12  work?

13     **A.  I don't recall.**

14     **Q.**  These notes that were left on your

15  vehicle, were they -- on how many occasions did

16  this occur?

17     **A.  Oh, probably, four or five, six times**

18  **maybe.**

19     **Q.**  What did they say, if you can recall?

20     **A.  If I remember right it said if you're in**

21  **need, I live in Windsor, Illinois or come to**

22  **Windsor, Illinois.**

23     **Q.**  Were they signed?

24     **A.  No.**

---

50

1      **Q.**  They weren't signed?

2      **A.  No.**

3      **Q.**  Did you do any investigation to find out

4  who wrote these notes?

5      **A.  No, I did not.**

6      **Q.**  What did you do with them?

7      **A.  I threw the notes away.**

8      **Q.**  Okay.  What made you think that they were

9  from Cindy?

10     **A.  I could just tell, just the way Cindy**

11  **talked towards me, and what other employees said in**

12  **the department about how Cindy felt towards me so I**

13  **kind of put two and two together.**

14     **Q.**  What employees said something to you about

15  how Cindy felt towards you?

16     **A.  Oh, one was Brenda Purcell.**

17     **Q.**  What did Brenda Purcell say?

18     **A.  If I remember right that Cindy thought I**

19  **was, I can't remember the term, cute, good looking**

20  **or something, she'd like to go out with me or**

21  **something to that nature.**

22     **Q.**  What did you tell Brenda Purcell in

23  response to that comment?

24     **A.  I don't remember.  There is a lot of**

---

52

1      **Q.**  Would his shift have overlapped at all

2  over your shift?

3      **A.  Matt's here I'd say lots of nights**

4  **5 o'clock, somewhere around there, so our shift**

5  **ends at three.**

6      **Q.**  You mean your shift starts at three?

7      **A.  Yes, yes.**

8      **Q.**  So in other words, it's possible he could

9  have done an investigation of your employees

10  between three and five; is that right?

11     **A.  Possibly.**

12     **Q.**  Do you know whether in fact he did?

13     **A.  No.**

14     **Q.**  Do you know whether he interviewed any of

15  the women who work in the department?

16     **A.  Yes, Matt interviewed several women that**

17  **worked in my department.**

18     **Q.**  Concerning Cindy Smith?

19     **A.  I would say so, yes.**

20     **Q.**  Do you know what that concerned?

21     **A.  I would say the discrimination or whatever**

22  **that Cindy was alleging would be my guess.**

23     **Q.**  Do you know specifically were you apprised

24  of what were the results of any of those

53

1  interviews?
2      A.  **What do you mean?**
3      Q.  Were you told of what was the result of
any of those interviews?
4      A.  **Yes.**
6      Q.  What were you told?
7      A.  **That there was no, I can't remember, there**
8  **was no -- not enough evidence or that it was -- I**
9  **can't recall.  It's been too long.**
10     Q.  Do you recall whether there was an
11  incident in which Alan Brickey had shoved Cindy and
12  Cindy asked you to call in the police?
13     A.  **I don't recall on that.**
14     Q.  Do you recall Dave Pantier being present
15  in which that was discussed about whether or not
16  the police would be called in or not?
17     A.  **No, I don't.**
18     Q.  Are you aware of whether Cindy Smith ever
19  dated anyone in the department on your second
20  shift?
21     A.  **Ever dated anyone?  I don't recall.  I**
22  **don't think so.**
23     Q.  Are you aware of Cindy Smith ever sleeping
24  with anyone in the second shift department, on

54

1  second shift in the department?
2      A.  **I recall Cindy stating that at one point**
3  **that she had made a comment about sleeping with**
4  **Dustin Hall.**
5      Q.  Is that the same Dustin Hall who would
6  have been throwing the stool over?
7      A.  **Yes.**
8      Q.  What did Cindy say about that?
9      A.  **I think it was along the lines that she**
10  **could still get young men, or something like that,**
11  **if she wanted to.**
12     Q.  Do you know whether she in fact did?
13     A.  **It's none of my business whether she did**
14  **or whether she didn't.**
15     Q.  Were you aware of whether Cindy Smith ever
16  passed out any notebooks to employees?
17     A.  **She passed out some notebooks, yes.**
18     Q.  What did that concern, if you know?
19     A.  **She was trying to get -- she was trying to**
20  **get documentation.  I'm not sure what it was.  I**
21  **know it was something for Cindy's benefit, but I**
22  **don't know what she was trying to accomplish.  It's**
23  **been too long.**
24     Q.  What were the -- which employees did she

55

1  pass out notebooks to?
2      A.  **I'm not 100 percent.  I'm thinking Sue**
3  **Gonzalez would have been one.**
4      Q.  How did you find out that Cindy Smith
5  passed out a notebook to Sue Gonzalez?
6      A.  **I don't recall.**
7      Q.  Do you know specifically the reason why
8  Cindy was passing out these notebooks?
9      A.  **Well, she was trying to get some type of**
10  **documentation or something to prove a fact that,**
11  **once again, I don't recall what she was trying to**
12  **collect.**
13     Q.  Was it documentation concerning sexual
14  harassment or discrimination?
15     A.  **It could have been.  I don't recall.**
16     Q.  When you found out that Cindy Smith was
17  passing out notebooks, did you ever have a
18  discussion with her about that?
19     A.  **I don't remember.**
20     Q.  Did you ever pass that information along
21  to anyone in the human resource department?
22     A.  **I don't recall whether I did or not.**
23     Q.  Did you ever, in the course of your
24  supervisory duties, ever write out a disciplinary

56

1  complaint or comment regarding Cindy Smith?
2      A.  **If I did there would be documentation**
3  **towards it.  I don't recall, but there would**
4  **definitely be documentation if I did.**
5          MS. de SAINT PHALLE:  Let's mark these as
6  deposition exhibits.  Let's see, I think we are at
7  four and five.
8              (Deposition Exhibit Nos. 4 and 5
9              was marked for identification.)
10     A.  **Is it all right to take a restroom break a**
11  **second?**
12         MS. de SAINT PHALLE:  Sure.  We can do
13  that.
14     A.  **Thank you.**
15             (Whereupon there was a recess
16             taken.)
17  BY MS. de SAINT PHALLE:
18     Q.  All right.  I think where I left off is we
19  had exhibits designated Number 4 and 5.  Could you
20  tell me what those are?
21     A.  **Those are absenteeism counseling.**
22     Q.  Are those -- did you write those
23  documents, those disciplinary tickets up?
24     A.  **Yes, yes.**

57

1    Q.  What was the reason for writing out those
2    two comments?
3        A.  It looked like Cindy had exceeded the
company -- did you say something?
5        MS. CREVELING:  No.
6        A.  Oh, I'm sorry.  It looked like Cindy had
7    exceeded the attendance policy.  We have a 2
8    percent attendance policy for absenteeism and any
9    time that you go over that percent, then you
10   receive counseling.
11       Q.  Do you know, do you have any recollection
12   as to whether Cindy's absences were excused or not?
13       A.  If she gets a write-up they would have had
14   to been unexcused.
15       Q.  Do you know what the absences concerned?
16       A.  No.  I just enter them in the system in
17   the computer as absence and any time it goes over 2
18   percent with the hours then.
19       Q.  Do you recall having any conversation with
20   Cindy about the absentee?
21       A.  Yes, any time I hand out one of these then
22   both people are present.
23       Q.  Well, what do you recall happened took
24   place when you had counseling with regard to Cindy?

58

1        A.  I probably just told her that she had
2    missed X number of hours and she was receiving a
3    verbal warning it looks like the first time, and
4    the second time would have been progressionary
5    discipline so it would have been a written warning.
6        Q.  Had she been -- I think there is about a
7    two-week differentiation between the two.
8        A.  Well, there is more than two weeks.  It's
9    about a five-month.
10       Q.  Oh, okay.  Had she missed more time in
11   that intervening five months?
12       A.  Well, once you get one warning, like you
13   get a verbal warning, your date starts from the
14   period of that warning instead of going back one
15   year.  So you really got to watch it after you get
16   your first warning, and it looks like she exceeded
17   -- she got her first warning put her at 2.08
18   percent and then she missed again and it put her at
19   2.7 percent.  So it's progressionary discipline is
20   what it is.
21       Q.  Do you know whether she had any injuries
22   during that time?
23       A.  Cindy had some injuries.
24       Q.  Was it up to you to designate whether or

59

1    not time lost was because of injuries?
2        A.  No, that's strictly human resource
3    department or our, what do you call it, our like
4    Cheryl would be.
5        MS. CREVELING:  Work comp person.
6        A.  Yeah, work comp person, first aid person.
7    Whatever you want to call it.
8        Q.  If an employee was injured at work, would
9    they go to first aid or what would happen?
10       A.  They would have to go to first aid and
11   then more than likely to our company doctor is the
12   procedure.  First they'd have to report it.
13       Q.  Were you aware of -- you said that Cindy
14   had some injuries.
15       A.  Uh-huh.
16       Q.  Were you ever asked to make an
17   investigation of those injuries?
18       A.  No, that wouldn't be me investigating.  If
19   she had an injury that occurred throughout the
20   night or something then she'd file a complaint with
21   me or I'd fill out an accident report and then turn
22   it in.
23       Q.  Do you recall whether you ever filled out
24   any accident reports for her?

60

1        A.  No, no, I don't.
2        Q.  Should there be some type of record of
3    that?
4        A.  I would think so.
5        Q.  Do you -- are you aware of whether any of
6    Cindy's complaints about injuries were
7    inappropriate?
8        A.  Complaints inappropriate?  Not to my
9    knowledge.
10       Q.  Did she ever appear to complain about an
11   injury when she didn't have an injury?
12       A.  No, I don't think so.
13       Q.  The verbal warning and the actual warning,
14   are those simply as a result of the computer
15   spitting out information?
16       A.  No.  All the computer does is it totals
17   the hours so you can tell how many hours that a
18   person has missed.  An HR department or someone
19   like that would determine whether those injuries
20   would be excused or unexcused or work comp or I
21   don't have anything to do with that.  All I do is
22   just issue the counseling if needed.
23       Q.  Do you recall going back to this meeting
24   that took place with Dave Pantier, Matt Ohrt,

61

1  yourself and Cheryl Doss whether Matt Ohrt ever
2  said things or made comments like Cindy better make
3  things right with God?
    **A.  I don't recall.  That's been, you know, a**
    **couple years ago.**
6    **Q.**  Did Matt Ohrt --
7         MS. CREVELING:  Take a quick break just a
8  second.
9              (Whereupon there was a brief
10                 pause in the proceedings.)
11       MS. de SAINT PHALLE:  Could you tell me
12  what was my last question.
13             (Whereupon, the requested portion
14                of the record was read back.)
15   **Q.**  Do you recall Matt Ohrt ever saying
16  something to Cindy that she should not make false
17  accusations?
18   **A.  No, I don't.**
19   **Q.**  Do you recall Cindy ever making false
20  accusations while you were present?
21   **A.  No, I don't.**
22   **Q.**  When employees had light duty
23  restrictions, whose responsibility was it to see
24  that those light duty restrictions were given?

62

1    **A.  That would have to be our work comp person**
2  **or our first aid person.**
3    **Q.**  Did you have any responsibility in
4  implementing?
5    **A.  No, the only responsibility I would have**
6  **is if they -- if they determined what her light**
7  **duty consist of, whether or not I would have**
8  **anything out there light duty she could do.  If**
9  **not, then she would have to be placed in a**
10  **department where they had light duty.**
11   **Q.**  Do you ever recall an instance where Cindy
12  was made to work her normal job even though her arm
13  was in a sling?
14   **A.  No, I don't.**
15   **Q.**  Do you recall any incidents with an
16  employee by the name of Art Decker?
17   **A.  Art Decker?  No, I don't know.  I know I**
18  **terminated Art Decker.**
19   **Q.**  What was the reason for terminating Art
20  Decker?
21   **A.  I don't recall.**
22   **Q.**  Were you aware of an incident in which Art
23  Decker hit Cindy with a wooden panel?
24   **A.  With a wooden what?**

63

1    **Q.**  Panel.
2    **A.  Not to my knowledge, no.**
3    **Q.**  Did you make a trip to Tennessee to
4  examine or investigate another Masterbrands plant?
5    **A.  Yes.**
6    **Q.**  Did you -- who went with you on that trip?
7    **A.  Cindy went and there was another employee**
8  **by the name of Patty Brown, first shift employee.**
9    **Q.**  Who determined which employees went on
10  this trip?
11   **A.  I don't recall.  I would say that I did,**
12  **but I don't recall because I don't know why -- I**
13  **think it may have been quality involved in it too**
14  **in the decision.**
15   **Q.**  Why did you ask Cindy to go?
16   **A.  I don't recall.**
17   **Q.**  When did this trip take place?
18   **A.  Oh, boy.  I don't recall.  It's been a**
19  **couple years, three years, four years.**
20   **Q.**  Did you ask Cheryl Doss to go on this
21  trip?
22   **A.  No.**
23   **Q.**  Is there any reason why you didn't?
24   **A.  That wasn't my decision.  She's a quality**

64

1  **person and Patty Brown was a quality person so that**
2  **probably would have been the quality director that**
3  **determined that.**
4    **Q.**  Cindy was apparently on the safety
5  committee; is that correct?
6    **A.  Yes, I do remember that.**
7    **Q.**  What was the reason why she was appointed
8  on the safety committee?
9    **A.  Oh, I don't appoint them on the safety**
10  **committee.  That is -- that's their own, if they**
11  **want to join the safety committee, that's their**
12  **prerogative to joint the safety committee.**
13   **Q.**  Was the safety committee simply made up of
14  non-supervisory employees?
15   **A.  Yes.  And there may even be a supervisory**
16  **person in it too.  I'm not 100 percent sure.**
17   **Q.**  Do you know whether there was any friction
18  because Cindy was on the safety committee?
19   **A.  No.**
20   **Q.**  Were there other employees that ever asked
21  you out for drinks or dinner or fishing?
22   **A.  No.**
23   **Q.**  Did an employee by the name of Scott
24  Stewart ever go out on a fishing trip with you?

65

1    A.    On a fishing trip with me?
2    Q.    Yeah.
3    A.    I went fishing with Scott Stewart, I can't
recall when, I mean I don't know after it was Cindy
was gone, whether Cindy was there or I don't
6    recall, but yes, I did do some fishing with Scott
7    on an evening.
8    Q.    Is he -- what job position did he have?
9    A.    He's held several.  The last one I recall
10    would have been a sheer operator.
11    Q.    But he was not in management?
12    A.    No, no.
13    Q.    Unlike yourself who was in management?
14    A.    Right, right.
15    Q.    Did Scott Stewart have the same job as
16    Cindy did?
17    A.    Scott I think he did at one time, but
18    there again I'm not 100 percent sure.
19    Q.    How come you went out with him on a
20    fishing trip?
21    A.    It wasn't really a trip.
22    Q.    Let me ask you about the last day that
23    Cindy Smith worked at the plant in April of '03; do
24    you recall that?

66

1    A.    No, I don't.
2    Q.    Was there an incident in which somebody
3    else was using the computer with her initials?
4    A.    I don't recall.
5    Q.    Do you recall whether Scott Stewart asked
6    Cindy if she had been running the computer?
7    A.    No, I don't.
8    Q.    Was there an incident in which Cindy's
9    initials had been put in the computer as if she
10    were running it when in fact she was not?
11    A.    I don't recall.
12    Q.    Do you recall Cindy Smith going to you
13    very upset that apparently somebody had been
14    ordering parts or doing something with her initials
15    when in fact it wasn't her doing it?
16    A.    I don't recall.
17    Q.    Do you recall at all the last day that
18    Cindy was there at the plant?
19    A.    No, I don't.
20    Q.    Do you recall any episodes where she went
into tears, got into tears?
22    A.    No.
23    Q.    Is it your testimony that there was never
24    an incident in which Cindy went into tears at the

67

1    plant?
2    A.    Say it again now.
3    Q.    Where Cindy had any crying episodes at the
4    plant?
5    A.    There could have been, but I don't recall.
6    Q.    Did you ever see Cindy Smith after her
7    last day at work?
8    A.    I don't even know when her last day of
9    work was.
10    Q.    Do you know the reason why she did not
11    come back to work after April of '03?
12    A.    No, I don't.
13    Q.    Did you ever see any doctors reports or
14    evaluations concerning Cindy?
15    A.    No.  I would never get doctors reports
16    anyway.
17    Q.    Did you ever know whether Cindy was under
18    a great deal of stress at work?
19    A.    Not to my knowledge.
20        MS. de SAINT PHALLE:  All right.  I think
21    I'm done.
22        CROSS EXAMINATION
23    BY MS. CREVELING:
24    Q.    Okay.  Mr. Winschief, do you recall any

68

1    complaints -- let me ask you, did Cindy Smith ever
2    complain to you that an employee by the name of
3    Kevin Gibson had a habit of throwing panels into a
4    trash can and some of that material would bounce
5    out and hit her?
6    A.    I don't recall.
7    Q.    Following the trip or around the time of
8    the trip to Tennessee did Cindy Smith report to you
9    that Maurie Lawrence had told her the only reason
10    she went to Tennessee was because quote she sucked
11    John's dick end quote?
12    A.    No, not to my knowledge.
13    Q.    What was Cindy's reputation in the
14    department?
15    A.    Cindy started out as a good employee.  I
16    mean I considered her reputation good, and then it
17    just changed drastically.
18    Q.    How so?
19    A.    It's kind of hard to say.  I mean --
20    Q.    Did she appear to be liked within the
21    department?
22    A.    At first she was liked, and then she
23    became it was like there was always trouble around
24    Cindy to some degree either with -- it didn't

1  **matter who the employee was, but it was to the**
2  **point where she was better off working by herself.**
3      Q.  Okay.  Now, I think you told us the second
4  shift started at 3:00, sometimes 3:30; am I
5  remembering that correctly?
6      **A.  Uh-huh.**
7      Q.  I'm sorry, is that a yes?
8      **A.  Yes, yes.**
9      Q.  And so would there still be people up in
10  the front office when your second shift started?
11      **A.  Yes.**
12      Q.  Okay.  If you needed to talk to a human
13  resources person, were they reachable or available
14  to you?
15      **A.  Yes.**
16      Q.  Okay.  HR wasn't just there to serve the
17  needs of the first shift, was it?
18      **A.  No.**
19      Q.  Was every material handler in your
20  department certified on a forklift?
21      **A.  I'm not sure on that.**
22      Q.  Okay.  How many forklifts were generally
23  in use on the second shift in the door plant?
24      **A.  I think just one.**

1      Q.  Okay.  Would there be a need or a
2  requirement that if there were four, five or six
3  material handlers, that everybody be driving a
4  forklift on any given shift?
5      **A.  No, no, because they done different jobs**
6  **within that classification.**
7      Q.  Okay.  Can you explain what do you mean by
8  a job classification?
9      **A.  It would be like a machine operator, an**
10  **assembler, a material handler, things such as that.**
11      Q.  And then are there different actual job
12  tasks within that classification?
13      **A.  Sometimes.  I mean a material handler**
14  **could do different things.  They could pull parts,**
15  **they could stock parts, just different things that**
16  **they could do.**
17      Q.  Okay.  And it's the job classification
18  that people bid in to?
19      **A.  Yes.**
20      Q.  I think you told us that Cindy asked you
21  to go out for drinks?
22      **A.  Uh-huh, yes.**
23      Q.  How many times did that happen?
24      **A.  It was repeatedly.**

1      Q.  How many times did you tell her you
2  weren't interested?
3      **A.  Probably half a dozen.**
4      Q.  You told us that Brenda Purcell told you
5  that Cindy thought you were good looking and wanted
6  to go out with you.  Did any other employees report
7  that to you --
8      **A.  No.**
9      Q.  -- or anything similar of that nature?
10      **A.  No, but I think they all would agree.**
11      Q.  Would agree that you were good looking?
12      **A.  No.**
13      Q.  I'm sorry, I had to ask.
14      **A.  No, no.**
15      Q.  Would agree what?
16      **A.  Now you got me confused.**
17      Q.  Sorry.  I'd asked you I think if there
18  were any other employees who had told you that they
19  had heard from Cindy that she thought you were good
20  looking or wanted to go out with you?
21      **A.  No, but there was others that would agree**
22  **that I'm good supervisor and that I wouldn't do**
23  **something like that anyway so.**
24      Q.  Did anybody -- any employees complain to

1  you about Cindy passing out notebooks in the
2  department?
3      **A.  No, I just I knew that she did and I don't**
4  **recall how.**
5      MS. CREVELING:  Okay.  I don't think I
6  have any other questions.
7          REDIRECT EXAMINATION
8  BY MS. de SAINT PHALLE:
9      Q.  Just a couple follow-ups.  You mentioned
10  that at the beginning that Cindy Smith was
11  well-liked and then it changed that there was
12  always trouble around Cindy.
13      **A.  Uh-huh.**
14      Q.  What do you mean by that?
15      **A.  It's just that whoever she worked, at**
16  **first, I mean, she was in an area and personality**
17  **wise Cindy was a likeable person.  I mean she had**
18  **done her job I think to the best of her ability**
19  **and, you know, things just over a time period**
20  **changed for whatever reason to where she couldn't**
21  **work with anybody and she was always complaining**
22  **about people.**
23      Q.  Did that concern her activities on the
24  safety committee?

73

1    **A.**  No, I wouldn't think it had anything to do
2 **with the safety committee.**
3    Q.  Do you know whether it would have
4 concerned anything to do with allegations about the
5 fact that she had complained about language that
6 some of the male employees used towards her?
7    **A.**  No, because it wasn't necessarily a male
8 **that she complained about. She complained about**
9 **females as well.**
10    Q.  Other than Mary Hackman, were there any
11 specific females that she complained about?
12    **A.**  Let me think of some that's within the
13 **department. I don't recall on that.**
14    Q.  Did she complain about male employees
15 using abusive language?
16    **A.**  I don't recall.
17    Q.  You said that Cindy did make complaints
18 about other employees. What did those complaints
19 concern?
20    **A.**  I don't know. She couldn't work with
21 **them, they were arguing about something. I'm not**
22 **sure what the details were. She said this type of**
23 **thing or just, you know, bickering. I can't really**
24 **say.**

74

1    Q.  Do you know what the reason was for your
2 statement that Cindy's got to the point that she
3 was having trouble working with the other
4 employees?
5    **A.**  Repeat that again.
6    Q.  Do you have any idea why Cindy apparently
7 started having trouble with getting along with
8 other employees?
9    **A.**  No, I don't.
10    Q.  Did Cindy ever complain about some of the
11 other employees using drugs?
12    **A.**  I don't know that Cindy complained, no.
13    Q.  Was there some friction about drug use in
14 the plant?
15    **A.**  I don't recall on that.
16    Q.  Do you recall whether any employees on
17 your shift were terminated while Cindy was working
18 there for drug use?
19    **A.**  I don't recall.
20    MS. de SAINT PHALLE: That's it.
21    MS. CREVELING: I've got one last
22 question.
23        (Deposition Exhibit No. 0749 was
24        marked for identification.)

75

1    MS. CREVELING: And Alex, for your
2 reference, this is bates number 0749.
3        RECROSS EXAMINATION
4 BY MS. CREVELING:
5    Q.  Let me have you take a look at the exhibit
6 that bears number MB 0749. Take a look, read that
7 if you would for me and tell me if you remember
8 sending that document.
9        (Whereupon there was a brief
10        pause in the proceedings.)
11    **A.**  That helps me remember, yes.
12    Q.  Okay. Can you tell us what you recall,
13 excuse me, about the first incident or the first
14 complaint that you mention in that e-mail from
15 Brenda Purcell?
16    **A.**  I just remember Brenda having a lot of
17 **troubles. It was like she was under a lot of**
18 **stress as well, but I remember that conversation**
19 **and that's basically what it's got written here.**
20    Q.  Okay. And who were you sending that
21 information to?
22    **A.**  That would have been in Matt Ohrt.
23    Q.  Okay. And who is Kord Kozma?
24    **A.**  He was the HR representative before Matt.

76

1    Q.  Okay. And so at this time both Matt and
2 Kord were in HR?
3    **A.**  Yes, I believe so.
4    Q.  Okay. And then there is a second thing
5 that you're relaying to them from Dorothy Jolley.
6 What do you recall about Ms. Jolley's complaints?
7    **A.**  She was just saying -- she was letting me
8 **know that Cindy was passing out booklets to take**
9 **notes about things going on in the door plant.**
10    Q.  And what was the purpose for sending this
11 e-mail to Matt Ohrt and to Kord Kozma?
12    **A.**  Just to make them aware of it because
13 **that's something that isn't tolerated within the**
14 **policy.**
15    Q.  Okay. And would you or was it your
16 expectation that human resources would handle it
17 from there?
18    **A.**  Yes, and they should be involved in a
19 **matter such as this.**
20    Q.  Okay. When you testified earlier that
21 Cindy seemed to just, I forget how you phrased it,
22 trouble followed her or however --
23    **A.**  Uh-huh.
24    Q.  I don't mean to put words in your mouth,

77

1  but are these examples of what you mean by that?
2      **A.   Yes.  And it didn't matter who you put her**
3  **with.  It was sooner or later something would**
   **develop that you would have to deal with.**
       MS. CREVELING:  Okay.  I don't have any
6  other questions.
7       MS. de SAINT PHALLE:  That's it.
8       MS. CREVELING:  Mr. Winschief, you will
9  have an opportunity to review and sign your
10 deposition if you'd like.  Would you like to do
11 that?
12     **A.   Yes, I don't have a problem with that.**
13       FURTHER DEPONENT SAYTH NOT
14
15
16
17
18
19
20
21
22
23
24

79

1  STATE OF ILLINOIS  )
2              )
3  COUNTY OF SANGAMON )
4          C E R T I F I C A T E
5      I, MOLLY A. HOBBIE, a Certified Shorthand
6  Reporter and Notary Public, in and for said County
7  and State, do hereby certify that the Deponent
8  herein, JOHN WINSCHIEF, prior to the taking of the
9  foregoing deposition, and on November 18, 2005 was
10 by me duly sworn to testify to the truth, the whole
11 truth and nothing but the truth in the cause
12 aforesaid; that the said deposition was taken down
13 by me in shorthand and afterwards transcribed, and
14 that the attached transcript contains a true and
15 accurate translation of my shorthand notes referred
16 to.
17      Given under my hand and seal this 6th day
18 of December, A.D., 2005.
19
20      Certified Shorthand Reporter
21      and Notary Public
22      CSR # 084-003897
23
24 My commission expires April 14, 2006.



78

1
2
3
4
5
6
7
8
9
10
11
12       ERRATA SHEET
13
14
15
16
17
18
19
20
22
23
24

"OFFICIAL SEAL"
Molly A. Hobbie
Notary Public, State of Illinois
My Commission Exp. 04/14/2006

**'01** [5] - 14:14, 23:3, 24:7, 24:9, 39:15
**'02** [1] - 39:15
**'03** [2] - 65:23, 67:11

## 0

**04-2215** [1] - 1:6
**0749** [4] - 4:15, 74:23, 75:2, 75:6
**084-003897** [1] - 79:22

## 1

**1** [6] - 4:13, 20:12, 20:13, 20:16, 24:7, 39:19
**100** [13] - 13:7, 16:4, 18:5, 22:9, 25:15, 27:9, 27:11, 29:17, 32:6, 51:23, 55:2, 64:16, 65:18
**11** [1] - 8:8
**114** [1] - 5:12
**11:30** [1] - 10:11
**12** [1] - 7:12
**1201** [2] - 1:13, 2:8
**1227** [1] - 3:4
**14** [1] - 79:24
**15** [1] - 12:5
**18** [3] - 1:12, 2:7, 79:9
**18th** [2] - 23:3, 24:9
**1976** [1] - 6:23

## 2

**2** [7] - 4:13, 22:16, 22:17, 22:20, 39:19, 57:7, 57:17
**2.08** [1] - 58:17
**2.7** [1] - 58:19
**20** [3] - 4:13, 9:23, 31:10
**2001** [3] - 9:1, 9:2, 9:15
**2005** [4] - 1:13, 2:7, 79:9, 79:18
**2006** [1] - 79:24
**217** [3] - 1:22, 1:23, 5:17
**22** [1] - 4:13
**25** [2] - 9:23, 31:10
**2700** [1] - 3:9

## 3

**3** [7] - 4:14, 38:16,

38:18, 39:14, 39:18, 40:2, 40:11
**300** [1] - 3:9
**38** [1] - 4:14
**385-2274** [1] - 5:17
**3:00** [2] - 10:11, 69:4
**3:30** [2] - 10:12, 69:4

## 4

**4** [3] - 4:14, 56:8, 56:19
**4.8** [4] - 21:1, 21:5, 21:8, 24:14
**46204** [1] - 3:10

## 5

**5** [5] - 4:3, 4:14, 52:4, 56:8, 56:19
**50** [1] - 6:14
**523-8244** [1] - 1:22
**56** [1] - 4:14

## 6

**62703** [1] - 3:5
**632-8244** [1] - 1:23
**67** [1] - 4:3
**6th** [1] - 79:17

## 7

**72** [1] - 4:4
**75** [2] - 4:4, 4:15
**75-day** [1] - 22:21

## 8

**8/1** [1] - 23:17
**8/18** [1] - 23:18

## 9

**90s** [1] - 8:10
**9:30** [2] - 1:13, 2:8

## A

**ability** [1] - 72:18
**able** [7] - 11:9, 25:21, 33:5, 33:12, 36:11, 42:7, 43:16
**absence** [2] - 24:15, 57:17
**absences** [2] - 57:12, 57:15
**absentee** [1] - 57:20
**absenteeism** [3] -

21:15, 56:21, 57:8
**abusive** [1] - 73:15
**acceptable** [7] - 20:23, 23:11, 24:1, 24:3, 24:4, 24:10
**accepted** [1] - 9:13
**accident** [2] - 59:21, 59:24
**accomplish** [1] - 54:22
**accurate** [1] - 79:15
**accusations** [2] - 61:17, 61:20
**acquire** [1] - 11:1
**acquired** [1] - 27:7
**act** [1] - 12:19
**acting** [1] - 32:9
**action** [1] - 29:24
**activities** [2] - 13:22, 72:23
**acts** [1] - 51:14
**actual** [4] - 6:7, 39:7, 60:13, 70:11
**Ad** [1] - 79:18
**address** [3] - 5:10, 5:11, 30:20
**addressed** [1] - 29:16
**advance** [1] - 43:4
**aforesaid** [1] - 79:12
**afterwards** [2] - 2:12, 79:13
**ago** [9] - 11:17, 11:19, 12:21, 18:4, 22:9, 27:11, 44:11, 45:9, 61:5
**agree** [4] - 71:10, 71:11, 71:15, 71:21
**agreed** [1] - 2:2
**aid** [4] - 59:6, 59:9, 59:10, 62:2
**air** [1] - 20:8
**aisle** [2] - 40:16
**Alan** [6] - 28:23, 29:2, 30:6, 37:4, 37:7, 37:8, 37:14, 53:11
**Alex** [1] - 75:1
**Alexandra** [1] - 3:3
**allegations** [1] - 73:4
**allegedly** [1] - 43:15
**alleging** [1] - 52:22
**almost** [1] - 18:22
**alone** [1] - 19:4
**amount** [1] - 8:7
**answer** [3] - 7:23, 41:3, 41:9
**answers** [1] - 2:10
**anyway** [2] - 67:16, 71:23
**apart** [1] - 23:20

**appear** [2] - 60:10, 68:20
**Appearances** [1] - 3:1
**Appeared** [2] - 3:6, 3:11
**appearing** [4] - 27:15, 27:17, 27:21, 28:9
**apply** [2] - 9:11, 27:4
**appoint** [1] - 64:9
**appointed** [1] - 64:7
**apprised** [1] - 52:23
**approach** [1] - 28:8
**April** [3] - 65:23, 67:11, 79:24
**arbitrating** [1] - 13:5
**Arcola** [1] - 8:5
**area** [7] - 19:13, 31:5, 31:9, 31:12, 31:17, 32:20, 72:16
**areas** [2] - 19:16, 31:14
**arguing** [1] - 73:21
**arm** [1] - 62:12
**Art** [5] - 62:16, 62:17, 62:18, 62:19, 62:22
**assembler** [2] - 19:12, 70:10
**assessment** [2] - 38:24, 39:1
**associate** [1] - 29:3
**assorted** [1] - 30:17
**Assumes** [1] - 41:2
**attached** [3] - 1:16, 4:22, 79:14
**attend** [1] - 44:3
**attendance** [3] - 21:12, 57:7, 57:8
**attention** [2] - 14:24, 18:7
**Attorneys** [2] - 3:4, 3:9
**attorneys** [1] - 2:3
**August** [3] - 23:3, 24:7, 24:9
**available** [1] - 69:13
**aware** [16] - 25:12, 27:22, 30:9, 30:22, 32:1, 32:3, 46:14, 46:18, 47:23, 53:18, 53:23, 54:15, 59:13, 60:5, 62:22, 76:12
**awhile** [1] - 12:21

## B

**Baker** [1] - 3:8
**ball** [1] - 11:8
**based** [1] - 41:4
**basis** [1] - 43:9
**bates** [1] - 75:2

**bears** [1] - 75:6
**beat** [1] - 16:16
**became** [1] - 68:23
**Becky** [3] - 26:24, 27:2, 27:4
**become** [3] - 8:22, 17:12, 37:11
**becomes** [1] - 39:22
**beginning** [1] - 72:10
**behalf** [2] - 3:6, 3:11
**behavior** [4] - 19:2, 19:3, 28:18, 29:22
**benefit** [1] - 54:21
**Bertoux** [1] - 3:8
**best** [1] - 72:18
**better** [6] - 8:20, 9:3, 12:3, 29:23, 61:2, 69:2
**between** [8] - 2:2, 6:14, 23:9, 39:12, 48:13, 48:21, 52:10, 58:7
**bickering** [1] - 73:23
**bid** [11] - 33:5, 33:15, 36:10, 37:18, 37:19, 37:21, 37:23, 42:10, 42:11, 42:21, 70:18
**biding** [4] - 42:24, 43:2, 43:6, 43:8
**bids** [1] - 42:17
**big** [1] - 46:23
**biggest** [1] - 11:24
**Bill** [2] - 13:13, 16:11
**bins** [1] - 6:8
**bit** [1] - 11:11
**bitch** [3] - 17:8, 19:21, 30:16
**bitches** [1] - 31:2
**Blvd** [2] - 1:14, 2:9
**Bodies** [1] - 7:10
**booklets** [1] - 76:8
**boss** [2] - 9:24, 10:2
**bounce** [1] - 68:4
**boy** [1] - 63:18
**break** [3] - 42:3, 56:10, 61:7
**breaking** [1] - 43:15
**Brenda** [6] - 50:16, 50:17, 50:22, 71:4, 75:15, 75:16
**Brickey** [5] - 28:23, 28:24, 29:2, 30:6, 37:4, 37:7, 37:8, 37:14, 53:11
**brief** [3] - 38:22, 61:9, 75:9
**Brown** [2] - 63:8, 64:1
**buckets** [1] - 6:9
**build** [1] - 6:9
**building** [2] - 20:2,

20:4
**business** [3] - 7:9, 7:20, 54:13
**busy** [1] - 6:16
**butt** [2] - 30:10, 30:11

**C**

**Cabinets** [1] - 1:7
**car** [4] - 47:11, 47:18, 47:22, 48:1
**carry** [1] - 6:9
**Case** [1] - 1:6
**caused** [1] - 48:20
**Central** [1] - 1:2
**certain** [1] - 43:3
**Certified** [4] - 1:15, 2:5, 79:5, 79:20
**certified** [1] - 69:20
**certify** [1] - 79:7
**chair** [3] - 29:8, 29:11
**Champaign** [1] - 9:10
**chance** [1] - 23:15
**change** [3] - 10:17, 10:21, 24:6
**changed** [5] - 39:8, 39:10, 68:17, 72:11, 72:20
**check** [1] - 12:3
**checked** [1] - 20:23
**Cheryl** [13] - 33:18, 33:21, 34:10, 35:11, 35:13, 35:16, 35:24, 41:13, 44:5, 51:20, 59:4, 61:1, 63:20
**Cindy** [128] - 1:4, 3:14, 14:6, 14:16, 14:20, 15:3, 16:3, 16:5, 16:9, 16:15, 16:23, 17:1, 17:7, 18:6, 18:10, 19:4, 19:7, 19:13, 19:18, 19:21, 20:4, 20:6, 21:14, 22:12, 24:13, 25:12, 25:14, 27:7, 27:10, 28:14, 28:17, 28:21, 29:9, 29:10, 29:11, 30:5, 30:9, 33:18, 34:21, 35:17, 35:24, 37:15, 38:10, 40:10, 40:12, 41:13, 42:1, 42:9, 43:13, 43:20, 44:1, 44:5, 44:24, 45:14, 46:12, 46:14, 46:19, 47:3, 47:6, 47:8, 48:13, 48:21, 48:24, 50:9, 50:10, 50:12, 50:15, 50:18, 51:9, 51:13, 52:18, 52:22, 53:11, 53:12,

53:18, 53:23, 54:2, 54:8, 54:15, 55:4, 55:8, 55:16, 56:1, 57:3, 57:6, 57:20, 57:24, 58:23, 59:13, 61:2, 61:16, 61:19, 62:11, 62:23, 63:7, 63:15, 64:4, 64:18, 65:4, 65:5, 65:16, 65:23, 66:6, 66:12, 66:18, 66:24, 67:3, 67:6, 67:14, 67:17, 68:1, 68:8, 68:15, 68:24, 70:20, 71:5, 71:19, 72:1, 72:10, 72:12, 72:17, 73:17, 74:6, 74:10, 74:12, 74:17, 76:8, 76:21
**Cindy's** [9] - 16:6, 33:6, 38:6, 54:21, 57:12, 60:6, 66:8, 68:13, 74:2
**circumstances** [3] - 21:16, 21:22, 35:6
**claiming** [1] - 19:23
**claims** [2] - 12:16, 12:20
**classes** [1] - 7:3
**classification** [5] - 33:4, 70:6, 70:8, 70:12, 70:17
**clear** [1] - 17:5
**closed** [1] - 31:19
**clue** [1] - 13:18
**collect** [1] - 55:12
**comfortable** [1] - 42:6
**coming** [3] - 32:19, 33:10, 42:6
**comment** [8] - 21:22, 43:14, 45:16, 45:21, 45:24, 50:23, 54:3, 56:1
**comments** [4] - 20:24, 21:12, 57:2, 61:2
**commission** [1] - 79:24
**committee** [9] - 64:5, 64:8, 64:10, 64:11, 64:12, 64:13, 64:18, 72:24, 73:2
**comp** [6] - 28:12, 28:14, 59:5, 59:6, 60:20, 62:1
**company** [6] - 7:9, 7:20, 8:19, 13:3, 57:4, 59:11
**Company** [2] - 8:5, 8:13
**company's** [1] - 42:19
**compensated** [1] -

28:1
**competent** [1] - 2:21
**complain** [7] - 29:11, 51:11, 60:10, 68:2, 71:24, 73:14, 74:10
**complained** [6] - 30:15, 73:5, 73:8, 73:11, 74:12
**complaining** [1] - 16:24, 19:7, 72:21
**complaint** [11] - 16:6, 16:8, 16:10, 16:14, 17:17, 18:9, 28:22, 43:19, 56:1, 59:20, 75:14
**Complaints** [1] - 60:8
**complaints** [11] - 12:15, 12:23, 28:18, 30:5, 30:9, 51:8, 60:6, 68:1, 73:17, 73:18, 76:6
**complete** [1] - 40:4
**completely** [1] - 32:20
**completing** [1] - 6:24
**comprises** [1] - 39:14
**computer** [6] - 57:17, 60:14, 60:16, 66:3, 66:6, 66:9
**concern** [4] - 16:14, 54:18, 72:23, 73:19
**concerned** [4] - 16:1, 52:20, 57:15, 73:4
**concerning** [4] - 19:22, 43:24, 55:13, 67:14
**Concerning** [1] - 52:18
**conduct** [1] - 48:24
**conducted** [1] - 51:21
**confused** [1] - 71:16
**Connie** [1] - 1:22
**considered** [2] - 38:14, 68:16
**consist** [1] - 62:7
**contains** [1] - 79:14
**context** [2] - 45:20, 45:22
**control** [1] - 33:24
**conversation** [4] - 35:24, 41:13, 57:19, 75:18
**copies** [1] - 2:23
**correct** [6] - 8:10, 14:17, 17:13, 24:23, 42:22, 64:5
**correctly** [1] - 69:5
**costa** [1] - 40:16
**counseling** [4] - 56:21, 57:10, 57:24, 60:22
**County** [2] - 79:3, 79:6

**couple** [4] - 43:22, 61:5, 63:19, 72:9
**course** [1] - 55:23
**Court** [4] - 1:1, 5:14, 8:1, 15:10
**Creveling** [19] - 3:8, 4:3, 4:4, 7:22, 12:9, 13:1, 23:5, 28:24, 41:2, 57:5, 59:5, 61:7, 67:23, 72:5, 74:21, 75:1, 75:4, 77:5, 77:8
**cross** [5] - 38:7, 38:10, 40:13, 40:18, 41:1
**Cross** [3] - 4:3, 38:8, 67:22
**cross-train** [1] - 38:10
**cross-trained** [4] - 38:7, 40:13, 40:18, 41:1
**Cross-trained** [1] - 38:8
**crying** [2] - 20:7, 67:3
**Csr** [1] - 79:22
**cunts** [1] - 30:17
**current** [2] - 5:10, 5:20
**cute** [1] - 50:19

**D**

**Daniels** [1] - 3:8
**date** [3] - 23:17, 39:14, 58:13
**dated** [5] - 23:2, 23:17, 53:19, 53:21
**Dave** [9] - 10:3, 10:8, 17:3, 18:15, 44:5, 44:21, 51:20, 53:14, 60:24
**David** [1] - 10:2
**daytime** [1] - 25:7
**de** [17] - 3:3, 4:3, 4:4, 5:8, 20:11, 22:15, 23:7, 38:15, 38:20, 56:5, 56:12, 56:17, 61:11, 67:20, 72:8, 74:20, 77:7
**deal** [3] - 22:9, 67:18, 77:4
**dealing** [2] - 13:5, 15:3
**dealings** [6] - 14:20, 14:21, 25:4, 48:6, 51:2, 51:5
**Dealings** [1] - 14:22
**December** [1] - 79:18
**decision** [10] - 17:22, 18:1, 18:2, 36:4, 36:7, 36:12, 42:11,

42:13, 63:14, 63:24
**Decker** [5] - 62:16, 62:17, 62:18, 62:20, 62:23
**Defendant** [2] - 1:9, 3:11
**definitely** [2] - 39:12, 56:4
**degree** [4] - 18:3, 38:8, 48:14, 68:24
**department** [27] - 13:21, 13:23, 14:5, 14:9, 15:1, 24:11, 32:13, 38:9, 46:2, 46:7, 46:16, 50:12, 51:15, 52:15, 52:17, 53:19, 53:24, 54:1, 55:21, 59:3, 60:18, 62:10, 68:14, 68:21, 69:20, 72:2, 73:13
**departments** [2] - 7:18, 46:8
**Deponent** [2] - 77:13, 79:7
**Deposition** [15] - 4:13, 4:13, 4:14, 4:14, 4:15, 20:12, 20:13, 20:15, 22:16, 22:17, 22:19, 38:16, 38:18, 56:8, 74:23
**deposition** [14] - 1:11, 2:4, 2:14, 2:19, 2:24, 21:10, 27:12, 27:16, 28:9, 28:10, 56:6, 77:10, 79:9, 79:12
**depositions** [1] - 2:20
**description** [3] - 25:24, 26:11, 35:21
**designate** [1] - 58:24
**designated** [1] - 56:19
**desk** [1] - 31:22
**details** [4] - 18:5, 44:9, 48:19, 73:22
**determination** [2] - 26:8, 26:10
**determine** [1] - 60:19
**determined** [4] - 43:8, 62:6, 63:9, 64:3
**develop** [1] - 77:4
**developmental** [1] - 40:15
**dick** [1] - 68:11
**difference** [1] - 12:5
**differences** [2] - 23:8, 23:10
**different** [10] - 19:15, 21:16, 21:22, 23:20, 23:21, 39:12, 70:5, 70:11, 70:14, 70:15
**differentiation** [1] -

58:7
dinner [1] - 64:21
Direct [2] - 4:3, 5:7
directed [1] - 19:3
director [1] - 64:2
disagreement [1] - 48:20
disciplinary [3] - 29:24, 55:24, 56:23
discipline [3] - 35:7, 58:5, 58:19
Discovery [1] - 1:11
discrimination [5] - 43:20, 51:12, 51:15, 52:21, 55:14
discussed [2] - 44:15, 53:15
discussion [3] - 33:11, 33:17, 55:18
discussions [1] - 46:11
disposition [1] - 28:12
dispute [1] - 22:13
District [2] - 1:1, 1:2
division [2] - 8:15, 8:17
Division [1] - 1:3
doctor [1] - 59:11
doctors [2] - 67:13, 67:15
document [2] - 38:21, 75:8
documentation [6] - 18:18, 54:20, 55:10, 55:13, 56:2, 56:4
documents [3] - 23:9, 27:13, 56:23
done [5] - 23:15, 52:9, 67:21, 70:5, 72:18
door [2] - 69:23, 76:9
doors [3] - 20:2, 20:4, 34:13
Dorothy [1] - 76:5
Doss [11] - 33:18, 33:21, 35:11, 35:13, 35:17, 35:24, 41:13, 44:5, 51:20, 61:1, 63:20
Doss's [1] - 34:10
down [3] - 2:11, 40:14, 79:12
dozen [1] - 71:3
drastically [1] - 68:17
drink [1] - 49:11
drinks [7] - 46:22, 47:22, 48:24, 49:5, 49:7, 64:21, 70:21
drive [11] - 11:23, 12:5, 25:12, 25:14, 25:21, 26:5, 26:8,

27:1, 27:5, 27:8, 27:10
driven [2] - 26:20, 26:22
driving [4] - 25:23, 26:22, 27:5, 70:3
drove [1] - 25:17
drug [2] - 74:13, 74:18
drugs [1] - 74:11
due [1] - 13:6
duly [2] - 5:5, 79:10
during [7] - 25:6, 44:12, 44:19, 44:22, 45:1, 45:11, 58:22
Dustin [13] - 15:15, 19:8, 19:10, 19:17, 19:20, 20:1, 37:4, 37:6, 37:8, 37:11, 37:14, 54:4, 54:5
duties [3] - 11:1, 33:1, 55:24
duty [6] - 17:4, 61:22, 61:24, 62:7, 62:8, 62:10

E

e-mail [2] - 75:14, 76:11
early [1] - 21:2
education [1] - 7:1
effect [1] - 41:14
efficiency [1] - 13:22
either [3] - 36:9, 37:14, 68:24
elevators [1] - 6:10
eligible [2] - 33:7, 36:14
emergency [1] - 38:2
employed [4] - 5:18, 7:2, 8:22, 37:15
employee [40] - 15:1, 15:4, 15:8, 15:15, 15:17, 15:21, 16:24, 17:7, 17:18, 17:19, 17:23, 18:10, 18:12, 18:21, 19:7, 22:6, 23:14, 28:22, 29:19, 30:1, 30:6, 30:7, 30:12, 34:9, 34:22, 39:8, 39:21, 40:9, 47:13, 48:9, 51:3, 51:6, 59:8, 62:16, 63:7, 63:8, 64:23, 68:2, 68:15, 69:1
employees [39] - 6:11, 9:20, 14:10, 22:10, 28:19, 30:15, 31:1, 31:9, 31:13, 31:20, 32:9, 33:1, 33:12,

33:14, 38:5, 46:5, 46:6, 49:5, 49:8, 50:11, 50:14, 51:4, 52:9, 54:16, 54:24, 61:22, 63:9, 64:14, 64:20, 71:6, 71:18, 71:24, 73:6, 73:14, 73:18, 74:4, 74:8, 74:11, 74:16
employer [1] - 5:20
employment [3] - 6:18, 25:18, 28:6
end [1] - 68:11
ended [1] - 15:19
ends [1] - 52:5
enter [1] - 57:16
entire [1] - 7:17
episodes [2] - 66:20, 67:3
Errata [1] - 78:12
especially [2] - 11:13, 26:10
essentially [1] - 13:20
evaluate [1] - 23:14
evaluation [12] - 20:17, 22:21, 22:23, 23:17, 23:24, 24:1, 39:2, 39:5, 39:8, 39:18, 39:23, 40:2
evaluations [7] - 23:2, 23:13, 23:19, 39:9, 39:24, 40:5, 67:14
evening [2] - 11:8, 65:7
evenings [2] - 11:14, 12:3
evidence [2] - 41:3, 53:8
exact [2] - 44:9, 48:19
exactly [2] - 9:22, 10:5
Exam [1] - 4:4
Examination [7] - 4:3, 4:3, 4:4, 5:7, 67:22, 72:7, 75:3
examine [1] - 63:4
example [3] - 32:8, 34:21, 38:5
examples [1] - 77:1
exceeded [3] - 57:3, 57:7, 58:16
except [1] - 2:16
excuse [1] - 75:13
excused [2] - 24:15, 57:12, 60:20
exhibit [4] - 21:10, 23:6, 38:17, 75:5
Exhibit [19] - 4:13, 4:13, 4:14, 4:15, 20:12, 20:13, 20:15, 22:16, 22:17, 22:19,

38:16, 38:18, 39:14, 39:18, 39:19, 40:2, 40:11, 56:8, 74:23
exhibits [2] - 56:6, 56:19
Exhibits [3] - 4:12, 4:14, 4:22
exit [1] - 21:2
expectation [1] - 76:16
expense [1] - 2:24
expensive [2] - 41:17, 41:19
expires [1] - 79:24
explain [2] - 23:9, 70:7
explanatory [1] - 46:10
express [1] - 41:21, 42:1, 51:8
expressed [1] - 38:13
expressly [1] - 2:15

F

fact [9] - 47:1, 47:2, 47:4, 52:12, 54:12, 55:10, 66:10, 66:15, 73:5
facts [1] - 41:2
false [2] - 61:16, 61:19
familiar [1] - 15:23
family [2] - 11:13, 11:24
far [6] - 10:7, 13:21, 23:10, 35:20, 37:22, 51:23
father [1] - 12:1
feedback [1] - 39:3
fellow [2] - 16:24, 22:6
felt [2] - 50:12, 50:15
females [2] - 73:9, 73:11
few [2] - 28:11
file [1] - 59:20
filing [1] - 2:15
fill [3] - 20:18, 20:21, 59:21
filled [3] - 39:3, 39:6, 59:23
fingernail [1] - 42:3
Finley [2] - 34:5, 34:7
fired [2] - 13:17, 18:21
First [2] - 15:23, 59:12
first [27] - 8:22, 11:3, 11:6, 11:7, 11:10, 11:16, 13:13, 14:6, 14:19, 15:2, 22:22, 39:16, 44:7, 45:23, 58:3, 58:16, 58:17, 59:6, 59:9, 59:10,

62:2, 63:8, 68:22, 69:17, 72:16, 75:13
fishing [6] - 64:21, 64:24, 65:1, 65:3, 65:6, 65:20
fit [1] - 34:10
five [6] - 49:17, 52:10, 56:7, 58:9, 58:11, 70:2
five-month [1] - 58:9
flat [1] - 40:16
floor [5] - 30:23, 31:19, 31:22, 32:1, 34:2
follow [1] - 72:9
follow-ups [1] - 72:9
followed [1] - 76:22
Following [1] - 68:7
follows [1] - 5:6
foregoing [1] - 79:9
forget [1] - 76:21
forklift [14] - 25:13, 25:15, 25:18, 25:21, 25:23, 26:5, 26:9, 26:12, 27:1, 27:5, 27:8, 27:10, 69:20, 70:4
forklifts [1] - 69:22
form [4] - 2:17, 20:17, 20:19, 20:21
foundation [1] - 2:22
four [9] - 17:8, 19:22, 24:20, 30:16, 31:7, 49:17, 56:7, 63:19, 70:2
fresh [1] - 20:8
friction [1] - 48:13, 48:15, 64:17, 74:13
friends [4] - 35:17, 35:19, 35:21, 49:9
front [1] - 69:10
fucking [4] - 17:8, 19:21, 30:16, 31:2
full [5] - 5:9, 22:22, 22:23, 23:24, 39:22
full-time [2] - 22:22, 22:23, 23:24, 39:22
furnished [1] - 2:23

G

games [1] - 11:9
Gatons [2] - 24:19, 24:22
Gazette [1] - 9:10
Gene [3] - 15:22, 16:14, 18:13
general [4] - 21:12, 33:17, 35:23, 46:6
generally [1] - 69:22

Gibson[3] - 47:14, 47:20, 68:3
given [3] - 26:4, 61:24, 70:4
Given[1] - 79:17
goals [2] - 13:23, 14:5
God[1] - 61:3
Golembeck[2] - 1:21, 1:22
Gonzalez[2] - 55:3, 55:5
goods [1] - 34:12
graduate [2] - 6:20, 6:22
graduating [1] - 7:5
Grain[5] - 5:21, 5:22, 6:1, 6:5, 7:10
grain [4] - 6:7, 6:8, 6:9
great [1] - 67:18
Greg[2] - 34:5, 34:7
group [3] - 17:24, 49:5, 49:8
Gsi[1] - 5:21
guess [7] - 7:15, 7:16, 9:23, 10:20, 14:22, 22:3, 52:22

**H**

habit [1] - 68:3
Hackman[5] - 47:21, 47:24, 48:7, 48:13, 73:10
half [2] - 24:9, 71:3
Hall[10] - 15:15, 19:8, 19:10, 19:17, 19:21, 37:4, 37:6, 37:8, 54:4, 54:5
hand [4] - 21:10, 23:5, 57:21, 79:17
handle [3] - 8:15, 8:17, 76:16
handler [8] - 26:1, 33:6, 34:22, 35:7, 38:6, 69:19, 70:10, 70:13
handlers [3] - 37:9, 37:10, 70:3
handles [1] - 8:15
handwriting [2] - 21:4, 21:19
harassment [6] - 12:16, 12:19, 12:24, 43:20, 51:16, 55:14
hard [2] - 41:8, 68:19
Hardwick [2] - 27:2, 27:4
health [1] - 12:1
hear [4] - 45:23, 46:3, 46:5, 51:1

heard [3] - 45:20, 46:1, 71:19
hearing [3] - 28:13, 28:14, 45:16
held [2] - 13:10, 65:9
help [2] - 14:4, 14:5
helpful [1] - 26:3
helps [1] - 75:11
hereby [2] - 2:16, 79:7
herein [1] - 5:4, 79:8
hereto [3] - 2:3, 2:21, 2:23
herself [1] - 69:2
hierarchy [2] - 34:9, 35:10
high [4] - 6:20, 6:22, 6:24, 7:5
Hinds [2] - 13:14, 16:12
hired [4] - 9:16, 14:8, 17:15, 24:24
history [1] - 6:18
hit [3] - 30:10, 62:23, 68:5
Hobbie[3] - 1:15, 2:5, 79:5
home [1] - 11:14
hour [3] - 1:13, 2:8, 12:6
hours [11] - 10:10, 21:1, 21:5, 21:8, 24:14, 24:20, 25:7, 57:18, 58:2, 60:17
Hr[5] - 17:4, 60:18, 69:16, 75:24, 76:2
human [10] - 16:20, 24:18, 24:22, 25:1, 25:6, 43:13, 55:21, 59:2, 69:12, 76:16

**I**

idea [1] - 74:6
identification [5] - 20:14, 22:18, 38:19, 56:9, 74:24
identify [1] - 22:19
ignore [1] - 51:1
Illinois [12] - 1:2, 1:14, 2:9, 3:5, 5:12, 5:21, 5:23, 47:8, 48:2, 49:21, 49:22, 79:1
immediately [1] - 18:22
implementing [1] - 62:4
improvement [2] - 24:8, 40:14
inappropriate [3] - 49:2, 60:7, 60:8

Inc [2] - 1:8, 6:5
incident [28] - 15:7, 15:18, 16:1, 16:23, 17:11, 17:20, 18:20, 19:7, 19:20, 20:1, 20:6, 21:1, 22:5, 29:1, 29:5, 29:7, 29:15, 30:2, 43:13, 44:14, 47:10, 53:11, 62:22, 66:2, 66:8, 66:24, 75:13
incidents [1] - 62:15
Incorporated [1] - 6:2
Indiana [1] - 3:10
Indianapolis [1] - 3:10
indicate [2] - 40:8, 40:17
indicating [2] - 21:7, 24:10
information [3] - 55:20, 60:15, 75:21
initial [1] - 16:23
initials [3] - 66:3, 66:9, 66:14
injured [1] - 59:8
injuries [7] - 58:21, 58:23, 59:1, 59:14, 59:17, 60:6, 60:19
injury [1] - 59:19, 60:11
inspector [2] - 33:22, 33:23
instance [4] - 1:12, 2:7, 5:4, 62:11
instances [2] - 32:7, 46:14
instead [1] - 58:14
interest [1] - 38:13
interested [1] - 71:2
interrogatories [2] - 2:6, 2:10
interrupt [1] - 7:23
intervene [1] - 12:19
intervening [1] - 58:11
interviewed [2] - 52:14, 52:16
interviews [2] - 53:1, 53:4
investigate [1] - 63:4
investigating [2] - 13:4, 59:18
investigation [5] - 43:19, 50:3, 51:21, 52:9, 59:17
investigations [1] - 51:23
inviting [1] - 47:22
involve [1] - 15:21
involved [8] - 13:3, 15:4, 15:18, 16:22,

29:20, 48:15, 63:13, 76:18
issue [1] - 60:22

**J**

Jason[4] - 15:22, 16:14, 18:13, 18:21
job [27] - 7:13, 9:6, 9:11, 19:17, 20:2, 25:24, 26:11, 30:19, 32:2, 33:1, 33:4, 33:6, 33:15, 33:16, 36:16, 37:18, 37:19, 37:21, 37:23, 38:6, 62:12, 65:8, 65:15, 70:8, 70:11, 70:17, 72:18
jobs [1] - 70:5
John[6] - 1:11, 2:4, 5:3, 5:11, 44:4, 79:8
Johns [1] - 48:11
join [1] - 64:11
joint [1] - 64:12
joke [1] - 42:2
Jolley[1] - 76:5
Jolleys [1] - 76:6
June[5] - 8:24, 9:1, 9:15, 14:14

**K**

Karen[4] - 51:3, 51:4, 51:6, 51:7
Kelley[1] - 3:8
Kevin[3] - 47:14, 47:20, 68:3
kid [1] - 42:4
kind [6] - 6:6, 6:14, 8:16, 39:23, 50:13, 68:19
knowledge [8] - 12:17, 30:13, 47:12, 51:17, 60:9, 63:2, 67:19, 68:12
knowledgeable [1] - 38:2
Kord[4] - 16:19, 75:23, 76:2, 76:11
Kozma[3] - 16:19, 75:23, 76:11

**L**

language [4] - 30:17, 31:3, 73:5, 73:15
large [1] - 31:5
last [12] - 5:13, 7:13, 7:15, 15:24, 28:11, 61:12, 65:9, 65:22,

66:17, 67:7, 67:8, 74:21
late [2] - 34:15, 34:24
Law[2] - 3:4, 3:9
Lawrence[1] - 68:9
lay [1] - 6:15
lay-off [1] - 6:15
leader [2] - 9:19, 39:1
leader's [1] - 9:17
learn [1] - 40:23
least [1] - 8:8
leave [2] - 7:19, 48:7
leaves [1] - 32:11
leaving [3] - 8:18, 11:21, 28:5
left [10] - 11:18, 13:16, 37:6, 46:24, 47:2, 47:17, 47:21, 48:1, 49:14, 56:18
letter [3] - 17:8, 19:22, 30:16
letting [1] - 76:7
license [3] - 26:12, 26:20, 27:8
life [1] - 11:7
light [5] - 61:22, 61:24, 62:6, 62:8, 62:10
likeable [1] - 72:17
likely [1] - 59:11
lines [1] - 54:9
live [1] - 49:21
lived [1] - 47:8
Londrigan[1] - 3:3
look [2] - 23:4, 75:5, 75:6
looked [2] - 57:3, 57:6
looking [5] - 13:4, 50:19, 71:5, 71:11, 71:20
looks [9] - 22:21, 22:22, 23:24, 38:24, 39:2, 39:15, 39:21, 58:3, 58:16
lost [1] - 59:1

**M**

ma'am [1] - 6:21
machine [28] - 19:11, 33:2, 33:3, 33:8, 34:22, 35:7, 36:10, 36:11, 36:13, 36:16, 36:19, 36:24, 37:1, 37:7, 37:11, 37:15, 37:17, 37:20, 37:22, 38:4, 40:16, 42:12, 42:14, 42:17, 42:18, 42:20, 42:21, 70:9
machinery [14] -

32:15, 32:16, 32:19, 32:23, 32:24, 38:2, 41:12, 41:16, 41:19, 41:22, 41:24, 42:2, 43:16
machines [14] - 14:2, 14:4, 33:10, 33:13, 33:15, 33:19, 36:1, 36:6, 36:8, 36:14, 36:20, 37:5, 38:11, 38:13
mail [3] - 28:12, 75:14, 76:11
main [2] - 31:19, 31:22
major [1] - 32:18
male [9] - 28:18, 30:7, 30:11, 30:15, 31:1, 46:5, 73:6, 73:7, 73:14
man [1] - 11:14
manage [1] - 13:21
management [2] - 65:11, 65:13
manager [8] - 6:4, 7:16, 7:17, 8:16, 16:21, 30:18, 43:14, 46:23
manifested [1] - 49:1
mark [4] - 20:11, 22:15, 38:15, 56:5
Marked [1] - 4:12
marked [6] - 20:14, 22:18, 24:8, 38:19, 56:9, 74:24
markings [1] - 40:5
married [1] - 45:14
Mary [6] - 47:21, 47:24, 48:6, 48:13, 48:21, 73:10
Masterbrands [24] - 1:7, 8:21, 8:23, 9:4, 9:7, 10:4, 10:13, 10:16, 11:2, 11:18, 11:22, 12:12, 13:9, 13:19, 14:13, 25:21, 26:17, 27:16, 27:18, 28:5, 28:8, 28:19, 45:18, 63:4
material [11] - 26:1, 33:6, 34:22, 35:7, 37:9, 37:10, 68:4, 69:19, 70:3, 70:10, 70:13
materials [1] - 38:6
Matt [21] - 43:14, 43:18, 43:21, 43:24, 44:4, 44:16, 44:18, 45:13, 45:15, 51:18, 51:19, 51:21, 52:16, 60:24, 61:1, 61:6,

61:15, 75:22, 75:24, 76:1, 76:11
Matt's [2] - 51:22, 52:3
matter [4] - 41:19, 69:1, 76:19, 77:2
Matthew [1] - 3:13
Maurie [1] - 68:9
Mb [1] - 75:6
mean [23] - 10:21, 10:22, 14:9, 35:5, 35:20, 36:8, 36:16, 43:11, 45:22, 46:20, 51:23, 52:6, 53:2, 65:4, 68:16, 68:19, 70:7, 70:13, 72:14, 72:16, 72:17, 76:24, 77:1
meant [2] - 11:4, 21:21
meet [3] - 13:23, 14:5, 25:9
meeting [19] - 32:4, 32:8, 44:3, 44:8, 44:10, 44:11, 44:13, 44:19, 44:22, 45:1, 45:2, 45:4, 45:5, 45:7, 45:9, 45:11, 48:17, 51:19, 60:23
men [3] - 45:14, 46:15, 54:10
mention [1] - 75:14
mentioned [1] - 72:9
Meridian [1] - 3:9
met [3] - 14:6, 14:9, 34:13
metal [1] - 8:17
mid [1] - 8:10
midnight [1] - 10:12
Midwest [2] - 7:10, 8:3
might [2] - 38:3, 49:9
minute [1] - 23:16
minutes [1] - 12:5
miss [1] - 35:1
missed [8] - 21:17, 21:23, 21:24, 22:1, 58:2, 58:10, 58:18, 60:18
mistaken [1] - 48:17
Molly [3] - 1:14, 2:5, 79:5
Monahan [6] - 8:5, 8:12, 9:4, 12:14, 12:18, 12:23
money [1] - 43:5
month [2] - 17:14, 58:9
months [3] - 7:7, 14:17, 58:11
most [1] - 43:10
mother [2] - 12:1, 12:2

mouth [1] - 76:24
move [1] - 41:7
must [3] - 21:24, 29:13

**N**

nail [1] - 43:15
name [21] - 5:9, 5:11, 5:13, 15:14, 15:17, 15:20, 15:22, 15:23, 15:24, 19:8, 24:19, 26:24, 28:23, 29:2, 34:6, 47:13, 51:6, 62:16, 63:8, 64:23, 68:2
named [1] - 16:19
names [3] - 19:21, 22:6, 36:22
nature [7] - 7:4, 13:24, 16:4, 29:10, 32:5, 50:21, 71:9
necessarily [3] - 40:20, 46:7, 73:7
need [5] - 15:10, 49:21, 70:1
needed [2] - 60:22, 69:12
needs [2] - 24:8, 69:17
neighborhood [4] - 6:13, 9:23, 29:9, 31:11
never [5] - 25:9, 31:2, 48:6, 66:23, 67:15
new [20] - 11:1, 32:14, 32:16, 32:18, 32:24, 33:1, 33:3, 33:7, 33:10, 33:19, 36:1, 36:6, 36:14, 36:17, 41:12, 41:16, 41:22, 42:2, 43:16
News [1] - 9:10
next [1] - 18:6
night [4] - 17:4, 18:23, 48:18, 59:20
nights [1] - 52:3
nobody [1] - 17:4
non [2] - 24:4, 64:14
non-acceptable [1] - 24:4
non-supervisory [1] - 64:14
none [1] - 54:13
normal [1] - 62:12
Nos [1] - 56:8
Notary [3] - 1:15, 79:6, 79:21
notation [2] - 21:14, 22:4
notations [2] - 23:10,

24:3
note [4] - 47:11, 47:21, 48:1, 48:7
notebook [1] - 55:5
notebooks [6] - 54:16, 54:17, 55:1, 55:8, 55:17, 72:1
noted [1] - 2:18
notes [10] - 18:9, 18:16, 46:24, 47:1, 47:17, 49:14, 50:4, 50:7, 76:9, 79:15
nothing [1] - 79:11
notice [1] - 28:4
November [3] - 1:12, 2:6, 79:9
number [4] - 5:16, 58:2, 75:2, 75:6
Number [5] - 20:12, 20:16, 22:16, 22:20, 56:19

**O**

o'clock [1] - 52:4
oath [1] - 5:5
Objection [1] - 41:2
objections [1] - 2:16
observe [1] - 32:7
obviously [1] - 35:6
occasion [3] - 19:6, 25:9, 49:10
occasionally [1] - 32:16
occasions [1] - 49:15
occur [1] - 49:16
occurred [3] - 17:11, 18:20, 59:19
office [3] - 31:19, 31:21, 69:10
Ohrt [16] - 3:13, 43:14, 43:18, 43:24, 44:4, 44:16, 44:18, 45:13, 51:19, 51:21, 60:24, 61:1, 61:6, 61:15, 75:22, 76:11
old [1] - 36:19
once [7] - 18:3, 24:16, 29:17, 42:9, 43:21, 55:11, 58:12
one [27] - 7:15, 11:23, 16:21, 19:16, 22:22, 23:16, 25:15, 29:1, 29:21, 36:17, 37:2, 37:11, 37:12, 49:6, 49:11, 50:16, 54:2, 55:3, 57:21, 58:12, 58:14, 65:9, 65:17, 69:24, 74:21
open [2] - 31:12,

31:14
opening [1] - 43:11
operate [3] - 41:15, 41:22, 43:2
operated [1] - 41:23
operator [2] - 19:11, 36:10, 37:12, 42:21, 65:10, 70:9
operators [6] - 36:13, 36:19, 36:21, 36:24, 37:2, 37:15
opportunities [1] - 40:15
opportunity [6] - 26:5, 40:20, 40:22, 41:1, 43:4, 77:9
opposed [1] - 7:24
oral [2] - 2:6, 2:10
order [2] - 37:17, 37:22
ordering [1] - 66:14
original [1] - 39:9
outside [1] - 20:8
overlapped [1] - 52:1
oversee [1] - 13:22
own [2] - 2:24, 64:10
Owner [1] - 1:22

**P**

page [1] - 38:16
Page [1] - 4:2
paid [1] - 27:20
Panel [1] - 63:1
panel [3] - 40:15, 40:16, 62:23
panels [1] - 68:3
Pantier [10] - 10:2, 10:3, 10:8, 17:3, 18:15, 44:5, 44:21, 51:20, 53:14, 60:24
paper [1] - 9:10
parent [1] - 6:7
parents [1] - 12:2
Paris [3] - 5:21, 5:23, 7:10
parking [2] - 16:15, 46:24
part [7] - 2:19, 11:22, 23:4, 25:23, 26:11, 30:18, 43:10
participate [1] - 18:2
particular [5] - 14:21, 17:11, 29:4, 29:19, 30:1
parties [2] - 2:3, 2:21
parts [4] - 19:23, 66:14, 70:14, 70:15
party [1] - 2:23

**pass** [2] - 55:1, 55:20
**passed** [4] - 26:18, 54:16, 54:17, 55:5
**passing** [4] - 55:8, 55:17, 72:1, 76:8
**patted** [1] - 30:10
**Patty** [2] - 63:8, 64:1
**pause** [3] - 38:23, 61:10, 75:10
**pay** [2] - 9:3, 12:12
**people** [10] - 23:21, 34:23, 41:6, 41:7, 42:4, 42:5, 57:22, 69:9, 70:18, 72:22
**percent** [18] - 13:8, 16:4, 18:5, 22:9, 25:15, 27:9, 27:11, 29:18, 32:6, 51:24, 55:2, 57:8, 57:9, 57:18, 58:18, 58:19, 64:16, 65:18
**performance** [1] - 40:6
**period** [7] - 13:7, 23:13, 32:22, 35:1, 43:4, 58:14, 72:19
**perk** [1] - 11:11
**permanently** [1] - 37:20
**permitted** [1] - 26:21
**person** [17] - 11:8, 17:4, 24:19, 24:23, 25:2, 36:10, 59:5, 59:6, 60:18, 62:1, 62:2, 64:1, 64:16, 69:13, 72:17
**personality** [1] - 72:16
**Phalle** [17] - 3:3, 4:3, 4:4, 5:8, 20:11, 22:15, 23:7, 38:15, 38:20, 56:5, 56:12, 56:17, 61:11, 67:20, 72:8, 74:20, 77:7
**phonetic** [2] - 15:22, 47:10
**phrased** [1] - 76:21
**picnic** [1] - 20:9
**place** [8] - 36:9, 36:17, 45:17, 51:15, 51:19, 57:24, 60:24, 63:17
**placed** [1] - 62:9
**Plaintiff** [5] - 1:5, 1:12, 2:7, 3:6, 5:5
**plank** [1] - 30:11
**plant** [17] - 6:7, 7:16, 7:17, 7:18, 8:16, 32:15, 33:11, 42:22, 48:17, 63:4, 65:23, 66:18, 67:1, 67:4, 69:23, 74:14, 76:9

**point** [6] - 37:3, 37:12, 41:21, 54:2, 69:2, 74:2
**police** [2] - 53:12, 53:16
**policy** [4] - 21:15, 57:7, 57:8, 76:14
**poor** [1] - 12:1
**portion** [1] - 61:13
**portions** [2] - 20:18, 20:21
**position** [16] - 7:13, 9:15, 9:17, 9:18, 10:17, 13:11, 19:10, 19:17, 20:2, 25:24, 33:16, 33:21, 34:10, 34:11, 38:6, 65:8
**positive** [1] - 9:2
**possibility** [2] - 22:11, 43:23
**possible** [1] - 52:8
**Possibly** [1] - 52:11
**Potter** [1] - 3:3
**preferred** [1] - 45:14
**prerogative** [1] - 64:12
**present** [8] - 41:14, 44:4, 44:16, 51:20, 53:14, 57:22, 61:20
**Present** [1] - 3:13
**pretty** [3] - 9:2, 46:10, 51:22
**previous** [2] - 13:10, 13:12
**probationary** [1] - 39:23
**problem** [1] - 77:12
**procedure** [1] - 59:12
**proceedings** [3] - 38:23, 61:10, 75:10
**process** [5] - 42:24, 43:2, 43:6
**progress** [1] - 23:21
**progression** [1] - 24:2
**progressionary** [2] - 58:4, 58:19
**promotion** [1] - 11:11
**promotions** [1] - 10:23
**proof** [1] - 2:22
**properly** [1] - 41:18
**propositioned** [2] - 46:19, 46:21
**propositioning** [1] - 46:15
**prove** [1] - 55:10
**Public** [3] - 1:16, 79:6, 79:21
**pull** [1] - 70:14
**Purcell** [5] - 50:16, 50:17, 50:22, 71:4,

75:15
**purpose** [3] - 2:20, 44:8, 76:10
**pursuant** [1] - 1:16
**put** [7] - 36:17, 50:13, 58:17, 58:18, 66:9, 76:24, 77:2
**puts** [1] - 42:20
**putting** [2] - 19:23, 34:13

**Q**

**quality** [7] - 33:22, 34:1, 34:13, 63:13, 63:24, 64:1, 64:2
**questions** [2] - 72:6, 77:6
**quick** [1] - 61:7
**quote** [3] - 42:24, 68:10, 68:11

**R**

**racks** [1] - 31:15
**raised** [1] - 40:15
**ramp** [2] - 6:12, 6:16
**ran** [1] - 37:6
**Randle** [1] - 3:3
**rate** [2] - 9:3, 12:11
**rates** [1] - 23:22
**reachable** [1] - 69:13
**read** [2] - 61:14, 75:6
**reading** [1] - 2:13
**real** [3] - 17:5, 19:12, 20:5
**really** [8] - 7:2, 16:12, 36:12, 41:8, 44:15, 58:15, 65:21, 73:23
**reason** [19] - 8:18, 11:5, 11:21, 11:24, 19:1, 21:8, 22:1, 22:2, 22:13, 48:4, 55:7, 57:1, 62:19, 63:23, 64:7, 67:10, 68:9, 72:20, 74:1
**reasons** [1] - 11:24
**receive** [3] - 7:1, 28:11, 57:10
**receiving** [1] - 58:2
**recess** [1] - 56:15
**recollection** [2] - 22:5, 57:11
**record** [3] - 30:4, 60:2, 61:14
**records** [1] - 26:17
**Recross** [2] - 4:4, 75:3
**Redirect** [2] - 4:4, 72:7
**redone** [1] - 32:20

**reference** [2] - 40:11, 75:2
**referred** [1] - 79:15
**referring** [2] - 18:12, 46:9
**refresh** [1] - 22:4
**regard** [1] - 57:24
**regarded** [1] - 24:15
**regarding** [3] - 28:14, 43:14, 56:1
**relationship** [1] - 42:5
**relaying** [1] - 76:5
**remain** [1] - 25:1
**remember** [23] - 16:4, 29:1, 29:2, 29:6, 44:10, 44:11, 45:2, 45:4, 45:5, 45:8, 45:9, 48:19, 49:20, 50:18, 50:19, 50:24, 53:7, 55:19, 64:6, 75:7, 75:11, 75:16, 75:18
**remembered** [1] - 29:14
**remembering** [1] - 69:5
**remind** [1] - 7:23
**Repeat** [1] - 74:5
**repeatedly** [1] - 70:24
**replaced** [1] - 13:16
**report** [5] - 9:24, 59:12, 59:21, 68:8, 71:6
**Reporter** [9] - 1:15, 2:6, 2:12, 5:2, 5:14, 8:1, 5:11, 79:6, 79:20
**Reporting** [1] - 1:21
**reports** [3] - 59:24, 67:13, 67:15
**representative** [1] - 75:24
**reputation** [2] - 68:13, 68:16
**request** [1] - 27:16
**requested** [1] - 61:13
**required** [1] - 26:2, 36:18
**requirement** [2] - 2:13, 70:2
**reserved** [1] - 2:16
**resource** [7] - 16:20, 24:18, 24:22, 25:1, 43:13, 55:21, 59:2
**resources** [3] - 25:6, 69:13, 76:16
**response** [1] - 50:23
**responsibilities** [1] - 13:20
**responsibility** [7] -

31:6, 34:18, 42:19, 61:23, 62:3, 62:5
**responsible** [1] - 26:7
**restrictions** [2] - 61:23, 61:24
**restroom** [1] - 56:10
**result** [3] - 17:19, 53:3, 60:14
**results** [1] - 52:24
**review** [2] - 27:12, 77:9
**Rhonda** [2] - 24:19, 24:22
**Rockton** [1] - 5:12
**role** [2] - 9:21, 13:4
**room** [2] - 31:8, 32:11
**run** [10] - 32:12, 33:5, 36:18, 37:4, 37:20, 38:3, 38:13, 42:12, 42:14, 42:20
**running** [3] - 42:18, 66:6, 66:10

**S**

**safety** [9] - 64:4, 64:8, 64:9, 64:11, 64:12, 64:13, 64:18, 72:24, 73:2
**Saint** [17] - 3:3, 4:3, 4:4, 5:8, 20:11, 22:15, 23:7, 38:15, 38:20, 56:5, 56:12, 56:17, 61:11, 67:20, 72:8, 74:20, 77:7
**salary** [1] - 12:7
**sale** [1] - 6:3
**Sangamon** [1] - 79:3
**satisfactory** [1] - 40:9
**Sayth** [1] - 77:13
**scheduled** [2] - 1:13, 2:8
**school** [4] - 6:20, 6:22, 6:24, 7:5
**Scott** [6] - 64:23, 65:3, 65:6, 65:15, 65:17, 66:5
**seal** [1] - 79:17
**season** [1] - 6:15
**second** [18] - 9:18, 9:19, 10:8, 10:10, 11:3, 11:6, 14:11, 34:7, 53:19, 53:24, 54:1, 56:11, 58:4, 61:8, 69:3, 69:10, 69:23, 76:4
**see** [18] - 11:10, 21:2, 22:24, 23:6, 24:14, 26:11, 30:19, 31:13, 31:16, 34:12, 35:3,

39:20, 40:22, 42:20, 56:6, 61:23, 67:6, 67:13
**self** [2] - 38:24, 46:10
**self-explanatory** [1] - 46:10
**sending** [3] - 75:8, 75:20, 76:10
**seniority** [2] - 43:9, 43:11
**separate** [1] - 31:18
**serve** [1] - 69:16
**Service** [1] - 1:21
**set** [1] - 36:9
**Seventh** [1] - 3:4
**several** [8] - 7:18, 14:4, 14:17, 18:4, 24:7, 36:21, 52:16, 65:9
**sex** [2] - 51:11, 51:15
**sexual** [5] - 12:16, 12:19, 12:23, 43:19, 55:13
**sheer** [1] - 65:10
**Sheet** [1] - 78:12
**shift** [29] - 9:18, 9:19, 10:8, 10:10, 11:3, 11:6, 11:7, 11:11, 11:16, 13:13, 14:11, 34:7, 48:18, 52:1, 52:2, 52:4, 52:6, 53:20, 53:24, 54:1, 63:8, 69:4, 69:10, 69:17, 69:23, 70:4, 74:17
**shifts** [2] - 10:13, 10:15
**shipment** [1] - 32:18
**Shorter** [1] - 11:23
**shorter** [1] - 12:4
**Shorthand** [4] - 1:15, 2:5, 79:5, 79:20
**shorthand** [2] - 2:11, 79:13, 79:15
**shoved** [2] - 30:6, 53:11
**shown** [1] - 47:17
**shows** [1] - 24:1
**sic** [1] - 28:12
**sign** [1] - 77:9
**signed** [2] - 49:23, 50:1
**signing** [1] - 2:14
**similar** [2] - 31:2, 71:9
**simply** [3] - 49:6, 60:14, 64:13
**Sinclair** [4] - 51:3, 51:4, 51:6, 51:7
**sit** [1] - 15:6
**situation** [1] - 38:3

**six** [3] - 7:7, 49:17, 70:2
**size** [1] - 31:7
**sleeping** [2] - 53:23, 54:3
**sling** [1] - 62:13
**slow** [1] - 6:14
**Smith** [30] - 1:4, 3:14, 14:7, 14:16, 14:20, 19:14, 28:14, 28:17, 28:21, 30:10, 33:18, 34:21, 35:17, 35:24, 44:5, 44:24, 48:13, 52:18, 53:18, 53:23, 54:15, 55:4, 55:16, 56:1, 65:23, 66:12, 67:6, 68:1, 68:8, 72:10
**so-to-speak** [2] - 11:12, 34:10
**solely** [1] - 43:8
**someone** [3] - 9:8, 41:18, 60:18
**Sometimes** [2] - 49:8, 70:13
**sometimes** [1] - 69:4
**somewhere** [3] - 9:1, 31:10, 52:4
**sooner** [1] - 77:3
**Sorry** [1] - 71:17
**sorry** [5] - 7:22, 12:9, 57:6, 69:7, 71:13
**sort** [1] - 6:17
**sounds** [1] - 15:23
**South** [1] - 3:4
**specific** [3] - 32:17, 32:21, 73:11
**specifically** [5] - 2:18, 13:2, 46:20, 52:23, 55:7
**specifications** [1] - 34:14
**specifics** [1] - 46:18
**spell** [1] - 5:13
**spitting** [1] - 60:15
**Springfield** [1] - 3:5
**started** [8] - 10:11, 14:11, 14:13, 19:21, 68:15, 69:4, 69:10, 74:7
**Started** [1] - 8:14
**starts** [2] - 52:6, 58:13
**State** [2] - 79:1, 79:7
**state** [1] - 5:9
**statement** [1] - 74:2
**States** [1] - 1:1
**stating** [1] - 54:2
**Stewart** [4] - 64:24, 65:3, 65:15, 66:5
**still** [6] - 10:6, 15:5,

17:12, 37:15, 54:10, 69:9
**stipulated** [1] - 2:2
**stipulation** [1] - 1:16
**stock** [1] - 70:15
**stool** [1] - 54:6
**stop** [2] - 8:4, 42:18
**Street** [2] - 3:4, 3:9
**stress** [2] - 67:18, 75:18
**strictly** [1] - 59:2
**subpoena** [1] - 28:15
**sucked** [1] - 68:10
**Sue** [2] - 55:2, 55:5
**Suite** [1] - 3:9
**superintendent** [1] - 48:18
**superior** [1] - 35:15
**supervise** [1] - 6:11
**supervision** [2] - 30:15, 48:10
**supervisor** [16] - 6:3, 8:14, 12:18, 13:10, 13:13, 13:15, 13:19, 15:5, 16:18, 16:19, 16:20, 17:12, 18:7, 18:16, 34:4, 71:22
**supervisory** [7] - 7:3, 9:20, 31:6, 33:24, 55:24, 64:14, 64:15
**supposed** [1] - 38:7
**switch** [1] - 11:16
**sworn** [3] - 5:1, 5:5, 79:10
**system** [1] - 57:16
**Systems** [4] - 5:21, 5:22, 6:1, 6:5
**systems** [1] - 6:8

**T**

**table** [1] - 20:9
**tasks** [1] - 70:12
**teacher** [1] - 32:11
**team** [2] - 9:17, 9:19
**tears** [3] - 66:21, 66:24
**telephone** [1] - 5:16
**temporarily** [2] - 37:23, 38:1
**temporary** [1] - 27:8
**Tennessee** [3] - 63:3, 68:8, 68:10
**term** [1] - 50:19
**terminate** [1] - 17:22
**terminated** [6] - 15:20, 17:18, 17:19, 18:17, 62:18, 74:17
**terminating** [1] - 62:19

**termination** [1] - 19:1
**terms** [2] - 34:9, 40:5
**test** [8] - 25:20, 26:14, 26:16, 26:18, 26:20, 26:22, 27:5
**testified** [3] - 5:6, 22:12, 76:20
**testify** [1] - 79:10
**testimony** [2] - 22:13, 66:23
**thereof** [1] - 2:19
**they've** [2] - 35:1, 39:8
**thinking** [4] - 8:24, 27:9, 29:7, 55:2
**Third** [1] - 5:12
**Thomas** [6] - 8:5, 8:12, 9:4, 12:14, 12:18, 12:23
**thorough** [1] - 51:22
**threatened** [1] - 16:15
**three** [9] - 5:24, 10:13, 10:15, 11:19, 31:7, 52:5, 52:6, 52:10, 63:19
**threw** [1] - 50:7
**throughout** [2] - 46:1, 59:19
**throwing** [2] - 54:6, 68:3
**thrown** [3] - 29:8, 29:9, 29:12
**tickets** [1] - 56:23
**today** [1] - 27:21
**together** [1] - 50:13
**tolerate** [1] - 30:21
**tolerated** [1] - 76:13
**took** [7] - 25:20, 26:13, 26:16, 26:18, 51:19, 57:23, 60:24
**top** [1] - 6:10
**totals** [1] - 60:16
**tough** [1] - 8:1
**towards** [8] - 19:4, 49:1, 50:11, 50:12, 50:15, 51:14, 56:3, 73:6
**Towards** [1] - 51:13
**track** [1] - 6:17
**train** [1] - 38:10
**trained** [7] - 13:12, 38:7, 38:8, 40:13, 40:18, 41:1, 41:18
**training** [3] - 7:3, 17:12, 38:1
**transcribed** [2] - 2:12, 79:13
**transcript** [1] - 79:14
**translation** [1] - 79:15
**transpired** [1] - 45:10
**trash** [1] - 68:4

**tried** [1] - 32:2
**trip** [11] - 63:3, 63:6, 63:10, 63:17, 63:21, 64:24, 65:1, 65:20, 65:21, 68:7, 68:8
**trouble** [5] - 68:23, 72:12, 74:3, 74:7, 76:22
**troubles** [1] - 75:17
**truck** [1] - 25:13, 25:15, 25:18, 25:21, 25:23, 26:5, 26:9, 27:1, 27:5, 27:8, 27:10
**true** [3] - 10:15, 35:12, 79:14
**truth** [3] - 79:10, 79:11
**try** [2] - 6:17, 24:14
**trying** [5] - 14:19, 54:22, 55:9, 55:11
**tubs** [1] - 19:23
**turn** [1] - 59:21
**Tuscola** [4] - 1:14, 2:9
**Two** [1] - 28:7
**two** [11] - 23:9, 23:20, 24:8, 38:16, 50:13, 57:2, 58:7, 58:8
**two-page** [1] - 38:16
**two-week** [1] - 58:7
**type** [6] - 31:3, 43:19, 51:21, 55:9, 60:2, 73:22

**U**

**unacceptable** [1] - 29:22
**under** [11] - 9:20, 21:12, 21:15, 21:22, 30:14, 33:24, 34:1, 48:9, 67:17, 75:17, 79:17
**unexcused** [2] - 57:14, 60:20
**union** [1] - 42:22
**United** [1] - 1:1
**unless** [1] - 2:18
**Unlike** [1] - 65:13
**up** [18] - 6:9, 6:13, 6:16, 8:9, 15:19, 16:16, 30:1, 32:9, 34:19, 34:23, 35:2, 35:13, 35:14, 56:23, 57:13, 58:24, 64:13, 69:9
**ups** [1] - 72:9
**upset** [2] - 22:7, 66:13
**Urbana** [1] - 1:3

## V

Vaguely [1] - 47:15
valuable [2] - 38:9, 40:23
vehicle [4] - 46:24, 47:2, 48:8, 49:15
verbal [3] - 58:3, 58:13, 60:13
versus [1] - 12:5
view [1] - 41:21
viewed [1] - 49:1
vis [2] - 34:11
vis-a-vis [1] - 34:11
voluntarily [2] - 13:16, 27:15
voluntary [1] - 11:22
vs [1] - 1:6

## W

wait [1] - 23:16
waived [2] - 2:15, 2:17
wants [1] - 40:21
warning [9] - 58:3, 58:5, 58:12, 58:13, 58:14, 58:16, 58:17, 60:13
warranted [1] - 35:6
watch [1] - 58:15
week [1] - 58:7
weeks [8] - 5:24, 11:19, 23:20, 24:8, 24:9, 28:7, 28:11, 58:8
well-liked [1] - 72:11
Wes [4] - 47:10, 47:12, 47:17, 47:21
West [1] - 5:12
whole [1] - 79:10
Wickart [2] - 47:10, 47:12
Wickart's [2] - 47:18, 47:22
wife's [1] - 12:2
windshield [1] - 47:11
Windsor [4] - 47:7, 48:2, 49:21, 49:22
Winschief [9] - 1:11, 2:4, 5:3, 5:11, 5:15, 13:1, 67:24, 77:8, 79:8
wise [1] - 72:17
witness [4] - 2:11, 2:14, 5:1, 5:4
woman [1] - 26:24
women [10] - 12:22, 30:14, 31:2, 36:23, 37:1, 41:15, 41:22,

41:23, 52:15, 52:16
wood [1] - 8:14
wooden [3] - 30:11, 62:23, 62:24
words [8] - 11:10, 12:11, 17:9, 19:22, 30:16, 40:1, 52:8, 76:24
worker [1] - 35:7
workers [1] - 34:23
works [2] - 12:3, 36:8
write [9] - 21:7, 21:14, 30:1, 34:19, 34:23, 35:13, 55:24, 56:22, 57:13
write-up [3] - 30:1, 35:13, 57:13
writing [1] - 57:1
written [12] - 26:13, 26:16, 26:18, 26:20, 27:5, 35:2, 35:14, 47:2, 47:6, 48:1, 58:5, 75:19
wrote [1] - 50:4

## Y

year [3] - 11:17, 39:16, 58:15
yearly [2] - 39:22, 40:2
years [12] - 7:12, 8:8, 18:4, 22:8, 27:11, 43:22, 44:10, 45:9, 61:5, 63:19
yelling [4] - 16:3, 16:5, 16:24, 18:10
young [1] - 54:10
yourself [4] - 14:2, 43:4, 61:1, 65:13